# APPENDIX I - Index

Case: 2:22–cv–00298
Assigned To : Bennett, Jared C.
Assign. Date : 5/2/2022
Description: Biers v Dentons US LLP et al

Exhibit I-A

(1) United States Department of the Interior-BIA Federal Registry, Notice, Vol. 85, No. 20, 5462 ....................51 ¶169; 53 ¶176

(2) United States Department of the Interior Corporate Charter of the Te-Moak Tribe of Western Shoshone (ratified December 12, 1938)....................18 ¶59; 76 ¶258

(3) Te-Moak Tribe Personnel Policies & Procedures ....................30 ¶¶101, 102, 103; 62 ¶203; 151 ¶557; 231 ¶788

(4) State of Nevada Cannabis Compact Agreement (**A2**) ....................35 ¶118, 119; 40-1 ¶134; 43 ¶139; 45 ¶146; 51 ¶169; 52 ¶¶170, 172-73; 53 ¶¶174(d), 175; 55 ¶181; 57-9 ¶¶186, 187, 188; 69 ¶¶228-29; 70 ¶231; 73 ¶246; 75 ¶¶255; 76 ¶257; 84 ¶282; 87 ¶291; 92 ¶309; 100 ¶341; 102 ¶¶347(d), 348; 104 ¶356; 205 ¶711; 206 ¶715; 212 ¶729; 215 ¶738; 220 ¶753; 223-24 ¶764; 233 ¶794; 239 ¶818; 242 ¶829

Exhibit I-B

(1) Order Dismissing Removal (11-CVS-2972); Order to Dismiss Removal (11-CVS02941); Order Sealing Personnel Records -State of N. Carolina....................31 ¶104; 33 ¶111

(2) Te-Moak Tribal Supreme Court "Sealed Order"(Case No. 2021-TM-SC-001)......146 ¶533

(3) Te-Moak Tribal Court Emergency Order (Case No. CIV-2021-0003)....................225 ¶769

(4) Te-Moak Tribal Court Temporary Order (Case No. TM-CV-01-22)....................233 ¶794

(5) D.O.I.-B.I.A. Western Region Judicial Services Contract Office of Hearings and Appeals (Case No. ISDA 2017-01/1ADR):
- (a) Settlement Agreement....................187 ¶657; 189 ¶665
- (b) Solicitor General Update Report....................31 ¶105

Exhibit I-C

(1) Te-Moak Council Resolution 03-TM-13 (Personnel Confidential Information Policy & Procedures) ....................107 ¶370; 144 ¶526; 145 ¶531; 146-7 ¶537; 151 ¶556; 169-71 ¶¶607, 608, 610; 172 ¶611; 173 ¶614; 186 ¶654; 228 ¶777

(2) Elko Band Council Resolution 2020-EBC-48(Cannabis Settlement Offer) ....................99-100 ¶339; 101 ¶347; 103 ¶351; 105 ¶359

(3) Te-Moak Council Resolution 20-TM-129 (Creation Tribal Court System) ..........................................................................39 ¶¶129, 130; 106 ¶363; 115 ¶393; 133-34 ¶474; 230 ¶785

(4) Te-Moak Council Resolution 20-TM-132 (Te-Moak Personnel Records & Information Management Policy) ..........................................107 ¶370; 147 ¶537; 151 ¶556; 155 ¶569; 170 ¶¶607, 608; 171-72 ¶¶610, 611; 173 ¶614; 186 ¶654; 228 ¶777

(5) Te-Moak Council Resolution 21-TM-29 (Appointment of Samuel Biers as Appellate Judge of the Te-Moak Supreme Court) .....................39 ¶129; 130 ¶461; 175 ¶622; 186 ¶655

(6) Te-Moak Council Resolution 21-TM-44 (Creation of Te-Moak Administrative Office of Courts and Budget for Judicial Services) .......................142-43 ¶517; 158 ¶573(o); 186 ¶655

(7) Te-Moak Council Resolution 21-TM-50 (Termination of Tribal Administrator Sam Biers)....................................150-51 ¶554; 152 ¶558; 153-54 ¶565; 155 ¶569; 160 ¶575; 170 ¶609; 176 ¶628

(8) Te-Moak Council Resolution 21-TM-83 (Removal of Appellate Judge Sam Biers) ..........................................173 ¶617; 176 ¶628; 183 ¶651; 186 ¶653; 202 ¶701; 210 ¶723; 223 ¶764

(9) Te-Moak Council Resolution 21-TM-124 (Modify ARP Budget, Amending Resolution 21-TM-121) ......................................................194 ¶680; 195 ¶¶683, 685; 212 ¶730; 217-18 ¶¶743

(10) Te-Moak Tribal Ordinance 19-ORD-TM-01 (Rescinded, Repealed & Revoked-Cannabis) ..........................................53 ¶174(f); 75 ¶254; 76 ¶258

# Appendix I

# Exhibit I-A(1)

Assessment Customer Satisfaction Survey (internet).

*Abstract:* Federal agencies are required to survey their customers to determine the kind and quality of services customers want and their level of satisfaction with those services. FEMA managers use the survey results to measure performance against standards for performance and customer service, measure achievement of strategic planning objectives, and generally gauge and make improvements to disaster service that increase customer satisfaction.

*Affected Public:* Not-for-profit institutions, State, Local, or Tribal government.

*Estimated Number of Respondents:* 4,034.

*Estimated Number of Responses:* 4,034.

*Estimated Total Annual Burden Hours:* 1,902.

*Estimated Total Annual Respondent Cost:* $110,371.31.

*Estimated Respondents' Operation and Maintenance Costs:* $12,420.00.

*Estimated Respondents' Capital and Start-Up Costs:* N/A.

*Estimated Total Annual Cost to the Federal Government:* $775,261.11.

## Comments

Comments may be submitted as indicated in the ADDRESSES caption above. Comments are solicited to (a) evaluate whether the proposed data collection is necessary for the proper performance of the agency, including whether the information shall have practical utility; (b) evaluate the accuracy of the agency's estimate of the burden of the proposed collection of information, including the validity of the methodology and assumptions used; (c) enhance the quality, utility, and clarity of the information to be collected; and (d) minimize the burden of the collection of information on those who are to respond, including through the use of appropriate automated, electronic, mechanical, or other technological collection techniques or other forms of information technology, *e.g.*, permitting electronic submission of responses.

**Maile Arthur,**

*Records Management Branch Chief, Office of the Chief Administrative Officer, Mission Support, Federal Emergency Management Agency, Department of Homeland Security.*

[FR Doc. 2020–01656 Filed 1–29–20; 8:45 am]

BILLING CODE 9111–23–P

## DEPARTMENT OF THE INTERIOR

### Bureau of Indian Affairs

### Indian Entities Recognized by and Eligible To Receive Services From the United States Bureau of Indian Affairs

**AGENCY:** Bureau of Indian Affairs, Interior.

**ACTION:** Notice.

**SUMMARY:** This notice publishes the current list of 574 Tribal entities recognized by and eligible for funding and services from the Bureau of Indian Affairs (BIA) by virtue of their status as Indian Tribes. The list is updated from the notice published on February 1, 2019 (84 FR 1200).

**FOR FURTHER INFORMATION CONTACT:** Ms. Laurel Iron Cloud, Bureau of Indian Affairs, Division of Tribal Government Services, Mail Stop 3645–MIB, 1849 C Street NW, Washington, DC 20240. Telephone number: (202) 513–7641.

**SUPPLEMENTARY INFORMATION:** This notice is published pursuant to Section 104 of the Act of November 2, 1994 (Pub. L. 103–454; 108 Stat. 4791, 4792), and in exercise of authority delegated to the Assistant Secretary—Indian Affairs under 25 U.S.C. 2 and 9 and 209 DM 8. Published below is an updated list of federally acknowledged Indian Tribes in the contiguous 48 states and Alaska. This list includes the addition of the Little Shell Tribe of Chippewa Indians of Montana. Other amendments to the list include formatting edits, name changes, and name corrections.

To aid in identifying Tribal name changes and corrections, the Tribe's previously listed or former name is included in parentheses after the correct current Tribal name. We will continue to list the Tribe's former or previously listed name for several years before dropping the former or previously listed name from the list.

The listed Indian entities are acknowledged to have the immunities and privileges available to federally recognized Indian Tribes by virtue of their government-to-government relationship with the United States as well as the responsibilities, powers, limitations, and obligations of such Tribes. We have continued the practice of listing the Alaska Native entities separately for the purpose of facilitating identification of them.

Dated: January 6, 2020.

**Tara Sweeney,**

*Assistant Secretary—Indian Affairs.*

### Indian Tribal Entities Within The Contiguous 48 States Recognized by and Eligible To Receive Services From the United States Bureau of Indian Affairs

Absentee-Shawnee Tribe of Indians of Oklahoma
Agua Caliente Band of Cahuilla Indians of the Agua Caliente Indian Reservation, California
Ak-Chin Indian Community (previously listed as Ak Chin Indian Community of the Maricopa (Ak Chin) Indian Reservation, Arizona)
Alabama-Coushatta Tribe of Texas (previously listed as Alabama-Coushatta Tribes of Texas)
Alabama-Quassarte Tribal Town
Alturas Indian Rancheria, California
Apache Tribe of Oklahoma
Arapaho Tribe of the Wind River Reservation, Wyoming
Aroostook Band of Micmacs (previously listed as Aroostook Band of Micmac Indians)
Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation, Montana
Augustine Band of Cahuilla Indians, California (previously listed as Augustine Band of Cahuilla Mission Indians of the Augustine Reservation)
Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation, Wisconsin
Bay Mills Indian Community, Michigan
Bear River Band of the Rohnerville Rancheria, California
Berry Creek Rancheria of Maidu Indians of California
Big Lagoon Rancheria, California
Big Pine Paiute Tribe of the Owens Valley (previously listed as Big Pine Band of Owens Valley Paiute Shoshone Indians of the Big Pine Reservation, California)
Big Sandy Rancheria of Western Mono Indians of California (previously listed as Big Sandy Rancheria of Mono Indians of California)
Big Valley Band of Pomo Indians of the Big Valley Rancheria, California
Bishop Paiute Tribe (previously listed as Paiute-Shoshone Indians of the Bishop Community of the Bishop Colony, California)
Blackfeet Tribe of the Blackfeet Indian Reservation of Montana
Blue Lake Rancheria, California
Bridgeport Indian Colony (previously listed as Bridgeport Paiute Indian Colony of California)
Buena Vista Rancheria of Me-Wuk Indians of California
Burns Paiute Tribe (previously listed as Burns Paiute Tribe of the Burns Paiute Indian Colony of Oregon)

Pueblo of Acoma, New Mexico
Pueblo of Cochiti, New Mexico
Pueblo of Isleta, New Mexico
Pueblo of Jemez, New Mexico
Pueblo of Laguna, New Mexico
Pueblo of Nambe, New Mexico
Pueblo of Picuris, New Mexico
Pueblo of Pojoaque, New Mexico
Pueblo of San Felipe, New Mexico
Pueblo of San Ildefonso, New Mexico
Pueblo of Sandia, New Mexico
Pueblo of Santa Ana, New Mexico
Pueblo of Santa Clara, New Mexico
Pueblo of Taos, New Mexico
Pueblo of Tesuque, New Mexico
Pueblo of Zia, New Mexico
Puyallup Tribe of the Puyallup Reservation
Pyramid Lake Paiute Tribe of the Pyramid Lake Reservation, Nevada
Quapaw Nation (previously listed as The Quapaw Tribe of Indians)
Quartz Valley Indian Community of the Quartz Valley Reservation of California
Quechan Tribe of the Fort Yuma Indian Reservation, California & Arizona
Quileute Tribe of the Quileute Reservation
Quinault Indian Nation (previously listed as Quinault Tribe of the Quinault Reservation, Washington)
Ramona Band of Cahuilla, California (previously listed as Ramona Band or Village of Cahuilla Mission Indians of California)
Rappahannock Tribe, Inc.
Red Cliff Band of Lake Superior Chippewa Indians of Wisconsin
Red Lake Band of Chippewa Indians, Minnesota
Redding Rancheria, California
Redwood Valley or Little River Band of Pomo Indians of the Redwood Valley Rancheria California (previously listed as Redwood Valley Rancheria of Pomo Indians of California)
Reno-Sparks Indian Colony, Nevada
Resighini Rancheria, California
Rincon Band of Luiseno Mission Indians of Rincon Reservation, California
Robinson Rancheria (previously listed as Robinson Rancheria Band of Pomo Indians, California and the Robinson Rancheria of Pomo Indians of California)
Rosebud Sioux Tribe of the Rosebud Indian Reservation, South Dakota
Round Valley Indian Tribes, Round Valley Reservation, California (previously listed as Round Valley Indian Tribes of the Round Valley Reservation, California)
Sac & Fox Nation of Missouri in Kansas and Nebraska
Sac & Fox Nation, Oklahoma
Sac & Fox Tribe of the Mississippi in Iowa
Saginaw Chippewa Indian Tribe of Michigan
Saint Regis Mohawk Tribe (previously listed as St. Regis Band of Mohawk Indians of New York)
Salt River Pima-Maricopa Indian Community of the Salt River Reservation, Arizona
Samish Indian Nation (previously listed as Samish Indian Tribe, Washington)
San Carlos Apache Tribe of the San Carlos Reservation, Arizona
San Juan Southern Paiute Tribe of Arizona
San Manuel Band of Mission Indians, California (previously listed as San Manual Band of Serrano Mission Indians of the San Manual Reservation)
San Pasqual Band of Diegueno Mission Indians of California
Santa Rosa Band of Cahuilla Indians, California (previously listed as Santa Rosa Band of Cahuilla Mission Indians of the Santa Rosa Reservation)
Santa Rosa Indian Community of the Santa Rosa Rancheria, California
Santa Ynez Band of Chumash Mission Indians of the Santa Ynez Reservation, California
Santee Sioux Nation, Nebraska
Sauk-Suiattle Indian Tribe
Sault Ste. Marie Tribe of Chippewa Indians, Michigan
Scotts Valley Band of Pomo Indians of California
Seminole Tribe of Florida (previously listed as Seminole Tribe of Florida (Dania, Big Cypress, Brighton, Hollywood & Tampa Reservations))
Seneca Nation of Indians (previously listed as Seneca Nation of New York)
Seneca-Cayuga Nation (previously listed as Seneca-Cayuga Tribe of Oklahoma)
Shakopee Mdewakanton Sioux Community of Minnesota
Shawnee Tribe
Sherwood Valley Rancheria of Pomo Indians of California
Shingle Springs Band of Miwok Indians, Shingle Springs Rancheria (Verona Tract), California
Shinnecock Indian Nation
Shoalwater Bay Indian Tribe of the Shoalwater Bay Indian Reservation (previously listed as Shoalwater Bay Tribe of the Shoalwater Bay Indian Reservation, Washington)
Shoshone-Bannock Tribes of the Fort Hall Reservation
Shoshone-Paiute Tribes of the Duck Valley Reservation, Nevada
Sisseton-Wahpeton Oyate of the Lake Traverse Reservation, South Dakota
Skokomish Indian Tribe (previously listed as Skokomish Indian Tribe of the Skokomish Reservation, Washington)
Skull Valley Band of Goshute Indians of Utah
Snoqualmie Indian Tribe (previously listed as Snoqualmie Tribe, Washington)
Soboba Band of Luiseno Indians, California
Sokaogon Chippewa Community, Wisconsin
Southern Ute Indian Tribe of the Southern Ute Reservation, Colorado
Spirit Lake Tribe, North Dakota
Spokane Tribe of the Spokane Reservation
Squaxin Island Tribe of the Squaxin Island Reservation
St. Croix Chippewa Indians of Wisconsin
Standing Rock Sioux Tribe of North & South Dakota
Stillaguamish Tribe of Indians of Washington (previously listed as Stillaguamish Tribe of Washington)
Stockbridge Munsee Community, Wisconsin
Summit Lake Paiute Tribe of Nevada
Suquamish Indian Tribe of the Port Madison Reservation
Susanville Indian Rancheria, California
Swinomish Indian Tribal Community (previously listed as Swinomish Indians of the Swinomish Reservation of Washington)
Sycuan Band of the Kumeyaay Nation
Table Mountain Rancheria (previously listed as Table Mountain Rancheria of California)
Tejon Indian Tribe
Te-Moak Tribe of Western Shoshone Indians of Nevada (Four constituent bands: Battle Mountain Band; Elko Band; South Fork Band and Wells Band)
The Chickasaw Nation
The Choctaw Nation of Oklahoma
The Muscogee (Creek) Nation
The Osage Nation (previously listed as Osage Tribe)
The Seminole Nation of Oklahoma
Thlopthlocco Tribal Town
Three Affiliated Tribes of the Fort Berthold Reservation, North Dakota
Timbisha Shoshone Tribe (previously listed as Death Valley Timbi-sha Shoshone Tribe and the Death Valley Timbi-Sha Shoshone Band of California)
Tohono O'odham Nation of Arizona
Tolowa Dee-ni' Nation (previously listed as Smith River Rancheria, California)
Tonawanda Band of Seneca (previously listed as Tonawanda Band of Seneca Indians of New York)
Tonkawa Tribe of Indians of Oklahoma
Tonto Apache Tribe of Arizona
Torres Martinez Desert Cahuilla Indians, California (previously listed as Torres-Martinez Band of Cahuilla Mission Indians of California)
Tulalip Tribes of Washington (previously listed as Tulalip Tribes of the Tulalip Reservation, Washington)

# Appendix I

# Exhibit I-A(2)

# UNITED STATES
# DEPARTMENT OF THE INTERIOR
# OFFICE OF INDIAN AFFAIRS
# CORPORATE CHARTER
# OF THE
# TE-MOAK BANDS
# OF WESTERN SHOSHONE INDIANS
# OF THE
# STATE OF NEVADA
# RATIFIED DECEMBER 12, 1938

UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON: 1939

---

## CORPORATE CHARTER OF THE TE-MOAK BANDS OF WESTERN SHOSHONE INDIANS OF THE STATE OF NEVADA A FEDERAL CORPORATION CHARTERED UNDER THE ACT OF JUNE 18, 1934

Whereas, the Te-Moak Bands of Western Shoshone Indians of the State of Nevada constitute a recognized Indian tribe organized under a constitution and by-laws ratified by the residents of the Elko Government Colony on May 31, 1938, and approved by the Secretary of the Interior on August 24, 1938, pursuant to Section 16 of the Act of June 18, 1934 (48 Stat. 984), as amended. by the Act of June 15, 1935, (49 Stat. 378) ; and

Whereas, more than one-third of the adult members of the Te-Moak Bands of Western Shoshone Indians have petitioned that a charter of incorporation be granted to such Indians, subject to ratification by a vote of the adult Indians who are members of said Bands;

Now, therefore, I, Oscar L. Chapman, Assistant Secretary of the Interior, by virtue of the authority conferred upon me by the said Act of June. 18, 1934 .(48 Stat. 984), do hereby issue and submit this charter of incorporation to the Indians of the Te-Moak Bands of Western Shoshone Indians to be effective from and after such time as it may be ratified by a majority vote of the adult Indians who are members of said Bands and who are residing on the Elko Government Colony at the time of an election for the ratification hereof in which at least thirty per cent of the eligible voters vote.

**Corporate Existence and Purposes**

1. In order to further the economic development of the Te-Moak Bands of Western Shoshone Indians in the State Of Nevada by conferring upon the said Indians certain corporate rights, powers, privileges and immunities; to secure for the members of the Tribe an assured economic independence; and to provide for the proper exercise by the Indians of various functions heretofore performed by the Department of the Interior, the aforesaid Indians are hereby chartered as a body politic and corporate of the United States of America, under the

corporate name "The Te-Moak Bands of Western Shoshone Indians of Nevada."

Perpetual Succession

2. The Te-Moak Bands of Western Shoshone Indians of Nevada shall, as a Federal corporation, have perpetual succession.

Membership

3. The Te-Moak Bands of Western Shoshone Indians shall be a membership corporation. Its members shall consist of all persons now or hereafter members of the Te-Moak Bands of Western Shoshone Indians of Nevada, as provided by their duly ratified and approved constitution and bylaws.

Management

4. The Te-Moak Western Shoshone Council established in accordance with the said constitution and by-laws of the Te-Moak Bands of Western Shoshone Indians shall exercise all the corporate powers hereinafter enumerated.

Corporate Powers

5. The Te-Moak Bands of Western Shoshone Indians, subject to any restrictions contained in the constitution and laws of the United States. or in the constitution and by-laws of the said Te-Moak Bands of Western Shoshone Indians, shall have the following corporate powers, in addition to all powers already conferred or guaranteed by the tribal constitution and by-laws.

(a) To adopt, use. and alter at, its pleasure, a corporate seal.

(b) To purchase, take by gift, bequest, or otherwise, own, hold, manage, operate, and dispose of property of every description, real and personal, subject to the following limitations.

(1) No sale or mortgage may be made by the Te-Moak Bands of any land or interests in land, including mineral rights, now or hereafter held by the members of the Te-Moak Bands of Western Shoshone Indians of Nevada within the territory of the Tribe.

(2) No leases or permits (which term shall not include land assignments to members of the Bands) covering any land or interests in land now or hereafter held by the Indians within the territory of the Te-Moak Bands shall be made by by the Indians for a longer term than ten years, and all such leases, permits or contracts must, be approved by the Secretary of the Interior or by his duly authorized representative; but mineral leases or any leases requiring substantial improvements of the land may be made for longer periods when authorized by law.

(3) No action shall be taken by or in behalf of the Te-Moak Bands which in any way operates to destroy or injure the grazing lands or other natural resources or the Te-Moak Bands of Western Shoshone Indians of Nevada. All leases or permits relating to the use of grazing lands shall conform to regulations of the Secretary of the Interior authorized by Section 6 of the Act of June 18, 1934, with respect to range carrying capacity and other matters therein specified. Conformity to such regulations shall be made a condition of any such lease or permit whether or not such agreement. requires the approval of the Secretary of the Interior, and violation of such condition shall render the agreement revocable, in the discretion of the Secretary of the Interior.

(c) To issue interests in corporate property in exchange for restricted Indian lands, the forms for such interests to be approved by the Secretary of the Interior.

(d) To borrow money from the Indian Credit Fund in accordance with the terms of Section 10 of the Act of June 18, 1934 (48 Stat. 984), or from any other governmental agency or from any member or association of members of the Te-Moak Bands of Western Shoshone Indians, and to use such funds directly for. productive tribal enterprises, or to loan money thus borrowed to individual members or to cooperative associations of members of the Bands, to community organizations for community use, or for loans by the community to members or to cooperative associations of members of the community: Provided, That the amount of indebtedness to which the Indians may subject themselves, aside from loans from the Indian Credit Fund, shall not exceed $500, except with the express approval of the Secretary of the Interior.

(e) To engage in any business that will further the economic well-being of the

members of the Bands, or to undertake any activity of any nature whatever, not inconsistent with law or with any provisions of this charter.

(f) To make and perform contracts and agreements of every description, not inconsistent with law or with any provisions of this charter, with any person, association, or corporation, with any municipality or any county, or with the United States or the State of Nevada, including agreements with the State of Nevada for the rendition of public services: Provided, That all contracts involving payment of money by the, corporation in excess of $300 in any one fiscal year shall be, subject to the approval of the Secretary of the Interior or his duly authorized representative.

(g) To pledge or assign chattels or future tribal income due or to become due to the Te-Moak Bands: Provided, That no such assignment of tribal income, other than all assignment, to the United States, shall extend more than ten years from the date of execution and shall not amount for any one year to more than one half of the net tribal income from any one source: And, provided further, That any such pledge or assignment shall be subject to the approval of the Secretary of the Interior or his duly authorized representative.

(h) To deposit corporate funds, from whatever source derived, in any national or state bank to the extent that such funds are insured by the Federal Deposit Insurance Corporation, or secured by a surety bond, or other security approved by the Secretary of the Interior to deposit such funds in the Postal Savings Bank or with a bonded disbursing officer of the United States to the credit of tile Te-Moak Bands of Western Shoshone Indians of Nevada.

(i) To sue and to be sued in courts of competent jurisdiction within tile United States; but the grant or exercise of such power to sue and to be sued shall not be deemed a consent by the Tribe or by the United States to the levy or any judgment, lien or attachment upon the property of the Te-Moak Bands of Western Shoshone Indians other than income or chattels specially pledged or assigned.

(j) To exercise such further incidental powers. not inconsistent with law, as may be necessary to the conduct of corporate business.

**Termination of Supervisory Powers.**

6. Upon request by the Te-Moak Western Shoshone Council for the termination of any supervisory power reserved to the Secretary of the Interior under Sections 5 (b) (2), 5 (d), 5 (f), 5 (g), 5 (h), and Section 8 of this Charter, tile Secretary of tile Interior, if he shall approve such request, shall thereupon submit the question of such termination for ratification by the Indians. The termination shall be effective upon ratification by a majority vote of the adult members of the Te-Moak Bands of Western Shoshone Indians, at an election in which at least thirty per cent of the eligible voters vote. If at any time after ten years from the date of ratification of this Charter such request shall be made and the Secretary shall disapprove it, or fail to approve or disapprove it, within ninety days after its receipt, the question of the termination of any such power may then be submitted by the Secretary or by the Te-Moak Western Shoshone Council to popular referendum of the adult members actually living within the territory of the Te-Moak Bands, and if the termination is approved by two-thirds of the eligible voters, it shall be effective.

**Corporate Property**

7. No property rights of the members of the Te-Moak Bands of Western Shoshone Indians of Nevada shall be in any way impaired by anything contained in this Charter, and the ownership by the Indians of unallotted lands, whether or not assigned to tile use of any particular individuals, is hereby expressly recognized. The individually-owned property of members of the Tribe shall not be subject to any corporate debts or liabilities, without such owners' consent. Any existing lawful debts may be satisfied or canceled pursuant to law.

**Corporate Dividends**

8. The Council may issue to each of the members of the Te-Moak Bands of Western Shoshone Indians of Nevada a non-transferable certificate of membership evidencing the equal share of each member in the assets of the Tribe and may distribute per capita among the recognized members of the Tribe, all income of the Tribe, over and above sums necessary to defray corporate obligations to members of the Tribe or to other persons, and over and above all sums which may be devoted to the establishment of a reserve fund, the construction of public works, the costs of public enterprises, the expenses of tribal government, the needs

of charity or other corporate purpose. No such distribution of profits in any one year amounting to a distribution of more than one half of the accrued surplus, ,shall be made without the approval of the Secretary of the Interior. No financial assets of the Te-Moak Bands shall be distributed except as provided herein.

Corporate Accounts

9. The officers of the Te-Moak Bands of Western Shoshone Indians of Nevada shall maintain accurate and complete public accounts of the financial affairs of the Indians, which shall clearly show all credits, debts, pledges and assignments, and shall furnish an annual balance sheet and report. of the financial affairs of the Tribe to the Commissioner of Indian Affairs.

Amendments

10. This Charter shall not be revoked or surrendered except by Act of Congress, but amendments may be proposed by resolutions by of the Te-Moak Western Shoshone Council which, if approved by the Secretary of the Interior shall be effective when ratified by a majority vote of the adult members of the Tribe at a popular referendum in which at least thirty per cent of the eligible voters vote.

11. This Charter shall be effective from and after the date of its ratification by a majority vote of the adult members of the Te-Moak Bands who reside in the Elko Government Colony provided at least thirty per cent of the eligible voters shall vote, such ratification to be formally certified by the Superintendent of the Carson Indian Agency and the Chairman and Secretary of the Te-Moak Bands.

Submitted by the Assistant Secretary of the Interior for ratification by Indians of the Te-Moak Bands of Western Shoshone Indians of Nevada.

OSCAR L. CHAPMAN,
Assistant Secretary of the Interior.
[SEAL]

Washington D. C., October 28, 1938.

CERTIFICATION

Pursuant to section 17 of the Act of June 18. 1934 (48 Stat. 984), this Charter, issued on October 28, 1938 by the, Assistant Secretary of the Interior to the Te-Moak Bands of Western Shoshone Indians of the State of Nevada was duly submitted for ratification to the adult members of said ' Bands residing in the Elko Government Colony and was on December 12, 1938, duly ratified by a vote of 37 for, and 2 against, in an election in which over 30 per cent of those entitled to vote cast their ballots.

JIMMIE JAMES
Chairman, Te-Moak Western Shoshone Council

CHARLES MALOTTE
Secretary, Te-Moak Western Shoshone Council.

ALIDA C. BOWLER,
Superintendent Carson Indian Agency,

# Appendix I

# Exhibit I-A(3)

**TE-MOAK TRIBE OF WESTERN SHOSHONE**

525 Sunset Street - Elko, Nevada 89801
(702) 738-9251

M E M O R A N D U M

TO: ALL TE-MOAK EMPLOYEES

FROM: Davis Gonzales, Tribal Administrator

DATE: July 19, 1993

SUBJ: Personnel Policy

Enclosed herewith is an updated Personnel Policy that has the amendments which were made by Te-Moak Council. On page 10 VIII ATTENDANCE AND LEAVE - A. Full Time Work Week #1 - amendment was made on April 3, 1992 and E. Annual #1 - amendment was made on October 22, 1992.

# I. GUIDING PRINCIPLES

The purpose of this manual is to establish a system of personnel administration that meets the social, economic, and program needs of the Te-Moak Tribe of Western Shoshone Indians of Nevada. This system provides means to recruit, select, develop and maintain an effective and responsible work force, and includes policies and procedures for employee hiring and advancement, position classification, salary administration, fringe benefits, discharge, resolution of grievances and other related activities. All appointments and promotions under the provisions of this manual shall be based on merit and fitness. The Te-Moak Tribal Council of the Te-Moak Tribe of Western Shoshone Indians of Nevada shall have the authority to establish Personnel Policies. The guiding personnel principles for the Te-Moak Tribes personnel system shall be:

(a) recruiting, selecting and advancing employees on the basis of their relative abilities, knowledge, and skills including open consideration of qualified Indian applicants, for initial appointments;

(b) to facilitate employment of disadvantaged persons, competition for "aide" or similar classes may be limited to such individuals;

(c) to provide equitable and adequate compensation;

(d) to train employees, as needed, to assure high-quality performance;

(e) to retain employees on the basis of adequacy of their performance, correcting inadequate performance, and separating employees whose inadequate performance cannot be corrected;

(f) the assuring of fair treatment of applicants and employees in all aspects of personnel administration without regard to political affiliation, family ties, age, race, color, national origin, sex, marital status, religious creed, or other non-merit considerations and with proper regard for their privacy and other constitutional rights as citizens except the Indian preference, meaning Enrolled Te-Moak members first, Native American second, shall be provided; and

(g) to assure that employees are protected against coercion for partisan political purposes and to prohibit their use of official authority for the purpose of interfering with or affecting the result of an election or nomination for office;

(h) to assure that employees of the Te-Moak Tribe, whether in regular tribal employment or programs funded by special grants or other outside funding, be subject to these policies;

(i) to require all Program Directors and officials with the Te-Moak Tribes service to follow these policies and procedures in all matters pertaining to personnel management and administration, including selection, promotion, separation, disciplinary action and all other matters covered by these policies. They will refer to the Personnel Officer all questions regarding correct procedures to be followed. requests for eligible lists, and other assistance as needed.

## II. CONDITIONS GOVERNING EMPLOYMENT

### A. Discrimination

The Te-Moak Tribe of Western Shoshone Indians: (a) will not discriminate because of political or religious opinions or affiliations, or because of race, national origin or other non-merit factors except for unique Indian preference (enrolled Te-Moak members first, Native American second) or as required by specific program guidelines. Discriminations on the basis of age, sex or physical disability will be prohibited except where specific age, sex or physical requirements constitute a bona fide occupational qualification necessary to proper and efficient administration; (b) will take affirmative action to insure that these provisions are carried out.

These requirements shall apply to, but not be limited to the following: recruitment, examination, appointment, promotion, retention, demotion, transfer, layoff, or termination, discipline, rates of pay or other forms of compensation and selection for training, including apprenticeship, or any other aspects of personnel administration. *Preferential treatment in employment practice may be given to Indians as provided in the Indian Self-Determination and Education Assistance Act, P.L. 93-638, January 4, 1975, Section 7: the Civil Rights Act, amended by P.L. 92-261; Section 703 and other sections.

### B. Political Activity Regarding Elections

1. Employees shall not:

(a) Use their official authority or influence for the purpose of interfering with an election or a nomination of affecting the result thereof.

2. (b) Directly or indirectly coerce, command or advise one another to pay, lend, or contribute salary, compensation or "anything else of value" for political purposes.

(c) Engage in any political activity during scheduled working hours.

(d) Neglect their assigned duties or responsibilities for political activity.

(e) Discriminate in favor of, against, a tribal officer, employee or applicant because of political affiliation.

(f) Engage in any permitted political activity directed at other Te-Moak tribal employees while they are on duty.

(g) Promise or use influence to secure Te-Moak tribal employment or other benefits and/or services as a regard for politica activity.

## III. AUTHORITY AND ADMINISTRATION OF THE PERSONNEL SYSTEM

A. Te-Moak Tribal Administrator

The Te-Moak Tribal Administrator shall be responsible for the implementation an overall administration of the Te Moak programs.

B. Personnel Officer

The Te-Moak Tribal Council shall select a Personnel Officer to administer the personnel system. The Personnel Officer shall be responsible for the implementation and overall administration of the personnel system approved by the Te-Moak Tribal Council.

The Personnel Officer will perform the following assigned functions:

(a) Screen all applicants for all the positions of the Te-Moak Tribe.

(b) Screen all applicants for an interview by the Te-Moak Tribal Council.

(c) In cases of three of less applicants for a position, all applicants shall be presented to the Te-Moak Tribal Council, provided the Personnel Officer determines the minimum qualifications are met.

(d) In instances when an employee is to be chosen for a Te-Moak position whose location is other than the Te-Moak Tribal Administration Building the following special provision will be adhered to:
After all applicants have been screened, the Personnel Officer will contact the Chairperson of the affected Band Council to setup a meeting at which the Band Council will pursue all applications. The Personnel Officer will, at that time document all recommendations on the Band Council's chosen applicant and will submit those recommendations to the Te-Moak Tribal Council.

C. Revisions and/or Amendments of the Personnel Policies

Any person affiliated with the Te-Moak Tribe of Western Shoshone may make recommendations for revisions and changes to the Te-Moak Tribe of Western Shoshone Personnel Policies.

Suggested revisions will be channeled as below:

(a) Submitted in writing to the Personnel Officer for review.

(b) The Personnel Officer will present any recommendations for final approval by majority vote of the Te-Moak Tribal Council at any regularly called meeting provided written notice of amendment is furnished to Council Members at least fifteen (15) days before the date of the meeting at which the amendment is to be considered.

D. Te-Moak Tribal Council as Appointing Authority

The Te-Moak Tribal Council shall make appointments for all Te-Moa positions.

## IV. AFFIRMATIVE ACTION PLAN

The Personnel Officer shall maintain an affirmative action plan which insures equal opportunity in recruitment and selection, job structure, promotion policies, training, upward mobility, layoff, disciplinary action and all other related personnel procedures and practices in accordance with the Indian Self-Determination and Education Assistance Act, P.L. 93-638, January 4, 1975, Section 7; the Civil Rights Act, amended by P.L. 92-261, Section 703.

## V. APPOINTMENT AND PROMOTION

A. General Provisions

1. Before any persons convicted of a felony or gross misdemeanor, the record of which has not been sealed, can be considered for employment, the Personnel Officer shall conduct an investigation, including reviewing the applicant's explanation and reviewing law enforcement and court records. The Personnel Officer shall report to the persons making the hiring decisions who may decide whether the conviction disqualifies the individual from employment.

2. The Personnel Officer may remove an employee or deny consideration of an applicant if it is found that the person misrepresented himself deliberately in the selection process, lied about significant information, used political or other pressure.

3. All vacant positions will be advertised to the general public. After advertisement of vacant position to general public, consideration shall be given to enrolled tribal employees who meet all qualifications for the particular vacancy. Selection will be in accordance with the enrolled Te-Moak Indian preference statement.

B. Minimum Qualifications

The qualifications for positions should be approved by the Te-Moak Tribal Council delegated that responsibility and be as part of the job description for each position.

Reasonable consideration shall be given to providing employment opportunities to persons who are willing to learn on the job. Consideration will be given to providing employment for persons who have been denied the benefit of formal education or who have been unable to acquire sufficient work experience. Consideration will be granted to persons whose income falls below the poverty guidelines.

An appropriate education may be necessary in certain professional positions, (e.g., teachers, attorneys).

G. Travel and Per Diem Allowance

Travel and per diem will be provided not to exceed the maximu allowable expense of Federal regulations or available funds. For specific details about per diem and travel rates for the various programs, refer to appendix.

H. Employee Benefits

The Te-Moak Tribe of Western Shoshone should provide those employee benefits approved by the Te-Moak Tribal Council.

1. Group Insurance

The Te-Moak Tribe will provide a group hospital insurance plan, travel accident insurance and an accidental death and dismemberment insurance plan. The details for each plan will be worked out with the insurance agencies involved. Participation will be limited to all full-time employees who have been employed for a maximum of ninety (90) days.

2. Workmen's Compensation Insurance

(a) All Te-Moak Tribal employees are covered by the provisions of the Federal Social Security Act (FICA) and are eligible for the benefits currently provided in this law.

(b) Further, all employees are covered by Workmen's Compensatior which meets the requirements of the Nevada State Laws.

3. Credit Union Savings

4. Additional as added at employee's request.

I. Standard Pay Deductions

1. Federal Income (Withholding) Tax
2. Federal Social Security (FICA) Tax

VIII.ATTENDANCE AND LEAVE

A. Full Time Work Week

1. The full time work week for employees shall be forty (40) hours Monday through Friday, eight (8) hours a day, from 8:00 a.m. to 4:30 p.m. with allowance for half (1/2) hour lunch and two (2) coffee breaks per day, a maximum of fifteen (15) minutes each. Variations from the normal work week will be scheduled in advance and approved by the employee's immediate supervisor. (amended by Council Action on 04-03-92)

If an employee 's going to be late:

(a) Every effort is to be made to phone your supervisor within the first hour of a regular work day.

6. The original of the performance standard and appraisal form shall be filed in the employee's personnel file. a copy shall go to the immediate supervisor, and a copy to the employee.

## X. GRIEVANCES, APPEALS AND DISCIPLINE

A. Grievances

1. A grievance is defined as an employee disagreement with an official decision by or action of another Te-Moak Tribal employee, including supervisors and administrative staff and including all personnel disciplinary actions or dissatisfaction with working conditions or procedures, which are considered to be at variance with established Te-Moak Tribal policy or detrimental to the health and well being of the employee involved.

All employees, subjected to disciplinary action, may file a grievance. Grievances shall be filed and processed in the following manner and within the time frame specified, unless time limits are waived by written mutual consent of both parties concerned or waived by the Tribal Administrator.

B. Grievance Steps

Step 1: When a complaint cannot be resolved at the level when the disagreement or dissatisfaction occurs, a written complaint shall be prepared by the aggrieved employee. The written statement will give specific details of the complaint and the action or redress desired by the aggrieved employee. This complaint is to be submitted to the supervisor or administrative staff person at the level at which the cause of the grievance occurred. A written decision shall be given to the aggrieved employee within five (5) working days of the filing of the complaint. If the grievance remains unresolved, the employee may proceed to STEP 2.

Step 2: Within five (5) working days of the date of written decision in STEP 1 is received or is due, the aggrieved employee may present the written complaint to the Program Director, if the cause of grievance occurred at or above the level of the Program Director, the employee is to submit the written complaint to the next level of supervision or administration above the level of occurrence. The Program Director or other appropriate level of administration will render a written decision within five (5) working days from the date of complaint was referred to that level. If the grievance remains unresolved, proceed to STEP 3.

Step 3: Within five (5) working days of the date the decision in STEP 2 is received or due, the aggrieved employee may present a written request to the Personnel Officer for review by the Tribal Administrator. Copies of all revellent materials and decisions rendered under previous steps of the grievance process shall be submitted to the Tribal Administrator. The Tribal Administrator shall review all

pertinent facts and issue a written decision within ten (10) working days. The review by the Tribal Administrator may include personal interviews with the aggrieved employee and supervisor or administrative staff involved, but such personal interviews are not mandatory. The decision of the Tribal Administrator shall be final, except as otherwise provided for under Appeals.

C. Appeals

1. An appeal is defined as a request from an employee for the Te-Moak Tribal Council to review any administrative action or decision which is alleged to violate certain rights of the employee either under applicable law or the official personnel policies of the Te-Moak Tribe of Western Shoshone.

2. The alleged violation of the following rights shall be appealable to the Te-Moak Tribal Council, after all other administrative remedies have been exhausted.

   (a) The right not to be discriminated against in any aspect of employment because of sex, race, national origin, age, political or religious affiliation.

   (b) The right to due process in the application of personnel policies related to disciplinary action.

3. Due process in the application of personnel policies and generally throughout the operation of Te-Moak Tribe shall mean only the rudiments of due process, that is, notice of the charge or complaint or proposed action and an opportunity to be heard on that subject, not a right of confrontation or cross examination.

4. The following disciplinary action provided for in Te-Moak Personnel Policies shall be appealable to the Te-Moak Tribal Council, after all other administrative remedies have been exhausted.

   (1) Suspension without pay for more than two (2) days.
   (2) Involuntary demotion.
   (3) Involuntary termination.

D. Appeal Procedures

STEP 1: The employee wishing to appeal shall send written statement of facts and a request for a hearing to the Personnel Officer. The written statements must specify the action or decision being appealed, specify the right under law or the policies allegedly violated. The Personnel Officer makes the following determinations:

Is the matter appealable under Te-Moak Policy?

Have all administrative remedies been exhausted?

12 The decision of the Te-Moak Tribal Council shall be final for Te-Moak Tribe and a matter once heard and decided shall not b reconsidered except upon a majority vote of the Council fo reconsideration either after a written application for reconsideration by the employee to the Tribal Administrator or suggestion of any Council member or the Tribal Administrator. A motion for reconsideration may be made at any time but the sooner the better and state matters might not be pursued unless new evidence or issues have come to light.

13. After this, the only recourse is the court.

F. <u>Causes for Disciplinary Action</u>

1. It is the responsibility of all employees to observe the regulations necessary for the proper operation of the Te-Moak Tribe. Administrative procedures have been established for the handling of disciplinary measures such as reprimand, suspension, demotion and dismissal.

2. If an employee receives two (2) written reprimand notices for offenses such as the following (for the same or different offenses) within a period of twelve (12) consecutive months, the employee shall, along with the second such notice, receive disciplinary action commensurate with the severity of the accumulated offense.

3. Upon receipt of the third written reprimand notice (for the same or different offenses) within the same consecutive twelve (12) month period, the employee may, at the time of issuance of the third such notice, be dismissed. If a decision is made to dismiss an employee, the employee will be informed in writing of the reasons for his dismissal and of the right and method of appeal. He will be give a minimum of two weeks notice.

4. A copy of each written reprimand will be placed in the employee's personnel folder and given to the employee. Written reprimand will be purged from an employee's file at the end of twelve (12) months from the date of issuance.

5. The immediate supervisor will sign the first two reprimands. The third reprimand shall also require the signature of the Program Director.

6. Causes for disciplinary action shall include. but not limited to:

   1. Excessive absenteeism and/or tardiness, abuse of sick leave, and insubordination, constituting a breach of discipline which remains uncorrected after warning or is particularly serious in any one instance.

   2. Rough or boisterous play or pranks on the job which disrupt work or are minor safety hazards.

   3. Violating a safety rule or safety practice.

4. Failure to report to work without notification of the immediate supervisor on one particular work day, unless it is impossible to give such notice, unless it is later shown.

5. Gross neglect of duty or refusal to comply with a lawful instruction unless such instruction is injurious to the employee's general health or safety.

6. Indulging in offensive language towards others on the job.

7. Being under the influence of intoxicants or drugs while on duty.

8. Sleeping on duty.

9. Inattentiveness to work, failing to start work at the designated time, quitting work before proper time, or leaving work area during working hours without authorization from the supervisor.

10. Vending, soliciting, or collecting contributions on Te-Moak Tribal time or premises without proper authorization; gambling.

11. Misfeasance or malfeasance in the performance of duty.

12. Use of Te-Moak Tribal personnel, property or other resources (including the employee's own work time) for personal reasons, purposes or gain without the supervisor's prior approval.

G. <u>Causes for Immediate Disciplinary Action or Dismissal</u>

1. Immediate disciplinary action may be taken or the employee may be dismissed immediately only for serious causes such as the following. Supervisors should make every attempt to be fair and match the disciplinary action with the severity of the offense:

(a) Using, or attempting to use, personal or political influence in an effort to secure special consideration as a Te-Moak Tribal employee or applicant for employment.

(b) Incompetency and/or inefficiency in the performance of job duties which result in not maintaining a satisfactory performance rating, providing that the employee has been counseled and notified in writing that job performance has been unsatisfactory.

(c) Absence from work for two (2) consecutive work days without authorization. (This will be considered automatic resignation by the employee).

(d) Major theft or intentional destruction of Te-Moak property.

# Appendix I

# Exhibit I-A(4)

2020 MAR -3 P 3:11
TE-MOAK TRIBE
WESTERN SHOSHONE

# CANNABIS AGREEMENT
Between
ELKO BAND COLONY OF THE TE-MOAK TRIBE OF WESTERN SHOSHONE INDIANS OF NEVADA
And
THE STATE OF NEVADA

## I. Introduction

This Agreement ("Agreement") is made by and between the Elko Band Colony of the Te-Moak Tribe of Western Shoshone Indians of Nevada ("Tribe") and the State of Nevada ("State"). The State is authorized to enter into this Agreement pursuant to Nevada Revised Statutes (NRS) Sec. 223.250 and by the provisions of Nevada Revised Statutes §§277.080 to 277.170.

## II. Definitions

A. "Agreement," means this Cannabis Agreement between the Tribe and the State, as may be amended.

B. "Auditor" means a certified public accountant licensed and in good standing in the State of Nevada.

C. "CCB" means Nevada's Cannabis Compliance Board.

D. "Cannabis" has the same meaning as "Marijuana" defined below.

E. "Cannabis cultivation facility" means any cannabis cultivator in Indian Country licensed or otherwise allowed by the Tribe pursuant to the Tribe's marijuana code to cultivate and sell cannabis at wholesale to cannabis product manufacturing facilities and other cannabis cultivation facilities.

F. "Cannabis dispensary" or "cannabis store" means any cannabis business in Indian Country licensed or otherwise allowed by the Tribe, pursuant to the Tribe's marijuana code, to sell or dispense cannabis products.

G. "Cannabis product manufacturing facility" means any cannabis processor in Indian Country licensed or otherwise allowed by the Tribe, pursuant to its marijuana code, to process cannabis into useable cannabis, cannabis concentrates, and cannabis-infused products, package and label useable cannabis and cannabis infused products for sale to cannabis dispensaries or cannabis stores, and sell cannabis products at wholesale to cannabis dispensaries or cannabis stores.

H. "Department" means the Nevada Department of Taxation.

I. "Essential Government Services" means services provided by the Tribe including, but not limited to, administration, public facilities, fire, police, health, education, elder care, social services, sewer, water, environmental and land use, transportation, utility services, community development, and economic development.

J. "Indian Country" means the lands of the Tribe, including the Tribe's Reservation, and all lands held in trust status by the United States for the Tribe or its Tribal Members.

K. "Marijuana," "edible marijuana products," "marijuana concentrates," "marijuana-infused products," and "useable marijuana" as used in this Agreement shall have the same meanings as in NRS Chapters 453A and 453D, or any amendments thereto. Together, these terms shall be referred to as "Cannabis Product" or "Cannabis Products."

L. "Parties," are the State and the Tribe.

M. "State" means the State of Nevada.

N. "State Licensee" means any cannabis product manufacturing facility, cannabis cultivation facility, cannabis distributor, cannabis testing facility, retail cannabis store or medical cannabis dispensary licensed by the State.

O. "State Tax" means any cannabis excise tax or sales and use tax imposed by the State on sales of recreational marijuana and medical marijuana products.

S. "Tribal Cannabis Policy" means the Tribe's policy for the Regulation and Taxation of Recreational Marijuana, approved by Elko Band Resolution #2019-EBC-33 and as may be amended.

T. "Tribal Enterprise" means a business or agency owned in whole or in part by the Tribe and authorized to sell cannabis products under the marijuana code.

U. "Tribal Tax" means a tax imposed by the Tribe on cannabis activities.

V. "Tribe," as defined above, means the Elko Band Colony of the Te-Moak Tribe of Western Shoshone Indians of Nevada.

## III. Parties

The Parties to this Agreement are the Tribe and the State (collectively, the "Parties").

The Tribe is located on Tribal Trust Lands, known as the Elko Band Colony of the Te-Moak Tribe of Western Shoshone Indians of Nevada, located in Elko County, in the State of Nevada. The Tribe is a federally-recognized Indian tribe possessed of the full sovereign powers of a tribal government.

The State is a state within the United States of America, possessed of the full powers of a state government. The Nevada Department of Taxation (the "Department") is an executive department of the State government operating under the authority of the Governor, with statutory authority with respect to Cannabis under Nevada Revised Statutes ("NRS") Chapters 453A and 453D until June 30, 2020. As of July 1, 2020, all statutory authority with respect to Cannabis will be moved to the Cannabis Compliance Board ("CCB") and Title 56 of NRS.

The Tribe and the State are separate sovereigns and each recognizes and respects the laws and authority of the other sovereign.

NRS 223.250 allows the Governor to enter into an agreement with any federally-recognized Indian tribe located within the geographical boundaries of Nevada regarding Cannabis.

## IV. Purpose and History

Historically, the cultivation, possession, delivery, distribution, and sale of cannabis have been illegal across the United States and in Indian Country. In 2016, Nevada voters passed Question 2, which sets forth a tightly regulated, state licensed system allowing for the cultivation, processing, and retail sale of cannabis, cannabis concentrates, useable cannabis, and cannabis-infused products for recreational purposes within the State.

While the federal Controlled Substances Act continues to designate marijuana as a Schedule 1 substance, on August 29, 2013, the United States Department of Justice issued a memorandum to all United States Attorneys (the "Cole Memorandum") setting forth guidance regarding marijuana enforcement. In that memo, James M. Cole, Deputy Attorney General, established eight enforcement priorities of particular importance to the federal government: (1) preventing the distribution of marijuana to minors; (2) preventing revenue from the sale of marijuana from going to criminal enterprises, gangs, and cartels; (3) preventing the diversion of marijuana from states where it is legal under state law in some form to other states; (4) preventing state-authorized marijuana activity from being used as a cover or pretext for the trafficking of other illegal drugs or other illegal activity; (5) preventing violence and the use of firearms in the cultivation and distribution of marijuana; (6) preventing drugged driving and the exacerbation of other adverse public health consequences associated with marijuana use; (7) preventing the growing of marijuana on public lands and the attendant public safety and environmental dangers posed by marijuana production on public lands; and (8) preventing marijuana possession or use on federal property. The Cole Memorandum further stated that the focus of federal law enforcement resources and efforts will be on those whose conduct interferes with the stated priorities and that state and local governments should provide sufficiently robust regulatory and enforcement systems to protect against these harms.

On October 28, 2014, the United States Department of Justice issued another memorandum to all United States Attorneys (the "Wilkinson Memorandum") providing a policy statement regarding marijuana issues in Indian Country. In that memo, Monty Wilkinson, Director, Executive Office for United States Attorneys, acknowledged that "(t)he eight priorities in the Cole Memorandum will guide United States Attorneys' marijuana enforcement efforts in Indian Country, including in the event that sovereign Indian Nations seek to legalize the cultivation or use of marijuana in Indian Country." The Wilkinson Memorandum effectively treated tribal governments the same as state governments in the decision to legalize marijuana.

Through Nevada law and the Department's implementing rules, the State has decriminalized the cultivation, possession, delivery, distribution, sale, and use of cannabis in Nevada and has attempted to set forth a civil regulatory system that accomplishes the federal priorities set forth above and keeps cannabis cultivation, processing, and sale in Nevada regulated and safe for the public.

After serious deliberation, the Tribe, as a sovereign nation, has also determined that present day circumstances make a complete ban of cannabis within Indian Country ineffective and unrealistic and has decriminalized its sale and possession in certain circumstances. At the same time, consistent with the federal priorities, the need still exists for strict regulation and control over the cultivation, possession, delivery, distribution, sale, and use of cannabis in Indian Country.

The State and the Tribe recognize the need for cooperation and collaboration with regard to cannabis in Indian Country. The State has authorized the entry of this Agreement by the Compacting Legislation, enacted by the 79th (2017) Session of the Nevada Legislature on May 23, 2017, signed by the Governor on June 2, 2017, effective June 2, 2017. Through this Compacting Legislation, the State authorized the Governor to enter agreements with American Indian tribes concerning the regulation ofmarijuana.

The Parties share a strong interest in ensuring that cannabis production, processing, and sales in Indian Country are well-regulated to protect public safety and community interests. The Parties acknowledge that pursuant to federal law, 21 U.S.C. § 812, marijuana is a Schedule I controlled substance and that this Agreement does not protect the sales or regulation of marijuana in Indian Country from federal law; however, the Parties have entered into this Agreement in order to strengthen their ability to meet these mutual interests and to provide a framework for cooperation to ensure a robust tribal and state regulatory and enforcement system sufficient to meet the federal priorities identified in the Cole and Wilkinson Memoranda.

The Parties acknowledge that the laws of the Tribal government relating to the possession, delivery, production, cultivation, processing, testing and use of cannabis, edible cannabis products, cannabis-infused products and cannabis products are at least as restrictive as the provisions of Chapters 453A and 453D of the NRS and any regulations adopted pursuant thereto and the Tribal government is enforcing or will enforce those

laws.

The Parties agree that it is in the best interests of the Tribe and the State that they enter into this Agreement to enhance public health and safety, ensure a lawful and well-regulated cannabis market, encourage economic development in Indian Country, and provide fiscal benefits to both the Tribe and the State.

## V. Terms

A. Applicability. This Agreement applies to the cultivation, processing, and sale of cannabis products in Indian Country where the Tribe or Tribal Enterprise (i) delivers, causes delivery to be made to, or receives delivery of cannabis products from a State Licensee or (ii) physically transfers possession of cannabis products from the seller to the buyer within Indian Country. Except as otherwise provided herein, the cultivation, processing, sale, and possession of cannabis products in Indian Country pursuant to the Tribal Cannabis Policy and in accordance with this Agreement are not subject to the terms of NRS 453A, NAC 453A, NRS 453D, NAC 453D or any amendments thereto and any such activities will not be a criminal or civil offense under Nevada state law.

B. Medical Marijuana Dispensary and Retail Store Sales. The Tribe and/or its Tribal Enterprises may sell medical and retail cannabis products in Indian Country pursuant to the Tribal Cannabis Policy and this Agreement.

1. The Tribe shall notify the Department at least 30 days prior to the opening of any medical cannabis dispensary or retail store location owned by the Tribe or Tribal Enterprise. Such notification shall include:

a. The identity of the Tribal entity which is operating the medical cannabis dispensary or retail store location;

b. Location of the premises; and

c. Certification that the premise is located in Indian Country.

2. Dispensary sales of all cannabis products by the Tribe and any Tribal Enterprise must be conducted in accordance with the Tribal Cannabis Policy and the internal policies and controls of the Tribe or Tribal Enterprise. The Tribal Cannabis Policy, as it exists on the date of this Agreement, is attached as Exhibit A. Current copies of the code and medical marijuana internal policies and controls of the Tribe and any Tribal Enterprise will be made available for review by the State upon request. The Tribe agrees to notify the State of any changes to the Tribe's Law and Order Code that may affect cannabis products within ten (10) working days of the date of adoption by the Tribe.

3. All cannabis products purchased by a medical cannabis dispensary or retail store from a State Licensee will be verified upon delivery in Indian Country, and confirmation of receipt will be made by executing the delivery invoice. The medical

cannabis dispensary or retail store will input or cause to be input all delivered purchases into the State's tracking system within twenty-four (24) hours of any such delivery.

4. All cannabis products purchased by the Tribe or a Tribal Enterprise from the tribal government, tribal enterprise, or member of another federally- recognized Indian Tribe with a reservation located within Nevada, or sold by the Tribe or a Tribal Enterprise to the tribal government, tribal enterprise, or member of another federally recognized Indian Tribe with a reservation located within Nevada, will be recorded in either the Tribe's or the State's tracking system within twenty-four (24) hours of any such receipt or delivery. The Tribe and any Tribal Enterprise will make such records available for review by the State upon request.

C. Cultivating and Processing of Cannabis Products. The Tribe may allow the cultivating and processing of cannabis products in Indian Country pursuant to the following terms:

1. The Tribe shall notify the Department at least 90 days prior to the start of operations of any cannabis product manufacturing facility or cannabis cultivation facility by the Tribe or a Tribal Enterprise. Such notifications shall include:

a. The identity of the Tribal entity which is operating the cannabis product manufacturing facility or cannabis cultivation facility;

b. Location of the premises; and

c. Certification that the premise is located in IndianCountry.

2. Cultivating and processing of cannabis products by the Tribe and any Tribal Enterprise must be conducted in accordance with the Tribal Cannabis Policy and the internal policies and controls of the Tribe or Tribal Enterprise. The Tribal Cannabis Policy as it exists on the date of this Agreement is attached as Exhibit A. Current copies of the code and any internal cannabis policies and controls of the Tribe and any Tribal Enterprise will be made available for review by the State upon request. The Tribe agrees to notify the State of any changes to the Tribe's Law and Order Code that may affect cannabis products within ten (10) days of the date of adoption by the Tribe.

3. The State may require that cannabis products sold by cannabis product manufacturing facilities and cannabis cultivation facilities to State Licensees be packaged, tested and labeled in compliance with State cannabis laws. With respect to "edibles" this may include State pre approval of the product packaging and labeling before sale to State Licensees; PROVIDED, that such pre approval shall not be unreasonably withheld and shall be timely provided. All transactions between the Tribe and State Licensees will be executed through the State traceability system following the same rules as State Licensees.

D. State Licensees.

1. The Tribe and Tribal Enterprises may purchase cannabis products from or sell cannabis products to State Licensees or any other entity operating under a valid agreement authorized by the Compacting Legislation, including any amendments thereto, with or otherwise authorized by the State. All transactions between the Tribe and State Licensees must be executed through the State traceability system, and cannabis products purchased from or sold to State Licensees must be tested to equivalent or higher standards as those required by Nevada's cannabis laws.

2. The State will not cite, fine, or otherwise take any other adverse licensing or other action against any State Licensee due to the mere fact that it bought or sold cannabis products from or to the Tribe or a Tribal Enterprise in accordance with the terms of this Agreement and the Tribe's marijuana code.

3. To the extent necessary, the State will work with the Tribe, Tribal Enterprise, and with any State Licensees or otherwise authorized medical marijuana product manufacturing facilities, cannabis cultivation facilities, medical cannabis dispensaries and retail stores to assure such entities that the Tribe and Tribal Enterprises are legally authorized to purchase and sell cannabis products pursuant to the terms of this Agreement.

E. Taxes.

1. State Tax. The State acknowledges that no State Tax or fee, assessment, or other charge imposed by the State or local governments may be assessed against or collected from the Tribe, Tribal Enterprises, State Licensees, or medical marijuana card holders in Indian Country related to any commercial activity related to the production, processing, sale, and possession of cannabis products governed by this Agreement. To the extent any other State Tax, fee, assessment, or other charge imposed by the State or local government, or Tribal Tax is assessed against or collected from any State Licensee related to a sale to or purchase in Indian Country from the Tribe or Tribal Enterprises, of any cannabis product, it shall be refunded or otherwise paid by the State to the Tribe within thirty days of receipt by the State. Any refund amounts so received by the Tribe will be used for Essential Government Services. No refund will be granted of State Tax collected from a cannabis card holder by State Licensees on the sale of cannabis or cannabis product if that cannabis or cannabis product was originally purchased by the State Licensee from the Tribe or Tribal Enterprises.

The State Sales Tax must be collected on sales made in non-Indian country and remitted to the State of Nevada.

2. Tribal Tax. The Tribe shall impose and maintain a Tribal Tax that is equal to at least 100 percent of the State Tax on all sales of cannabis products in Indian Country,

the Tribe's Police Department from the State.

c. Cooperation. Both Parties will cooperate in good faith to undertake all State-requested premises checks jointly. The Tribe's Police Department and/or authorized Tribal authorities will make reasonable efforts to arrange and conduct all State requested premises checks within twenty-four (24) hours of being provided written notice of such request by the State. All such written notices shall be sent to the Chief of Police and the Chairman of the Tribe. Should either Party have any concerns arising out of a premises check or the results thereof, the Parties will meet in good faith to discuss any suggested changes to protocols of the premises checks themselves or of cannabis product sales by the Tribe or Tribal Enterprise that were checked.

2. Compliance Checks/Minors.

a. By the Tribe. The Tribe may conduct its own compliance checks in Indian Country using minors ages 18, 19, or 20 through the Tribe's Police Department or other authorized agency in accordance with Tribal regulations and policies. To the extent it is informed of the results of such checks, Tribe's Tribal Council will provide the results of the checks to the State. No criminal action may be taken against any minor who purchases marijuana as part of such a compliance check.

b. By the State. State staff may also conduct compliance checks. Prior to conducting any such compliance check, the State will contact the Tribe's Police Department or other authorized agency to provide twenty-four (24) hours' written notice of such compliance check. The Tribe's Police Department and/or authorized Tribal authorities must observe and participate in all compliance checks. The State will share the results of such compliance checks with Tribe's Tribal Council.

c. Cooperation. Both Parties will cooperate in good faith to undertake all State-requested compliance checks jointly. The Tribe's Police Department or other authorized agency will make reasonable efforts to arrange and conduct all State-requested compliance checks within twenty-four (24) hours of being provided written notice of such request by the State. All such written notices shall be sent to the Chief of Police and the Chairman of the Tribe. Should either Party have any concerns arising out of a compliance check or the results thereof, the Parties will meet in good faith to discuss any suggested changes to protocols of the compliance checks themselves or of marijuana sales by the Tribe or Tribal Enterprise that were checked.

G. Dispute Resolution.

1. Should a dispute arise between the Parties regarding compliance with this Agreement by either Party, or by their officers, employees or agents, the Parties will attempt to resolve the dispute through the following dispute resolution process:

a. Notice. Either Party may invoke the dispute resolution process

by notifying the other, in writing, of its intent to do so. The notice must set out the issues in dispute and the notifying Party's position on each issue.

b. Meet and Confer. The first stage of the process will include a face- to-face meeting between representatives of the two Parties to attempt to resolve the dispute by negotiation. The meeting must be convened within thirty (30) days after the receiving Party's receipt of the written notice described in subsection (a). The representatives of each Party will come to the meeting with the authority to settle the dispute. If the dispute is resolved, the resolution will be memorialized in a writing signed by the Parties.

c. Mediation. The second stage of the process will be that if the Parties are unable to resolve the dispute within sixty (60) days after the receiving Party's receipt of the written notice sent under subsection (a) above, the Parties will engage the services of a mutually agreed upon qualified mediator to assist them in attempting to negotiate the dispute. Costs for the mediator will be borne equally by the Parties. The Parties will pursue the mediation process in good faith until the dispute is resolved or until the mediator determines that the Parties are not able to resolve the dispute. If the Parties cannot agree on a format for the mediation process, the format will be that directed by the mediator. If the dispute is resolved, the resolution will be memorialized by the mediator in a writing signed by the Parties, which will bind the Parties.

d. Arbitration. If a Party terminates the process before completion, or if the mediator determines that the dispute cannot be resolved in the mediation process, or if the dispute is not resolved within one hundred twenty (120) days after the date the mediator is selected, either Party may initiate binding arbitration proceedings under the rules of the American Arbitration Association ("AAA"), but the AAA need not administer the arbitration. If the arbitrator determines that a Party is in violation of a material provision of this Agreement, and such violation is not or cannot be cured within thirty (30) days after the arbitrator's decision, then the other Party may terminate this Agreement with sixty (60) days' prior written notice;

(1) The arbitrator shall have no authority to award monetary damages or issue injunctive or other equitable relief; and,

(2) Each Party will bear its own legal costs incurred under this Section. All costs of the arbitrator will be shared equally.

2. If, at any time after the effective date of this Agreement, the State enters into an agreement, compact, or consent decree with any other federally recognized Indian tribe or governmental agency thereof, of or relating to the

regulation of marijuana in Indian Country which includes a "most favored nation" provision, then, upon the Tribe's written request, this Agreement will be amended to include such provision. A "most favored nation" provision is defined as language by which the State agrees to accord a tribe or tribal government agency the same favorable terms that are offered in later agreements with any other tribe or tribal government agency. This will not be construed to require that the State offer the Tribe the option to receive the same terms offered to every tribe or tribal government agency, in the absence of a most favored nation provision in the Agreement.

3. In any action filed by a third party challenging either the Tribe's or the State's authority to enter into or enforce this Agreement, the Parties each agree to support the Agreement and defend their own separate authority to enter into and implement this Agreement; provided, however, that this provision does not waive, and must not be construed as a waiver of, the sovereign immunity of the Tribe, or the State, or any of its subdivisions or enterprises thereof.

H. Termination. This Agreement may be terminated with sixty (60) days' prior written notice that the Tribe is in default if the Department determines that the Tribal government laws relating to the possession, delivery, cultivation, production, processing, testing and use of cannabis products are not as restrictive as the provisions of chapters 453A and 453D of the Nevada Revised Statutes and any regulations adopted pursuant thereto or that the Tribal government is not enforcing its laws, provided:

1. The State has given the Tribe written notice detailing the claimed default, and granting the Tribe a 45-day period of time to cure the default. In the event that the State determines that the default has been cured or the Tribe has cured the default or is making satisfactory progress toward the cure of the default during the 45-day period, the notice of default shall be withdrawn;

2. In the event that the State determines that the Tribe has not cured the default, that satisfactory progress in the cure of the default is not being made by the Tribe, or that it is impossible for the Tribe to cure the default within 45 days of the notice of default, then, the State shall give written notice to the Tribe of the State's determination, whereupon, the Tribe may invoke the alternative dispute resolution procedures of subsection G, above, by giving notice within ten days to the State that the alternative dispute process has been invoked by the Tribe. The outcome of the alternative dispute resolution process will determine whether the Agreement may be terminated by the State, should the alternative dispute process be invoked.

3. Should the Tribe fail or refuse to invoke the alternative dispute

process, then, the State's determination to terminate stands.

I. Sovereign Immunity. The State agrees that, except for the limited purpose of resolving disputes in accordance with subsection G, above, the signing of this Agreement by the Tribe does not imply a waiver of sovereign immunity by the Tribe or any of its subdivisions or enterprises and is not intended as a waiver of sovereign immunity and that any action by the State in regard to marijuana regulation by the Tribe shall be in accord with this Agreement. Except as expressly provided otherwise, herein, the Tribe retains its sovereignty and immunity from suit.

J. No Limitation. The Parties agree that the signing of this Agreement and the resultant benefits and obligations shall not be construed as limiting any otherwise lawful activity of the Tribe or its subdivisions or enterprises nor subject the Tribe or its subdivisions or enterprises to any State jurisdiction not agreed to in this Agreement.

## VI. Communication and Notice

A. Annual Meeting. The Parties agree to maintain regular and open communication regarding the administration and implementation of this Agreement. The Parties agree that the following individuals will be designated primary contacts regarding administration of this Agreement:

For the State:

Office of the Governor
General Counsel
101 N. Carson Street
Carson City, NV 89701
(775) 684-5670

Department of Taxation or
Cannabis Compliance Board
Executive Director
1550 College Parkway, Suite 115
Carson City, NV 89706
(775) 684-2000

For the Tribe:

Tribal Chairman
Elko Band Colony of the Te-Moak Tribe of
Western Shoshone Indians of Nevada
1745 Silver Eagle
Elko, NV 89801
(775) 738-8889

Senior Staff Attorney
1745 Silver Eagle

Elko, NV 89801
(775) 738-8889

The Parties agree that if either party believes that the goals and objectives of this Agreement are not being met, that they will meet promptly to discuss any issues and concerns.

B. Notice. Any notice that may be or is required to be sent under this Agreement shall be sent as follows:

| | |
|---|---|
| If to the State: | Office of the Governor<br>General Counsel<br>101 N. Carson Street<br>Carson City, NV 89701<br>(775) 684-5670 |
| With a copy to: | Department of Taxation or<br>Cannabis Compliance Board<br>Executive Director<br>1550 College Parkway, Suite 115<br>Carson City, NV 89706<br>(775) 684-2000 |
| If to the Tribe: | Tribal Chairman<br>Elko Band Colony of the Te-Moak Tribe of<br>Western Shoshone Indians of Nevada<br>1745 Silver Eagle<br>Elko, NV 89801<br>(775) 738-8889 |
| With a copy to: | Senior Staff Attorney<br>Tribal Legal Department<br>1745 Silver Eagle<br>Elko, NV 89801<br>(775) 738-8889 |

## VII. Effect, Duration, and Amendment

A. Term. This Agreement shall remain in effect for a term of ten (10) years, unless the Parties mutually agree in writing that the Agreement should be vacated or terminated and superseded by a new agreement or compact between the Parties within that time frame. The Compact shall be automatically renewed for successive periods of ten (10) years, unless a party provides written notice to the other, no later than one hundred twenty (120) days before the expiration of the then current ten (10) year period that it wishes to modify the terms of the Agreement.

B. Amendment. No amendment or alteration of this Agreement shall arise by implication or course of conduct. This Agreement may be altered only by a subsequent written document, approved by the Parties, expressly stating the Parties' intention to amend this Agreement.

C. Severability. If any provision of this Agreement or its application to any person or circumstance is held invalid, the remainder of the Agreement is not affected.

D. Change in Classification. If the classification of marijuana as a Schedule I drug is altered in any way or federal marijuana enforcement policy (as described in III, above) changes, the Parties agree to meet and discuss the need to modify this Agreement. If such modifications cannot be agreed upon, then either Party may terminate this Agreement with 60 days' written notice.

This Agreement is hereby made this 23 day of January, 2020.

GOVERNOR OF THE STATE OF NEVADA

Governor

ELKO BAND COLONY OF THE TE-MOAK TRIBE OF WESTERN SHOSHONE INDIANS OF NEVADA

Elko Band Chairman

# Appendix I

# Exhibit I-B(1)

STATE OF NORTH CAROLINA
COUNTY OF DURHAM

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE # 11 CVS 2941

DURHAM COUNTY
FILED
JUN 1 2011
AT 11:41 AM
BY
CLERK OF SUPERIOR COURT

**IN THE MATTER OF**
**MAGISTRATE**
**SAMUEL L. BIERS**

**ORDER ON MOTION TO WITHDRAW**

---

THIS CAUSE CAME ON TO BE HEARD AND WAS HEARD BY THE UNDERSIGNED presiding over the May 26th, 2011 session of Civil Superior Court for Durham County, North Carolina. Movant was represented by Attorney Patrice Walker and the State of North Carolina in this file was represented by Attorney Dale A. Morrill.

At the opening of this matter, Mr. Morrill announced that Kenya Newell, the affiant who requested the removal of Magistrate Biers in this matter, wished to withdraw her affidavit. Without objection from Ms. Inserra or Ms. Walker, Ms. Newell's request to withdraw her affidavit is allowed. With the consent of all of the parties herein, this matter is dismissed.

WHEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT this matter is dismissed.

This the 31st day of May, 2011.

Honorable Michael R. Morgan
Judge Presiding

STATE OF NORTH CAROLINA
COUNTY OF DURHAM

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE # 11 CVS 2972

DURHAM COUNTY
FILED
JUN 1 2011
AT 1:41 P.M.
BY [signature]
CLERK OF SUPERIOR COURT

IN THE MATTER OF
MAGISTRATE
SAMUEL L. BIERS

ORDER ON MOTION TO DISMISS

---

THIS CAUSE CAME ON TO BE HEARD AND WAS HEARD BY THE UNDERSIGNED presiding over the May 26th, 2011 session of Civil Superior Court for Durham County, North Carolina. Movant was represented by Attorney Patrice Walker and the State of North Carolina was represented by Attorney Marie Inserra.

Ms. Walker tendered a revised resignation which was admitted and filed in this case. Respondent's Motion to Dismiss on the grounds that this case is now moot was heard and considered based on the revised resignation dated May 26th, 2011.

The Court having considered the law and the arguments of counsel, the Court determines that good cause exists to grant the Respondent's Motion to Dismiss.

WHEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT, Respondent's Motion to Dismiss on the grounds of mootness is allowed and this matter is dismissed.

This the 31st day of May, 2011.

[signature]
Honorable Michael R. Morgan
Judge Presiding

STATE OF NORTH CAROLINA
COUNTY OF DURHAM

FILED IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
2011 MAY 19 PM 3: 24 FILE # 11 CVS 2972
DURHAM COUNTY C.S.C.
BY ____

**IN THE MATTER OF MAGISTRATE SAMUEL L. BIERS**

**ORDER FOR RELEASE OF PERSONNEL RECORD**

---

This matter came before the undersigned judge on May 16, 2011, on the motion *ore tenus* of Appointed Counsel Curtis Massey pursuant to G.S. § 126-24, seeking an order directing the Administrative Office of the Courts to file a certified copy of Magistrate Biers' personnel file with the Clerk of Superior Court and permitting all of the counsel in this matter with access to that file and make copies of such portions as they require to properly prepare for the hearing of this matter. Magistrate Biers' counsel further advised that she was in possession of a copy of the Magistrate's personnel file which she would make available for use by the counsel pending receipt of the certified copy. Upon consideration of the matters in controversy, the undersigned finds that the motion should be, and therefore is, granted.

WHEREFORE IT IS ORDERED, ADJUDGED, AND DECREED that,

1. The Director of Human Resources of the Administrative Office of the Courts shall file a certified copy of Magistrate Samuel Biers' personnel file with the Clerk of Superior Court for Durham County within three days of this order being entered.

2. The Clerk of Superior Court for Durham County shall maintain that personnel file, and any portion thereof provided to him by Magistrate Biers' counsel, under seal.

3. The Counsel in this matter shall have the right to access the Magistrate's personnel file and make copies thereof. The Counsel may utilize the contents of the Magistrate's personnel file as necessary to properly prepare for the hearing of this matter, but any copies of the file which are not admitted into evidence shall be destroyed upon completion of these proceedings

4. The staff of the Administrative Office of the Courts may speak with counsel regarding the contents of Magistrate Biers' personnel file, the hiring and employment process in general, and as it pertains to him, and any communications they may have had with him, or actions they have taken in regards to his employment, or suspension.

This the 19th day of May, 2011.

Michael R. Morgan
Superior Court Judge, Presiding

# Appendix I

# Exhibit I-B(2)

# IN THE TE-MOAK SUPREME COURT

| | | |
|---|---|---|
| IN THE MATTER OF<br>TRIBAL RECORDS PENDING<br>FEDERAL INVESTIGATION | *<br>*<br>* | SEALED ORDER<br><br>Case No. 2021-TM-SC-S1 |

## SEALED ORDER

NOW ON THIS THE 10th day of March, 2021 the Te-Moak Supreme Court, pursuant to the Constitution of the Te-Moak Tribe of Western Shoshone Indians of Nevada, Preamble (*administer justice*), and Article 8, Section 2 and 3 that provides "[a]ll judicial powers of the Tribe shall be vested in the Judicial Branch," and "judicial power shall extend to all cases in law or equity arising under this Constitution or Tribal enactments," the Court hereby ORDERS the following:

[1] The Te-Moak Tribal Administrator and appellate judge Samuel L. Biers shall retain, possess or hold in custody any and all copies of records, documents and information, to preserve the integrity of those records, documents and information as directed by United States Department of Justice Federal Bureau of Investigations Andrew Melville and the agents of the United States Office of Inspector General-Treasury, while the federal, (and any state), agencies conduct investigations and as may be necessary to preserved the "administration of justice" and "welfare" of the Tribe and "govern the affairs of [the] Tribe." Id.

[2] When requested from this Court by a duly authorized federal or state agency, a true and correct copy of any document, record or other information shall be provided to the appropriate government agencies with jurisdiction to investigate any claim or allegation related to any OIG or state agency complaint involving the Te-Moak Tribe of Western Shoshone Indians of Nevada, including, but not limited to any current or former officer, agent, employee or representative of the Te-Moak Tribe of Western Shoshone Indians of Nevada.

[3] This Order shall remain under SEAL until such time that either the terms are completed; disclosure is necessary to prevent further unlawful, impermissible or unethical harm or injury to the Tribe, its institutions, employees, agents, representatives or offices; or release is ordered or required by a court of record with jurisdiction and disclosure of any record, document or information, including this Order shall remain at the discretion of this Court as to whether an appropriate court order is required or not under the terms expressed

herein. The SEAL is required due to the nefarious criminal actors currently employed by or representing the Te-Moak Tribe of Western Shoshone Indians of Nevada who continue to breach confidentiality policies and law of the Tribe and who are in leadership positions, exercising *ultra vires* authority attempting to subvert the Te-Moak Tribal courts and its personnel with unlawful conduct.

[4] All applicable provisions contained in the language or referenced in any Te-Moak Ordinance, Resolution and Motion related to the release, possession, custody or disclosure of records, documents or information are hereby suspended or held inapplicable as it related to the terms and conditions of this Order.

DATED THIS THE 10th DAY of March 2021 BY:

Hon. Samuel L. Biers
Te-Moak Supreme Court

# Appendix I

# Exhibit I-B(3)

IN THE TE-MOAK TRIBAL COURT
OF THE TE-MOAK TRIBE OF WESTERN SHOSHONE INDIANS OF NEVADA
TE-MOAK RESERVATION, NEVADA

TEMOAK TRIBAL COURT
DEC 28 2021
FILED

TE-MOAK TRIBAL COUNCIL,

Petitioner,

vs.

VINCENT GARCIA, CHAUNA COTA, ANGIE QUINTANA, JAY ALLISON, DANENA IKE AND SAMUEL BIERS

Respondents.

Case No: CIV-2021-0003

**COURT'S ORDER OF DECEMBER 27, 2021 GRANTING PETITIONER'S EMERGENCY TEMPORARY RESTRAINING ORDER**

NOW on this 27th day of December 2021, this matter comes before the Court upon Petitioner's request for the issuance of an Emergency Temporary Restraining Order. In the interest of safety for the Tribal members of the Te-Moak Tribe of Western Shoshone Indians of Nevada and in the interest of preserving the integrity of the Te-Moak Constitution and the Te-Moak election Ordinance, said Emergency Temporary Restraining Order is granted retaining the elected officials in office who were seated prior to the elections of October 2021, and prohibiting any person purportedly elected in the October 2021 election from being seated, from exercising the authority of the office, and from changing the locks on any Te-Moak and/or Te-Moak Band building pending an adjudication of Petitioner's request for an order for a new election for those seats involved in the October 2021 election, and a declaratory judgment that the October 2021 elections were invalid because of constitutional and statutory violations.

Hearing on this Motion for a Permanent Restraining Order is set for January 28, 2021.

IT IS SO ORDERED.

12/27/2021

WENDELL HAYES, CHIEF JUDGE

Te-Moak Tribe of Western Shoshone

# Appendix I

# Exhibit I-B(4)

**IN THE TE-MOAK TRIBAL COURT**
**OF THE TE-MOAK TRIBE OF WESTERN SHOSHONE INDIANS OF NEVADA**
**TE-MOAK RESERVATION, NEVADA**

**IN RE: TE-MOAK TRIBAL OFFICES,**

**TE-MOAK TRIBAL COUNCIL, ANGELEA MENDEZ, ALFREDA WALKER, TANYA REYNOLDS,**

**Petitioners.**

**Vs.**

**VINCENT GARCIA, CHAUNA COTA, ANGIE QUANTANTA, JAY ALLISON, DANENA IKE, AND SAMUEL BIERS NON-EMPLOYEE OCCUPANTS, OF THE TRIBAL OFFICE,**

**Respondents,**

**Case No. TM CV 01-22**

TEMOAK TRIBAL COURT
FEB 26 2022
FILED

**TEMPORARY ORDER**

After a regularly scheduled hearing on February 25, 2021, and with proper notice to all parties and after hearing testimony and arguments of the parties and having found the Te-Moak Tribal Court ("Court") has jurisdiction over the parries and subject matter, the Court hereby issues a Temporary Injunction effective immediately.

**UNTIL FURTHER ORDER OF THIS COURT IT IS ORDERED** that:

1) Defendants, Intervenors and all other persons in the Te-Moak Tribal Offices located at 525 Sunset Street, Elko, Nevada, and or at any other Te-Moak Tribal Building, who are present without permission of Te-Moak Tribal Chairman, Joseph Holley or his designee, shall leave all material and documents and equipment located within the buildings and immediately remove themselves from the Premises.

2) Defendants, Intervenors and all others who do not have the permission of Te-Moak Chairman Joseph Holley or his designee shall not come within three hundred (300) feet of the Tribal Offices except for tribal members seeking legitimate services.

3) Defendants, Intervenors and all others shall not threaten harm or harass the Plaintiffs or other tribal employees at any place, or by any means or by use of media such as Facebook,

4) Defendants and Intervenors shall inventory all contents taken out of the Tribal Offices. immediately collect and return the inventory and all contents taken out of the Te-Moak buildings to Angelea Mendez including but not limited to Te-Moak Tribal stationery, stamps, Tribal member records, financial information and enrollment records before February 25, 2022 at 5.00 p.m..

5) The Temporary Restraining Order in Te-Moak Tribal Court Case, *Te-Moak Tribal Council v Garcia et al.* CIV 2021-003 and *Mendez v Non-Employee Occupants*, Case No. PO 22 WR06 are hereby superseded.

6) Angelea Mendez, Alfreda Walker, Tanya Reynolds and all other Te-Moak employees that were employed as of December 28, 2021 shall return to work on February 28, 2022 and shall be paid for time since December 28, 2021.

7) Joseph Holley is officially recognized as the only legitimately elected Chairman of the Te-Moak Tribal Council and all restrictions imposed upon Chairman Joseph Holley and Holley's Te-Moak Tribal Council by Magistrate Harlan in *Mendez v Non-Employee Occupants*, Case No. PO 22 WR06 are null and void.

8) Chairman Joseph Holley or his designees are officially recognized as the only legal and legitimate officials to conduct Te-Moak Tribal Business with third parties including but not limited to the Nevada State Bank and all other Te-Moak related financial institutions; any and all Te-Moak related Accounting Firms including Hinton & Burtick; any and all Te-Moak related

Grants including but not limited to Section 638 Grants and any Grants on Grants.gov; any and all utilities; postal services; and all daily operations of the Te-Moak Tribe.

9) Defendants, Intervenors and all others who have not obtained the permission of Chairman Joseph Holley or his designee are strictly prohibited and restrained from all communications and conducting business with any Te-Moak related third parties in behalf of the Te-Moak Tribe including but not limited to Nevada State Bank and all other financial institutions; any and all Te-Moak related Accounting firms including Hinton & Burtick: any and all Te-Moak related Grants including but not limited to Section 638 Grants and any Grants on Grants.gov;

10) Te-Moak Tribal Council Resolution 21-TM-112, an official declaration which finds and declares "Samuel Lee Biers is not a Justice of the Te-Moak Tribal court and does not represent the Te-Moak Tribe in any capacity," is hereby acknowledge as a legal official declaration and decision of the Te-Moak Tribe , resulting in all past, present and future purported orders by Samuel Lee Biers to be declared null and void.

11) Plaintiffs, with the permission of Chairman Joseph Holley or his designees, may change locks for the Te-Moak Tribal buildings and use any other legal means to physically secure the buildings from entry by Defendants, Intervenors, and all others who have entered these buildings or wish to enter these buildings without the express permission of Chairman Joseph Holley or his designees.

12) Previous findings by the CIO Magistrate in *Mendez v Non-Employee Occupants*, Case No. PO 22 WR06 regarding election outcomes are hereby set aside.

13) All Te-Moak employment decisions since December 28, 2021 other than those made by the authority of Chairman Joseph Holley are reversed.

14) The Court finds that the United States Department of Interior Bureau of Indian Affairs Western Regional Office ("BIA") on February 9, 2022 transferred jurisdiction of the Code of Federal Regulation Courts to the Te-Moak Tribal Court.

15) The Court finds that the United States government through the BIA recognizes Wendall Hayes as Chief Judge of the Te-Moak Tribal Court.

16) The Court finds that the United States government through the BIA does not recognizes Samuel Lee Biers as a judge or judicial officer in any capacity of the Te-Moak Tribal Court.

**FURTHER** the Court finds probable cause that Vince Garcia, Danena Ike, Jay Allison, Angie Quintana, and Chauna Cota violated the Temporary Restraining Order issued in *Te-Moak Tribal Council v Garcia et al.* CIV 2021-003 and *Mendez v Non-Employee Occupants*, Case No. PO 22 WR06 and a hearing showing cause why they should not be held in contempt shall be scheduled by the Court.

**FURTHER IT IS ORDERED** that Bureau of Indian Affairs and Tribal Police shall serve all notices of these proceedings, petitions, papers, orders, and other document filed in this case and assist Plaintiffs in executing this Order including removal of Defendants, Intervenors and all others that have not obtained the permission of Chairman Joseph Holley and securing all Te-Moak Tribal Building including but not limited to the Te-Moak Administration building and the Te-Moak Diabetes Building.

**ORDERED** this 26th day of February 2022.

Te-Moak Tribal Court Chief Judge Wendell Hayes

2/24/2022

# Appendix I

# Exhibit I-B(5)(a,b)

C. ANDRES RUEDAS
Attorney-Advisor
Office of the Regional Solicitor
U.S. Department of the Interior
Suite 6201, Federal Building
125 South State Street
Salt Lake City, UT 84138
Tel: 801-239-0555, ext. 559
Fax: 801-524-4506

Attorney for the Bureau of Indian Affairs

**BEFORE THE UNITED STATES DEPARTMENT OF THE INTERIOR**
**OFFICE OF HEARINGS AND APPEALS**
**DEPARTMENTAL CASES HEARINGS DIVISION**
**HONORABLE JAMES H. HEFFERNAN**

| | | |
|---|---|---|
| IN THE MATTER OF | ) | ISDA 2017-01 |
| | ) | |
| TE-MOAK TRIBE OF WESTERN SHOSHONE | ) | Emergency Reassumption of Contract No. A15AV00203, Judicial Services |
| | ) | |
| | ) | |

**UPDATE REPORT**

By way of update and in brief response to the filing of Chairwoman Lydia Johnson, dated October 7, 2017, the undersigned, as Counsel to the Bureau of Indian Affairs (BIA), hereby submits the following:

Unless a tribal constitution states otherwise, BIA customarily considers a tribal council as having the ultimate authority to act on behalf of a tribe. The Constitution of the Te-Moak Tribe of Western Shoshone Indians of Nevada (Tribe) confirms this position. Because the Te-Moak Tribal Council (Tribal Council) has not yet officially designated a representative in this emergency reassumption of Judicial Services Contract No. A15AV00203 proceeding (Proceeding), it is our position that no single individual, Councilmember or other officer currently holds the authority to negotiate with the United States or to bind the Tribe with respect to the Proceeding. Rather, it is BIA's position that the Tribal Council as a whole retains this authority until it is officially delegated for the specific purpose of the Proceeding. For this reason, we have refrained from negotiating or seeking to resolve this matter with any single person

purporting to represent the Tribe, including individual Councilmembers or officers, and with respect to the Proceeding, we take no actions to support one party or faction over the other to the extent there is a dispute regarding the Tribe's internal governing structure. Nevertheless, as more fully explained in our Procedural Recommendations Report dated August 18, 2017, if the Tribal Council is unable to act with respect to the Proceeding, there may come a time when BIA is required to unilaterally determine a representative for purposes of negotiating the Proceeding, and such action would be supported by law. In the meantime, all filings, including certificates of service, filed on behalf of BIA are mailed to each Tribal Councilmember (as known to BIA), the Chairwoman, the Tribal Manager, and attorney Charles Zeh to ensure that all Tribal Councilmembers are aware of the any updates in the Proceeding. It is our understanding, based on filings made to this Court, that the Tribal Council is scheduled to meet on October 16, 2017, in part to address these issues. It is our hope that the Tribal Council will take appropriate action allowing this proceeding to move forward.

Dated this 16th day of October, 2017.

C. Andres Ruedas, Counsel for BIA
Department of Interior, Office of the Solicitor
Intermountain Region

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of October, 2017, the foregoing Update Report was mailed, postage prepaid to:

Honorable Lydia Johnson, Chairwoman
Te-Moak Tribe of Western Shoshone
525 Sunset Street
Elko, NV 89801
Fax: 775-738-2345

David Decker, Councilmember
Te-Moak Tribe of Western Shoshone
525 Sunset Street
Elko, NV 89801
Fax: 775-738-2345

Leta Jim, Councilmember
Te-Moak Tribe of Western Shoshone
525 Sunset Street
Elko, NV 89801
Fax: 775-738-2345

Steven Brady, Councilmember
Te-Moak Tribe of Western Shoshone
525 Sunset Street
Elko, NV 89801
Fax: 775-738-2345

Florine Maine, Councilmember
Te-Moak Tribe of Western Shoshone
525 Sunset Street
Elko, NV 89801
Fax: 775-738-2345

Gilbert Temoke, Councilmember
Te-Moak Tribe of Western Shoshone
525 Sunset Street
Elko, NV 89801
Fax: 775-738-2345

Alice Tybo, Councilmember
Te-Moak Tribe of Western Shoshone
525 Sunset Street
Elko, NV 89801
Fax: 775-738-2345

Honorable Davis Gonzales, Vice Chairman
Te-Moak Tribe of Western Shoshone
525 Sunset Street
Elko, NV 89801
Fax: 775-738-2345
Email: dgonzales1@frontiernet.net

Penny Stevens
Te-Moak Tribe of Western Shoshone
525 Sunset Street
Elko, NV 89801
Fax: 775-738-2345

Emerson Winap
Te-Moak Tribe of Western Shoshone
525 Sunset Street
Elko, NV 89801
Fax: 775-738-2345

Phaline Conklin, Tribal Administrator
Te-Moak Tribe of Western Shoshone
525 Sunset Street
Elko, NV 89801
Fax: 775-738-2345
Email: tmkadmin@elko-nv.com

Charles R. Zeh, Esq.
575 Forest Street, Suite 200
Reno, NV 89509
Email: crzeh@aol.com

Carli Brough

Carli Brough, Legal Assistant

**Settlement Agreement**

WHEREAS the Te-Moak Tribe of Western Shoshone ("Tribe") previously operated a Judicial Services Program (the "Judicial Services Program") pursuant to P.L. 93-638 Contract No. AV15AV00203 (the "Contract");

WHEREAS, by letter dated June 11, 2017, the Bureau of Indian Affairs ("BIA") effectuated an emergency reassumption of the Judicial Services Program pursuant to 25 C.F.R. § 900.252 (the "Reassumption");

WHEREAS, the Tribe is entitled to a hearing on the Reassumption under 25 C.F.R. § 900.171, and the Tribe has not waived this right.

WHEREAS, in an attempt to resolve this matter without the need for a hearing, the Parties have engaged in mediation facilitated by the Department of the Interior's Office of Hearings and Appeals and now wish to enter into this settlement agreement.

NOW THEREFORE, the Parties intending to be bound legally, hereby enter into the following Settlement Agreement ("Agreement"):

1. This Agreement is the result of the Parties compromising and settling disputed claims. Neither this Agreement nor representation made by either Party in the course of negotiating this Agreement shall constitute or be construed as an admission of liability or wrongdoing by any Party, or their employees, or agents.

2. The Tribe agrees to seek an order waiving its right to a hearing in this matter consistent with the Proposed Motion and Order attached as Exhibit A, with the Department of the Interior's Office of Hearings and Appeals regarding Case No. ISDA 2017-01, and request that the Office of Hearings and Appeals issue a decision finding that the Parties have negotiated a Settlement in lieu of a hearing and dismissing the pending appeal. Nothing herein precludes the Parties from enforcing the obligations set forth in this Settlement Agreement.

3. Following a final decision from the Office of Hearings and Appeals dismissing Case No. ISDA 2017-01, the BIA agrees to formally recognize that the Te-Moak Tribal Court, reestablished on November 23, 2020 ("Tribal Court") pursuant to Resolution No. 20-TM-129, has jurisdiction over all cases arising within the territory of the Tribe pursuant to Article 2 of the Tribal Constitution., and that the regulations establishing and governing the Court of Indian Offenses in 25 C.F.R. Part 11 no longer apply to the Tribe, as required by 25 C.F.R. 11.104, except to the extent the Tribe otherwise relies upon the regulations of 25 C.F.R. Part 11 within its law-and-order code. The Tribe asserts that it has put into effect a law-and-order code that establishes a court system and that meets the requirements of 25 C.F.R. §11.104(b) and has presented the same to the Assistant Secretary – Indian Affairs pursuant to 25 C.F.R. § 11.104(b). BIA agrees to review the Tribe's compliance with 25 C.F.R. § 11.104 and issue a

determination within 30 days following execution of this Agreement by the Tribe and BIA. If BIA determines the Tribe has not adequately complied with 25 C.F.R. § 11.104, BIA agrees to work with the Tribe in good faith and as expeditiously as reasonably possible to remedy any deficiencies. BIA's obligations under this paragraph will become effective upon a finding that the requirements of 25 C.F.R. § 11.104 have been met (the "Effective Date").

4. In order to effectuate an orderly transfer of jurisdiction contemplated under Paragraph 3, the Parties agree to work cooperatively in developing a transition plan. Pursuant to said transition plan, all new cases arising after the Effective Date will fall under the exclusive jurisdiction of the Tribal Court. Cases outstanding before the Western Regional Court of Indian Offenses as of the Effective Date will be subject to a transition plan wherein BIA, upon the Effective Date, will immediately begin a transfer of civil cases, with highest priority given to active civil cases and cases identified by the Tribe as high priority. Under said transition plan, all active civil cases and those designated by the Tribe as high priority will be transferred within 30 days of the Effective Date. All civil cases will be fully transferred within 90 days of the Effective Date, and criminal actions will be fully transferred within 180 days following the Effective Date. The Parties agree to share information and work cooperatively to ensure a timely and orderly transition of jurisdiction.

5. Following the Tribe's waiver of its right to a hearing on the Reassumption pursuant to Section 2 of this Agreement, the Tribe may submit to BIA a request for reimbursement of actual and reasonable "wind up costs" incurred after the effective date of the Reassumption, as allowed under 25 C.F.R. § 900.254. Any allowed wind up costs shall be paid from funds outstanding under the Contract.

6. Each Party to this Agreement shall bear all of its own costs, expenses, and attorney's fees for all aspects of the claims and related appeals thereof. Notwithstanding the foregoing, the Tribe may, pursuant to Section 4 of this Agreement, include costs and expenses to the extent they are reasonably related to the winding up of the Contract and Judicial Services Program.

7. This Agreement shall not constitute a precedent or argument in this or any other matter, nor shall it be used as evidence or otherwise in any pending or future civil or administrative action against or involving DOI, or its employees, representatives, or agents, or any agency or instrumentality of the Unites States, except as may be necessary to establish or clarify the Parties' respective rights and obligations under this Agreement, or to show estoppel against any future litigation in violation of this Agreement. The Parties acknowledge that negotiations underlying the Agreement are confidential and are subject to Federal Rule of Evidence 408. None of the representations made by either Party in the course of negotiating this Agreement shall be disclosed to any individual other than the Parties to this case, their attorneys, or their experts.

8. This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective predecessors, successors, agents, and assignees.

9. The terms of this Agreement shall constitute the entire settlement agreement between the Parties regarding both the final disposition of the claims and the Parties respective rights and obligations under this Agreement, and any prior oral or written statement, representation, agreement, or understanding that is not expressly contained herein, shall have no force of effect whatsoever. This Agreement shall be deemed to have been drafted jointly by the Parties, and no alleged ambiguity shall be construed against any Party as the drafter.

10. The Parties may execute this Agreement in counterparts, each of which constitutes an original and all of which constitute one and the same Agreement. A facsimile or other duplicate of a signature shall constitute an acceptable, binding signature for purposes of this Agreement.

11. For any bonds collected by the court prior to the Reassumption date, June 11, 2017, the Tribe agrees, with the cooperation of the BIA, to pay any outstanding bond owing to the bond payer. After repayment of bonds owing, any fees or fines collected prior to the Reassumption date, June 11, 2017, shall be considered "program income" under P.L. 93-638 and shall be expended by the Tribe in its discretion to further the general purposes of the Judicial Services program as required under P.L. 93-638 Section 106(m), including for costs and fees associated with negotiating this Settlement Agreement and winding down the Contract.

12. This Agreement will become effective upon execution of the Agreement by the signatories for all Parties and delivery of the fully executed Agreement to all Parties.

13. The Parties hereby declare that they have voluntarily entered into this Agreement in good faith, have read and fully understand the entire Agreement, and consider it to be a fair and reasonable settlement agreement.

14. Undersigned counsel of the Tribe certifies that the governing body of the Tribe by Resolution (attached hereto as Exhibit B), has authorized the execution of this Agreement for the Tribe, by and through its undersigned counsel. The signatory to this Agreement on behalf of DOI represents and warrants that s/he is fully authorized to enter into this Agreement on behalf of DOI.

This 27 day of July, 2021.

For the Tribe:

Joseph Holley, Chairman
Te-Moak Tribe of Western Shoshone

TE-MOAK TRIBE OF WESTERN SHOSHONE

**RESOLUTION OF THE GOVERNING BOARD
OF THE
TE-MOAK TRIBE OF WESTERN SHOSHONE INDIANS OF NEVADA**

**RESOLUTION NO. 21-TM-94**

**BE IT RESOLVED BY THE TRIBAL COUNCIL OF THE TE-MOAK TRIBE OF WESTERN SHOSHONE INDIANS OF NEVADA THAT:**

**WHEREAS,** this Organization is an Indian Organization as defined under the Indian Reorganization Act of June 18, 1934, as amended, to exercise certain rights of home rule and to be responsible for its Tribal members, and

**WHEREAS**, the Te-Moak Tribe of Western Shoshone Indians of Nevada, Tribal Council ("Council") is composed of Constituent Bands known individually as the Battle Mountain Band Council, Elko Band Council, South Fork Band Council and the Wells Band Council (collectively "Bands"); and

**WHEREAS**, the Tribal Council of the Te-Moak Tribe of Western Shoshone Indians of Nevada has sworn to promote and protect the best interest of the Te-Moak Tribe to conserve Tribal property, to develop resources and to promote the welfare of generations of the Tribe, and

**WHEREAS,** by a letter dated June 11, 2017, the Bureau of Indian Affairs ("BIA") effectuated an emergency reassumption of the Judicial Services Program pursuant to 25 C.F.R. Section 900.252 (the "Reassumption"); and

**WHEREAS,** the Tribe is entitled to a hearing on the Reassumptions under 25 C.F.R. Section 900.171, and the Tribe has not waived this right; and

**WHEREAS,** in an attempt to resolve this matter without need for a hearing, the Parties have engaged in mediation facilitated by the Department of the Interior's Office of Hearings and Appeals, and now wish to enter a Settlement Agreement to be signed by the Regional director of the Bureau of Indian Affairs, Bryan Bowker and by the Regional solicitor of the Office of the solicitor, Intermountain Region, Erik. E. Petersen, and have negotiated a Settlement in lieu of a hearing and have dismissed the pending appeal, Case No. ISDA 2017-01; and

**WHEREAS,** following the final decision from the Office of Hearing and Appeals dismissing Case No. ISDA 201-01, the BIA agrees to formally recognize that the Te-Moak Tribal Court, reestablished on November 23, 2020 ("Tribal Court"), pursuant to Resolution No. 20-TM-129, has jurisdiction over all cases arising within the territory of the Tribe pursuant to Article 2 of the Tribal Constitution, and that regulations, establishing and governing the Court of Indian Offenses in 25 C.F.R. Part 11 no longer apply to the Tribe; and

**WHEREAS,** at duly held Council Meeting on July 27, 2021, the Te-Moak Tribe of Western Shoshone Indians of Nevada, by way and through a majority vote of the Te-Moak Tribal Council, gave Chairman Joseph Holley or Vice-Chairperson Alice Tybo, in Chairman Holley's absence, full authority to approve and to sign said Settlement Agreement on behalf of the Te-Moak Tribe.

**NOW THEREFORE BE IT RESOLVED THAT,** the Te-Moak Tribe of Western Shoshone Indians of Nevada, by way and through a majority vote of the Te-Moak Council, give Chairman Joseph Holley or Vice-Chairman Alice Tybo in Chairman Holley's absence, full authority to approve and to sign said Settlement Agreement on behalf of the Te-Moak Tribe.

**C-E-R-T-I-F-I-C-A-T-I-O-N**

I, Joseph Holley, the undersigned, as Chairman of the Te-Moak Tribal Council of the Te-Moak Tribe of Western Shoshone Indians of Nevada, do hereby certify that the Te-Moak Tribal Council is composed of twelve (11) members of whom 9, were present at the Tribal Council meeting which constituted a quorum held on July 27, 2021, and the foregoing Resolution was adopted at such meeting by a **VOTE OF 5 FOR; 0 AGAINST; 2 ABSTENSIONS**, pursuant to the Authority of Article 4, Section 3 of the Constitution of the Te-Moak Tribe of Western Shoshone Indians of Nevada.

*INVALID IF NO SEAL APPEARS BELOW:*

TRIBE OF WESTERN SHOSHONE INDIANS TE-MOAK OFFICIAL TRIBAL SEAL

Joseph Holley, Chairman
Te-Moak Tribe of Western Shoshone Indians of Nevada

**ATTEST:**

Suzanna Sandoval, Tribal Council Recording Secretary

# Appendix I

# Exhibit I-C(1)

RESOLUTION OF THE GOVERNING BODY
OF THE
TE-MOAK TRIBE OF WESTERN SHOSHONE INDIANS OF NEVADA

RESOLUTION NO. 03-TM-13

BE IT RESOLVED BY THE TRIBAL COUNCIL OF THE TE-MOAK TRIBE OF WESTERN SHOSHONE INDIANS OF NEVADA, THAT

WHEREAS, this organization is an Indian organization as defined under the Indian Reorganization Act of June 18, 1934, as amended, to exercise certain rights of home rule and to be responsible for the promotion of economic and social welfare of its Tribal members, and

WHEREAS, the tribe has need of a Confidential Information Policy that protects the confidential information of Te-Moak tribal members, employees, and others, contained in tribal program records, and

WHEREAS, the tribal records are to be kept as accurate, relevant, timely and complete as possible, and

WHEREAS, tribal members should have the opportunity to request amendments on personal records which are believed to be inaccurate or untrue, and

WHEREAS, tribal members should have the right to litigation to resolve the problem, and

WHEREAS, persons with the "need to know" require limited, relevant confidential information to perform job duties, and

WHEREAS, criminal penalties are needed to prevent misuse of confidential information from tribal members; employees; or other persons records; and from other confidential material contained in the Te-Moak Tribal office's files.

NOW, THEREFORE BE IT RESOLVED, that the Te-Moak Tribal Council hereby approves the attached Te-Moak Tribe Confidential Information Policy & Procedures.

**C-E-R-T-I-F-I-C-A-T-I-O-N**

I, the undersigned, as Chairman of the Te-Moak Council of the Te-Moak Tribe of Western Shoshone Indians of Nevada, do hereby certify that the Te-Moak Western Shoshone Council is composed of **9** members of whom **7** constituting a quorum were present at a duly held meeting on the **2nd day of JULY, 2003** and that the foregoing resolution was duly adopted at such meeting by a vote of **4 FOR; 1 AGAINST; 1 ABSTENTIONS**, pursuant to Article 4, Section 3 (n) of the Constitution of the Te-Moak Tribe of Western Shoshone Indians of Nevada.

FELIX IKE, Chairman
Te-Moak Western Shoshone Council

ATTEST:

Recording Secretary
Te-Moak Western Shoshone Council

APPROVED

## CONFIDENTIAL INFORMATION POLICY & PROCEDURES OF THE TE-MOAK TRIBE

This Confidential Policy shall be to provide protection from the misuse of confidential information contained in the files of the Te-Moak Tribe.

The Te-Moak Tribal Council, Te-Moak Programs and Committees, and other organizations or agencies that have the "need to know" to perform job duties on a "routine use" basis shall be provided limited confidential information relevant to each program upon written request. This policy establishes the officials, programs, committees, and other organizations or agencies that are authorized to request such information in other to provide services to the tribe.

### SECTION 1 - THE SCOPE OF THE TE-MOAK TRIBE CONFIDENTIAL POLICY

A. This Te-Moak Tribe Confidential Policy provides safeguards against an invasion of privacy from the misuse of information contained in the Te-Moak Tribal Council or Tribal Programs files, by the Te-Moak Tribal Council (TTC); Te-Moak Committees; Tribal Employees, or others who may have access to such records or who are authorized to request information from those records.

### SECTION 2 - PERSONS/AGENCIES AUTHORIZED TO REQUEST INFORMATION

A. Request for Information. An individual may not make a request for information from another person's records or request access to another person's records. The subject of the record can only make a request for information from a person's file. The request must be in typed or written form, and signed by the requester.

### SECTION 3 - EXCEPTION – PERSONS/AGENCIES AUTHORIZED TO REQUEST INFORMATION

A. Exceptions. Requests must be typed or written, dated, and signed by the requester. The request must include the requester's current address and should include the requester's telephone number. Persons/Agencies authorized to request information.

1. A parent or legal guardian can request information for a minor or a person who has been declared incompetent.

2. The Te-Moak Tribal Council Chairman/Chairwoman is authorized to request:

   a. Statistics information to develop proposals for grant/contract programs that benefit the Te-Moak tribal members.
   b. Information relevant to Te-Moak tribal enrollment for the Te-Moak Tribal Council to determine the eligibility of individuals to receive any Indian Programs/tribal benefits.
   c. Information for the Te-Moak Tribal Council to resolve tribal election challenge appeals.
   d. Relevant information to determine eligibility for lot assignments and housing on the Te-Moak Colonies and Reservations.
   e. Information from Tribal Programs for the Te-Moak Tribal Council to resolve other problems.

3. The Indian Health Services (I.H.S.) and Tribal Health Centers for certifications of Te-Moak Tribal members/descendants to prove eligibility for direct/contract health care.

4. The Bureau of Indian Affairs (B.I.A.) and Indian Health Services (I.H.S.) for verification of eligibility for Indian Preference Employment.

5. The B.I.A. for verification of eligibility for higher education grants and other B.I.A. benefits.

6. The Te-Moak Judicial Services is authorized to request names and addresses of Te-Moak members/descendants, in order to perform court duties.

7. The Te-Moak Enrollment Coordinator shall be authorized to:

   a. Exchange enrollment information with other tribes or agencies to correct and update the Te-Moak Tribal Base and Membership Rolls.
   b. Provide names, birthdates, and other information – when applicable – to tribes or agencies as proof of eligibility to receive Indian benefits.

8. The Band/Tribal Election Committee is authorized to request names and address of valid tribal voters in addition to the Eligible Voters List, before elections.

9. Other legitimate Te-Moak Committees shall be authorized to request limited, relevant information in order to perform its duties.

10. The Indian Child Welfare Act (ICWA) Program is authorized to request relevant information from other programs for routine use to perform duties.

11. The Community Health Representative (CHR) is authorized to request relevant information from other programs for routine use to perform duties.

12. The Alcohol & Drug Abuse Program is authorized to request relevant information from other programs for routine use to perform duties.

13. The Education Program (Higher Ed, AVT and JOM) is authorized to request relevant information from other programs for routine use to perform duties related to the education assistance program.

14. Other Agencies/Programs to verify the eligibility of Te-Moak members to receive benefits from such programs.

## SECTION 4 - SPECIFIC EXEMPTIONS

A. Specific Exemptions under the Confidential Policy.

1. Record system required by statute to be used solely as statistical records.

2. Medical Records. The Community Health Representative (CHR) or tribal health care worker may deny individuals direct access to records, including psychological records, if it is deemed necessary. However, the health care

worker can arrange for disclosure to a physician or other person chosen by the client.

3. Litigation Records. There shall be a general limitation on access to litigation records. The Tribal Judiciary that has jurisdiction over the Te-Moak Tribe shall not disclose to any individual any information compiled in reasonable anticipation of a civil action or proceeding.

4. Financial Records. Disclosure of program personnel finances shall not be disclosed to any individual. The Te-Moak Tribal Council shall have closed door meetings to determine personnel cost-of-living/pay raises or other job related benefits. The information contained in these records shall be confidential.

5. Personal information shall be exempt from disclosure, to protect important confidential information of the tribal members/employees – except by written authorization from the individual concerned.

## SECTION 5 - RELEASE OF INFORMATION

A. The Te-Moak Tribal Council; Te-Moak Program staff; Te-Moak Committees and other responsible for keeping tribal records and other confidential records are authorized to release limited, relevant information to persons and agencies that have the "need to know" for routine use in accomplishing their job duties.

1. Additional relevant information required to accomplish work assignments shall be provided to the authorized person, tribe, committee, or agency.

2. The request must be typed or written, dated, and signed by the requester.

3. The requester should include a telephone number in the information request.

## SECTION 6 - REQUEST TO AMEND A RECORD

A. A member shall be allowed to request a correction of a record that is not accurate, relevant, timely, or complete. This remedy allows a member to correct errors and to prevent those errors from being disseminated by the tribe or used unfairly against the tribal member.

1. A member can only correct errors in a record that pertains to him or herself.

2. Documents of proof to correct errors shall be provided to the appropriated tribal program for administrative action.

3. Records about unrelated events or about other people cannot be amended unless the records are in a file under the name of the person who is seeking to make the correction.

4. The request must be typed or written form, dated, and signed by the requester. It shall be addressed to the appropriate Te-Moak program, or to the official responsible for maintaining records containing the erroneous information.

5. Requester's telephone number should be included, to clarify any questions about the request. This will prevent delays in resolving the matter.

6. The envelope must be marked **"Te-Moak Confidential Policy Amendment Request"** on the lower left corner.

B. There are five basic elements to request for amending a person's record.

1. It should clearly state it is a request to amend a record under the Te-Moak Confidential Policy.

2. It should identify the specific record and the specific information in the record for which an amendment is being sought.

3. It should state why the information is not accurate, relevant, timely, or complete. Supporting evidence should be included in the amendment request.

4. It should state what new or additional information should be included in place of the erroneous information. Evidence of the validity of information should be included with the request to amend a member's record.

5. If the information in the file is wrong and needs to be removed rather than added to, or corrected, the amendment request should make that fact clear.

SECTION 7 - APPEAL PROCEURES FOR DENIAL OF INFORMATION

A. Appeal Procedures for Denial of Information. If an initial request for information or amendment request is denied, the denial may be appealed without going to court. An appeal letter should contain the following:

1. The letter should be typed or in writing, dated, signed, and addressed to the appropriate Te-Moak Program.

2. It shall state the denial being appealed: the information that was withheld; or amendment denied, and explains why the denial was improper or unnecessary.

3. The requester's name and address must be included. A telephone number should be included to obtain information to clarify any questions on the appeal letter, and to avoid any delays in resolving the appeal.

B. Appeals and Requirements for Te-Moak Program Responses. The appropriated Te-Moak Program must acknowledge receipt of a Te-Moak Confidential Policy request within twenty (20 working days; and must rule promptly on the request.

1. The Te-Moak Program may disclose the information, in completely or in part, or make the requested amendment. If an amendment is approved, it must notify any person, other tribe, or agency, which has the previous information, of any corrections.

2. If the Te-Moak Program refuses to disclose the requested information or make the requested change, it must inform the requester:

(1) Of the Te-Moak Program's refusal to disclose information or amend the record.
(2) The reasons for refusing to disclose the information or amend the record.
(3) Of the procedures to request a review of the denial.
(4) The tribe must provide the name and business address of the officials responsible for conducting the review.

C. Appeal of Denial to the Te-Moak Tribal Council. If information requested, or a Te-Moak Program denies amendment to a person's file, the member may appeal the decision to the Te-Moak Tribal Council.

1. The letter must be typed or written, dated, signed, and addressed to the Te-Moak Tribal Council.

2. The Te-Moak Tribal Council must decide an appeal of denial within thirty working days unless the Te-Moak Tribal Council for good cause extends the time. If the appeal is granted, the information shall be disclosed - in whole or in part - or the record will be corrected.

3. If appeal is denied, the person must be told of the right to judicial review.

4. A requester also has the right to place a concise statement of disagreement in the tribal file with information that was in the amendment request. When a statement of disagreement has been filed and the tribe is disclosing the disputed information, the tribe must make the information and provide copies of statement of disagreement. It must also give a copy of the statement of disagreement to any person or agency to which the record had previously been disclosed. The Te-Moak Tribal Council may include a concise statement of its own reasons for not making the requested amendment.

D. Filing a Judicial Appeal. The following civil remedy shall apply whenever the tribe denies a request for information from a record or refuses to amend a record.

1. An individual may file a Judicial Appeal with the Te-Moak Court of Indian Offences.

   a. The appeal will be to contest the denial of a request from information from an individual's record, or the denial to amend a record to assure the accuracy, relevance, timeliness, and completeness of the record.
   b. Accurate records are necessary to assure fairness in Te-Moak Tribal Council decisions and when the Te-Moak Tribal Council makes decisions that may be adverse to the individual.

2. The appeal must be typed or in writing, dated, signed, and filed within thirty working days after the date on the letter of denial from the Te-Moak Tribal Council.

3. The Te-Moak Court of Indian Offences decision will be final.

## PART 8 – SECURITY OF CONFIDENTIAL INFORMATION

A. Security. The Te-Moak Tribal Council and Tribal Administrative Staff shall safeguard confidential records by implementing the following procedures:

1. Lock the material in file cabinets and post with Warning Notices of Penalties.
2. Confidential materials should not be left out in the open for anyone without the "need to know" to read.
3. Computer Data should be protected by use of access codes.
4. Access codes should be changed periodically, and when personnel changes.
5. Log off, or darken the screen if interrupted for short periods.
6. Turn computer off – if not needed, or if not needed for very long intervals.
7. Locate monitor where unauthorized persons, or turn monitor at an angle away from unauthorized viewers cannot view the screen.
8. Administrators and staff should not casually discuss sensitive information that may be overheard by persons without the "need to know".
9. Assure that unauthorized people does not hear telephone conversations.
10. Telephone requests – disclose information only if you know the person, and only if the requester has the "need to know" for routine use in job duties.
11. If a telephone request is for another staff person who is out of the office, do not give out information; take a message for that staff person.
12. Include fax cover confidentiality statement and criminal penalties, in case the document is sent to the incorrect fax number/address.
13. Do not leave confidential material on fax machine where unauthorized persons can view it.
14. Only a copy of an edited document approved for dissemination should be provided to the requester, as words or names, on the actual copy that has been edited, can sometimes be seen when held up to a light source.
15. Implement other safeguards related to security of confidential material.

## PART 9 – EXEMPTION EXCEPTIONS

A. Exceptions to Exemptions. Some tribal records are exempt from the disclosure requirements, but no records are exempt from all Te-Moak Confidential Policy requirements. Exceptions to Exemptions shall be:

1. No tribal records can be exempted from the limitations on disclosure of the records outside of the Te-Moak Tribe.

2. No tribal records are exempt from the requirement to maintain an accounting for disclosures.

3. No tribal records are exempt from the restriction against the maintenance of unauthorized information on the exercise of First Amendment rights.

4. All tribal records are subject to the requirements that reasonable efforts be taken to assure that records disclosed outside the Te-Moak Tribe be accurate, complete, timely, and relevant.

5. The Te-Moak Tribe must maintain proper administrative controls and security for all tribal program records.

6. The criminal penalties remain fully applicable to all tribal program records.

## PART 10 – RETENTION & DISPOSAL OF CONFIDENTIAL MATERIAL

A. Disposal of confidential records/material. Worksheets; preliminary drafts; tribal archives material kept beyond retention requirements and determined by the tribal governing body to be no longer needed for future use/reference purposes; and other outdated/superceded documents shall be physically destroyed by shredding or burning the material.

1. The Te-Moak Tribal Council decides what documents shall be stored in the tribal archives.

2. The Te-Moak Tribal Council decides what documents to retain future reference/use.

3. The Te-Moak Tribal Council decides what documents/records are to be physically destroyed.

## PART 11 – CRIMINAL VIOLATIONS AND PENALTIES

A. Violations. Criminal violations of this Te-Moak Tribe Confidential Policy are:

1. It is a crime to knowingly and willfully misuse confidential information from under the Te-Moak Tribe Confidential Policy under false pretenses.

2. It is a crime knowingly and willfully misuses confidential information from the tribal records that adversely affect a tribal member or employee.

3. It is a crime knowingly and willfully misuses information from tribal records that adversely affect tribal programs and harm the tribe.

4. It is a crime to remove any records or tribal program material from the tribal building or offices without the official consent of the Tribal Chairperson and/or a Tribal Council quorum.

   a. Employees own time sheet copies and other personal items may be taken home.

B. Penalties. Criminal penalties for the above violations shall be up to a five thousand-dollar ($5,000.00) fine and/or up to six months in jail.

# Appendix I

# Exhibit I-C(2)

# ELKO BAND COUNCIL

**RESOLUTION OF THE GOVERNING BODY OF THE ELKO BAND COUNCIL**

**Resolution No. 2020-EBC-48**

**BE IT RESOLVED BY THE ELKO BAND COUNCIL, that**

**WHEREAS,** this organization is an Indian Organization known as the Elko Band Council as defined under the Indian Reorganization Act of June 1934, as amended, to exercise certain rights of home rule and to promote economic and the social welfare of its Tribal members; and

**WHEREAS,** the Elko Band Council is a Constituent Band of the Te-Moak Tribe of Western Shoshone Indians of Nevada, and is the governing body of the Elko Indian Colony; and

**WHEREAS,** the Elko Band Council has the obligation to protect and preserve the safety, welfare, and properties associated with the Elko Indian Colony members; and

**WHEREAS,** the purpose of this resolution is to resolve existing areas of conflict between the Elko Band Council and the Te-Moak Council in mutually beneficial ways that advance the betterment and interests of all members of the Te-Moak Tribe.

**WHEREAS,** the Te-Moak Tribe and each of its four constituent Bands (Elko, Battle Mountain, South Fork and Wells) are best served by having an independent judiciary, strong lobbying and government relations teams nationally and in Nevada, and by promoting economic development and job creation within all Bands. Cooperation promotes the strength of the entire Tribe.

**WHEREAS,** the Elko Band Council understands that Te-Moak Council will agree to the following:

- Passing a resolution authorizing attorneys Scott Sypolt and Darian Stanford to draft revisions to the Te-Moak Constitution, including but not limited to the following:
    - Clarifying the respective powers of Te-Moak Council and the Band Councils;
    - Removing or revising language referencing federal law;
    - Revising language about the composition of Te-Moak Council;
- Passing a resolution or ordinance officially affirming the continuing validity of all Elko Band business enterprises and agreeing to cooperate with Elko in defeating any and all challenges to such business enterprises;

/////

- Passing an ordinance imposing a general band business tax of five percent (5%) of revenues applicable to all business enterprises of the four Te-Moak bands. Such tax shall be collected quarterly and paid exclusively to Te-Moak;

- Using revenues to establish an independent judicial system, independent law enforcement and strong lobbying and government relations teams nationally and in Nevada;

- Temporarily creating a "Bank Account Commission," to be disbanded after six months, consisting of attorney Scott Sypolt, attorney Darian Stanford, Te-Moak Chair Joe Holley, an Elko Band Council representative on Te-Moak, and the certified public accountants for Te-Moak and Elko charged with reviewing the respective publicly available bank accounts for Te-Moak and Elko and, in good faith, produce a report with findings about such accounts.

**WHEREAS,** the Elko Band hereby agrees to the following:

- Ownership and control of four buildings on the Lower Colony shall be as follows:
  - The Te-Moak Administration Building, 525 Sunset, is and remains the exclusive property of Te-Moak;
  - The Diabetes Building, 511 Sunset, shall be jointly used by Te-Moak and Elko for six months following the date of this Resolution. After six months, the Diabetes Building shall be the property of Te-Moak;
    - Effective immediately, Elko will stop charging Te-Moak for rent for the Diabetes Building;
    - Existing revenues allocated by Te-Moak for rent for the Diabetes Building shall be disbursed consistent with the actions of the Te-Moak Council on October 13, 2020;
  - The Housing Building, 504 Sunset, is not the property of Elko;
  - The Maintenance Shed shall be jointly used by Elko and Te-Moak for six months from the date of this Resolution. After six months, the Maintenance Shed shall be the property of Te-Moak;
- Until December 31, 2021, the Te-Moak Council will consist of twelve members: 4 from Elko, 4 from Battle Mountain, 2 from Wells, 2 from South Fork. After December 31, 2021, the Te-Moak Council will consist of eight members: 2 from Elko, 2 from Battle Mountain, 2 from Wells, 2 from South Fork;
- Elko will withdraw its lawsuit challenging the apportionment of the Te-Moak Council;
- Elko Band Council agrees to the Bank Account Commission and will cooperate in good faith with the findings and recommendations produced therein.

**NOW THEREFORE, BE IT RESOLVED,** that this resolution shall remain in effect for the duration of Elko Band's Compact with the State of Nevada.

**C-E-R-T-I-F-I-C-A-T-I-O-N**

I, the undersigned, as Chairman of the Elko Band Council do hereby certify that the Elko Band Council is composed of 7 members of whom 6 constituted a quorum were present at a duly held meeting on the 14th day of October, 2020, and that the foregoing resolution was duly adopted at such meeting by a **VOTE OF 5 FOR, 1 AGAINST, 0 ABSTENTIONS**, pursuant to the authority contained in Article 4, Section 12, of the Constitution of the Te-Moak Tribe of Western Shoshone Indians of Nevada.

Davis Gonzales, Chairman
ELKO BAND COUNCIL

**ATTESTED:**

Wiona Smart, Recording Secretary

# Appendix I

# Exhibit I-C(3)

TE-MOAK TRIBE OF WESTERN SHOSHONE

# TE-MOAK TRIBE OF WESTERN SHOSHONE

## RESOLUTION OF THE GOVERNING BODY OF THE TE-MOAK TRIBE OF WESTERN SHOSHONE INDIANS OF NEVADA

RESOLUTION NO. 20-TM-129

**BE IT RESOLVED BY THE TRIBAL COUNCIL OF THE TE-MOAK TRIBE OF WESTERN SHOSHONE INDIANS OF NEVADA, THAT:**

**WHEREAS**, this Organization is an Indian Organization as defined under the Indian Reorganization Act of June 18, 1934, 25 U.S.C. Section 461 et seq., (as amended), to exercise certain rights of home rule and to be responsible for its Tribal members; and

**WHEREAS,** the Te-Moak Tribe of Western Shoshone Tribal Council ("Council") is composed of Constituent Bands known individually as the Battle Mountain Band Council, the Elko Band Council, the South Fork Band Council and the Wells Band Council (collectively, "Bands"); and authority over its lands and people, as established by the Constitution of the United States, Article I, Section 2, cl. 3; Article I, Section 8 and the Fourteenth Amendment, Section 2; United States v. Mazurie, 419 U.S. 544, 557 (1975), ("Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory…[as] 'separate people' possessing 'the power of regulating their internal and social relations…" (citing and quoting Worcester v. Georgia, 31 U.S. 557 (1832); U.S. v. Kagama, 118 U.S. 375, 381-82 (1886) and McClanahan v. Arizona State Tax Comm'n, 411 U.S. 164, 173 (1973); the Constitution of the Te-Moak Tribe of Western Shoshone Indians of Nevada; and 25 U.S.C. Section 1301 et of the seq., (affirming the constitutional rights of Native Americans and the recognition of the United States regarding Native American tribal "powers of self-government" to include "all governmental powers possessed by an Indian tribe, executive, legislative and judicial and all offices, bodies and tribunals by and through which they are executed, including Courts of Indian Offenses," and "Indian Court" means any Indian tribal court or court of Indian offense"); and

**WHEREAS,** pursuant to the Constitution of the Te-Moak Tribe of Western Shoshone Indians of Nevada, Article 4, section 3 (j), (k) and (n), the Council retains the sovereign authority to promote and protect the health, safety and welfare of the Tribe, its members and all persons within the Tribe's jurisdiction and the Council retains authority to promulgate resolutions that are "necessary and proper for carrying into effect" the

Council's authority to "regulate all administrative and legislative bodies of the Tribe, Tribal agencies, officers and organizations,"; and

**WHEREAS**, the Preamble of the Constitution of the Te-Moak Tribe of Western Shoshone Indians of Nevada sets forth the purpose behind the Constitution as necessary "to improve the governing structure… administer justice… and otherwise govern the affairs of this Tribe"; and

**WHEREAS,** Article 4, Section 3(n) of the Te-Moak Constitution gives the Te-Moak Tribal Council the power to enact all ordinances and resolutions which shall be necessary and proper for carrying into effect the foregoing powers; and

**WHEREAS**, Article 8, Section 1 of the Te-Moak Constitution states that there shall be a court of general jurisdiction and a Supreme Court of appellate jurisdiction; and

**WHEREAS**, Article 8, Section 4 of the Te-Moak Constitution provides for the Te-Moak Tribal Council to appoint judges for both Tribal Courts (general and appellate) for six (6) year terms; and

**WHEREAS**, the Te-Moak Tribe of Western Shoshone Indians of Nevada intends to resume operation of its Tribal Court and replace the Court of Indian Offenses currently exercising jurisdiction over areas of Indian Country with the Te-Moak Tribe's jurisdiction; and

**WHEREAS**, at a duly held meeting on November 23, 2020, the Te-Moak Tribe of Western Shoshone Indians of Nevada, by way and through the Te-Moak Council, approved adoption of an existing Te-Moak Law and Order Code and approved establishing a Te-Moak Tribal Court of General jurisdiction and a Te-Moak Supreme Court of Appellate jurisdiction thereby immediately withdrawing the Te-Moak Tribe of Western Shoshone Indians of Nevada from the jurisdiction of the Court of Indian Offenses.

**NOW THEREFORE BE IT RESOLVED,** that the Te-Moak Tribe of Western Shoshone Indians of Nevada hereby exercises its status as a sovereign nation and consistent with Article 8 and Article 4, Section 3(n) of the Te-Moak Constitution, adopts use of a Te-Moak Law and Order Code that is and remains in effect and approves reestablishment of a Te-Moak Tribal Court of General Jurisdiction and a Te-Moak Supreme Court of Appellate Jurisdiction and withdraws the Tribe from the jurisdiction of the Court of Indian Offenses. This Resolution is effective immediately and stays all pending cases involving the Te-Moak Tribal Council, the four Constituent Te-Moak Bands and all Tribal members of the Te-Moak Tribe presently before the Court of Indian Offenses.

Fw: REVISED RESOLUTION

From: Te Moak Administrator (te.moak.adm@outlook.com)

To: sambiers@yahoo.com

Date: Friday, March 26, 2021, 05:47 AM PDT

**From:** Sypolt, Scott <scott.sypolt@dentons.com>
**Sent:** Tuesday, November 24, 2020 3:19 PM
**To:** Te.Moak.Adm@outlook.com <Te.Moak.Adm@outlook.com>
**Cc:** jhchairman1@yahoo.com <jhchairman1@yahoo.com>; Sypolt, Scott <scott.sypolt@dentons.com>
**Subject:** REVISED RESOLUTION

大成 DENTONS Scott Sypolt

Visit the **New Dynamic Hub**, available to our clients and communities as part of the commitment that Dentons, the world's largest law firm, is making across 75+ countries, to address accelerating change resulting from the pandemic.

D +1 312 876 8184 | US Internal 18184
scott.sypolt@dentons.com
Bio | Website

Dentons US LLP

Durham Jones & Pinegar > LEAD Advogados > Rattagan Macchiavello Arocena > Jiménez de Aréchaga, Viana & Brause > Lee International > Kensington Swan > Bingham Greenebaum > Cohen & Grigsby > Sayarh & Menjra > Larraín Rencoret > For more information on the firms that have come together to form Dentons, go to dentons.com/legacyfirms

Dentons is a global legal practice providing client services worldwide through its member firms and affiliates. This email may be confidential and protected by legal privilege. If you are not the intended recipient, disclosure, copying, distribution and use are prohibited; please notify us immediately and delete this copy from your system. Please see dentons.com for Legal Notices.

115944833_1.pdf
137.2kB

# TE-MOAK TRIBE OF WESTERN SHOSHONE

## RESOLUTION OF THE GOVERNING BODY OF THE TE-MOAK TRIBE OF WESTERN SHOSHONE INDIANS OF NEVADA

RESOLUTION NO. 20-TM-129

**BE IT RESOLVED BY THE TRIBAL COUNCIL OF THE TE-MOAK TRIBE OF WESTERN SHOSHONE INDIANS OF NEVADA, THAT:**

**WHEREAS,** this Organization is an Indian Organization as defined under the Indian Reorganization Act of June 18, 1934, 25 U.S.C. Section 461 et seq., (as amended), to exercise certain rights of home rule and to be responsible for its Tribal members; and

**WHEREAS,** the Te-Moak Tribe of Western Shoshone Tribal Council ("Council") is composed of Constituent Bands known individually as the Battle Mountain Band Council, the Elko Band Council, the South Fork Band Council and the Wells Band Council (collectively, "Bands"); and authority over its lands and people, as established by the Constitution of the United States, Article I, Section 2, cl. 3; Article I, Section 8 and the Fourteenth Amendment, Section 2; United States v. Mazurie, 419 U.S. 544, 557 (1975), ("Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory…[as] 'separate people' possessing 'the power of regulating their internal and social relations…" (citing and quoting Worcester v. Georgia, 31 U.S. 557 (1832); U.S. v. Kagama, 118 U.S. 375, 381-82 (1886) and McClanahan v. Arizona State Tax Comm'n, 411 U.S. 164, 173 (1973); the Constitution of the Te-Moak Tribe of Western Shoshone Indians of Nevada; and 25 U.S.C. Section 1301 et of the seq., (affirming the constitutional rights of Native Americans and the recognition of the United States regarding Native American tribal "powers of self-government" to include "all governmental powers possessed by an Indian tribe, executive, legislative and judicial and all offices, bodies and tribunals by and through which they are executed, including Courts of Indian Offenses," and "Indian Court" means any Indian tribal court or court of Indian offense"); and

**WHEREAS,** pursuant to the Constitution of the Te-Moak Tribe of Western Shoshone Indians of Nevada, Article 4, section 3 (j), (k) and (n), the Council retains the sovereign authority to promote and protect the health, safety and welfare of the Tribe, its members and all persons within the Tribe's jurisdiction and the Council retains authority to promulgate resolutions that are "necessary and proper for carrying into effect" the

Council's authority to "regulate all administrative and legislative bodies of the Tribe, Tribal agencies, officers and organizations,"; and

**WHEREAS**, the Preamble of the Constitution of the Te-Moak Tribe of Western Shoshone Indians of Nevada sets forth the purpose behind the Constitution as necessary "to improve the governing structure… administer justice… and otherwise govern the affairs of this Tribe"; and

**WHEREAS,** Article 4, Section 3(n) of the Te-Moak Constitution gives the Te-Moak Tribal Council the power to enact all ordinances and resolutions which shall be necessary and proper for carrying into effect the foregoing powers; and

**WHEREAS**, Article 8, Section 1 of the Te-Moak Constitution states that there shall be a court of general jurisdiction and a Supreme Court of appellate jurisdiction; and

**WHEREAS**, Article 8, Section 4 of the Te-Moak Constitution provides for the Te-Moak Tribal Council to appoint judges for both Tribal Courts (general and appellate) for six (6) year terms; and

**WHEREAS**, the Te-Moak Tribe of Western Shoshone Indians of Nevada intends to resume operation of its Tribal Court and replace the Court of Indian Offenses currently exercising jurisdiction over areas of Indian Country with the Te-Moak Tribe's jurisdiction; and

**WHEREAS**, at a duly held meeting on November 23, 2020, the Te-Moak Tribe of Western Shoshone Indians of Nevada, by way and through the Te-Moak Council, approved adoption of an existing Te-Moak Law and Order Code and approved establishing a Te-Moak Tribal Court of General jurisdiction and a Te-Moak Supreme Court of Appellate jurisdiction thereby immediately withdrawing the Te-Moak Tribe of Western Shoshone Indians of Nevada from the jurisdiction of the Court of Indian Offenses.

**NOW THEREFORE BE IT RESOLVED,** that the Te-Moak Tribe of Western Shoshone Indians of Nevada hereby exercises its status as a sovereign nation and consistent with Article 8 and Article 4, Section 3(n) of the Te-Moak Constitution, adopts use of a Te-Moak Law and Order Code that is and remains in effect and approves reestablishment of a Te-Moak Tribal Court of General Jurisdiction and a Te-Moak Supreme Court of Appellate Jurisdiction and withdraws the Tribe from the jurisdiction of the Court of Indian Offenses. This Resolution is effective immediately and stays all pending cases involving the Te-Moak Tribal Council, the four Constituent Te-Moak Bands and all Tribal members of the Te-Moak Tribe presently before the Court of Indian Offenses.

**CERTIFICATION**

I, the undersigned, as Chairperson of the Tribal Council of the Te-Moak Tribe of Western Shoshone Indians of Nevada do hereby certify that the Te-Moak Western Shoshone Council is composed of 12 members of whom 9 constituting a quorum were present at a duly held meeting on the 23rd day of November, 2020, and that the foregoing Resolution was duly adopted at such meeting by an affirmative vote of 6 FOR , 0 AGAINST, 2 ABSTENTIONS, pursuant to the authority contained in Article 4, Section 3(j), (k) and (n) and Article 8 of the Constitution of the Te-Moak Tribe of Western Shoshone Indians of Nevada.

*INVALID IF NO SEAL APPEARS BELOW:*

______________________________

Joseph Holley, Chairman
Te-Moak Tribe of Western Shoshone

ATTEST:

______________________________

Colby Boykin, Recording Secretary

# Appendix I

# Exhibit I-C(4)

TE-MOAK TRIBE OF WESTERN SHOSHONE

# TE-MOAK TRIBE OF WESTERN SHOSHONE

## RESOLUTION OF THE GOVERNING BODY OF THE TE-MOAK TRIBE OF THE WESTERN SHOSHONE INDIANS OF NEVADA

**Adopting Records and Information Retention Policy** **RESOLUTION NO. 20-TM-132**

**BE IT RESOLVED BY THE TRIBAL COUNCIL OF THE TE-MOAK TRIBE OF WESTERN SHOSHONE INDIANS OF NEVADA, THAT:**

**WHEREAS,** this Organization is an Indian Organization as defined under the Indian Reorganization Act of June 18,1934, 25 U.S.C. Section 461 et seq., (as amended), to exercise certain rights certain rights of home rule and to be responsible for its Tribal Members; **and**

**WHEREAS,** the Te-Moak Tribe of Western Shoshone Tribal Council ("Council") is composed of the Constituent Bands known individually as the Battle Mountain Band Council, the South Fork Band Council, and the Wells Band Council (collectively, "Bands");

**WHEREAS,** the Te-Moak Tribe of Western Shoshone Indians of Nevada retains the inherent right to govern itself and exercise sovereign authority over its lands and people as established by the Constitution of the United States, Article 1, Section 2, cl. 3; Article 1 Section 8 and the Fourteenth Amendment, Section 2; United Sates v. Mazurie, 419 U.S. 544, 557 (1975), *("Indian Tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory... [as] 'separate people' possessing the power of regulating their internal and social relations'... ")* (citing and quoting Worcester v Georgia, 31 U.S. 557 (1832); U.S. v. Kagama, 118 U.S. 375, 381-82 (1886) and McClanahan v. Arizona State Tax Comm'n, 411 U.S. 164,173 (1973); the Constitution of the Te-Moak Tribe of Western Shoshone Indians of Nevada; and the 25 U.S.C. Section 1301 et of the seq., *("affirming the constitutional rights of Native Americans and the recognition of the United States regarding Native American Tribal "powers of self-government" to include "all governmental powers possessed by an Indian Tribe, executive, legislative and judicial and all offices, bodies and tribunals by and though which they are executed, including Courts of Indian Offenses," and "Indian Court" means and Indian Tribal Court or Court of Indian Offense");* **and**

**WHEREAS,** pursuant to the Constitution of the Te-Moak Tribe of Western Shoshone Indians of Nevada, Art. 4, sec. 3 (j), (k) and (n), the Council retains the sovereign authority "[t]o promote and protect the health, safety, and welfare of the Tribe, its members and all persons within the Tribe's jurisdiction," the Council retains the authority "[t]o promulgate resolution that are "necessary and proper for carrying into effect," the Council's authority "[t]o regulate all administrative and legislative bodies of the Tribe, Tribal agencies, officers and organizations;" **and**

**WHEREAS,** the Preamble of the Constitution of the Te-Moak Tribe of Western Shoshone Indians of Nevada sets forth the purpose behind the Constitution as necessary "to improve the governing structure…administer justice… and otherwise govern the affairs of this Tribe;" **and**

**WHEREAS,** at a duly held meeting on December 2, 2020, the Te-Moak Tribe of Western Shoshone Indians of Nevada Tribal Council, by way of unanimous vote, adopts the Te-Moak Records and Information Retention Policy.

**THEREFORE BE IT RESOLVED,** the Te-Moak Tribe of Western Shoshone Indians of Nevada Tribal Council hereby adopts, by Resolution 20-TM-132, the Te-Moak Records and Information Retention Policy.

**C-E-R-T-I-F-I-C-A-T-I-O-N**

I, Joseph Holley, the undersigned Chairman of the Te-Moak Tribal Council of the Te-Moak Tribe of Western Shoshone Indians of Nevada, do hereby certify the Tribal Council is composed of **(12)** members of whom 7 were present at the meeting which constituted a quorum held **December 2, 2020,** and the foregoing Resolution was adopted at such meeting by a unanimous vote of 6 **FOR,** 0 **AGAINST,** 0 **ABSTENTION** pursuant to the authority of Article 4, Section 3 of the Constitution of the Te-Moak Tribe of Western Shoshone Indians of Nevada.

INVALID IF NO SEAL APPEARS BELOW

Joseph Holley, Chairman
Te-Moak Tribe of Western Shoshone

**ATTEST:**

Colby Boykin, Recording Secretary

# TE-MOAK TRIBE OF WESTERN SHOSHONE INDIANS OF NEVADA
# RECORDS AND INFORMATION MANAGEMENT POLICY

## Section 1. INTRODUCTION

The Te-Moak Tribe recognizes and endorses the fundamental importance of transparency and accountability in the application of laws, policies and procedures used in self-governance and in the support functions of its administration of federal programs.

However, the Te-Moak Tribe also recognizes that some aspects of the organization and its operations must be restricted, and thus, certain types of information are protected against disclosure when unrestricted availability would be detrimental to Tribal operations, personnel or to Tribal members. Some of this information includes verbal and non-verbal communications, information contained or expressed on paper, electronically recorded or stored on other media.

## Section 2. APPLICATION

When information is recorded on a document embodied on a medium that can be stored, read and/or transmitted, such media, including, but not limited to paper or electronic medium, shall be identified by the Te-Moak Tribe at different levels of classification for documents and information. The classifications to be applied are:

A. **Confidential**: These types of documents, records and information are protected against disclosure when the Tribal Council orders the documents or information to be kept secret in the interest of its sovereignty as a matter of policy or defense, typically labeled as such because these documents and information are of a sensitive nature that they are available only to designated personnel or third parties with a legitimate purpose. The disclosure, unauthorized access or unauthorized use of confidential information can have a significant impact on the Tribe and/or members of the public. See 5 U.S.C. §552

B. **Proprietary**: Documents, records and information containing or referencing "trade secrets and commercial and financial information obtained from a person that is privileged or confidential." See 5 U.S.C. §552

C. **Privileged**: Special, confidential documents, records, communications and information that is not subject to subpoena or disclosure, usually involving a special class of individual and information and any release that will require all relevant parties to intentionally waive the privilege in writing before release.

D. **Protected**: Documents, records and information that individually or collectively means, Confidential, Confidential Privilege, Sensitive, Critical Infrastructure or Health Insurance Portability and Accountability Information (HIPPA), and includes information that is labeled, marked or otherwise identified by or on behalf of the Te-Moak Tribe, its Council or Administrator so as to connote that such information is confidential, privileged, sensitive or proprietary in nature. The Term Protected shall also include all work product that contains or is derived from, whether in whole or in part, irrespective of the original author, when the Tribal Council or Administrative Staff receives such information and agrees to treat such information as Protected; and

E. **Public:** These records, documents and information are the least restrictive and must be distributed to the requesting party when all requesting procedures are complete and final approval granted. Public records, documents and information do not include Financial communication, internal process or communications; Purchase Orders; Project Data; Metrics and Statistics; non-public contracts, policies and internal communications and administrative actions.

## Section 3. <u>POLICY AND PURPOSE</u>

This Records and Information Management Policy provides procedures for the implementation of the Te-Moak Disclosure and Retention Policy to increase transparency and public access, while also minimizing liability and risk of accidental release of information and documents to the Te-Moak community or the public-at-large. This policy shall apply to Te-Moak Tribal Members; Te-Moak Tribal Council members, including its Officers, Executives, Managers, Employees, Subcontractors and Volunteers, as well as to members of the public-at-large, public service employees at other agencies and branches of government, and private contractors.

Since the Te-Moak Tribe administers federal programs, as well as receiving and distributing federal money, some records contain information that may fall under the Freedom of Information and Privacy Act, 5 U.S.C. §552 (as amended).

Document and information retention practices are based on the assigned classification, and subsequent safeguarding procedures are dependent on the proper use of the Te-Moak Records and Information Management Policy. It is important to note that Disclosure and Classification are distinct from Retention and Safeguarding. Records Retention involves the regulation and the preservation of documents and information, while Disclosure-Classification regulates the sharing and identification of documents and information retained and safeguarded by the organization or its subdivisions. Some classifications will include an expiration date, while others will include an archival or destruction date, if applicable.

This Policy shall be approved by the Te-Moak Tribal Council, and each Officer, Program Director and Executive shall be responsible to develop, compile and retain records for their program in compliance with the policy approved by the Council, and they should also record and segregate records pursuant to this policy. More importantly, this policy shall supplement the Confidential Information Policy & Procedures of the Te-Moak Tribe, as adopted by Resolution 03-TM-13, and the Te-Moak Procurement Policy to effectuate the policy consideration that every member of the Te-Moak Tribal government is responsible to protect classified, privileged and protected documents in their custody or control.

It shall remain within the discretionary authority of the Te-Moak Tribal Council to allow reductions in the retention period for certain classes of records for just cause.

## Section 4. RECORDS RETENTION

### A. Requirements

1. ***General Rule***.

The Federal Acquisition Regulation (FAR) requires that all negotiated procurement and sealed bid contracts contain clauses requiring contractors and subcontractors to retain all records related to pricing, proposals, negotiations and performance of the contracts and subcontracts for specific periods of time.

2. ***Definitions***

a. Records shall include "books, documents, accounting procedures and practices, and other data, regardless of type and regardless of whether such items are in written form, in the form of computer data, or in any other form, and other supporting evidence to satisfy contract negotiation, administration, and audit requirements of the contracting agencies."

b. Contract and Contract Files shall include "contract, agreement, Audit, Purchase Order, Blanket Purchase Agreement (BPA) Order and BPA Call, Task Order, Delivery Order and also includes awards that are above or below the Te-Moak Micro-Purchase Threshold, (MPT)."

c. Financial and Cost Accounting Records shall include "Accounts receivable invoices; adjustments to the accounts; invoice registers; carrier freight bills; shipping orders; material, work or service order files consisting of purchase requisitions or purchase orders for material or services or orders for transfer of material or supplies; cash advance recapitulations, prepared as posting entries to accounts receivable ledgers for amounts of expense vouchers created for employee's travel and related expenses; paid, cancelled and voided checks; accounts payable records to support disbursement of funds for material, supplies, equipment and services containing original or copies of documents related to remittance advices and statements, vendor's invoices, invoice audits and distribution slips, receiving and inspection reports or comparable certifications of receipt and inspections of materials or services, and debit and credit memoranda; and petting cash records showing descriptions of expenditures, to whom paid, name of authorizing person and date authorized, including copies of vouchers and other supporting documents."

d. Pay Management Records shall mean "payroll sheets, registers or their equivalents, of salaries and wages paid to individual Council members, employees, directors and subcontractors for each payroll period; change slips; time, leave and attendance cards; paid checks, receipts for wages paid in cash or other evidence of payments for services rendered."

e. Acquisition and Supply Records shall include "requisitions for materials, supplies, equipment and services; work orders for maintenance and other services; equipment records reflecting accountability for the receipt and use of material in the performance of a contract; receiving and inspection report records consisting of reports reflecting receipt and inspection of supplies, equipment and materials; purchase order files for supplies, equipment, material or services used in the performance of a contract with, when applicable, supporting documents and backup files including, but not limited to, invoices and memoranda, e.g. memoranda of negotiations showing principal elements of subcontract price negotiations; production records related to quality control, reliability and inspection; and property records."

f. Te-Moak Micro-Purchase Threshold shall mean "the dollar amount for acquisitions of material, equipment, supplies or services consisting of an amount of $3,500.00 or less, is set by the Te-Moak Tribal Council as the small purchase or Micro-Purchase Threshold that will remove the need or requirement for prior authorization in order to expedite purchases, without removing the requirement to report all such purchases to the Council as otherwise required by existing policy."

B. **Retention Periods**

1. ***General Rule***.

General administration documents and records shall be retained no less than three (3) years after the date of the final payment, if a final payment is applicable, otherwise three (3) from the date the document or record was included and entered in the Te-Moak Administration log.

2. ***Specific Retention Periods***.

a. A copy and/or the original of all official Te-Moak Legislative Actions, e.g. Constitutional Records, Resolutions, Meeting Minutes and Ordinances shall be retained indefinitely.

b. A copy of all Grants, Agreements and Contracts, including Contract files, must be retained no less than five (5) years after final payment, unless the Grant, Agreement or Contract specifies a longer period of retention or if a material term is in excess of $150,000.00 then all associated records must be retained no less than six (6) years.

c. A copy of all Financial and Cost Accounting Records with a final payment date at or after September 30, 2018 shall be retained no less than six (6) years after the date of final payment.

d. All entries and records contained in the Te-Moak computerized log system must be retained no less than seven (7) years from the date of entry.

e. All Pay Management Records with a final payment date at or after September 30, 2018 shall be retained no less than six (6) years after the date of final payment.

f. All Acquisition and Supply Records in excess of the Te-Moak Micro-Purchase Threshold amount shall be retained no less than six (6) years after the date of final payment.

g. All Acquisition and Supply Records at or below the Te-Moak Micro-Purchase Threshold amount shall be retained no less than four (4) years after the date of final payment.

h. All Personnel and Employment records, not otherwise provided herein, shall be retained for no less than two (2) years after the date of separation.

C. **Calculation of Retention Periods**

If the federal government requests certain records and those records are not available the Te-Moak Tribe may end up paying substantial financial penalties. This is why retention and the calculation of retention periods is critical.

The Fair Labor and Standards Act requires employers to retain all payroll records for at least three (3) years.

The Equal Employment Opportunity Commission requires that all employers retain Personnel and Employment records for at least one (1) year.

The retention periods identified herein should be calculated from the end of the fiscal year that an entry was made charging or allocating a cost to a Grant, Agreement or Contract, unless the date of final payment occurred at a different point in time and that point shall govern the beginning date to calculate the retention period.

For all calculations, do not count the first day of the event, count the last, unless it falls on a holiday or weekend, if so, then count the next day that is not a holiday or weekend as the last day of the event being calculated.

If records or documents are generated during a prior contract and those documents or records are used to negotiate cost or pricing in a successive contract, the retention period begins from the date of the successive contract, if fully executed.

If any record or document falls into two or more categories and separating them is impractical, then the entire record or document series must be retained for the longest period required of the mutual categories involved in that group. FAR 4.704.

D. **Exceptions**

1. ***General Rule***.

All retention periods start from the date of submission of any final expenditure report. The following are exceptions to the standard record retention period:

a. If any claim, lawsuit, audit or other action involving records has started before the expiration of the applicable, standard record retention period, then the records must be retained until all issues involving the subject records have been resolved and final action taken.

b. Records related to and real property, and records related to equipment with a value in excess of $5,000.00, acquired with Federal Funds must be retained no less than three (3) years after final disposition.

c. When required for program income earned after the period of performance, the record retention period starts from the end of the fiscal year that the program income is earned.

d. Indirect Cost Proposals submitted for negotiation must be retained for no less than three (3) years from the date of submission, and Indirect Cost Proposals not submitted for negotiation must be retained no less than three (3) years from the end of the fiscal year covered by the proposal.

e. Pursuant to 42 U.S.C. §13925(b)(2) grantees, pass-through entities and subgrantees of U.S. Department of Justice awards are prohibited from disclosing identifying information about specific victims of crimes and survivors without a written, informed, time-limited release from the victim, and such a release is barred from becoming a condition of receiving services from grantees, pass-through entities or subgrantees who are required to document compliance with this procedure. Non-compliance may lead to penalties under 2 C.F.R. §200.207 and 2 C.F.R. §200.338, and if any award, contract or grant is terminated or partially terminated thereunder, the awarding agency or pass-through entity and the recipient or sub-recipient remain responsible to comply with the Close-Out provisions of 2 C.F.R §200.343 and 2 C.F.R. §200.344.

# Appendix I

# Exhibit I-C(5)

TE-MOAK TRIBE OF WESTERN SHOSHONE

**RESOLUTION OF THE GOVERNING BODY**

**OF THE**

**TE-MOAK TRIBE OF WESTERN**

**SHOSHONE INDIANS OF NEVADA**

**Appointment of Samuel L. Biers as Appellate Judge** **RESOLUTION NO. 21-TM-29**

**BE IT RESOLVED BY THE TRIBAL COUNCIL OF THE TE-MOAK TRIBE OF WESTERN SHOSHONE INDIANS OF NEVADA, THAT**

**WHEREAS,** this organization is an Indian Organization as defined under the Indian Reorganization Act of June 18, 1934, 25 U.S.C. §461 et seq., (as amended), to exercise certain rights of home rule and to be responsible for the promotion of economic and social welfare of its Tribal members; **and**

**WHEREAS,** the Te-Moak Tribe of Western Shoshone Indians of Nevada's Tribal Council ("Council") is composed of Constituent Bands known as the Battle Mountain Band Council, Elko Band Council, South Fork Band Council and Wells Band Council, (collectively "Bands"); **and**

**WHEREAS,** The Te-Moak Tribe of Western Shoshone Indians of Nevada retains the inherent right to govern itself and exercise sovereign authority over its lands and people, as established by the Constitution of the United States, Art. I sec. 2 cl. 3; Art. I sec.8 and the Fourteenth Amend. Sec. 2; United States v. Mazurie, 419 U.S. 544, 557(1975)("*Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory. . . [as] 'separate people' possessing 'the power of regulating their internal and social relations. . . .*")(citing and quoting Worcester v. Georgia, 31 U.S. 557 (1832); U.S. v. Kagama, 118 U.S. 375, 381-82(1886) and McClanahan v. Arizona State Tax Comm'n, 411 U.S. 164, 173(1973)); the Constitution of the Te-Moak Tribe of Western Shoshone Indians of Nevada; and 25 U.S.C. §1301 et seq.,(*affirming the constitutional rights of Native Americans and the recognition of the United States regarding Native American tribal "'powers of self-government'" that includes "all governmental powers possessed by an Indian tribe, executive, legislative, and judicia"*); **and**

**WHEREAS,** pursuant to the Constitution of the Te-Moak Tribe of Western Shoshone Indians of Nevada, Art. 4, sec.3(j), (k) and (n), the Council retains the sovereign authority to promote and protect the health, safety and welfare of the Tribe, its members and all persons within the Tribe's jurisdiction and the Council retains the authority to promulgate resolutions that are "necessary and proper for carrying into effect" the Council's authority to "regulate all administrative and legislative bodies of the Tribe, Tribal agencies, officers and organizations;" **and**

/
/
/

**WHEREAS,** the Preamble of the Constitution of the Te-Moak Tribe of Western Shoshone Indians of Nevada sets forth the purpose behind the Constitution as being necessary "to improve the governing structure. . .administer justice. . .and otherwise govern the affairs of this Tribe;" **and**

**WHEREAS,** at a duly held meeting on February 3, 2021 the Te-Moak Tribal Council, by way of majority vote, hereby hires and appoints Samuel L. Biers to the Supreme Court of the Te-Moak Tribe of Western Shoshone Indians of Nevada, as the Appellate Judge, pursuant to the Constitution of the Te-Moak Tribe of Western Shoshone Indians of Nevada, Art. 8, who shall take the Oath of Office on February 5, 2021.

**NOW THEREFORE BE IT RESOLVED,** the Te-Moak Tribal Council, hereby hires and appoints Samuel L. Biers to the Supreme Court of the Te-Moak Tribe of Western Shoshone Indians of Nevada, as the Appellate Judge, pursuant to the Constitution of the Te-Moak Tribe of Western Shoshone Indians of Nevada, Art. 8, who shall take the Oath of Office on February 5, 2021.

**BE IT FURTHER RESOLVED AND DECLARED** that the Te-Moak Tribe of Western Shoshone Indians of Nevada is a Sovereign Nation.

**C-E-R-T-I-F-I-C-A-T-I-O-N**

I, Joseph Holley, the undersigned Chairman of the Te-Moak Tribal Council of the Te-Moak Tribe of Western Shoshone Indians of Nevada, do hereby certify that the Tribal Council is composed of **(12)** members of whom _**10**_ were present at the meeting which constituted a quorum held **February 3, 2021** and the foregoing resolution was adopted at such meeting by a vote of _**5**_ **FOR,** _**3**_ **AGAINST,** _**1**_ **ABSTENSION** pursuant to the authority of Article 4, Section 3 of the Constitution of the Te-Moak Tribe of Western Shoshone Indians of Nevada.

INVALID IF NO SEAL APPEARS BELOW:




Joseph Holley, Chairman
Te-Moak Tribe of Western Shoshone

**ATTEST:**

Colby Boykin
Te-Moak Tribal Council Recording Secretary

# Appendix I

# Exhibit I-C(6)

TE-MOAK TRIBE OF WESTERN SHOSHONE

**RESOLUTION OF THE GOVERNING BODY**

**OF THE**

**TE-MOAK TRIBE OF WESTERN**

**SHOSHONE INDIANS OF NEVADA**

**Creation of Te-Moak Administrative Office of Courts** **RESOLUTION NO. 21-TM-44**

**BE IT RESOLVED BY THE TRIBAL COUNCIL OF THE TE-MOAK TRIBE OF WESTERN SHOSHONE INDIANS OF NEVADA, THAT**

**WHEREAS,** this organization is an Indian Organization as defined under the Indian Reorganization Act of June 18, 1934, 25 U.S.C. §461 et seq., (as amended), to exercise certain rights of home rule and to be responsible for the promotion of economic and social welfare of its Tribal members; **and**

**WHEREAS,** the Te-Moak Tribe of Western Shoshone Indians of Nevada's Tribal Council ("Council") is composed of Constituent Bands known as the Battle Mountain Band Council, Elko Band Council, South Fork Band Council and Wells Band Council, (collectively "Bands"); **and**

**WHEREAS,** The Te-Moak Tribe of Western Shoshone Indians of Nevada retains the inherent right to govern itself and exercise sovereign authority over its lands and people, as established by the Constitution of the United States, Art. I sec. 2 cl. 3; Art. I sec.8 and the Fourteenth Amend. Sec. 2; United States v. Mazurie, 419 U.S. 544, 557(1975)("*Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory. . . [as] 'separate people' possessing 'the power of regulating their internal and social relations. . .*")(citing and quoting Worcester v. Georgia, 31 U.S. 557 (1832); U.S. v. Kagama, 118 U.S. 375, 381-82(1886) and McClanahan v. Arizona State Tax Comm'n, 411 U.S. 164, 173(1973)); the Constitution of the Te-Moak Tribe of Western Shoshone Indians of Nevada; and 25 U.S.C. §1301 et seq.,(*affirming the constitutional rights of Native Americans and the recognition of the United States regarding Native American tribal "'powers of self-government'" that includes "all governmental powers possessed by an Indian tribe, executive, legislative, and judicia*"); **and**

**WHEREAS,** pursuant to the Constitution of the Te-Moak Tribe of Western Shoshone Indians of Nevada, Art. 4, sec.3(j), (k) and (n), the Council retains the sovereign authority to promote and protect the health, safety and welfare of the Tribe, its members and all persons within the Tribe's jurisdiction and the Council retains the authority to promulgate resolutions that are "necessary and proper for carrying into effect" the Council's authority to "regulate all administrative and legislative bodies of the Tribe, Tribal agencies, officers and organizations;" **and**

/

/

/

**WHEREAS,** the Preamble of the Constitution of the Te-Moak Tribe of Western Shoshone Indians of Nevada sets forth the purpose behind the Constitution as being necessary "to improve the governing structure. . .administer justice. . .and otherwise govern the affairs of this Tribe;" **and**

**WHEREAS,** at a duly held meeting on March 4, 2021 the Te-Moak Tribal Council, by way of unanimous vote, approved the creation and establishment of a distinct organization subordinate to the Te-Moak Tribal Council now known as the Te-Moak Administrative Office of the Court, (AOC); approving the AOC Tentative Budget; Transferring $54,000.00 from the Nevada State Bank "RAMAH" Account for AOC specific expenditures (personnel wages, costs, supplies and equipment); authorizing the Te-Moak Tribal Chairman and Vice-Chair to Open a Bank account that will receive the $54,000.00 as its initial deposit and also authorizing the Chair and Vice Chair to open a Credit Card account specifically for the Te-Moak Administrative Office of the Courts.

**NOW THEREFORE BE IT RESOLVED,** that the Te-Moak Tribal Council approves the creation and establishment of a distinct organization subordinate to the Te-Moak Tribal Council now known as the Te-Moak Administrative Office of the Court, (AOC); approving the AOC Tentative Budget; Transferring $54,000.00 from the Nevada State Bank "RAMAH" Account for AOC specific expenditures (personnel wages, costs, supplies and equipment); authorizing the Te-Moak Tribal Chairman and Vice-Chair to Open a Bank account that will receive the $54,000.00 as its initial deposit and also authorizing the Chair and Vice Chair to open a Credit Card account specifically for the Te-Moak Administrative Office of the Courts.

**C-E-R-T-I-F-I-C-A-T-I-O-N**

I, Joseph Holley, the undersigned Chairman of the Te-Moak Tribal Council of the Te-Moak Tribe of Western Shoshone Indians of Nevada, do hereby certify that the Tribal Council is composed of **(11)** members of whom _7_ were present at the meeting which constituted a quorum held **March 4, 2021** and the foregoing resolution was adopted at such meeting by a vote of **_5_ FOR, _0_ AGAINST, _0_ ABSTENSION** pursuant to the authority of Article 4, Section 3 of the Constitution of the Te-Moak Tribe of Western Shoshone Indians of Nevada.

INVALID IF NO SEAL APPEARS BELOW:

Joseph Holley, Chairman
Te-Moak Tribe of Western Shoshone

**ATTEST:**

Colby Boykin
Te-Moak Tribal Council Recording Secretary

# Te-Moak Tribe of Western Shoshone Indians
# 2021 Start Up Budget (Estimate)
# Judicial Services- Justification

| | | | |
|---|---|---|---|
| **i. Salaries & Wages** | | | **39000.00** |
| Admin/Court Clerk @ 18.75 per Hr X1040 | 19500.00 | | |
| Court Assistance Officer @ 18.75 per hrX 1040 | 19500.00 | | |
| **ii. Fringe Benefits** | | | **5381.00** |
| 300.1010.6220 FICA @6.2% | 2418.00 | | |
| 300.1010.6221 Medicare @ 1.5% | 585.00 | | |
| 300.1010.6250 SUTA @ 5.4% | 2106.00 | | |
| 300.1010.6270 Workmans Comp | 272.00 | | |
| **iii. Postage** | | | **1000.00** |
| Postage Costs | 1000.00 | | |
| **iv. Professional Services-Legal** | | **$** | **55,000.00** |
| Chief Judge @ 1200.00 per session x 2 x 12 months | 28000.00 | | |
| Tribal Prosecutor @ 1000 mo X12 months | 12000.00 | | |
| Mileage/Travel Costs- all court staff | 15000.00 | | |
| ** Appellate Judge- unknown hourage/pay rate | 0.00 | | |
| ** Defense Attorney- unknown hourage/payrate | 0.00 | | |
| **v. Supplies** | | | **6000.00** |
| Cost of paper, computer, printer cartridges, folders, pencils, other office supplies & testing kits Probation Officer | | | |
| **vi. Training Conferences** | | | **5000.00** |
| Cost of conference and training registration and per diem | | | |
| | **TOTAL** | | **$111,381.00** |

**Te-Moak Tribe of Western Shoshone Indians**
**2021 Budget (Estimate)**

**Judicial Services**

Budget Name: Judicial Services
Budget Number: 001

Effective Date: 02/01/2021
Closing Date : 12/31/2021

| DESCRIPTION | TOTAL |
|---|---|
| Salaries & Wages | $39,000.00 |
| FICA Tax | $2,418.00 |
| Medicare Tax | $585.00 |
| SUTA Tax | $2,106.00 |
| Workmans Comp | $272.00 |
| Postage | $1,000.00 |
| Professional Services-Legal | $55,000.00 |
| Supplies | $6,000.00 |
| Training Conferences | $5,000.00 |
| | |
| | |
| Total | $111,381.00 |
| | |
| | |

# Appendix I

# Exhibit I-C(7)

TE-MOAK TRIBE OF WESTERN SHOSHONE

**RESOLUTION OF THE GOVERNING BOARD**
**OF THE**
**TE-MOAK TRIBE OF WESTERN SHOSHONE INDIANS OF NEVADA**

RESOLUTION NO. 21-TM-50

**IMMEDIATE TERMINATION OF SAMUEL LEE BIERS AS TE-MOAK TRIBAL ADMINISTRATOR**

**BE IT RESOLVED BY THE TRIBAL COUNCIL OF THE TE-MOAK TRIBE OF WESTERN SHOSHONE INDIANS OF NEVADA THAT:**

**WHEREAS**, this Organization is an Indian Organization as defined under the **Indian Reorganization Act of June 18, 1934**, 25 U.S.C. Section 461 et seq., (as amended), to exercise certain rights of home rule and to be responsible for its Tribal members, and

**WHEREAS**, the Te-Moak Tribe of Western Shoshone Indians Tribal Council ("Council") is composed of Constituent Bands known individually as the Battle Mountain Band Council, Elko Band Council, South Fork Band Council and the Wells Band Council (collectively "Bands"); and

**WHEREAS**, the Te-Moak Tribe of Western Shoshone Indians of Nevada retains the inherent right to govern itself and exercise sovereign authority over its lands and its people, as established by the **Constitution of the United States, Article I, Section 2, Clause 3; Article I, Section 8**; and by the **Fourteenth Amendment, Section 2**; and in the **United States v. Mazurie**, 419 U.S. 544, 557 (1975) ruling that "Indian Tribes are unique aggregations possessing attributes of sovereignty over both their members and over their territory... [as] 'separate people' possessing 'the power of regulating their internal and social relations..." (citing and quoting **Worcester v. Georgia**, 31 U.S. 557 (1832); **United States v. Kagama**, 118 U.S. 375, 381-82 (1886) and **McClanahan v. Arizona State Tax Comm'n**, 411 U.S. 164, 173 (1973); the **Constitution of the Te-Moak Tribe of Western Shoshone Indians of Nevada** and **25 U.S.C. Section 1301 et seq**., (affirming the Constitutional Rights of Native Americans and the recognition by the United States of Native American Tribal "Powers of Self-Government" to include "all governmental powers possessed by an Indian Tribe including Executive, Legislative & Judicial Rights, and all offices, bodies and tribunals by and through which these Rights are executed, including but not limited to courts of Indian Offenses,' and "Indian Court" meaning any Indian Tribal and/or court of Indian offenses"); and

**WHEREAS**, pursuant to **the Constitution of the Te-Moak Tribe of Western Shoshone Indians of Nevada, Article 4, Section 3(j), (k), and (n),** the Council retains the Sovereign Authority to promote and protect the health, safety and welfare of the Tribe, its members and all persons within the Tribe's jurisdiction and the Council retains the authority to promulgate Resolutions that are "necessary and proper for carrying into effect" the Council's authority to "regulate all administrative, executive, judicial and legislative bodies of the Tribe, Tribal Agencies, officers and organizations," and

**WHEREAS**, the **Preamble of the Constitution of the Te-Moak Tribe of Western Shoshone Indians of Nevada** sets forth the purpose behind the Constitution as necessary "to improve the governing structure... administer justice... and otherwise govern the affairs of this Tribe,' and

**WHEREAS**, at a duly held Council Meeting with a quorum present on March 19, 2021, the Te-Moak Tribe of Western Shoshone Indians of Nevada, by way and through a majority vote of the Te-Moak Tribal Council approved the permanent and immediate Termination of Samuel Lee Biers as the Te-Moak Tribal Administrator of the Te-Moak Tribe of Western Shoshone Indians of Nevada.

**NOW, THEREFORE, IT IS RESOLVED**, the Te-Moak Tribe of Western Shoshone Indians of Nevada, by way and through a majority vote of the Te-Moak Tribal Council, permanently and immediately terminates Samuel Lee Biers as the Te-Moak Tribal Administrator of the Te-Moak Tribe of Western Shoshone Indians of Nevada.

**CERTIFICATION**

I, Joseph Holley, the undersigned, as Chairman of the Te-Moak Tribal Council of the Te-Moak Tribe of Western Shoshone Indians of Nevada, do hereby certify that the Te-Moak Tribal Council is composed of twelve (12) members of whom _6_ were present at the Tribal Council meeting which constituted a quorum held on March 19, 2021, and the foregoing Resolution was adopted at such Meeting by a vote of _5_ In Favor; _0_ Against; _0_ Abstaining, pursuant to the Authority of Article 4, Section 3 of the Constitution of the Te-Moak Tribe of Western Shoshone Indians of Nevada.

Joseph Holley, Chairman
Te-Moak Tribe of Western Shoshone Indians of Nevada

**ATTEST:**

Alice Tybo, Recording Secretary

# Appendix I

# Exhibit I-C(8)

TE-MOAK TRIBE OF WESTERN SHOSHONE

**RESOLUTION OF THE GOVERNING BOARD**
**OF THE**
**TE-MOAK TRIBE OF WESTERN SHOSHONE INDIANS OF NEVADA**

**RESOLUTION NO. 21-TM-83**

**BE IT RESOLVED BY THE TRIBAL COUNCIL OF THE TE-MOAK TRIBE OF WESTERN SHOSHONE INDIANS OF NEVADA THAT:**

**WHEREAS**, this Organization is an Indian Organization as defined under the Indian Reorganization Act of June 18, 1934, as amended, to exercise certain rights of home rule and to be responsible for its Tribal members, and

**WHEREAS**, the Te-Moak Tribe of Western Shoshone Indians of Nevada, Tribal Council ("Council") is composed of Constituent Bands known individually as the Battle Mountain Band Council, Elko Band Council, South Fork Band Council and the Wells Band Council (collectively "Bands"); and

**WHEREAS**, the Tribal Council of the Te-Moak Tribe of Western Shoshone Indians of Nevada has sworn to promote and protect the best interest of the Te-Moak Tribe to conserve Tribal property, to develop resources and to promote the welfare of generations of the Tribe, and

**WHEREAS,** the Te-Moak Tribal Council at a duly held regular meeting on February 3, 2021 adopted Resolutions 21-TM-16 – Amend 20-TM-03 to hire S. Biers to Court personnel; 21-TM-26 – Administrator to make 4-month court appointment to court personnel; and 21-TM-29 Appoint Sam Biers – Appellate Judge, and

**WHEREAS,** during the duly held regular meeting on February 3, 2021 the Council adopted Resolution 21-TM-29 to appoint Sam Biers as the Appellate Judge, pending a background check, and

**WHEREAS,** the Constitution of the Te-Moak Tribe of Western Shoshone Indians of Nevada Article 8 Judicial Brant of Government; Section 4 Term of Office and Qualifications; (b) Qualifications – a Judge shall be at least thirty (30) years of age and of good moral character, and

**WHEREAS,** after determining the background of Sam Biers he does not meet the qualification requirements as specified in the Constitution of the Te-Moak Tribe of Western Shoshone Indians of Nevada.

**NOW THEREFORE BE IT RESOLVED,** that the Te-Moak Tribal Council hereby removes Sam Biers as the Te-Moak Tribal Court Appellate Judge as he does not meet qualifications under the Constitution of the Te-Moak Tribe of Western Shoshone Indians.

**BE IT FURTHER RESOLVED,** that any Resolutions adopted appointing, hiring or having the involvement of Sam Biers as the Te-Moak Tribal Court Appellate Judge are null and void.

**C-E-R-T-I-F-I-C-A-T-I-O-N**

I, Joseph Holley, the undersigned, as Chairman of the Te-Moak Tribal Council of the Te-Moak Tribe of Western Shoshone Indians of Nevada, do hereby certify that the Te-Moak Tribal Council is composed of twelve (12) members of whom **9**, were present at the Tribal Council meeting which constituted a quorum held on June 11, 2021, and the foregoing Resolution was adopted at such meeting by a vote of **9 FOR; 0 AGAINST; 0 ABSTENSIONS**, pursuant to the Authority of Article 4, Section 3 of the Constitution of the Te-Moak Tribe of Western Shoshone Indians of Nevada.

*INVALID IF NO SEAL APPEARS BELOW:*

TE-MOAK TRIBE OF WESTERN SHOSHONE INDIANS
OFFICIAL TRIBAL SEAL

Joseph Holley, Chairman
Te-Moak Tribe of Western Shoshone Indians of Nevada

**ATTEST:**

Suzanna Sandoval, Tribal Council Recording Secretary

# Appendix I

# Exhibit I-C(9)

TE-MOAK TRIBE OF WESTERN SHOSHONE

RESOLUTION OF THE GOVERNING BOARD
OF THE
TE-MOAK TRIBE OF WESTERN SHOSHONE INDIANS OF NEVADA

**RESOLUTION NO. 21-TM-124**

**Modified ARP 2021 Budget**

**BE IT RESOLVED BY THE TRIBAL COUNCIL OF THE TE-MOAK TRIBE OF WESTERN SHOSHONE INDIANS OF NEVADA THAT:**

121

**WHEREAS**, this Organization is an Indian Organization as defined under the **Indian Reorganization Act of June 18, 1934**, 25 U.S.C. Section 461 et seq., (as amended), to exercise certain rights of home rule and to be responsible for its Tribal members, and

**WHEREAS**, the Te-Moak Tribe of Western Shoshone Indians Tribal Council ("Council") is composed of Constituent Bands known individually as the Battle Mountain Band Council, Elko Band Council, South Fork Band Council and the Wells Band Council (collectively "Bands"); and

**WHEREAS**, the Te-Moak Tribe of Western Shoshone Indians of Nevada retains the inherent right to govern itself and exercise sovereign authority over its lands and its people, as established by the **Constitution of the United States, Article I, Section 2, Clause 3; Article I, Section 8**; and by the **Fourteenth Amendment, Section 2**; and in the **United States v. Mazurie**, 419 U.S. 544, 557 (1975) ruling that "Indian Tribes are unique aggregations possessing attributes of sovereignty over both their members and over their territory... [as] 'separate people' possessing 'the power of regulating their internal and social relations..." (citing and quoting **Worcester v. Georgia**, 31 U.S. 557 (1832); **United States v. Kagama**, 118 U.S. 375, 381-82 (1886) and **McClanahan v. Arizona State Tax Comm'n**, 411 U.S. 164, 173 (1973); the **Constitution of the Te-Moak Tribe of Western Shoshone Indians of Nevada** and **25 U.S.C. Section 1301 et seq.**, (affirming the Constitutional Rights of Native Americans and the recognition by the United States of Native American Tribal "Powers of Self-Government" to include "all governmental powers possessed by an Indian Tribe including Executive, Legislative & Judicial Rights, and all offices, bodies and tribunals by and through which these Rights are executed, including but not limited to courts of Indian Offenses,' and "Indian Court" meaning any Indian Tribal and/or court of Indian offenses"); and

**WHEREAS**, pursuant to **the Constitution of the Te-Moak Tribe of Western Shoshone Indians of Nevada, Article 4, Section 3(j), (k), and (n),** the Council retains the Sovereign Authority to promote and protect the health, safety and welfare of the Tribe, its members and all persons within the Tribe's jurisdiction and the Council retains the authority to promulgate Resolutions that are "necessary and proper for carrying into effect" the Council's authority to "regulate all administrative, executive, judicial and legislative bodies of the Tribe, Tribal Agencies, officers and organizations," and

**WHEREAS**, the Preamble of the Constitution of the Te-Moak Tribe of Western Shoshone Indians of Nevada sets forth the purpose behind the Constitution as necessary "to improve the governing structure administer justice and otherwise govern the affairs of this Tribe,' and

**WHEREAS**, at a duly held Council Meeting at a duly held meeting on November 17, 2021 the Te-Moak Tribal Council, by way of majority vote, hereby approves the modifications to the American Recue Plan budget and rescinds resolution 21-TM-121 in its entirety and:

SORNA $75,000.00
Enrollment $75,000.00
Eyewear $30,000.00
Paid Sick/Hazard Premium $231,776.37
Supplies $60,000.00
Rent/Utilities $550,000.00
Workplace Health and Safety/Janitor $80,000.00
Equipment $60,000.00
Contractors $550,000.00
Transportation $20,000.00

**NOW, THEREFORE, IT IS RESOLVED**, the Te-Moak Tribe of Western Shoshone Tribal Council hereby modify the 2021 American Rescue Plan Act budget for Te-Moak Tribe of Western Shoshone Indians of Nevada. Listed above are the changes that have been approved.

**C-E-R-T-I-F-I-C-A-T-I-O-N**

I, Joseph Holley, the undersigned, as Chairman of the Te-Moak Tribal Council of the Te-Moak Tribe of Western Shoshone Indians of Nevada, do hereby certify that the Te-Moak Tribal Council is composed of twelve (9) members of whom _5_ were present at the Tribal Council meeting which constituted a quorum held on November 17, 2021, and the foregoing Resolution was adopted at such Meeting by a vote of _4_ **FOR**; _0_ **AGAINST**; _0_ **ABSTENSION**, pursuant to the Authority of Article 4, Section 3 of the Constitution of the Te-Moak Tribe of Western Shoshone Indians of Nevada.

OFFICIAL TRIBAL SEAL

Joseph Holley, Chairman
Te-Moak Tribe of Western Shoshone Indians of Nevada

**ATTEST:**

Alfreda Walker, Tribal Council Recording Secretary

# Appendix I

# Exhibit I-C(10)

(c) The federal Controlled Substances Act, 21 U.S.C. § 801 *et. seq.*, classifies Cannabis as a Schedule 1 drug and prohibits any possession or use of Cannabis except in the course of federally approved research projects. The Controlled Substances Act makes it unlawful under federal law for a person to cultivate manufacture, distribute, disperse or possess with intent to manufacture, distribute or disperse, Cannabis.

(d) In November 2016, the voters of the State of Nevada passed Question 2, an initiative to legalize, regulate and tax recreational cannabis in Nevada. The language of Question 2 is codified at Nevada Revised Statutes § 453D.

(e) The Tribe has decided to allow Elko Band Council to open certain lands within their jurisdiction to the production, sale and manufacture of recreational cannabis consistent with this Chapter.

(f) The possession of cannabis on Tribal Lands is hereby legal. The cultivation, production and sale of cannabis on Tribal Lands is also hereby legal; however, the only persons or entities authorized to engage in the production, manufacture or sale of cannabis is Elko Band Council, a Constituent Bands of the Te-Moak Tribe of Western Shoshone Indians of Nevada. No other cultivation, production or sale is authorized. No other cultivation, production or sale is authorized except as authorized expressly and in writing by the Tribe or its Constituent Bands or their respective cannabis commissions.

(g) The production, manufacture and sale of cannabis should be taken away from criminals and regulated under a controlled system where businesses will be taxed and the revenue will be dedicated to the welfare of the members of the Elko Band and the enforcement of the regulations in this Chapter.

(h) The production, manufacture and sale of cannabis shall be regulated in the following manner:

(1) All cannabis businesses on Tribal Land shall be owned by the Elko Band Council.

(2) Cultivating, manufacturing, testing, transporting and selling cannabis will be strictly controlled through licensing and regulation.

(3) Except as provided in this Ordinance 83-ORD-TM-04, the provisions of the Te-Moak Narcotics Ordinance remain in effect.

(i) The State of Nevada, in SB 375, has authorized intergovernmental agreements ("Compacts") between the State and Nevada Indian Tribes. The Tribe hereby authorizes Elko Band Council to enter the cannabis business and to enter into such Compacts for the cultivation, manufacture, testing, sale and transport of cannabis on Te-Moak Tribal lands.

**Sec. 2 Definitions.**

(a) "Cannabis" means all parts of any plant of the genus Cannabis, whether growing or not, the seeds thereof, the resin extracted from a part of the plan, and every compound, manufacture, salt, derivative, mixture, or preparation of the plant, its seeds or resin. "Cannabis" does not include:

Repealed [illegible] ... Elko Band Council ... 2020 ... 5-11-2020

a. The mature stems of the plant, fiber produced from the stems, oil, or cake made from the seeds of the plant, any other compound, manufacture, salt, derivative, mixture, or preparation of the mature stems (except the resin extracted therefrom) fiber, oil, or cake, the sterilized seed of the plant which is incapable of germination; or

b. The weight of any other ingredient combined with Cannabis to prepare topical or oral administrations, food, drink, or other products.

(b) "Cannabis Cultivation Facility" means an entity that cultivates, processes and packages Cannabis, that has Cannabis tested by a Cannabis testing facility, and that sells Cannabis to retail stores, to Cannabis product manufacturing facilities, and to other Cannabis cultivation facilities, but not to consumers.

(c) "Cannabis Distributor" means an entity that transports Cannabis from a Cannabis establishment to another Cannabis establishment.

(d) "Cannabis Establishment" means a Cannabis cultivation facility, a Cannabis testing facility, a Cannabis product manufacturing facility, a Cannabis distributor, or retail Cannabis store.

(e) "Cannabis Product Manufacturing Facility" means an entity that purchases Cannabis, manufactures, processes and packages Cannabis and Cannabis products, and sells Cannabis and Cannabis products to other Cannabis product manufacturing facilities and to retail Cannabis store, but not to consumers.

(f) "Cannabis Products" means products comprised of Cannabis or concentrated Cannabis and other ingredients that are intended for use or consumption, such as, but not limited to edible products, ointments and tinctures.

(g) "Cannabis Paraphernalia" means any equipment, products, and materials of any kind which are used, intended for use, or designed for use in planting, propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, preparing, testing, analyzing, packaging, repacking, storing, or containing Cannabis, or for ingesting, inhaling or otherwise introducing Cannabis into the human body.

(h) "Cannabis Testing Facility" means an entity licensed by the Department to test Cannabis and Cannabis products including for potency and contaminants.

(i) "Concentrated Cannabis" means the separated resin, whether crude or purified, obtained from Cannabis.

(j) "Department means the Nevada Department of Taxation.

(k) "Excluded felony offense" means a conviction of an offense that would constitute a category A felony if committed in the State of Nevada or convictions for two or more offenses that would constitute felonies if committed in Nevada. It does not include:

a. A criminal offense for which the sentence, including probation, incarceration or supervise release, was completed more than 10 years ago; or

b. An offense involving conduct that would be immune from arrest, prosecution or penalty under the Tribal Code or NRS chapter 493A.

(l) "NRS" refers to Nevada Revised Statutes.

(m) "Process" means to harvest, dry, cure, trim, and separate parts of the Cannabis plant.

(n) "Retail Cannabis Store" means an entity that purchases Cannabis from Cannabis cultivation facilities, that purchases Cannabis and Cannabis products from Cannabis product manufacturing facilities and retail Cannabis store and sells Cannabis and Cannabis products to consumers.

(o) "State" refers to the State of Nevada.

(p) "Unreasonably impracticable" means that the measure necessary to comply with the regulations require such a high investment of risk, money, time or any other resource or asset that the operations of a Cannabis establishment is not worthy of being carried out in practice by a reasonably prudent businessperson.

**Sec. 3. Effect.**

(a) The provisions of this Chapter do not permit any person to engage in and do not prevent the imposition of any civil, criminal, or other penalty for:

(1) Driving, operating, or being in actual physical control of a vehicle, aircraft, or vessel under power or sail while under the influence of cannabis or while impaired by cannabis; or

(2) Violating the Te-Moak Narcotics Ordinance, except that the possession, cultivation, production and sale of Cannabis consistent with this Ordinance is now legal. To the extent there is any conflict between this Ordinance and the Te-Moak Narcotics Ordinance relating to cannabis, this Ordinance controls.

**Sec. 4. Ownership of Cannabis Establishments.**

The Cannabis Establishments on Tribal Lands shall be owned by Elko Band. Neither non-tribal members nor individual tribal members may own such Cannabis Establishments.

**Sec. 5. Cannabis Establishments.**

Cannabis Establishments shall:

(a) Employ security;

(b) Utilize video surveillance for indoor facilities;

(c) Secure every entrance to the Establishment so that access to areas containing cannabis is restricted to persons authorized to possess cannabis;

Repealed ... Tribal Council on ... 2020
5-11-2020

(d) Secure the inventory and equipment of the Cannabis Establishment during and after operating hours to deter and prevent theft of cannabis;

(e) Determine the criminal history of any person before the person works or volunteers at the Cannabis Establishment and prevent any person who has been convicted of an excluded felony offense or who is not 21 years of age or older from working or volunteering for the Cannabis Establishment.

**Sec.6. Production, manufacture and sale.**

(a) All production, manufacture and sale of Cannabis must meet the following requirements:

(1) Must take place at a physical address approved by the Constituent Bands and within an area that is controlled in a manner that restricts access only to persons authorized to access the area; and

(2) Must take place on property in the Cannabis Establishment's lawful possession or with the consent of the person in lawful physical possession of the property.

**Sec.7. Inventory Tracking.**

The Elko Band Council will utilize the State's inventory tracking system to track all cannabis on Te-Moak Tribal Lands.

**Sec. 8. Product Acquisition.**

The Tribe and Elko Band Council shall only acquire cannabis from (1) entities under its control; (2) State-licensed Cannabis Establishments; and (3) other Nevada Tribes who have exercised Compacts with the State.

**Sec. 9. Packaging, Testing, and Labeling.**

(a) All Cannabis products sold by Elko Band Council must be packaged, tested, and labeled in compliance with the Cannabis regulations of the State of Nevada.

(b) Testing of Cannabis Products shall be conducted by laboratories licensed by the State/Department to the standards of the State.

(c) The Elko Band Council shall adopt regulations at least as restrictive as those of the State relating to serving sizes, potency labeling, and packaging limitations.

**Sec. 10. Advertising.**

Advertising on Tribal Lands shall not be designed to appeal to minors. Advertisements off the Tribal Lands will comply with State regulations.

**Sec. 11. Enforcement of contracts.**

Repealed by Te-Moak Tribal Council on May 2021 5-11-2020

It is the public policy of the Tribe and Elko Band that the contracts related to Cannabis under this Ordinance and under NRS Chapter 453D should be enforceable and shall not be deemed unenforceable on the basis that the actions or conduct permitted pursuant to the license are prohibited by federal law. In addition, the Tribe will take no action, legal, legislative or otherwise, that will interfere with the operation of cannabis business established by Elko Band Council pursuant to this ordinance.

**Sec. 12. Regulations.**

Elko Band Council shall adopt regulations as necessary to carry out the provisions of this Ordinance. These regulations must not prohibit the operation of Cannabis Establishments, either expressly or through regulations that make their operation unreasonably impracticable.

For the classes of regulations identified below, Elko Band Council's regulations shall be at least as restrictive as those of the State:

(a) Requirements to prevent the sale or diversion of Cannabis and Cannabis Products to persons under 21 years of age;

(b) Requirements for the packaging of Cannabis and Cannabis Products, including requirements for child-resistant packaging;

(c) Requirements for the testing and labeling of Cannabis and Cannabis Products sold by Cannabis Establishments including a numerical indication of potency based on the ratio of THC to the weight of a product intended for oral consumption;

(d) Requirements for record keeping by Cannabis Establishments; and

(e) Procedures for the collection of taxes, fees, and penalties.

**Sec. 13. Taxes.**

Elko Band Council shall impose a tribal tax that is equal to at least 100 percent of the State tax on all sales of Cannabis products on Te-Moak Tribal Lands. The tribal tax shall not be imposed if the transaction is otherwise exempt from taxation under State or federal law. Any and all taxes collected by Elko Band Council shall remain the sole property of Elko Band Council.

**Sec. 14. Adoption of Te-Moak Narcotics Ordinance: Cannabis.**

(a) This Te-Moak Narcotic Ordinance: Cannabis as amended shall become effective upon the date when adopted by a majority vote of the Tribal Council members in a duly called and noticed Council meeting.

**Sec. 15. Amendments.**

Any further amendments to the Te-Moak Narcotics Ordinance may be made by the Tribal Council, provided that the Tribal Council shall deliver, by personal service or return receipt mail, the proposed amendment to this Ordinance to each Band Council office for review and comment by the Band at least ten (10) days but no more than forty-five (45) days before a vote is taken on such proposed amendment by the Te-Moak Tribal Council.

All resolutions and other expressions of policy of the Tribe or the Elko Band Council of whatever nature predating the effective date of this Ordinance are ratified and continued in full force and effect if such are consistent with this Ordinance.

**C-E-R-T-I-F-I-C-A-T-I-O-N**

I, the undersigned as Vice-Chairman of the Tribal Council of the Te-Moak Tribe of Western Shoshone Indians of Nevada, do hereby certify that the Tribal Council is composed of 9 members, of whom 5 constituting a quorum were present at a duly held meeting on the 7th day of August, 2019, and that the foregoing ordinance was duly adopted at such meeting by an affirmative VOTE of 3 FOR 2 AGAINST, 0, ABSTENTIONS, pursuant to the authority contained under the Article, Section 3, (n) of the Constitution of the Te-Moak Tribe of Western Shoshone Indians of Nevada.

5-11-2020

Joseph Holley, Chairman
Te-Moak Tribe of Western Shoshone

ATTEST:

Sharla Dick, Recording Secretary

Repealed & Rescinded by Te-Moak Tribal Council Of

**Addendum to the Te-Moak Narcotics Ordinances: Cannabis (Amended)**

The attached Ordinance of the Te-Moak Tribe of Western Shoshone Indians of Nevada was ratified at a duly held meeting of the Te-Moak Tribal Council on August 7, 2019, presided over by Vice-Chairman Juan Arevalo, who voted to break the tie to read: **3 FOR; 2 AGAINST; 0 ABSTENTIONS.**

Joseph Holley, Chairman
Te-Moak Tribe of Western Shoshone

**ATTEST:**

Sharla Dick, Recording Secretary

epealed ... escinded by Te- oak Triba uncil o ay 9, 202

5-11-2020