Case: 2:22–cv–00298
Assigned To : Bennett, Jared C.
Assign. Date : 5/2/2022
Description: Biers v Dentons US LLP et al

# APPENDIX II - Index

Exhibit II-A

(1) Elko Cannabis Poll.......................................................................................................31 ¶106

(2) Joint Venture Agreement(**A6**) ..............................................................................................
.................43-5 ¶¶141-46; 46¶152; 48 ¶157; 57-9 ¶¶186-88; 67 ¶221; 72-3 ¶¶244-45; 74 ¶252; 75-6 ¶¶255, 257; 77 ¶258; 79 ¶267; 80-1 ¶¶271-72; 82 ¶275-76; 84-5 ¶¶282, 283; 87 ¶291; 90 ¶301; 91 ¶304; 92-3 ¶¶309, 311; 102 ¶348; 113-14 ¶388; 117-18 ¶401, 403; 119 ¶409, 410; 136 ¶485; 140 ¶504; 150-51 ¶¶554, 555; 161 ¶580; 164 ¶586; 167-68 ¶602; 173 ¶617; 175 ¶624; 176 ¶628; 177 ¶629; 178 ¶633; 179 ¶634; 181-82 ¶¶643, 645, 647; 185-86 ¶653; 187 ¶657; 197-200 ¶¶693, 694; 204 ¶708; 207 ¶717; 211-12 ¶¶727, 728; 215 ¶738; 222 ¶759; 227 ¶772; 229 ¶780; 231-32 ¶789; 239-40 ¶¶818, 819, 821

(3) SCS Cannabis Advancement of Business Letter ..............................................................
............................45 ¶147; 46-7 ¶151,152,153; 51 ¶169; 53 ¶175; 58-9 ¶187, 188; 176 ¶628

(4) Articles of Incorporation of the Newe Cannabis Commission (**A3**) ..............................35-6 ¶119; 40-1 ¶134; 50-1 ¶¶165, 166, 167; 58 ¶187; 59 ¶188; 212 ¶729; 231 ¶789; 240 ¶821

(5) Cash Flow, Safe Access and Funds Withdrawal Procedures ..............................................
......................................................51 ¶168; 54 ¶177, 178, 179; 55 ¶181, 182; 59 ¶188; 176 ¶628

(6) Policy for the Regulation and Taxation of Recreational Marijuana ....................................
.......45 ¶144; 47-8 ¶¶155, 156, 158, 159; 49 ¶160, 161, 162; 50 ¶164; 58-9 ¶188; 239 ¶817

(7) Nevada Compact Response Letter (June 12, 2020)..........................................53 ¶¶174-75

(8) NCC Vacancy Advertisement...........................................................63 ¶205, 206; 218 ¶747

(9) Newe Cannabis –Dutchie.com Packaging............48-9 ¶159; 72 ¶244; 73 ¶245; 239 ¶817

Exhibit II-B

(1) Te-Moak Housing Authority:
(a) 1st Global Capital Corp and Avantax Investment Services ........................................
..............................................................................77 ¶259; 88 ¶293; 89 ¶¶300, 301, 303
(b) TMHA Investment Policy, 90-TMHA-28 and 90-TMHA-27 .......................................
.................................................................................................................90 ¶303; 91 ¶305

(2) Newe Cannabis Distribution Log ..............................................................................................83 ¶276; 102 ¶348; 117 ¶401; 164 ¶586; 179-80 ¶¶636, 638; 181 ¶643; 182 ¶647; 239 ¶816

(3) EBC Expanded General Ledger ....................................54-5 ¶180; 115-16 ¶¶395, 396, 397

(4) EBC Purchase Order and Receipts....................................................................54-5 ¶180, 181

(5) Elko Central Dispatch RICO Payment Packet ......................................................................
.........................................103 ¶354; 114 ¶392; 115-16 ¶397, 398, 399, 400; 119 ¶¶409, 410

(6) Greenbits Cannabis-Sales Report..........................................................................................
.....................................................36 ¶121; 58-9 ¶188; 168 ¶602; 178-9 ¶635, 636; 188 ¶662

(7) NCC Profit and Loss Statement....177-78 ¶¶629, 630, 631, 632, 633, 635, 636; 180 ¶639

(8) EBCE Distribution Tracker ..........................................................36 ¶121; 179 ¶¶634, 637

(9) NCC Monthly Reports ......................................................36 ¶121; 167-68 ¶602; 175 ¶624

(10) Te-Moak Tax Receipt and Cash Count-Newe Cannabis..................................162-63 ¶583

(11) Te-Moak Cash Count Receipt ..........................................................................188-89 ¶¶662, 663

(12) Email - Kevin Clock, Cascade Strategic Investment from A. Hernandez ..........................
...........................................................................177-78 ¶631; 179 ¶634; 181 ¶¶642, 643

(13) Empyreal Logistics Deposit and Bag Slip ..............................................................38-9
¶128; 56 ¶184; 56-7 ¶186; 58 ¶187; 59 ¶188; 179 ¶634; 181-82 ¶645; 211-12 ¶¶728, 729

(14) ECBE 2021 SALAL Distribution Check .......................................57-8 ¶¶186, 188; 213 ¶731

(15) Te-Moak Final Report.........................193 ¶676, 678; 194-95 ¶¶681, 682, 683, 684, 685

Exhibit II-C

(1) Te-Moak Public Notice .........................................................................232-33 ¶¶791, 792

(2) Holley Letter...................................................................................................223-24 ¶765

(3) Mose and Hayes Oath of Office ..........................................................204 ¶708; 205 ¶710

(4) Aaron Ford Receipt Letter..................................................................107 ¶368; 118 ¶407

(5) Bowker Interference Letter ..............................................................115 ¶393; 128 ¶449

(6) Te-Moak Council Closed Meeting Minutes .........................................................214 ¶734

(7) Te-Moak Council Special Open Meeting Minutes .................................184-85 ¶652; 228 ¶775

(8) February 3, 2021 Transcript ........................................................................................................................................121 ¶418; 124-28 ¶¶428 -29, 431-452; 129-30 ¶¶455-459, 461

(9) February 24, 2021 Transcript –Excerpt.................................................137-39 ¶¶491-498

(10) Te-Moak Resolution 75-TM-21 ........................................................29 ¶97; 127 ¶447

(11) Judge Carrie Frias Resignation Letter ..........................160 ¶576; 196 ¶688; 209 ¶720(8)

# Appendix II

# Exhibit II-A(1)

| | | | | |
|---|---|---|---|---|
| MEDICAL PURPOSES ONLY: | 91 | YES | 25 | NO |
| RECREATIONAL PURPOSES ONLY: | [illegible] | YES | [illegible] | NO |
| MEDICAL AND RECREATIONAL BOTH | 90 | YES | [illegible] | NO |

By majority vote Medical Purposes Only has been selected.

[illegible] Special Cannabis Election [illegible] true and correct [illegible]

[illegible]

[illegible], Chairperson

[illegible], Vice Chairperson

[illegible], Secretary

[illegible]

[illegible]

| | | | | |
|---|---|---|---|---|
| MEDICAL PURPOSES ONLY: | 91 | YES | 25 | NO |
| RECREATIONAL PURPOSES ONLY: | 58 | YES | 40 | NO |
| MEDICAL AND RECREATIONAL BOTH | 90 | YES | 25 | NO |

By majority vote Medical Purposes Only has been selected.

[illegible] Special [illegible] Election [illegible] registered voters [illegible]

[illegible]

[illegible], Chairman

[illegible], Vice Chairman

[illegible], Secretary

[illegible]

[illegible]

# Appendix II

# Exhibit II-A(2)

# CONFIDENTIAL

This document contains financial terms and other information that are held by SCS and/or Elko Band on a confidential and privileged basis. Please take appropriate precautions to maintain the confidentiality of this document and its terms and refrain from disclosing this document or its terms without the consent of the parties hereto.

## RECREATIONAL CANNABIS JOINT VENTURE AGREEMENT

This JOINT VENTURE AGREEMENT ("Agreement"), made on 5/2/2019 April __, 2019 and between SCS Elko, LLC, a Nevada limited liability company ("SCS"), the ELKO BAND COLONY (the "Band"), and ELKO BAND COLONY ENTERPRISES, a formally established Tribal Authority ("EBCE"). The parties are hereinafter sometimes referred to together as the "Joint Venturers" or the "Parties" and individually as a "Joint Venturer" or "Party."

WHEREAS, the Parties wish to establish a joint venture for the purpose of operating recreational cannabis dispensary and/or cannabis cultivation, cannabis production, or related businesses, on tribal land pursuant to the rules and guidelines of the Te-Moak Tribe of Western Shoshone and the Elko Band Colony.

WHEREAS, the Parties wish to enter into this Agreement to carry out the purpose of the joint venture and to define the respective rights and obligations of the Parties with respect to this joint venture.

NOW THEREFORE, in consideration of the mutual promises, covenants, warranties and conditions herein, the Joint Venturers agree as follows:

**Name.** The Parties hereby form and establish a cannabis business featuring a recreational cannabis dispensary and/or cannabis cultivation, cannabis processing, and related businesses (the "Business"). The Parties agree that the legal title to all property acquired to operate the Business shall remain in the name of EBCE. The retail store shall be named at a later date.

**Place of Business and Term.** The principal place of business of the Joint Venture shall be located at: 1555 Shoshone Circle, Elko, Nevada 89801.

**Term.** The term of the Joint Venture shall commence on the date the first cannabis product is sold at the cannabis dispensary and will continue for ten (10) years thereafter. The term may be renewed for a period to be agreed upon in writing by the Parties.

**Purpose.** The Joint Venturers form this Joint Venture to operate a cannabis dispensary, and/or cannabis cultivation, cannabis production, and related businesses ("the Facilities") pursuant to the rules and guidelines set forth in the Te-Moak Tribe of Western Shoshone and the Elko Band Colony cannabis ordinances. SCS shall use its best efforts to construct and open the Facilities at the earliest legal opportunity. For federal tax reasons, or other reasons, the form of this agreement may change from time to time. The Parties agree to work together in good faith to facilitate such changes.

**<u>Funding</u>.** SCS will finance or arrange for third-party financing for the development and construction of the facilities used in the Business and, to the extent income from the Business

# CONFIDENTIAL

This document contains financial terms and other information that are held by SCS and/or Elko Band on a confidential and privileged basis. Please take appropriate precautions to maintain the confidentiality of this document and its terms and refrain from disclosing this document or its terms without the consent of the parties hereto.

is insufficient, amounts necessary to operate the Business. The Parties shall endorse, assume, or guarantee such obligations of the Business as the Parties may mutually agree upon. It is understood between the Parties that sales tax or excise tax greater than or equal to those charged by the state of Nevada will be applied to sales of the Business. Tax revenue shall be deemed to be a part of the Gross Revenue.

**Percentage Interest In The Joint Venture.** The respective percentage interest in the Joint Venture owned by each Joint Venturer, respectively, is as follows:

| | |
|---|---|
| SCS | 50% |
| EBCE | 50% |

**Management and Delegation of Authority.** Management of the Joint Venture shall be conducted by the head officers/appointed representative of SCS ("Manager") as follows: Kevin Clock shall represent the interest, authority, and decision making of SCS. The acting Chairperson for the EBCE shall represent EBCE for purposes of consultation, notices, interest, authority and decision making.

**Scope of Authority.** The Parties agree to operate the business in a collaborative manner. Telephonic meetings between the Parties will occur at least monthly. In-person meetings will occur at least quarterly. Manager shall have authority in conjunction with EBCE to conduct the day-to-day operations of the Joint Venture. All design, architectural, and capital improvement decisions shall be made with the advice and consent of both Parties. SCS shall provide the Joint Venture with operating budgets on an annualized basis. EBCE shall have the right to review and comment to determine the commercial reasonableness of compensation to employees and consultants. SCS owners, officers and/or representatives will not receive compensation or salary from the Joint Venture before the distribution of net profits. All public relations materials and statements will be made with the advice and consent of both Parties. In the event of a dispute over commercial reasonableness of the compensation, the matter shall be resolved pursuant to the deadlock provision.

**Profits.** The net profits as they accrue for the term of this Agreement or so long as the Joint Venturers are the owners in common of the business interest, shall be distributed between the Joint Venturers, based on the respective percentage interest in the Joint Venture owned by each Joint Venturer as follows:

| | |
|---|---|
| SCS | 50% |
| EBCE | 50% |

**Business Losses.** To the extent that Net Cash Flow may from time to time be negative, SCS will provide or arrange for financing to cover such shortfall.

**Expenses of Venture.** All losses and disbursements in acquiring, operating, holding and protecting the business interest and the net profits shall, during the period of the Joint Venture, be the responsibility of the Joint Venturers, to be paid from the revenues of the Joint

# CONFIDENTIAL

This document contains financial terms and other information that are held by SCS and/or Elko Band on a confidential and privileged basis. Please take appropriate precautions to maintain the confidentiality of this document and its terms and refrain from disclosing this document or its terms without the consent of the parties hereto.

Venture or as otherwise provided herein. In no case shall the Band be required to contribute funds to the Joint Venture.

**Books and Records.** SCS, as operator and manager, shall maintain the books and records of the Joint Venture in accordance with the Generally Accepted Accounting Principles. EBCE and/or the Elko Band Colony shall receive financial statements on a quarterly basis and shall have reasonable access to all books and records upon request. The Band and EBCE may in their discretion review financial statements with their accountants or other professionals, and such review shall not be deemed a violation of any provision of this Agreement.

**Insurance.** During the term of the Joint Venture, the Joint Venture shall maintain both workers' compensation and general liability insurance. During construction, owners' comprehensive construction insurance shall also be maintained.

**Hiring Preference.** For open positions, preference will be given to cardholding members of the Elko Band Colony and their direct descendants. If members or descendants are hired, they will be subject to the same performance and discipline standards as all other employees. SCS will provide training opportunities to members of the Elko Band Colony and their descendants to better their chance of employment by the Business.

**Confidential Information.** "Confidential Information" means nonpublic information that (a) the disclosing Party designates as confidential, or (b) which, under the circumstances surrounding disclosure, ought to be treated as confidential. Confidential Information may include, without limitation, intellectual property rights, marketing materials, ideas, know-how, methods, formulae, processes, designs, apparatus, devices, techniques, systems, sketches, photographs, plans, drawings, specifications, studies, findings, data, reports, projections, plant and equipment expansion plans, lists or identities of employees, financial statements or other financial information, pricing information, cost and expense information, product development and marketing plans, information, procedures, notes, summaries, descriptions, results and the like.

**Intellectual Property Rights.** "Intellectual Property Rights" means any and all patent, copyright, trademark, trade secret, know-how, trade dress or other intellectual or industrial property rights or proprietary rights (including, without limitation, all claims and causes of action for infringement, misappropriation or violation thereof and all rights in any registrations, applications and renewals thereof), whether existing now or in the future, whether worldwide or in individual countries or political subdivisions thereof, or regions, including, without limitation, the United States.

**Treatment of Proprietary and Confidential Information**

1. In connection with the performance of this Agreement, each Party contemplates the disclosure by it of certain Confidential Information to the other Party. Each Party considers its Confidential Information to be an asset of substantial commercial value,

**CONFIDENTIAL**

This document contains financial terms and other information that are held by SCS and/or Elko Band on a confidential and privileged basis. Please take appropriate precautions to maintain the confidentiality of this document and its terms and refrain from disclosing this document or its terms without the consent of the parties hereto.

having been developed at considerable expense, but will disclose such information to the other Party under the terms and conditions of this Agreement.

(a) During the Term and continuing thereafter for two (2) years from the termination or expiration of the Agreement, the Party receiving Confidential Information ("Receiving Party") from the disclosing Party ("Disclosing Party") shall (i) treat all Confidential Information disclosed by the Disclosing Party as secret and confidential and shall not disclose all or any portion of the Confidential Information to any other Person, except as provided in section 1.(b), (ii) not use any of such Confidential Information except in the performance of the Receiving Party's covenants and obligations or otherwise as contemplated under this Agreement, and (iii) restrict access to Confidential Information to the Receiving Party's employees (including contractors, accountants and counsel and similar representatives) who have a need to know such information in connection with the performance of the Receiving Party's obligations and covenants under this Agreement and shall be responsible to ensure that such employees maintain the terms of confidentiality and nonuse as required in this Agreement.

(b) In the event that either Party desires to use a third-party service provider ("Service Provider"), including, for example, an engineering design firm or a contract manufacturer, to develop or produce the Product using Technology or Technology Improvements, all Parties to this Agreement must first enter into at least an acceptable non-disclosure and technology ownership agreement with the Service Provider. Neither Party to this Agreement may disclose any Confidential Information to a Service Provider unless (i) both Parties to this Agreement have individually entered into a non-disclosure agreement with the Service Provider and (ii) the Service Provider has a presence in the United States and is able to be served legal documents in the United States or agrees, in writing, that it can be served and that United States courts have personal jurisdiction over the Service Provider.

2. Notwithstanding anything to the contrary herein, Confidential Information shall not include any information that: (a) is presently in the Receiving Party's possession, provided that such information has not been obtained from the Disclosing Party and that such possession can be demonstrated by the Receiving Party's written records; (b) is, or becomes, generally available to the public through no act or omission of the Receiving Party; (c) is received by the Receiving Party in written form from a third party having no binding obligation to keep such information confidential; or (d) is required to be disclosed by law, upon the advice of legal counsel.

3. Specific Confidential Information shall not be deemed to be available to the public or in the possession of the Receiving Party merely because it is embraced by more general information so available or in said Receiving Party's possession, nor shall a combination or aggregation of features that form confidential information be deemed to be

# CONFIDENTIAL

This document contains financial terms and other information that are held by SCS and/or Elko Band on a confidential and privileged basis. Please take appropriate precautions to maintain the confidentiality of this document and its terms and refrain from disclosing this document or its terms without the consent of the parties hereto.

non-confidential merely because the individual features, without being combined or aggregated, are non-confidential.

4. Each of the Parties hereby agrees that all written or other tangible forms of Confidential Information (including any materials generated by the Receiving Party related to any Confidential Information) shall be and remain the property of its owner and shall be promptly returned to the owner upon the written request of the owner.

5. Neither the Agreement nor the disclosure of any information by the Disclosing Party shall be deemed to constitute by implication or otherwise, a vesting of any title or interest or a grant of any license, immunity or other right to the Receiving Party with regard to the Confidential Information. Additionally, except as expressly provided in this Agreement, the execution of the Agreement shall not operate, directly or indirectly, to grant to either Party any rights under any patent, trade secret or know-how now or hereafter owned by or licensed to the other Party.

6. Each Party warrants that it is the rightful owner of the Confidential Information to be disclosed under this Agreement and that it has the lawful right to make such disclosure.

7. In the event that the Receiving Party or any of its representatives are requested or required to disclose Confidential Information pursuant to a subpoena or an order of a court or government agency, the Receiving Party shall (a) promptly notify the Disclosing Party of the existence, terms and circumstances surrounding the governmental request or requirements; (b) consult with the Disclosing Party on the advisability of taking steps to resist or narrow the request; (c) if disclosure of Confidential Information is required, furnish only such portion of the Confidential Information as the Receiving Party is advised by counsel is legally required to be disclosed; and (d) cooperate with the Disclosing Party in its efforts to obtain an order or other reliable assurance that confidential treatment be accorded to that portion of the Confidential Information that is required to be disclosed.

Because money damages may not be a sufficient remedy for any breach of this Section of the Agreement by the Receiving Party, the Disclosing Party shall be entitled to seek equitable relief, including injunction and specific performance, as a remedy for any such breach of this Section. Such remedy shall not be deemed to be the exclusive remedy for a breach of this Section of the Agreement by the Receiving Party, but shall be in addition to all other remedies available at law or equity to the Disclosing Party. In the event of litigation relating to the Agreement, if a court of competent jurisdiction determines that the Receiving Party has breached this Section of the Agreement, then the Receiving Party shall be liable and pay to the Disclosing Party the reasonable attorney fees, court costs and other reasonable expenses of litigation, including any appeal therefrom. The Receiving Party further agrees to waive any requirement for the posting of a bond in connection with any such equitable relief.

**Indemnity.** Each Party agrees to defend, indemnify, and hold harmless the other Party and its officers, directors, agents, affiliates, distributors, representatives, and employees from any and all third-party claims, and any and all claims related to this Joint Venture, demands,

**CONFIDENTIAL**

This document contains financial terms and other information that are held by SCS and/or Elko Band on a confidential and privileged basis. Please take appropriate precautions to maintain the confidentiality of this document and its terms and refrain from disclosing this document or its terms without the consent of the parties hereto.

liabilities, costs and expenses, including reasonable attorney fees, costs and expenses resulting from the indemnifying Party's material breach of any duty, representation, or warranty under this Agreement. To the extent possible, the Joint Venturer shall indemnify each party.

**Deadlock.** In the event the Joint Venturers are divided on a material issue and cannot agree on the conduct of the business and affairs of the Joint Venture, then a deadlock between the Joint Venturers shall be deemed to have occurred. Upon the occurrence of a deadlock, the issue will be submitted to Arbitration as set forth below.

**Legal Title to the Joint Venture.** The Joint Venturers agree that the legal title to the Tribal Real Property and improvements shall remain in the name of the Elko Band Colony. All other assets including intellectual property, trade name, processes and procedures shall remain the property of SCS to the extent such information is not available to the Public. Following termination of the Joint Venture, property brought into the Joint Venture will remain the property of EBCE.

**Transfers of Joint Venturers' Interests.** Except as otherwise expressly permitted herein, no Joint Venturer may sell, transfer, assign or encumber its interest in the Joint Venture, or admit additional Joint Venturers, without the prior written consent of the other Joint Venturer. Any attempt to transfer or encumber any interest in the Joint Venture in violation of this Section shall be null and void.

The obligations and Rights of Transferees are as follows:

(a) Any person who acquires in any manner whatsoever any interest in the Joint Venture, irrespective of whether such person has accepted and adopted in writing the terms and provisions of this Agreement, shall be deemed by the acceptance of the benefit of the acquisition thereof to have agreed to be subject to and bound by all the obligations of this Agreement that any predecessor in interest of such a person was subject to or bound by; and

(b) The person acquiring an interest in the Joint Venture shall have only such rights, and shall be subject to all of the obligations, as are set forth in this Agreement; and, without limiting the generality of the foregoing, such a person shall not have any right to have the value of its interest ascertained or receive the value of such interest or, in lieu thereof, profits attributable to any right in the Joint Venture, except as herein set forth.

**Termination.** Upon the termination or dissolution of the Joint Venture, the Joint Venturers shall proceed to liquidate the Joint Venture, and all proceeds of such liquidation shall be applied and distributed in the manner set above according to the interests held by each party in the Joint Venture. A reasonable time shall be allowed for the orderly liquidation of the Joint Venture's assets in order to minimize losses normally attendant upon such liquidation.

# CONFIDENTIAL

This document contains financial terms and other information that are held by SCS and/or Elko Band on a confidential and privileged basis. Please take appropriate precautions to maintain the confidentiality of this document and its terms and refrain from disclosing this document or its terms without the consent of the parties hereto.

**Notice.** Any notices to be given under this Agreement by either party to the other may be effected either by personal delivery in writing or by mail, registered or certified, postage prepaid with return receipt requested. Mailed notices must be addressed to the addresses of the parties as they appear in the introductory paragraph of this Agreement. Each party may change its address by written notice in accordance with this paragraph. Notices delivered personally will be deemed communicated as of actual receipt; mailed notices will be deemed communicated as of fifteen (15) business days after mailing.

**Dispute Resolution.** Except as expressly provided herein, any disagreements arising under this Agreement shall first be submitted to mediation and, if necessary, arbitration. The Parties will attempt in good faith to agree on a mediator. If the Parties cannot agree on a mediator, the mediator shall be designated by the Nevada office of the Judicial Arbitration and Mediation Service ("**JAMS**"), with preference given to a mediator in geographic proximity to the place of business of the Joint Venture. The Parties shall share equally the mediator's fees. If the dispute is not resolved through mediation or otherwise within 30 days after the date that either Party seeks to initiate mediation, the Parties shall submit the dispute to final arbitration to a mutually agreeable arbitrator, or if such person cannot be agreed upon within five business days, to that person designated by the Nevada office of JAMS. Except as expressly provided in this Agreement, mediation and arbitration as described herein shall be the Exclusive Forum for any Dispute in connection with, relating to, or arising under this Agreement (the "Exclusive Forum"). An arbitration opinion and award resulting from a proceeding under this provision shall be enforceable in the Federal Courts of the State of Nevada, or in a Tribal/CFR Forum with the express written consent of all parties. The Parties shall share equally all costs of arbitration except their own attorney's fees unless ordered by the arbitrator to pay the attorney's fees of the prevailing Party.

**Express, Irrevocable Limited Waiver of Sovereign Immunity.** The Band expressly and irrevocably grants a limited waiver of its sovereign immunity solely as to any Dispute in connection with, relating to, or arising under this Agreement. This limited waiver does not allow recovery from any appointed or elected officials, officers or employees of the Band for any monetary damages whatsoever. The Band covenants and agrees that its limited waiver of sovereign immunity and other waivers and agreements in Sections above are valid, binding, enforceable and irrevocable, notwithstanding any future changes in the structure or composition of the Band's tribal government, and agrees not to revoke or seek to revoke, repudiate or further limit, in whole or in part, any of such waivers or agreements. The parties further covenant and agree they shall not apply to a Tribal Forum for resolution of any Dispute or proceeding in connection with, relating to, or arising under this Agreement, except by express written consent of all Parties. In the event the Band (i) revokes, further limits or attempts to revoke of further limit the limited waiver of sovereign immunity granted under the above Section, (ii) takes any action which is inconsistent with the waiver granted in this Section, or (iii) in the event either Party fails to submit to the jurisdiction of the Exclusive Forum, the Parties recognize and agree that (1) there remains no adequate remedy at law available to the party bringing the Dispute, (2) the party bringing the Dispute will be irreparably injured upon any revocation or further limitation of this Section, and (3) the Parties

# CONFIDENTIAL

This document contains financial terms and other information that are held by SCS and/or Elko Band on a confidential and privileged basis. Please take appropriate precautions to maintain the confidentiality of this document and its terms and refrain from disclosing this document or its terms without the consent of the parties hereto.

hereby consent to the entry of appropriate injunctive relief, consistent with the terms of this Agreement, without the need for the Party bringing the Dispute to prove that actual damages or monetary relief would not be an adequate remedy and without having to post a bond. In such event, the affected Party bringing the Dispute may immediately seek injunctive, interim or provisional relief in the Federal Courts of the State of Nevada, or in a Tribal/CFR Forum with express written consent of the Parties, to preserve the status quo pending mediation and arbitration in the Exclusive Forum. In addition, notwithstanding any other provision of this Agreement, each Party may at any time seek interim or provisional judicial relief in the Federal Courts of the State of Nevada, or in a Tribal/CFR Forum with the express written consent of all parties, while the Dispute resolution and/or Arbitration process is pending and/or on-going, including but not limited to injunctive relief, that may be necessary to protect the rights or property of that Party. Nothing herein shall be deemed to limit the Band's right to enforce its rules and ordinances in a tribal forum. In any legal action or proceeding as to which the Band has waived its sovereign immunity as set forth in this Section, the Band irrevocably consents and agrees that process against it shall be effective if served on the Chairman of the Band.

**Fees and Commissions.** Each Joint Venturer hereby represents and warrants to the other that it has not incurred or obligated the Joint Venture for any brokerage, finder's or other similar fees or commissions in connection with the transactions covered by this Agreement or in connection with acquiring the Joint Venture or forming this Joint Venture. Each Joint Venturer hereby agrees to indemnify and hold harmless the other from and against all liabilities, costs, damages and expenses from any breach or alleged breach of the foregoing representation.

**Waiver.** Failure on the part of any Party to complain of any act of another Party or to declare another Party in default, shall constitute a waiver by such Party of its rights with respect to such act of default, unless Notice and a reasonable opportunity to cure if given to the Party alleged to be in default within ninety (90) days of the act complained of. No waiver of, or consent to, any breach or default shall be deemed or construed to be a waiver of, or consent to, any future breach or default.

**Severability.** If any provision of this Agreement or the application thereof shall be determined by a court of competent jurisdiction to be invalid and unenforceable, the remainder of this Agreement and the application of the other provisions herein contained shall not be affected thereby, and all such other provisions shall remain effective and in force and shall be enforced to the fullest extent permitted by law.

**Binding Effect.** This Agreement shall inure to the benefit of and be binding upon the Parties, and their heirs, successors and assigns.

**Duplicate Originals.** This Agreement may be executed in duplicate, with each such duplicate to be considered an original for all purposes.

**CONFIDENTIAL**
This document contains financial terms and other information that are held by SCS and/or Elko Band on a confidential and privileged basis. Please take appropriate precautions to maintain the confidentiality of this document and its terms and refrain from disclosing this document or its terms without the consent of the parties hereto.

**Construction of Agreement.** The captions contained in this Agreement are inserted only as a matter of convenience and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provision thereof. As used herein, the word "person" shall include the individuals, corporations, partnerships and other entities of any type. In this Agreement, the use of any gender shall be applicable to all genders, and the singular shall include the plural, and the plural shall include the singular.

**Other Activities of Joint Venturers.** Any Party may engage in other business ventures of every nature and neither the Joint Venture nor the other Parties shall have any right or obligation in such independent ventures or the income and profits derived therefrom.

**Merger Clause.** This Agreement, when executed by the Parties, shall contain the entire understanding and agreement between the Parties, if any, with respect to the matters referred to herein and shall supersede all prior or contemporaneous agreements, representations and understanding with respect to such matters.

**Amendments.** This Agreement may be amended by the mutual assent of the Parties hereto at any time prior; provided, however, that any amendment must be by an instrument or instruments in writing signed and delivered on behalf of each of the Parties hereto.

**Governing Law.** This Agreement shall be governed by and interpreted in accordance with the laws of the state of Nevada. The Parties agree that any rule of construction to the effect that ambiguities are to be resolved in favor of either Party shall not be employed in the interpretation of this Agreement and is hereby waived. The prevailing Party in any action or proceeding for the enforcement, protection or establishment of any right or remedy under this Agreement shall be entitled to recover its reasonable attorney fees and costs in connection with such action or proceeding from the non-prevailing Party. Without limiting either Party's indemnification obligations with respect to third-party claims, neither Party shall be entitled to recover consequential, incidental, special, punitive or exemplary damages against the other Party. Nothing in this Section shall be deemed to make the laws of the State of Nevada applicable to the Band's enforcement of its rules and ordinances.

[signatures on next page]

# CONFIDENTIAL

This document contains financial terms and other information that are held by SCS and/or Elko Band on a confidential and privileged basis. Please take appropriate precautions to maintain the confidentiality of this document and its terms and refrain from disclosing this document or its terms without the consent of the parties hereto.

IN WITNESS WHEREOF, the Parties hereto acknowledge that they have read and fully understand this Agreement:

**ELKO BAND COLONY ENTERPRISES**

Signature: Davis Gonzales

By: Chairman Davis Gonzales

Date: May 3, 2019

**ELKO BAND COLONY**

Signature: Davis Gonzales

By: Chairman Davis Gonzales

Date: May 2, 2019

**SCS Elko, LLC**

Signature: Kevin Clock

By: Kevin Clock, President

Date: 5/2/2019

# Appendix II

# Exhibit II-A(3)

June 19, 2019

**BY HAND DELIVERY**

Elko Band Council
Davis Gonzales, Chairman
Juan Arevalo, Vice-Chairman
Jill Temoke, Member
Larry Yaeger, Member
Robert Brady, Member
LaDonna Leyva, Member
Thalia Marin, Member
1745 Silver Eagle Road
Elko, Nevada 89801

Re: Advancement of Cannabis Business

Dear Council,

On May 2, 2019, the Elko Band Colony and Elko Band Colony Enterprises executed a Recreational Cannabis Joint Venture Agreement (the "Agreement") with SCS Elko, LLC ("SCS"). The purpose of the Agreement was to operate a cannabis dispensary and/or cultivation, production and related cannabis businesses (collectively, the "Business").

Since that time (and long before), the members of SCS have worked diligently to advance the Business, including multiple trips to Elko, drafting architectural/layout plans for the retail store, engaging with third parties relating to growing, store management, etc., and writing the Compact for the Elko Band with the State of Nevada. Considerable time, money and energy has already been invested.

Given the above information, SCS was extremely disappointed to learn about the results of the Te-Moak Tribal Council vote relating to the cannabis authorization ordinance on Friday, June 7. The final vote on the ordinance was 3 for and 3 against, leading Te-Moak Tribal Chair Joseph Holley to have to cast the tie-breaking vote to defeat the ordinance.

What is most disappointing is that, had all four members of the Elko Band who sit on the Te-Moak Tribal Council voted yes, the ordinance would have passed. Jill Temoke voted yes. Larry Yaeger voted yes. Robert Brady voted yes. But, inexplicably, Juan Arevalo left the room minutes before the vote. Because he failed to vote, Chair Holley had to cast the deciding vote, and he killed the measure.

# Appendix II

# Exhibit II-A(4)

# ARTICLES OF INCORPORATION
# OF THE NEWE CANNABIS COMMISSION ("NCC")

## Article 1 – Name of Commission

The name of the Commission shall be the "Newe Cannabis Commission". It shall also be know with a short title as the NCC.

## Article 2 – Principal Place of Business

The principal place of business is 515 Shoshone Circle, Elko, Nevada 89801.

## Article 3 – Duration

The duration of the NCC is perpetual, dated on this ___day of August, 2019.

## Article 4 – Purposes

The NCC is organized for the following purposes: (1) to engage in the business of cannabis; (2) to engage in any other business which can, in the opinion of the NCC, be advantageously carried on in connection with the foregoing business; and (3) to oversee and do such things as are incidental to the foregoing or necessary/desirable in order to accomplish the foregoing.

## Article 5 – NCC Membership

### Article 5.1 - Number of Members

The NCC shall initially consist of five (5) members, including:

- one (1) member of Sovereign Cannabis Solutions; and
- four (4) tribal members appointed by the Elko Band Council

### Article 5.2 - Term of Members

NCC members shall serve five (5) year terms and are eligible for reappointment for up to three (3) consecutive terms.

### Article 5.3 - Compensation of Members

If the Elko Band Council wishes, NCC Members who are tribal members may receive compensation and other reasonable expenses incidental to NCC activities, including travel, lodging, and per diem allowances. Such compensation and expense reimbursement shall come from the Elko Band's

earnings from the business.

### Article 5.4 – Abstention/Conflict of Interest

A member may abstain from voting on any matter he/she desires, and shall abstain in any matter that has a personal interest or conflict of interest issue.

### Article 5.5 – Resignation of Membership

An NCC member may resign by filing written resignation with the NCC.

### Article 5.6 – Termination of Membership

A member can have NCC membership terminated by a unanimous vote of the remaining four members of the NCC.

### Article 5.7 – Vacancies

The Elko Band Council shall appoint persons to fill any vacancies. New members filling a vacancy will serve the remaining term of the position that was vacated.

### Article 5.8 – Order

The NCC may consult Robert's Rules of Order to answer questions regarding absences, vacancies and removal from the NCC.

# BY-LAWS OF THE NEWE CANNABIS COMMISSION (NCC)

## Bylaw 1. Officers

The NCC shall appoint a Chairperson; Vice-Chairperson, Secretary and Treasurer.

- The Chairperson shall convene regularly scheduled board meetings, shall preside or arrange for other members of the NCC to preside at each meeting in the following order: vice-chairperson, secretary, treasurer.

- The Vice-Chairperson may preside over and/or assume duties of the Chairperson in limited fashion, such as if the Chairperson is unable to perform his regular duties, but he/she shall chair committees on special subjects as designated by the NCC.

- The Secretary shall be responsible for keeping records of NCC actions, including overseeing the taking of minutes at all NCC meetings, sending out meeting announcements, distributing copies of minutes and the agenda to each NCC member, handling of all correspondence matters, and assuring that corporate records are maintained.

- The Treasurer shall make a report at each NCC meeting. The Treasurer shall assist in the preparation of the budget and make financial information available to the NCC.

## Bylaw 2. Frequency of meetings

The NCC shall meet at least quarterly, at an agreed upon time and place.

## Bylaw 3. Quorum

Three (3) members shall constitute a quorum. A quorum is necessary for business transactions to take place and motions to pass.

## Bylaw 4. Resignations

Resignations from the NCC must be in writing and received by the Secretary.

## Bylaw 5. Removal

An NCC member may be removed by a unanimous vote of the remaining four

members.

**Bylaw 6. Committees**

The NCC may create committees as needed.

**Bylaw 7. Amendment**

These Bylaws may be amended when necessary by four-fifths majority of the NCC. Proposed amendments must be submitted to the Secretary to be sent out with regular NCC announcements.

## APPROVAL

These Articles of Incorporation and Bylaws were approved at a meeting of the Elko Band Council on August 13 ,2019.

# Appendix II

# Exhibit II-A(5)

# NEWE Cannabis Commission

## Cash Flow, Safe Access and Funds Withdrawal Procedures

### Purpose

This document shall establish Elko Band Council's Policy and Procedures for chronicling quarterly cash profits and tracking cash from the NEWE Cannabis Dispensary to the NEWE Cannabis Commission to the Elko Band Council Finance Department.

### Quarterly Profits Count Procedures

At the end of each quarter, Elko Band Council receives its fifty (50%) percent share of profits from the NEWE Cannabis Dispensary operations. The following authorized individuals shall be present to witness the cash count process:

a) Elko Band Council representative (chairman)
b) NEWE Cannabis Commission representative (treasurer)
c) NEWE Cannabis Dispensary representative (cash manger)

The three (3) authorized representatives shall count and verify Elko Band Council's share of profits from the dispensary operations, and sign the Quarterly Cash Statement indicating the total amount of cash received and deposited into the NEWE Cannabis Commission safe.

No other person(s) shall participate or be present in the cash counting process by the three (3) authorized representatives.

Copies of the Quarterly Cash Statement bearing the three (3) authorized signatures shall be immediately provided to the Elko Band Council Finance Department, the NEWE Cannabis Commission chairman and treasurer, and NEWE Cannabis Dispensary representative for respective record keeping.

### Cash Handling and Safe Access Procedures

Only authorized representatives shall process Elko Band Council's cash and each shall be assigned access to only one-third (⅓) combination of the NEWE Cannabis Commission safe code. The three (3) authorized representatives are listed below:

a) Elko Band Council representative (chairman)
b) NEWE Cannabis Commission representative (treasurer)
c) NEWE Cannabis Dispensary representative (cash manager)

Whenever there is a change of authorized representatives; the combination to the NEWE Cannabis Commission safe shall be reset in order to maintain access integrity.

No other person(s) shall participate or be present in the cash counting process conducted by the three (3) authorized representatives.

The three (3) authorized representatives shall remain present during the cash counting procedure and whenever cash is being removed or returned to the safe.

The three (3) authorized representatives shall count the cash utilizing an electronic digital counterfeit detector/counter which shall have the following minimum functions:

| | |
|---|---|
| currency size detection (DD) | ultraviolet detection (UV) |
| magnetic ink detection (MG) | infrared detection (IR) |
| magnetic thread detection (MT) | duplicate serial number detection |
| mixed denomination count | |

The NEWE Cannabis Commission shall procure a counterfeit currency detector/counter unit as described above with funds from its account. This counterfeit detector/counter unit will ensure speed, accuracy and maintain the integrity of the counting the cash.

The counterfeit detector/counter unit **shall not** be identical to those operated by the NEWE Cannabis Dispensary; this will establish an additional security measure for detecting counterfeit currency which may have by-passed NEWE Cannabis Dispensary counterfeit currency detection during its initial and subsequent quarterly cash counts.

All three (3) authorized representatives shall sign the original safe access log sheet acknowledging the correct recorded amount of all transactions such as cash breakdown i.e. amount of currency, coins, banknotes, etc.

The original safe access log sheet entries shall be accurate, legible and document the following:

a) date
b) amount deposited or withdrawn from the safe
c) transaction(s) description
d) signatures of three (3) authorized representatives

The original safe access log sheet shall be retained within the locked safe at all times and copies of the safe access log sheet shall be provided immediately to the Elko Band Council Finance Department and NEWE Cannabis Commission chairman and treasurer whenever

One (1) authorized representative of Elko Band Council and NEWE Cannabis Commission shall physically accompany funds when it is transported to or from the safe.

Copies of all Elko Band Council withdrawal requisition form(s) shall be provided to the NEWE Cannabis Commission chairman and treasurer for record keeping.

[redacted]

## Withdrawal of Funds Submission Deadline

Elko Band Council shall designate the administrator as requestor for NCC safe funds. The administrator shall submit the received applications to the Elko Band Council for review and authorization. Elko Band Council shall plan in advance and anticipate its need of NCC funds from the NCC safe on the designated date on a monthly basis.

The first Thursday of each month will be the deadline to submit standardized withdrawal requisitions to the NEWE Cannabis Commission for processing. The NEWE Cannabis Commission will review submitted paperwork and document expenditures at its monthly meeting.

This will streamline the requisition process and prevent missing documentation required in submitted paperwork prior to the safe access date. Requisitions which do not have all required documentation or other necessary information will not be processed and returned to requisition submitter.

## Safe Access Date

The second Thursday of each month will be the date for accessing the NEWE Cannabis Commission safe for withdrawal of funds per approved withdrawal requisition(s).

# SAFE ACCESS LOG SHEET

**ELKO BAND ENTERPRISE** **NEWE CANNABIS COMMISSION**

| DATE | STARTING BALANCE | DEPOSIT AMOUNT | WITHDRAW AMOUNT | TRANSACTION DESCRIPTION | DISPENSARY REP. | NCC TREASURER | EBC CHAIRMAN |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

# Appendix II

# Exhibit II-A(6)

# ELKO BAND TRIBAL COUNCIL

## POLICY FOR THE REGULATION AND TAXATION OF RECREATIONAL MARIJUANA

### 1. Findings and Purpose

Pursuant to Article 4, Section 12 of the Constitution of the Te-Moak Tribe, approved May 3, 1938, as Amended on August 26, 1982, as organized under the Reorganization Act of June 18, 1934, (48 Stat.), as amended by the Act of June 15, 1935,(49 Stat. 378), the following regulations are intended to carry out the Elko Band Colony (the "Band")'s regulation of the operation of Marijuana Establishments on tribal lands belonging to the Band ("Elko Band Tribal Lands").

The Band hereby finds and declares that:

(a) The United States recognizes Indian tribes as domestic dependent nations with sovereignty over their members and territories.

(b) Pursuant to the Te-Moak Tribe's Constitution, the Elko Band Tribal Council has the authority to adopt resolutions, form contracts, engage in business, and exercise other delegated powers.

(c) The federal Controlled Substances Act, 21 U.S.C. § 801 *et, seq.*, classifies Marijuana as a Schedule 1 drug and prohibits any possession or use of Marijuana except in the course of federally approved research projects. The Controlled Substances Act makes it unlawful under federal law for any person to cultivate, manufacture, distribute, disperse or possess with intent to manufacture, distribute or disperse, Marijuana.

(d) In November 2016, the voters of the State of Nevada passed Question 2, an initiative to legalize, regulate and tax recreational Marijuana in Nevada. The language of Question 2 is codified at Nevada Revised Statutes § 453D.

(e) The Band has decided to open certain lands within its jurisdiction to the possession, consumption, cultivation, processing and distribution of recreational Marijuana by enacting these regulations.

(f) The Elko Band Tribal Council delegates the authority to manage the Band's Marijuana business(es) to the Newe Cannabis Commission (the "Commission"). The Commission shall report at least quarterly to

the Elko Band Tribal Council on the status of the Band's Marijuana Business(es).

(g) It is in the interest of public health and public safety to declare that the use of Marijuana should be legal for persons 21 years of age and older and that the cultivation and sale of Marijuana should be regulated similar to other legal businesses.

(h) The cultivation and sale of Marijuana should be taken away from criminals and regulated under a controlled system where businesses will be taxed and the revenue will be dedicated to education, economic opportunity, and the enforcement of the regulations in these regulations.

(i) Marijuana shall be regulated in a manner similar to alcohol so that:

(1) All Marijuana businesses on Elko Band Tribal Lands shall be owned by the Band and operated through the Commission.

(2) Cultivating, manufacturing, testing, transporting and selling Marijuana will be strictly controlled through licensing and regulation.

(3) Selling or providing Marijuana to persons under 21 years of age shall remain illegal.

(4) Marijuana sold on any Tribal Lands will be appropriately tested and labeled.

## 2. Definitions

(a) "Concentrated Marijuana" means the separated resin, whether crude or purified, obtained from Marijuana.

(b) "Consumer" means a person who is 21 years of age or older who purchases Marijuana or Marijuana Products for use by persons 21 years of age or older, but not for resale to others.

(c) "Department" means the Nevada Department of Taxation.

(d) "Excluded felony offense" means a conviction of an offense that would constitute a category A felony if committed in the State of Nevada or convictions for two or more offenses that would constitute felonies if committed in Nevada. It does not include:

(1) A criminal offense for which the sentence, including probation, incarceration or supervise release, was completed more than 10 years ago; or

(2) An offense involving conduct that would be immune from arrest, prosecution or penalty under Tribal law or NRS chapter 493A.

(e) "Marijuana" means all parts of any plant of the genus Cannabis, whether growing or not, the seeds thereof, the resin extracted from any part of the plant, and every compound, manufacture, salt, derivative, mixture, or preparation of the plant, its seeds or resin. "Marijuana" does not include:

(1) The mature stems of the plant, fiber produced from the stems, oil, or cake made from the seeds of the plant, any other compound, manufacture, salt, derivative, mixture, or preparation of the mature stems (except the resin extracted therefrom) fiber, oil, or cake, the sterilized seed of the plant which is incapable of germination; or

(2) The weight of any other ingredient combined with Marijuana to prepare topical or oral administrations, food, drink, or other products.

(f) "Marijuana Cultivation Facility" means an entity that cultivates, processes and packages Marijuana, that has Marijuana tested by a Marijuana Testing Facility, and that sells Marijuana to retail stores, to Marijuana Product Manufacturing Facilities, and to other Marijuana Cultivation Facilities, but not to Consumers.

(g) "Marijuana Distributor" means an entity that transports Marijuana from a Marijuana Establishment to another Marijuana Establishment.

(h) "Marijuana Establishment" means a Marijuana Cultivation Facility, a Marijuana Testing Facility, a Marijuana Product Manufacturing Facility, a Marijuana Distributor, or a Retail Marijuana Store.

(i) "Marijuana Product Manufacturing Facility" means an entity that purchases Marijuana, manufactures, processes and packages Marijuana and Marijuana Products, and sells Marijuana and Marijuana Products to other Marijuana Product manufacturing facilities and to Retail Marijuana stores, but not to Consumers.

(j) "Marijuana Products" means products comprised of Marijuana or Concentrated Marijuana and other ingredients that are intended for use or consumption, such as, but not limited to edible products, ointments and tinctures.

(k) "Marijuana Paraphernalia" means any equipment, products, and materials of any kind which are used, intended for use, or designed for use in planting, propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, preparing, testing, analyzing, packaging, repacking, storing, or containing Marijuana, or for ingesting, inhaling or otherwise introducing Marijuana into the human body.

(l) "Marijuana Testing Facility" means an entity licensed by the Department to test Marijuana and Marijuana Products, including for potency and contaminants.

(m) "NRS" refers to Nevada Revised Statutes.

(n) "Process" means to harvest, dry, cure, trim, and separate parts of the Marijuana plant.

(o) "Retail Marijuana Store" means an entity that purchases Marijuana from Marijuana Cultivation Facilities, that purchases Marijuana and Marijuana Products from Marijuana Product Manufacturing Facilities and Retail Marijuana Stores, and that sells Marijuana and Marijuana Products to Consumers.

(p) "State" refers to the State of Nevada.

(q) "Unreasonably impracticable" means that the measure necessary to comply with the regulations require such a high investment of risk, money, time or any other resource or asset that the operation of a Marijuana Establishment is not worthy of being carried out in practice by a reasonably prudent businessperson.

(r) "NAC" refers to the Nevada Administrative Code.

(s) "Tribal Marijuana Establishment" means a Marijuana Cultivation Facility, a Marijuana Product Manufacturing Facility, a Marijuana Distributor, or a Retail Marijuana Store operated on the tribal land of a federally recognized Indian Tribe or constituent band in the State pursuant to a validly enacted compact or other agreement with the State or a state licensee.

(t) "Batch" means the usable flower and trim consisting of a specific lot or lots of Marijuana grown by a Marijuana Cultivation Facility from one or more seeds or cuttings of the same strain of Marijuana.

(u) "Batch number" means a unique numeric or alphanumeric identifier assigned to a batch by a Marijuana Establishment when the batch is planted.

(v) "Edible Marijuana Products" means products that:

(1) Contain Marijuana or an extract thereof;

(2) Are intended for human consumption by oral ingestion; and

(3) Are presented in the form of foodstuffs, extracts, oils, tinctures and other similar products.

(w) "Enclosed, locked facility" means a closet, display case, room, greenhouse or other enclosed area that meets the requirements of these regulations related to storage and is equipped with locks or other security devices which allow access only by a Marijuana Establishment agent and the holder of a valid registry identification card.

(x) "Extraction" means the process or act of extracting THC or CBD from Marijuana, including, without limitation, pushing, pulling or drawing out THC or CBD from Marijuana.

(y) "Facility for the production of edible Marijuana Products or Marijuana-infused Products" means a business that:

(1) Is licensed by the State or operates under a tribal compact or other agreement with the State; and

(2) Acquires, possesses, manufactures, delivers, transfers, transports, supplies or sells edible Marijuana Products or Marijuana-infused Products licensees or tribal Marijuana Establishments.

(z) "Inventory control system" means a process, device or other contrivance that may be used to monitor the chain of custody of Marijuana from the point of cultivation to the end Consumer.

(aa) "Lot" means:

(1) The flowers from one or more Marijuana plants of the same strain, in a quantity that weighs 5 pounds or less;

(2) The leaves or other plant matter from one or more Marijuana plants, other than full female flowers, in a quantity that weighs 15 pounds or less; or

(3) The wet leaves or other plant matter from one or more Marijuana plants used only for extraction, in a quantity that weighs 125 pounds or less.

(bb) "Marijuana-infused products" means products that:

(1) Are infused with Marijuana or an extract thereof; and

(2) Are intended for use or consumption by humans through means other than inhalation or oral ingestion.

(3) The term includes, without limitation, topical products, ointments, oils and tinctures.

**3. Effect**

(a) These regulations do not permit any person to engage in and do not prevent the imposition of any civil, criminal, or other penalty for:

(1) Driving, operating, or being in actual physical control of a vehicle, aircraft, or vessel under power or sail while under the influence of Marijuana or while impaired by Marijuana;

(2) Knowingly delivering, giving, selling, administering, or offering to sell, administer, give, or deliver Marijuana to a person under 21 years of age, unless:

(i) The recipient is permitted to possess Marijuana pursuant to NRS chapter 453A; or

(ii) The person demanded and was shown bona fide documentary evidence of the majority and identity of the recipient issued by a federal, state, county, or municipal government, or subdivision or agency thereof.

(3) Undertaking any task under the influence of Marijuana that constitutes negligence or professional malpractice.

(b) These regulations do not prohibit:

(1) A public or private employer from maintaining, enacting, and enforcing a workplace policy prohibiting or restricting actions or conduct otherwise permitted under these regulations;

(2) A state or local government agency that occupies, owns, or controls a building from prohibiting or otherwise restricting the consumption, cultivation, processing, manufacture, sale, delivery, or transfer of Marijuana in that building; or

(3) A person who occupies, owns, or controls a privately owned property from prohibiting or otherwise restricting the smoking, cultivation, processing, manufacture, sale, delivery, or transfer of Marijuana on that property.

## 4. Exemption from prosecution for certain acts.

Notwithstanding any other provision of Tribal law, State law and the law of any political subdivision of the State, except as otherwise provided in these regulations, it is lawful, and must not be used as the basis for prosecution or penalty by the Band, and must not be a basis for seizure or forfeiture of assets for persons 21 years of age or older to:

(a) Possess, use, consume, purchase, obtain, process, or transport Marijuana Paraphernalia, one ounce or less of Marijuana other than Concentrated Marijuana, or one-eighth of an ounce or less of Concentrated Marijuana;

(b) Give or otherwise deliver one ounce or less of marijuana, other than Concentrated Marijuana, or one-eighth of an ounce or less of Concentrated Marijuana without remuneration to a person provided that the transaction is not advertised or promoted to the public; or

(c) Assist another person who is 21 years of age or older in any of the acts described in this section.

## 5. Additional exemptions from prosecution for certain acts

Notwithstanding any other provision of Tribal law, State law and the law of any political subdivision of the State, except as otherwise provided in these regulations or the regulations adopted pursuant to these regulations, it is

lawful and must not be used as the basis for prosecution or penalty by the Band or be a basis for seizure or forfeiture of assets for persons 21 years of age or older to:

(a) Possess Marijuana and Marijuana Products, purchase Marijuana from a Marijuana Cultivation Facility, purchase Marijuana and Marijuana Products from a Marijuana Product Manufacturing Facility, return Marijuana or Marijuana Products to a facility from which they were purchased, transport Marijuana and Marijuana Products to or from a Marijuana Testing Facility, use the services of a Marijuana Distributor to transport Marijuana or Marijuana Products to or from Marijuana Establishments, or sell Marijuana and Marijuana Products to consumers, if the person conducting the activities described in this subsection has a current, valid license to operate a Retail Marijuana Store or is acting in the person's capacity as an agent of a Retail Marijuana Store.

(b) Cultivate, harvest, process, package, or possess Marijuana, sell Marijuana to a Marijuana Cultivation Facility, a Marijuana Product Manufacturing Facility, or a Retail Marijuana Store, transport Marijuana to or from a Marijuana Cultivation Facility, a Marijuana Product Manufacturing Facility, or a Marijuana Testing Facility, use the services of a Marijuana Distributor to transport Marijuana to or from Marijuana Establishments, or purchase Marijuana from a Marijuana Cultivation Facility, if the person conducting the activities described in this subsection has a current, valid license to operate a Marijuana Cultivation Facility or is acting in his or her capacity as an agent of a Marijuana Cultivation Facility.

(c) Package, process, manufacture, or possess Marijuana and Marijuana Products, transport Marijuana and Marijuana Products to or from a Marijuana Testing Facility, a Marijuana Cultivation Facility, or a Marijuana Product Manufacturing Facility, use the services of a Marijuana Distributor to transport Marijuana or Marijuana Products to or from Marijuana Establishments, sell Marijuana and Marijuana Products to a Retail Marijuana Store or a Marijuana Product Manufacturing Facility, purchase Marijuana from a Marijuana Cultivation Facility, or purchase Marijuana and Marijuana Products from a Marijuana Product Manufacturing Facility, if the person conducting the activities described in this subsection has a current, valid license to operate a Marijuana Product Manufacturing Facility or is acting in his or her capacity as an agent of a Marijuana Product Manufacturing Facility.

(d) Possess Marijuana and Marijuana Products and transfer and transport Marijuana and Marijuana Products between Marijuana Establishments, if the person transporting the Marijuana and Marijuana Products has a current, valid license to operate as a Marijuana Distributor or is acting in his or her capacity as an agent of a Marijuana Distributor.

(e) Possess, process, repackage, transport, or test Marijuana and Marijuana Products if the person has a current, valid license to operate a Marijuana Testing Facility or is acting in his or her capacity as an agent of a Marijuana Testing Facility.

(f) Lease or otherwise allow property owned, occupied, or controlled by any person, corporation, or other entity to be used for any of the activities conducted lawfully in accordance with this section.

## 6. No crime for certain acts involving Marijuana Paraphernalia

Notwithstanding any other provision of Tribal law, State law and the law of any political subdivision of the State, it is not unlawful and shall not be an offense or be a basis for seizure or forfeiture of assets for persons 21 years of age or older to manufacture, possess, use, transport, or purchase Marijuana Paraphernalia, or to distribute or sell Marijuana Paraphernalia to a person who is 21 years of age or older.

## 7. Enforcement of contracts

It is the public policy of the Band that contracts related to Marijuana under these regulations and under NRS chapter 453D should be enforceable and shall not be deemed unenforceable on the basis that the actions or conduct permitted pursuant to the license are prohibited by federal law.

## 8. Ownership of Marijuana Establishments

All Marijuana Establishments on Elko Band Tribal Lands shall be owned by the Band. Neither non-tribal members nor individual tribal members may own such Marijuana Establishments.

## 9. Additional Regulations

The Band may adopt regulations as necessary to carry out the provisions of these regulations. Such additional regulations must not prohibit the operation of Marijuana Establishments, either expressly or through regulations that make their operation unreasonably impracticable. For the classes of regulations identified below, the Band's regulations shall be at least as restrictive as those of the State:

(a) Requirements for the security of Marijuana Establishments;

(b) Requirements to prevent the sale or diversion of Marijuana and Marijuana Products to persons under 21 years of age;

(c) Requirements for the packaging of Marijuana and Marijuana Products, including requirements for child-resistant packaging;

(d) Requirements for the testing and labeling of Marijuana and Marijuana Products sold by Marijuana Establishments including a numerical indication of potency based on the ratio of THC to the weight of a product intended for oral consumption;

(e) Requirements for record keeping by Marijuana Establishments.

**10. Inventory control system; where establishment may acquire Marijuana and Marijuana Products; perpetual inventory system of manufacturing process; duties of establishment if loss is incurred.**

(a) Each Marijuana Establishment shall designate a Marijuana Establishment agent who has oversight of the inventory control system of the Marijuana Establishment.

(b) A Marijuana Establishment shall only acquire Marijuana, edible Marijuana Products or Marijuana-infused Products from another licensed Marijuana Establishment or Tribal Marijuana Establishment, including, without limitation, a Marijuana Cultivation Facility and a facility for the production of edible Marijuana Products or Marijuana-infused Products.

(c) Each Marijuana Cultivation Facility, Marijuana Establishment and facility for the production of edible Marijuana Products or Marijuana-infused Products shall establish and implement an inventory control system that documents:

(1) Inventory, acquisitions, harvests, sales, disbursements, and disposal of unusable Marijuana.

(2) When acquiring marijuana from another licensed or Tribal Marijuana Establishment:

(i) A description of the Marijuana acquired, including the amount, strain and batch number, lot number and production run number, or any combination thereof;

(ii) The name and identification number of the Marijuana Establishment registration certificate of the Marijuana Establishment providing the Marijuana; and

(iii) The date of acquisition.

(3) For each batch of Marijuana cultivated:

(i) The batch number, lot number and production run number, as applicable.

(ii) Whether the batch originated from Marijuana seeds or Marijuana cuttings.

(iii) The strain of the Marijuana seeds or Marijuana cuttings planted.

(iv) The number of Marijuana seeds or Marijuana cuttings planted.

(v) The date on which the Marijuana seeds or cuttings were planted.

(vi) A list of all chemical additives used in the cultivation, including, without limitation, nonorganic pesticides, herbicides and fertilizers.

(vii) The number of Marijuana plants grown to maturity.

(viii) Harvest information, including, without limitation:

I) The date of harvest; and

II) The final yield weight of processed usable Marijuana, in grams.

(ix) The disposal of Marijuana that is not usable Marijuana, including:

I) A description of and reason for the Marijuana being disposed of, including, if applicable, the number of failed or other unusable Marijuana plants;

II) The date of disposal;

III) Confirmation that the Marijuana was rendered unusable before disposal; and

IV) The method of disposal.

(4) When providing Marijuana to another Marijuana Establishment or Tribal Marijuana Establishment:

(i) The amount, strain, batch number, lot number and production run number, as applicable, of Marijuana provided to the Marijuana Establishment;

(ii) The name and Marijuana Establishment registration certificate number of the other Marijuana Establishment;

(iii) The date on which the Marijuana was provided to the Marijuana Establishment or Tribal Marijuana Establishment.

(5) When receiving edible Marijuana Products from another Marijuana Establishment or Tribal Marijuana Establishment:

(i) A description of the edible Marijuana Products received from the Marijuana Establishment, including the total weight of each edible Marijuana Product and the amount of THC, measured in milligrams, and the production run number of the Marijuana in each edible Marijuana Product.

(ii) The total amount and production run number of Marijuana in the edible Marijuana Products.

(iii) The name and Marijuana Establishment registration certificate number of the Marijuana Establishment providing the edible Marijuana Products to the receiving Marijuana Establishment.

(iv) The date on which the edible Marijuana Products were provided to the Marijuana Establishment or Tribal Marijuana Establishment.

(6) When receiving Marijuana-infused Products from another Marijuana Establishment or Tribal Marijuana Establishment:

(i) A description of the Marijuana-infused Products received from the Marijuana Establishment, including the total weight of each Marijuana-infused Product and the amount of THC, measured in milligrams, and the production run number of the Marijuana infused in each Marijuana-infused Product.

(ii) The total amount and production run number of Marijuana infused in the Marijuana-infused Products.

(iii) The name and Marijuana Establishment registration certificate number of the Marijuana Establishment providing the Marijuana-infused Products to the receiving Marijuana Establishment.

(iv) The date on which the Marijuana-infused Products were provided to the Marijuana Establishment.

(7) When receiving Concentrated Marijuana or products containing Concentrated Marijuana from a facility for the production of edible Marijuana Products or Marijuana-infused Products:

(i) A description of the Concentrated Marijuana or products containing Concentrated Marijuana received from the facility for the production of edible Marijuana Products or Marijuana-infused Products, including the total weight of each product, the amount of THC, measured in milligrams, and the production run number for each product;

(ii) The name and Marijuana Establishment registration certificate number of the Marijuana Establishment providing the Concentrated Marijuana or products containing Concentrated Marijuana to the receiving Marijuana Establishment; and

(iii) The date on which the Concentrated Marijuana or products containing Concentrated Marijuana were provided to the Marijuana Establishment.

(d) Each Marijuana Establishment shall:

(1) Establish and maintain an inventory system which adequately documents the flow of materials through the manufacturing process;

(2) Establish procedures that reconcile the raw material used to the finished product on the basis of each job. Significant variances must be documented, investigated by management personnel and immediately reported to the Band or the Commission.

(e) If a Marijuana Establishment identifies a reduction in the amount of Marijuana in the inventory of the Marijuana Establishment not due to documented causes, the Marijuana Establishment shall determine where the loss has occurred and take and document corrective action. If the reduction in the amount of Marijuana in the inventory of the Marijuana Establishment is due to suspected criminal activity by a Marijuana Establishment agent, the Marijuana Establishment shall report the Marijuana Establishment agent to the Band or the Commission.

(f) A Marijuana Establishment shall maintain the documentation required in this subsection at the Marijuana Establishment.

## 11. Seed-to-Sale Inventory Program

A Marijuana Establishment shall:

(a) Use a Seed-to-Sale Inventory Program compatible with the software system selected by the State;

(b) Use the Seed-to-Sale Inventory Program in connection with the software system selected by the State in order to provide accurate inventory accounting; and

(c) Pay any fees associated with this connection to the software system selected by the State.

## 12. Reporting of loss or theft of Marijuana; maintenance of documentation

A Marijuana Establishment shall:

(a) Document and report any loss or theft of Marijuana from the Marijuana Establishment to the Band or the Commission; and

(b) Maintain copies of any documentation required pursuant to this regulation for at least three (3) years after the date on the documentation.

**13. Security**

(a) To prevent unauthorized access to Marijuana at a Marijuana Establishment, the Marijuana Establishment must have security protocols to deter and prevent unauthorized entrance into limited access areas that includes, without limitation, exterior lighting to facilitate surveillance; electronic monitoring, including video cameras which provide coverage of all entrances to and exits from limited access areas and all entrances to and exits from the building and which are capable of identifying any activity occurring in or adjacent to the building, a video camera at each point-of-sale location which allows for the identification of any person purchasing Marijuana; a method for storing video recordings from the video cameras for at least 21 calendar days; sufficient battery backup for video cameras and recording equipment to support at least 5 minutes of recording in the event of a power outage; and notification to alert the Band or the Commission of an unauthorized breach of security at the Marijuana Establishment; and security personnel on site at all days and hours.

(b) Policies and procedures:

(1) That restrict access to the areas of the Marijuana Establishment that contain Marijuana to persons authorized to be in those areas only;

(2) That provide for the identification of persons authorized to be in the areas of the establishment that contain Marijuana;

(3) That prevent loitering;

(4) For conducting electronic monitoring; and

(5) For notification to alert the Band or the Commission an unauthorized breach of security at the Marijuana Establishment.

**14. Storage and sale of usable Marijuana, Concentrated Marijuana and related products; disclosure of independent testing laboratory which performed quality assurance testing.**

(a) A Marijuana Establishment must store all usable Marijuana, concentrated cannabis, edible Marijuana Products and Marijuana-infused Products behind a counter or other barrier to ensure a customer does not have direct access to the usable Marijuana, concentrated Marijuana, edible Marijuana Products or Marijuana-infused Products.

(b) A Marijuana Establishment must disclose the name of the independent testing laboratory that performed the required quality assurance tests for the Marijuana Establishment.

(c) A Marijuana Establishment may only sell Concentrated Marijuana, edible Marijuana Products and marijuana-infused products obtained from a Tribal Marijuana Establishment or facility for the production of edible Marijuana Products or Marijuana-infused Products which holds a Marijuana Establishment registration certificate issued by the State.

(d) A Marijuana Establishment may not sell a product other than usable Marijuana, Concentrated Marijuana, edible Marijuana Products or Marijuana-infused Products that contains any level of THC or CBD without the approval of the State. Each Marijuana Establishment shall maintain a file that contains test results for any such approved product and shall make the file available for review upon request.

**15. Packaging: Generally**

(a) When sold at a Marijuana Establishment, any product containing Marijuana must be dispensed in child-resistant packaging.

(b) Except as otherwise provided, Marijuana-infused Products in solid or liquid form and Concentrated Marijuana must be packaged in plastic which is four (4) mils or more in thickness.

(c) Marijuana-infused Products in liquid form and Concentrated Marijuana may be sealed using a metal crown cork-style bottle cap.

(d) Any container or packaging containing usable Marijuana, Concentrated Marijuana, edible Marijuana Products or Marijuana-infused Products must protect the contents from contamination and must not impart any toxic or deleterious substance to the usable Marijuana, concentrated Marijuana or Marijuana Product.

## 16. Labeling: Generally

Each Marijuana Cultivation Facility, facility for the production of edible Marijuana Products or Marijuana-infused Products and Marijuana Establishment shall:

(a) Use for labeling of all Marijuana, edible Marijuana Products and Marijuana-infused Products the standard label described herein;

(b) Exercise strict control over labeling materials issued for use in labeling operations for Marijuana, edible Marijuana Products and Marijuana-infused Products;

(c) Carefully examine labeling materials issued for a batch for identity and conformity to the labeling specified in the applicable production or control records; and

(d) Have and follow written procedures describing in sufficient detail the control procedures employed for the issuance of labeling.

## 17. Labeling as "Organic"

A Marijuana Cultivation Facility or facility for the production of edible Marijuana Products or Marijuana-infused Products shall not label usable Marijuana, concentrated Marijuana, edible Marijuana Products or Marijuana-infused Products as "organic" unless the Marijuana plants used are produced, processed and certified in a manner that is consistent with the national organic standards established by the United States Department of Agriculture in accordance with the Organic Foods Production Act of 1990.

## 18. Maximum unit size; minimum requirements for font and size of label

(a) Any Marijuana Establishment that packages Marijuana, edible Marijuana Products or Marijuana-infused Products must individually package, label and seal the Marijuana or Marijuana Products in unit sizes such that no single unit contains more than a 2 1/2 ounce supply of Marijuana.

(b) For Marijuana, edible Marijuana Products or Marijuana-infused Products that are intended to be dispensed or sold:

(1) The text used on all labeling must be printed in at least 10-point font and may not be in italics; and

(2) Each label must be at least 2 1/4 inches high by 4 inches wide.

**19. Labeling requirements for usable Marijuana sold at retail; accompanying materials**

(a) A Marijuana Establishment must affix to each container or package containing usable Marijuana sold at retail or provide in the packaging at the time of sale a label that must include, without limitation:

(1) The business or trade name and the Marijuana Establishment registration certificate number of the Marijuana Cultivation facility that cultivated and sold the usable Marijuana.

(2) The lot number.

(3) The date and quantity dispensed, including the net weight measured in ounces and grams or by volume, as appropriate.

(4) The cannabinoid profile and potency levels and terpenoid profile as determined by the independent testing laboratory, which may include the potential total THC but shall not include any other calculated level of THC.

(5) A warning that states: "This product may have intoxicating effects and may be habit forming."

(6) The statement: "This product may be unlawful outside of the State of Nevada." and

(7) The date on which the Marijuana was harvested.

(b) A Marijuana Establishment must provide with all usable Marijuana sold at retail accompanying material that discloses any pesticides applied to the Marijuana Plants and growing medium during production and processing and contains the following warnings:

(1) "Warning: This product may have intoxicating effects and may be habit forming. Smoking is hazardous to your health."

(2) "There may be health risks associated with consumption of this product."

(3) "Should not be used by women who are pregnant or breastfeeding."

(4) "For use only by the person named on the label of the dispensed product. Keep out of the reach of children."

(5) "Marijuana can impair concentration, coordination and judgment. Do not operate a vehicle or machinery under the influence of this drug."

(c) The text used on all accompanying material must be printed in at least 12-point font and may not be in italics.

**20. Testing**

A Marijuana Establishment shall ensure that all Marijuana and Marijuana Products produced, manufactured or sold at the Marijuana Establishment are or have been tested by a Marijuana Testing Facility. No Marijuana or Marijuana Products shall be sold by any Marijuana Establishment unless and until the Marijuana Products have been tested by a Marijuana Testing Facility and shown to meet applicable State standards, to ensure compliance with applicable State laws and regulations.

**21. Labeling requirements for concentrated Marijuana, edible Marijuana Products or Marijuana-infused Products sold at retail; accompanying materials**

(a) A Marijuana Establishment must affix to each container or package containing concentrated Marijuana, edible Marijuana Products or Marijuana-infused Products sold at retail or provide in the packaging at the time of sale a label that must include, without limitation:

(1) The business or trade name and the Marijuana Establishment registration certificate number of the facility for the production of edible Marijuana Products or Marijuana-infused Products that extracted and sold the Concentrated Marijuana or manufactured and sold the product.

(2) The production run number that accounts for all lot numbers of all Marijuana used to extract the Concentrated Marijuana or create the product, as recorded in the inventory control system of the facility for the production of edible Marijuana Products or Marijuana-infused Products that sold the Concentrated Marijuana or product.

(3) The date on which the Concentrated Marijuana was extracted or the product was manufactured.

(4) The date on which the Concentrated Marijuana or product was packaged.

(5) If the Marijuana Product is perishable, a suggested use-by date.

(6) The cannabinoid profile and terpenoid profile of the product, as determined by the independent testing laboratory that tested the product, which may include the potential total THC but shall not include any other calculated level of THC.

(7) A list of all ingredients and all major food allergens as identified in 21 U.S.C. §§ 343.

(8) The net weight of the concentrated Marijuana or product.

(9) A warning that states: "Caution: When eaten or swallowed, the intoxicating effects of this drug may be delayed by two or more hours."

(10) If Concentrated Marijuana or a Marijuana extract was added to the product, a disclosure of the type of extraction process and any solvent, gas or other chemical used in the extraction process, or any other compound added to the extract.

(11) A warning that states: "This product may have intoxicating effects and may be habit forming."

(12) A statement that: "This product may be unlawful outside of the State of Nevada."

(b) A Marijuana Establishment must provide with all concentrated Marijuana, edible Marijuana Products and Marijuana-infused Products sold at retail accompanying material that discloses any pesticides applied to the Marijuana plants and growing medium during production of the Marijuana used to create the extract added to the edible Marijuana Products or Marijuana-infused Products and the type of extraction method used, including, without limitation, any solvents, gases or other chemicals or compounds used to produce or that are added to the extract, and contains the following warnings:

(1) "There may be health risks associated with consumption of this product."

(2) "This product contains or is infused with Marijuana or active compounds of Marijuana."

(3) "Should not be used by women who are pregnant or breastfeeding."

(4) "For use only by the person named on the label of the dispensed product. Keep out of the reach of children."

(5) "Products containing Marijuana can impair concentration, coordination and judgment. Do not operate a vehicle or machinery under the influence of this drug."

(6) "Caution: When eaten or swallowed, the intoxicating effects of this drug may be delayed by two or more hours."

(c) The text used on all accompanying material must be printed in at least 12-point font and may not be in italics.

**22. Required examinations of packaged and labeled Marijuana Products**

Each Marijuana Cultivation Facility, facility for the production of edible Marijuana Products or Marijuana-infused Products and Marijuana Establishment shall:

(a) Examine packaged and labeled Marijuana Products during finishing operations to provide assurance that the containers and packages have the correct labels; and

(b) Collect a representative sample of units at the completion of finishing operations and ensure that the samples are visually examined for correct labeling.

**23. Requirements for operation of Marijuana Establishment**

Marijuana Establishments shall:

(a) Secure every entrance to the Marijuana Establishment so that access to areas containing Marijuana is restricted to persons authorized to possess Marijuana;

(b) Secure the inventory and equipment of the Marijuana Establishment during and after operating hours to deter and prevent theft of Marijuana.

**24. Requirements and restrictions concerning sale and advertising of Marijuana Products; requirements on Marijuana Product Manufacturing Facility and Retail Marijuana Store.**

Each Retail Marijuana Store and Marijuana Product Manufacturing Facility shall ensure that all Marijuana Products offered for sale:

(a) Are labeled clearly and unambiguously:

(1) As Marijuana with the words "THIS IS A MARIJUANA PRODUCT" in bold type; and

(2) As required by these regulations.

(b) Are not presented in packaging that contains an image of a cartoon character, mascot, action figure, balloon or toy, except that such an item may appear in the logo of the Marijuana Product Manufacturing Facility that produced the Marijuana Product.

(c) Are regulated and sold on the basis of the concentration of THC in the products and not by weight.

(d) Are packaged and labeled in such a manner as to allow tracking by way of an inventory control system.

(e) Are not packaged and labeled in a manner which is modeled after a brand of products primarily consumed by or marketed to children.

(f) Are labeled in a manner which indicates the number of servings of THC in the product, measured in servings of a maximum of 10 milligrams per serving, and includes a statement that the product contains Marijuana and its potency was tested with an allowable variance of the amount determined by the Department by regulation.

(g) Are not labeled or marketed as candy.

(h) A Marijuana product must be sold in a single package. A single package must not contain:

(i) For a Marijuana Product sold as a capsule, more than 100 milligrams of THC per capsule or more than 800 milligrams of THC per package.

(ii) For a Marijuana Product sold as a tincture, more than 800 milligrams of THC.

(iii) For a Marijuana Product sold as a food product, more than 100 milligrams of THC.

(iv) For a Marijuana Product sold as a topical product, a concentration of more than 6 percent THC or more than 800 milligrams of THC per package.

(v) For a Marijuana Product sold as a suppository or transdermal patch, more than 100 milligrams of THC per suppository or transdermal patch or more than 800 milligrams of THC per package.

(vi) For any other Marijuana Product, more than 800 milligrams of THC.

(i) A Marijuana Product Manufacturing Facility shall not produce Marijuana Products in any form that:

(i) Is or appears to be a lollipop or ice cream.

(ii) Bears the likeness or contains characteristics of a real or fictional person, animal or fruit, including, without limitation, a caricature, cartoon or artistic rendering.

(iii) Is modeled after a brand of products primarily consumed by or marketed to children.

(iv) Is made by applying Concentrated Marijuana to a commercially available candy or snack food item other than dried fruit, nuts or granola.

(j) A Marijuana Product Manufacturing Facility shall:

(i) Seal any Marijuana Product that consists of cookies or brownies in a bag or other container which is not transparent.

(ii) Affix a label to each marijuana product intended for human consumption by oral ingestion which includes, without limitation, in a manner which must not mislead consumers, the following information:

(A) The words "Keep out of reach of children";

(B) A list of all ingredients used in the Marijuana Product;

(C) A list of all allergens in the Marijuana Product; and

(D) The total weight of Marijuana contained in the Marijuana Product or an equivalent measure of THC concentration.

(iii) Package all Marijuana Products produced by the Marijuana Product Manufacturing Facility on the premises of the Marijuana Product Manufacturing Facility.

(k) A Retail Marijuana Store or Marijuana Product Manufacturing Facility shall not engage in advertising that in any way makes Marijuana or Marijuana Products appeal to children, including, without limitation, advertising which uses an image of a cartoon character, mascot, action figure, balloon, fruit or toy.

(l) Each Retail Marijuana Store shall offer for sale containers for the storage of Marijuana and Marijuana Products that lock and are designed to prohibit children from unlocking and opening the container.

(m) A Retail Marijuana Store shall:

(i) Include a written notification with each sale of Marijuana; or Marijuana Products that advises the purchaser:

(A) To keep Marijuana and Marijuana Products out of the reach of children;

(B) That Marijuana and Marijuana Products can cause severe illness in children;

(C) That allowing children to ingest Marijuana or Marijuana Products, or storing Marijuana or Marijuana

Products in a location that is accessible to children may result in an investigation by an agency which provides child welfare services or criminal prosecution for child abuse or neglect;

(D) That the intoxicating effects of marijuana products may be delayed by two hours or more and users of Marijuana Products should initially ingest a small amount of the Marijuana Product, then wait at least 120 minutes before ingesting any additional amount of the Marijuana Product;

(E) That pregnant women should consult with a physician before ingesting Marijuana or Marijuana Products;

(F) That ingesting Marijuana or Marijuana Products with alcohol or other drugs, including prescription medication, may result in unpredictable levels of impairment and that a person should consult with a physician before doing so;

(G) That Marijuana or Marijuana Products can impair concentration, coordination and judgment and a person should not operate a motor vehicle while under the influence of Marijuana or Marijuana Products; and

(H) That ingestion of any amount of Marijuana or Marijuana Products before driving may result in criminal prosecution for driving under the influence.

(ii) Enclose all Marijuana and Marijuana Products in opaque, child-resistant packaging upon sale.

## 25. Individual privacy

To ensure that individual privacy is protected:

(a) The Band shall not require a Consumer to provide a Retail Marijuana Store with identifying information other than government-issued identification to determine the Consumer's age; and

(b) A Retail Marijuana Store shall not acquire and record personal information about Consumers other than information typically acquired in a financial transaction conducted at a retail liquor store.

## 26. Prohibitions on operators of Marijuana Establishments

Persons who operate Marijuana Establishments must have not been convicted of an excluded felony offense.

## 27. Other rules for Marijuana Establishments

Marijuana Establishments shall:

(a) Employ Tribal police or private security;

(b) Utilize video surveillance;

(c) Secure every entrance to the Marijuana Establishment so that access to areas containing Marijuana is restricted to persons authorized to possess Marijuana;

(d) Secure the inventory and equipment of the Marijuana Establishment during and after operating hours to deter and prevent theft of Marijuana; and

(e) Determine the criminal history of any person before the person works or volunteers at the Marijuana Establishment and prevent any person who has been convicted of an excluded felony offense or who is not 21 years of age or older from working or volunteering for the Marijuana Establishment.

## 28. Violations and penalties

(a) A person who smokes or otherwise consumes Marijuana in a public place not approved by the Band, in a Retail Marijuana Store, or in a moving vehicle is guilty of a misdemeanor punished by a fine of not more than $500.

(b) A person under 21 years of age who falsely represents himself or herself to be 21 years of age or older to obtain Marijuana is guilty of a misdemeanor punished by a fine of not more than $200.

(c) A person under 21 years of age who knowingly enters, loiters, or remains on the premises of a Marijuana Establishment shall be punished by a fine of not more than $200 unless the person is authorized to possess Marijuana pursuant to Tribal law or NRS chapter 453A and the Marijuana Establishment is a dual licensee.

(d) A person who knowingly gives Marijuana to any person under 21 years of age, or who knowingly leaves or deposits any Marijuana in any place with the intent that it will be procured by any person under 21 years of age is guilty of a misdemeanor.

**29. Taxes**

The Band shall impose a Tribal tax that is equal to at least 100 percent of the State tax on all sales of Marijuana Products on Tribal lands. The Tribal tax shall not be imposed if (1) the sale is to the Band or an enrolled member of the Band or (2) the transaction is otherwise exempt from taxation under State or federal law.

**30. Inventory tracking**

The Band will use an electronic verification system and inventory control system that will track Marijuana Products from seed to sale. For all transactions with State licensees, the Band will provide data to the State documenting the purchase or sale of Marijuana Products within 24 hours of the transaction.

**31. Product acquisition**

The Band shall only acquire Marijuana and Marijuana Products from (1) entities under its control; (2) State-licensed Marijuana Establishments; and (3) other Nevada tribes who have executed compacts with the State.

**32. Packaging, testing and labeling**

(a) All Marijuana Products sold by the Band must be packaged, tested and labeled in compliance with the Marijuana regulations of the State.

(b) Testing of Marijuana Products shall be conducted by laboratories licensed by the State/Department to the standards of the State.

(c) The Band adopts the regulations of the State relating to serving sizes, potency labeling, and packaging limitations.

**33. Advertising**

Advertising on Elko Band Tribal Lands shall not appeal to minors. Advertisements off of Elko Band Tribal Lands will comply with State regulations.

# Appendix II

# Exhibit II-A(7)

AARON D. FORD
*Attorney General*

KYLE E.N. GEORGE
*First Assistant Attorney General*

CHRISTINE JONES BRADY
*Second Assistant Attorney General*

STATE OF NEVADA
OFFICE OF THE ATTORNEY GENERAL

100 North Carson Street
Carson City, Nevada 89701

JESSICA L. ADAIR
*Chief of Staff*

RACHEL J. ANDERSON
*General Counsel*

HEIDI PARRY STERN
*Solicitor General*

June 12, 2020

*Via U.S. Mail and Electronic Mail*

David Carrera, Chairman
Battle Mountain Band Colony
Te-Moak Tribe of Western Shoshone

Email: tribalchairman.carrera@yahoo.com

**Re: Elko Band Colony Cannabis Compact**

Dear Chairman Carrera:

I am in receipt of your email dated May 28, 2020, where you asked, "*why did your office approve cannabis when Battle Mountain Band Council had a Gaming compact in place and our constitution specifically says cannabis is illegal...*"?

On January 23, 2020, Governor Steve Sisolak signed a Cannabis Agreement between the Elko Band Colony of the Te-Moak Tribe of Western Shoshone Indians of Nevada. In entering into that agreement, the State of Nevada relied in part on Te-Moak Tribe of Western Shoshone Indians of Nevada Resolution No. 17-TM-06, dated February 1, 2017. This resolution included a provision that band constituents/members would have "the option to take advantage of recreational [cannabis]" when it became available.

The Elko Band also provided the State of Nevada with Te-Moak Tribe of Western Shoshone Ordinance No. 19-ORD-TM-01, dated August 7, 2019. Section 1(e) of that ordinance states in full:

> The Tribe has decided to allow Elko Band Council to open certain lands within their jurisdiction to the production, sale and manufacture of recreational cannabis consistent with this Chapter.

I am sensitive to your concerns that the Battle Mountain Band Council does not provide for legal usage of cannabis. The January 23, 2020 Compact,

however, is strictly between the State of Nevada, and the Elko Band Colony, and does not extend to the Battle Mountain Band. As a result, while I do not purport to interpret or be an expert on your Constitution, it appears that this agreement is not inconsistent or incompatible with the Battle Mountain Band's Constitution.

Lastly, the document you attached to your email is dated May 11, 2020, and was therefore not considered prior to entering into the January 23, 2020 Compact with the Elko Band Colony.

Respectfully,

Kyle George

Kyle E. N. George
First Assistant Attorney General

cc: Stacey Montooth, Executive Director, Nevada Indian Commission

# Appendix II

# Exhibit II-A(8)

ELKO BAND COUNCIL

# ELKO BAND COUNCIL IS SEEKING TO FILL TWO (2) VACANCIES ON THE NEWE CANNABIS COMMISSION

## THIS IS A FIVE (5) YEAR TERM.

If you are interested in serving on the Newe Cannabis Commission, please submit a letter of interest with your name, address, and telephone number to the Elko Band Administration Office.

**DATE OPEN: November 18, 2021**
**DATE CLOSED: December 2, 2021**

Should you have questions, please contact the Elko Band Administration Office at 738-8889

# Appendix II

# Exhibit II-A(9)


ORDER ONLINE - NEWECANNABIS.COM
NEWE
CANNABIS
CONTAINS MARIJUANA - CANNABIS - KEEP OUT OF REACH OF CHILDREN
ELKO, NV | THE BEST CANNABIS DISPENSARY FOR MILES AND MILES

# Appendix II

# Exhibit II-B(1)

# RESOLUTION OF THE TE-MOAK TRIBE OF WESTERN SHOSHONE HOUSING AUTHORITY

RESOLUTION 90-TMHA- #28

WHEREAS: The Te-Moak Western Shoshone Tribal Council, hereinafter called the Tribal Council or "Council", by Ordinance Number V (76-01), adopted on the 10th day of August, 1966 and amended on the 17th day of December, 1975, chartered a corporation by Resolution Number 66-TM-22, shall be known as the Te-Moak Western Shoshone Housing Authority; and

WHEREAS: The Te-Moak Tribal Council under its Constitution, Article IV, Section 3(E), authorized the Te-Moak Housing Authority to act as an independent sub-organization of the Te-Moak Tribe of Western Shoshone; and

WHEREAS: The primary purpose of the Te-Moak Western Shoshone Housing Authority is to provide safe and sanitary housing for all tribal members in need of housing; and

WHEREAS: The Te-Moak Housing Authority has recently undergone management review(s) by the Department of Housing and Urban Development-Office of Indian Programs. The reviews were very critical of the Housing Authority's current operating policies which were shown to be outdated or inadequate policies for the Authority.

NOW, THEREFORE, BE IT RESOLVED that the Board of Commissioners of the Te-Moak Housing Authority hereby authorizes the Executive Director and Commission Chairman to make investment transactions pursuant to the Investment Policy of the Te-Moak Western Shoshone Housing Authority; and

BE IT FURTHER RESOLVED that the Chairman and Executive Director be authorized to make the Te-Moak Housing Authority investment transactions immediately effective upon the acceptance by the Board of Commissioners of the revised policy.

C-E-R-T-I-F-I-C-A-T-I-O-N

I, the undersigned, Chairman of the Te-Moak Western Shoshone Housing Authority, do hereby certify that the Housing Authority Board of Commissioners is composed of seven members, of whom at least four, constituting a quorum, were present at a duly held meeting on the 25th day of October, 1990, and the affirmative vote of __5__ FOR, __0__ AGAINST: pursuant to Article IV, Section 1 (F6), Authority of Ordinance V as amended by (76-01). This resolution pursuant to the Authority invested therein has not been rescinded nor amended.

____________________________________
CHAIRMAN FELIX IKE

# RESOLUTION OF THE TE-MOAK TRIBE OF WESTERN SHOSHONE HOUSING AUTHORITY

RESOLUTION 90-TMHA- #27

WHEREAS: The Te-Moak Western Shoshone Tribal Council, hereinafter called the Tribal Council or "Council", by Ordinance Number V (76-01), adopted on the 10th day of August, 1966 and amended on the 17th day of December, 1975, chartered a corporation by Resolution Number 66-TM-22, shall be known as the Te-Moak Western Shoshone Housing Authority; and

WHEREAS: The Te-Moak Tribal Council under its Constitution, Article IV, Section 3 (E), thereby authorized the Te-Moak Housing Authority to act as an independent sub-organization of the Te-Moak Tribe of Western Shoshone; and

WHEREAS: The primary purpose of the Te-Moak Western Shoshone Housing Authority is to provide safe and sanitary housing for all tribal members in need of housing; and

WHEREAS: The Te-Moak Housing Authority has recently undergone management review(s) by the Department of Housing and Urban Development-Office of Indian Programs. The reviews were very critical of the Housing Authority's current operating policies which were shown to be outdated or inadequate policies for the Authority.

NOW, THEREFORE, BE IT RESOLVED that the Board of Commissioners of the Te-Moak Housing Authority hereby revise the Investment Policy of the Te-Moak Western Shoshone Housing Authority; and

BE IT FURTHER RESOLVED that the revised policies will become immediately effective upon the acceptance by the Board of Commissioners of the revised policies.

C-E-R-T-I-F-I-C-A-T-I-O-N

I, the undersigned, Chairman of the Te-Moak Western Shoshone Housing Authority, do hereby certify that the Housing Authority Board of Commissioners is composed of seven members, of whom at least four, constituting a quorum, were present at a duly held meeting on the 25th day of October, 1990, and the affirmative vote of 5 FOR, 0 AGAINST; pursuant to Article IV, Section 1 (F6), Authority of Ordinance V as amended by (76-01). This resolution pursuant to the Authority invested therein has not been rescinded nor amended.

____________________________
CHAIRMAN FELIX IKE

## Section 4. Authorizations

All investment transactions shall require the signature of the two authorized officials. The Board of Commissioners shall designate by resolution the personnel authorized to make investment transactions.

## Section 5. Collateralization of Funds

The Housing Authority shall require all depositories to continuously and fully (100%) secure all deposits in excess of the $100,000.00 insured amount. The Executive Director shall be responsible for monitoring account balances to ensure excess funds are being collateralized promptly and that HUD-approved securities are pledged as collateral. The Housing Authority shall maintain evidence of collateralization.

Account Number: EBR-113247
Account Name: TE-MAOK
Statement Date: 01/01/2006 to 12/31/2006

**1st GLOBAL CAPITAL Corp.**

# DETAIL

## Checking Activity

| Date | Check Number | Payee Detail | Expense Code | Amount |
|---|---|---|---|---|
| 05/24/06 | 1004 | CHECK PAID | | $30,000.00 |
| 08/29/06 | 1005 | CHECK PAID | | ($65,710.00) |
| **Net Checking Activity** | | | | ($95,710.00) |

## UNREALIZED GAIN (LOSS) LOT DETAIL - YEAR ENDING 2006

NFS determines the appropriate cost basis method for calculating gain and loss based on positions held at the time of sale. For open-end mutual funds, NFS determines cost basis using the average cost-single category (ACSC) method unless otherwise instructed. For all other securities, NFS determines cost basis using the first-in, first-out (FIFO) method if NFS does not receive appropriate specific share instructions. NFS determines cost basis using the specific share identification method if NFS receives appropriate specific share instructions; however, such cost basis information may not correspond to a customer's cost basis information records if a customer used the specific share identification method prior to the time that such method tracking was made available by NFS. Cost basis, associated gain and loss, and holding period information reported may not reflect all adjustments necessary for tax reporting purposes. Cost basis information for debt securities has not been adjusted for amortization or accretion.

LIMITATION ON COST BASIS INFORMATION: NFS's cost basis information system has a cumulative lifetime limit on how much activity it can track for each individual security position in an account. For this purpose, each buy, sell dividend, wash sale disallowed loss, stock split, stock merger, etc, is an event. For some customers, this limit can be reached with approximately 1500 events. Cost basis information for events beyond that limit will usually show as not available or unknown. In addition, any cost basis information shown may be outdated due to events occurring after the limit is exceeded. Once the limit is reached, all cost basis information for the affected position will need to be tracked and updated by the investor.

FIXED INCOME

| Description | Account Type | Date Acquired | Symbol/ Cusip | Price on 12/31/06 | Quantity | Market Value | Cost Basis/ Proceeds | Unrealized Gain (Loss) | Holding Period |
|---|---|---|---|---|---|---|---|---|---|
| FEDL HOME LN MTG CRP SER 2585 CL DG 4.500% 03/15/2023 MULTICLASS MTG PARTN CTFS GTD | CASH | 04/28/05 | 31393MDX3 | $96.404 | 173,000 | $85,198.92 | $87,824.58 | ($2,625.66) | LT |
| FEDL HOME LN MTG CRP SER 2809 CL WK 5.25% 05/15/2033 MULTICLASS MTG PARTN CTFS GTD | CASH | 05/20/03 | 313930SY9 | $98.12 | 170,000 | $84,224.95 | $90,034.48 | ($5,809.53) | LT |
| FEDL HOME LN MTG CRP SER 2839 CL | CASH | 10/20/05 | 31393VVE8 | $98.382 | 300,000 | $167,508.07 | $168,560.27 | ($1,052.20) | LT |



Account carried with National Financial Services LLC, Member NYSE, SIPC
See last page for important information about your brokerage account and this statement

**Statement for the Period July 1, 2020 to July 31, 2020**

TE-MOAK HOUSING AUTHORITY - Unincorporated Assn
Account Number: EBP-113247

Avantax℠ Investment Services

## HOLDINGS > FIXED INCOME *continued*

| Description | Symbol/Cusip Account Type | | Quantity | Estimated Price on 07/31/20 | Estimated Current Market Value | Estimated Annual Income | Original/Adjusted Cost Basis | | Unrealized Gain (Loss) |
|---|---|---|---|---|---|---|---|---|---|
| **GOLDMAN SACHS BK USA NY CD 3.25000%** | 38148P2B2 | ***continued*** | | | | | | | |
| Next Interest Payable: 11/14/20 | | | | | | | | | |
| Estimated Yield 3.12% | | | | | | | | | |
| Accrued Interest $1287.27 | | | | | | | | | |
| Average Unit Cost $1.00 | | | | | | | | | |
| Adjusted Cost Basis | | | | | | | $183,006.39 | D | $7,361.19 |
| YTD Amortized Premium | $2.40 E | | | | | | | | |
| **CAPITAL ONE BK USA NATL ASSN CD 2.30000%** 03/01/2022 FDIC INSURED | 140420Y53 CASH | | 105,000 | $1.03402 | $108,572.10 | $2,415.00 | $105,014.50 | | |
| CPN PMT SEMI-ANNUAL | | | | | | | | | |
| ON SEP 01, MAR 01 | | | | | | | | | |
| Next Interest Payable: 09/01/20 | | | | | | | | | |
| Estimated Yield 2.22% | | | | | | | | | |
| Accrued Interest $1012.31 | | | | | | | | | |
| Average Unit Cost $1.00 | | | | | | | | | |
| Adjusted Cost Basis | | | | | | | $105,004.78 | D | $3,567.32 |
| YTD Amortized Premium | $1.46 E | | | | | | | | |
| **STATE BK INDIA NEW YORK NY CD 3.00000%** 03/29/2023 FDIC INSURED | 856285KQ3 CASH | | 23,000 | $1.07427 | $24,708.21 | $690.00 | $23,014.50 | | |
| CPN PMT SEMI-ANNUAL | | | | | | | | | |
| ON SEP 29, MAR 29 | | | | | | | | | |
| Next Interest Payable: 09/29/20 | | | | | | | | | |
| Estimated Yield 2.79% | | | | | | | | | |
| Accrued Interest $236.30 | | | | | | | | | |
| Average Unit Cost $1.00 | | | | | | | | | |
| Adjusted Cost Basis | | | | | | | $23,007.98 | D | $1,700.23 |
| YTD Amortized Premium | $1.41 E | | | | | | | | |
| **DISCOVER BK CD 2.80000% 03/01/2027 FDIC** INSURED | 2546723P1 CASH | | 108,000 | $1.13135 | $122,185.80 | $3,024.00 | $108,014.50 | | |
| CPN PMT SEMI-ANNUAL | | | | | | | | | |
| ON SEP 01, MAR 01 | | | | | | | | | |
| Next Interest Payable: 09/01/20 | | | | | | | | | |
| Estimated Yield 2.47% | | | | | | | | | |
| Accrued Interest $1267.59 | | | | | | | | | |
| Average Unit Cost $1.00 | | | | | | | | | |

**Statement for the Period July 1, 2020 to July 31, 2020**

TE-MOAK HOUSING AUTHORITY - Unincorporated Assn
Account Number: EBP-113247

Avantax℠ Investment Services

ACTIVITY > BANK DEPOSIT DETAIL *continued*

| Bank | Beginning Balance | Ending Balance |
|---|---|---|
| Capital One Bank | $1,579.37 | $48,712 96 |
| PNC Bank | $246,502.02 | $246,502 08 |
| State Bank of India | $246,501.84 | $246,502.08 |
| Total Bank Deposits | $741,085.25 | $788,219.20 |

# Footnotes and Cost Basis Information

Amortization, accretion and similar adjustments to cost basis have been provided for many fixed income securities (and some bond-like equities), however, they are not provided for certain types, such as short-term instruments, Unit Investment Trusts, foreign fixed income securities, or those that are subject to early prepayment of principal (pay downs). Where current year premium or acquisition premium amortization is provided, the prior years' cumulative amortization is reflected in the adjusted cost basis, but we cannot provide a breakdown or the total of such prior amortization amounts.

NFS is required to report certain cost basis and related information to the IRS on the Form 1099-B. Your official 1099-B forms for certain transactions will reflect which lots have been sold for tax purposes. To apply a specific identification cost basis method to 1099-B reporting, appropriate instructions must be on file with NFS or be received by NFS before the trade has settled Absent such instructions, NFS determines cost basis at the time of sale based on its default methods of average cost for open-end mutual funds and first-in, first-out (FIFO) for all other (including ETFs) unless your broker dealer has elected to use another default method. NFS applies FIFO (or other disposal method, if applicable) based on its records, which may be different from yours. For transactions that are not subject to 1099-B cost basis reporting, you should refer to your trade confirmations and other applicable records to determine which lots were considered sold for tax purposes.

While NFS must meet IRS requirements with respect to certain information required to be reported to the IRS, NFS-provided cost basis, realized gain and loss, and holding period information may not reflect all adjustments necessary for your tax reporting purposes. NFS makes no warranties with respect to and specifically disclaims any liability arising out of a customer's use of, or any tax position taken in reliance upon, such information.

For investments in partnerships, NFS does not make any adjustments to cost basis information as the calculation of basis in such investments requires supplemental information from the partnership on its income and distributions during the period you held your investment. Partnerships usually provide this additional information on a Form K-1 issued by April 15th of the following year.

Consult your tax advisor for further information.

D - Adjusted cost basis reflects any cumulative original issue discount, premium, or acquisition premium, and it assumes such amounts were amortized by the taxpayer over the life of the security from acquisition date through disposition date. For securities still held, maturity date was used instead of disposition date. Premium amortization was calculated using the yield-to-maturity method. Acquisition premium was calculated using the ratable accrual method. If applicable, adjusted cost basis reflects market discount accretion which was calculated using the straight line method and was recognized at disposition date. Gain/loss displayed for this transaction was based on cost basis as adjusted for premium and discount as stated above and does not reflect any losses disallowed because of wash sales (if applicable). The adjusted cost basis may not reflect all adjustments necessary for tax reporting purposes and may also not apply if you are using an alternative amortization calculation method. Refer to IRS Publication 550, Investment Income and Expenses, for additional information. E - YTD amortized premium was calculated on the yield-to-maturity amortization method. Cumulative premium amortization from acquisition date through disposition date is reflected in the adjusted cost basis. For securities still held, maturity date was used instead of disposition date. For tax-exempt securities, amortization of premium is required and is not deductible from taxable income. For taxable bonds, a tax election may be required to amortize premium, and the current year's amortized premium may be deductible from taxable income. Our adjusted cost basis calculation may not reflect all adjustments necessary for tax reporting purposes It may not be applicable if you have not made an appropriate tax election or if you are using an alternative amortization calculation method Review prior adjustments that you have made, and consult your tax advisor and IRS Publication 550, Investment Income and Expenses, for additional information.

# Appendix II

# Exhibit II-B(2)

## Distribution Log

| Date | Period | Total $ | EBCE | SCS |
|---|---|---|---|---|
| 7/8/2020 | Q2 2020 | $ 1,000,000.00 | $ 500,000.00 | $ 500,000.00 |
| 10/14/2020 | Q3 2020 | $ 1,500,000.00 | $ 750,000.00 | $ 750,000.00 |
| 1/13/2021 | Q4 2021 | $ 1,500,000.00 | $ 750,000.00 | $ 750,000.00 |
| 4/14/2021 | Q1 2021 | $ 1,200,000.00 | $ 600,000.00 | $ 600,000.00 |
| 7/14/2021 | Q2 2021 | $ 1,450,000.00 | $ 725,000.00 | $ 725,000.00 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| Total | | $ 6,650,000.00 | $ 3,325,000.00 | $ 3,325,000.00 |

# Appendix II

# Exhibit II-B(3)

EBC
Expanded General Ledger - Unposted Transactions Included In Report
From 8/1/2020 Through 12/31/2020

| Debit | Credit | Document Description | Name | |
|---|---|---|---|---|
| 35,000.00 | | Rcls Scholarships Due from Other Enterprise | | |
| 3,000.00 | | Reimbursement for Payment on Roofing Repairs | Sharlene Allison | |
| | 23,396.76 | Deposit - 1920 | | |
| 8,996.00 | | Rex Knight Bed 10/16 | | |
| 3,000.00 | | Marin Roofing - S. Allison Roof | | |
| 100,000.00 | | Law Enforcement | | |
| 1,843.31 | | RIBAO BCS-160 BANK GRADE YWO POCKET & 3 YR PROTEC | Nevada State Bank | Commission Expense |
| 151,839.31 | 23,396.76 | | | |
| 128,422.55 | Remaining amount owed to EBC. | | | |

# Appendix II

# Exhibit II-B(4)

# Elko Band Council

1745 Silver Eagle Drive, Elko, NV 89801 Ph: 775-738-8889

Purchase Order [ ] Note: Mark here if applicable
Credit Card Request [X] Note: Mark here if applicable
Check Request [ ] Note: Mark here if applicable

VENDOR Amazon
NV Bank

Avoid C-Stop Bank

SHIP TO

| DATE OF REQUEST | DATE REQUIRED | DEPARTMENT |
|---|---|---|
| 11/24/2020 | | |
| | | |
| | | |

| QTY | ITEM # | DESCRIPTION | PROGRAM | UNIT PRICE | LINE TOTAL |
|---|---|---|---|---|---|
| | | | | | |
| 1.00 | | Ribao BCS-160 Bank Grade Two Pocket Mixed Value Money Counter | | 1,596.00 | $ 1,596.00 |
| 1.00 | | 3 year protection plan with Tech Support | | 133.99 | $ 133.99 |
| | | | | | $ - |
| | | Sale Tax | | | $ 113.32 |
| | | | | | |
| | | Justification: Needed for daily work - Administration | | | $ - |
| | | | | | $ - |
| | | Receipts attached | | | $ - |
| | | | | | $ - |
| | | | | | $ - |
| | | | | | $ - |
| | | | | | $ - |
| | | | | SUBTOTAL | |
| | | | | | |
| | | | | | $ 1,843.31 |

| Program | Line Item | Amount |
|---|---|---|
| 010 | ~~7740~~ 1920 | $ 1,843.31 |
| | | |

Total $ 1,843.31

**Authorization Signatures (Must be completed to process)**

| Signature | Date |
|---|---|
| V. Huerta — Department Head/Delegate Signer | 11-24-20 |
| Administrator | 11/24/20 |
| Tribal Chairman | |
| Finance Department | 11-30-20 |

**Purchase Order / Check Information**

Check# ______

Purchase Order # ______

Date Issued ______

*Adopted by Elko Band Council 10/18/2017*

BLANK

Deliver to SUSAN
Elko 89801

Office Products ▾

Hello, Su... Account ▾ | Returns & Orders

Black Friday Deals | Gift Cards | Susan's Amazon.com | Buy Again | Prime ▾ | Coupons | Customer Service | Prime Video | Beat the holiday rush

**Office Products** | Office Deals | School Supplies ▾ | Printers, Ink & Toner | Projectors

*"Alexa, buy ... on Audible."* Learn more ›

Office Products › Office & School Supplies › Forms, Recordkeeping & Money Handling › Money Handling Products › Bill Counters

You last purchased this item on November 24, 2020.
View this order



VIDEO



Roll over image to zoom in

60 Bank
Pocket
Counter,
IR/CIS
umber
Bill
orter, 2-
ervice

...OLOGY Store
...atings

Prime FREE
...E Returns

...31, 2021

a 3.5" TFT
...ed on small
...y to read the

200pcs/mim in
...000pcs/min in

...pper capacity
...pacity 200pcs,
...et capacity

- ...counterfeit & non-stop counting: UV,MG,MT,IR and double CIS with the latest and advanced counterfeit technology are used. It won't stop counting with the rejected pocket.
- Warranty and technological support: We offer a 2-year after service against manufacturer defect. Software can be upgraded through USB port.It can be installed with 14 different currencies in one machine at most. Please feel free to contact us for more technological support.

$1,596.00

Prime FREE Delivery
& FREE Returns

FREE Delivery by **Thursday, Dec 3** for Prime members
Order within 9 hrs and 13 mins
Details

**Extended delivery time:** This item takes longer than usual to ship due to its size and/or weight.

Only 2 left in stock - order soon.

Qty: 1

Add to Cart

Buy Now

Secure transaction

| | |
|---|---|
| Ships from | Amazon |
| Sold by | Ribao Technology |
| Packaging | Shows what's inside. T... |

Details

**Add a Protection Plan:**

☐ 3 Year Portable Electronic Accident Protection Plan for $135.99

☐ 2 Year Portable Electronic Accident Protection Plan for $89.99

☐ Add gift options

Deliver to SUSAN - Elko 89801

Add to List

Have one to sell?

amazon.com

Print this page for your records.

**Order Placed:** November 24, 2020
**Amazon.com order number:** 113-4638001-9589847
**Order Total: $1,709.32**

## Not Yet Shipped

| Items Ordered | Price |
|---|---|
| 1 of: *Ribao BCS-160 Bank Grade Two-Pocket Mixed Value Counter, UV/MG/MT/IR/CIS and Serial Number Counterfeit Bill Counter & Sorter, 2-Year After Service*<br>Sold by: Ribao Technology (seller profile)<br>Condition: New | $1,596.00 |

**Shipping Address:**
Susan Zazueta
1745 SILVER EAGLE
ELKO, NV 89801-5085
United States

**Shipping Speed:**
Standard Shipping

## Payment information

**Payment Method:**
Visa | Last digits: 1925

**Billing address**
Susan Zazueta
1745 SILVER EAGLE
ELKO, NV 89801-5085
United States

| | |
|---|---|
| Item(s) Subtotal: | $1,596.00 |
| Shipping & Handling: | $0.00 |
| | ----- |
| Total before tax: | $1,596.00 |
| Estimated tax to be collected: | $113.32 |
| | ----- |
| **Grand Total:** | **$1,709.32** |

To view the status of your order, return to Order Summary.

Conditions of Use | Privacy Notice © 1996-2020, Amazon.com, Inc. or its affiliates

amazon.com

Print this page for your records.

**Order Placed:** November 24, 2020
**Amazon.com order number:** 113-5816828-1426656
**Order Total: $133.99**

## Not Yet Shipped

| Items Ordered | Price |
|---|---|
| 1 of: *ASURION 3 Year Portable Electronic Accident Protection Plan with Tech Support $1500-1999.99*<br>Sold by: Asurion, LLC (seller profile)<br>Condition: New | $133.99 |

**Shipping Address:**
Susan Zazueta
1745 SILVER EAGLE
ELKO, NV 89801-5085
United States

**Shipping Speed:**
Expedited Shipping

## Payment information

**Payment Method:**
Visa | Last digits: 1925

**Billing address**
Susan Zazueta
1745 SILVER EAGLE
ELKO, NV 89801-5085
United States

| | |
|---|---|
| Item(s) Subtotal: | $133.99 |
| Shipping & Handling: | $0.00 |
| | ----- |
| Total before tax: | $133.99 |
| Estimated tax to be collected: | $0.00 |
| | ----- |
| **Grand Total:** | **$133.99** |

To view the status of your order, return to Order Summary.

Conditions of Use | Privacy Notice © 1996-2020, Amazon.com, Inc. or its affiliates

# Appendix II

# Exhibit II-B(5)

August 16, 2016

Carolyn Richards, Deputy Director
Western Regional Office, Bureau of Indian Affairs
2600 North Central Avenue
Phoenix, AZ 85004

Dear Ms. Richards,

The Te-Moak Tribe of Western Shoshone is assuming the responsibilities of the Western Shoshone Public Safety Board as stated in the attached resolution 13-TM-07. This action is effective immediately.

This action is due to the oversight responsibility that lies at the Te-Moak Tribal Council level. Currently, the public safety board is not able to function as a full board due to resignations.

The board before resigning did pass a resolution authorizing that all financial responsibility be turned to the Tribe on August 2rd, 2016 , #02-WSDPS-16 . Furthermore, the WSDPS board did acknowledge and accept Mr. David Pratts', the Chief of Police resignation. Therefore, we are moving forward with restructuring of the Law Enforcement.

On August 16, 2016 the Te-Moak tribe did accept the WSDPS resolution by 16-TM-31 (see enclosed) and will now be operating the financial oversight of the Public Safety Board for the remainder of this fiscal year.

Finally, the constituent Bands namely, Elko Band Council, Wells Band Council and Battle Mountain Council are considering the option of 638ing their own law enforcement programs for FY2017 and further resolutions and letters will be coming forth from the Bands indicating their intentions.

If you have any questions regarding this action you may contact me directly at 775-374-0417 or Davis Gonzales, Vice Chairman at 775-738-9251.

Sincerely,

Lydia Johnson, Chairperson
Te-Moak Tribe of Western Shoshone

Davis Gonzales, Vice-Chairman
Te-Moak Tribe of Western Shoshone

TE-MOAK TRIBE OF WESTERN SHOSHONE

# RESOLUTION OF THE GOVERNING BODY OF THE TE-MOAK TRIBE OF WESTERN SHOSHONE

**RESOLUTION NO. 16-TM-31**

**WHEREAS,** this organization is a recognized Indian organization as defined under the Indian Reorganization Act of 1934, as amended, and exercises rights of home rule and is responsible for the promotion of the economic, health and welfare of its members: and

**WHEREAS,** the Te-Moak Tribe is the parent council for the communities of Elko, Battle Mountain, South Fork and Wells: and

**WHEREAS,** The Western Shoshone Department of Public Safety is a recognized organization which governs the Elko Indian Colony, Battle Mountain Indian Colony, and the Wells Indian Colony. The organization exercises rights of home rule and is responsible for the promotion of the economic, health and welfare of its members: and

**WHEREAS,** The Te-Moak Tribe of Western Shoshone Indians of Nevada, is responsible to protect and preserve the safety, welfare of our Tribal Members: and

**WHEREAS,** the Te-Moak Tribe adopted Resolution No. **13-TM-07** indicating the oversight of the Western Shoshone Public Safety Board: and

**WHEREAS,** the Western Shoshone Department of Public Safety Board passed a resolution on August 2, 2016, **# 02-WSDPS-16**, turning the financial responsibility back to the Tribe: and

**WHEREAS,** the Western Shoshone Department of Public Safety Board has had resignations from three of the Board members: namely Kristi Begay, Kay Brady and Gelford Jim and now only two members currently reside on the Boards: Darla Lozano and Donna Hill, which does not constitute a quorum: and

**WHEREAS.** the Nevada State Bank accounts requires two signatures: and

**NOW THEREFORE BE IT RESOLVED.** that the Te-Moak Tribal Council hereby recognizes and accepts the Western Shoshone Department of Public Safety Board resolution **#02-WSDPS-16**: and

**BE IT FURTHER RESOLVED,** that with this resolution the financial responsibility and management of all Contracts and Grants will be at the Te-Moak level: and

**BE IT FURTHER RESOLVED,** that until further notice Lydia Johnson. Tribal Chairperson and Davis Gonzales. Tribal Vice-Chairman will be the additional check signers on the Nevada State Bank account.

**FINALLY BE IT RESOLVED.** the Contract is with the Bureau of Indian Affairs Law Enforcement and request that they honor and respect this resolution.

**C-E-R-T-I-F-I-C-A-T-I-O-N**

I. the undersigned. as Chairperson of the Te-Moak Tribal Council. do hereby certify that the Tribal Council is composed of nine (9) members of whom (7) were present at the meeting which constituted a quorum held **August 16, 2016** and that the foregoing resolution was adopted at such a meeting by a vote o (6)**FOR**. (0)_**AGAINST** and (0) **ABSTENTION** pursuant to the authority at Article 4. Section 3 of the Constitution of the Te-Moak Tribe of Western Shoshone Indians of Nevada.

Lydia Johnson
Lydia Johnson. Chairperson
Te-Moak Tribe of Western Shoshone

ATTEST:

Phaline A. Conklin.
Recording Secretary

# CENTRAL DISPATCH ADMINISTRATIVE AUTHORITY

To: Western Shoshone DPS

From: Donna Holladay, Director

Subject: Unit Count

Date: February 8, 2017

Central Dispatch Administrative Authority is beginning the budget process for FY 2017-2018. The following is the unit counts for your agency on file at this time. Please make any changes necessary, sign where indicated and fax back to me as soon as possible at (775)738-5604.

Donna Holladay, Director

Unit Radio Counts: 5 (4510, 4511, 4512, 4518, 4519)

Note Changes ( ) Count un-changed ( )

4510 WSDPS

Signature and Date

911

# Fax Transmittal Form

Date: 10-9-19

Total Pages: 5

To: SHARLA DICK
Attn:
Phone Number: 775.738.2345
Fax Number:
Fax Number:

From: Elko Central Dispatch Administrative Authority

Phone Number: (775)777-7300
Fax Number: (775)738-5604
E-mail:

- ☐ Urgent
- ☐ For Review
- ☐ Please Comment
- ☐ Please Reply

Message:

725 Aspen Way Elko NV 89801



Elko Central Dispatch Administrative Authori
725 Aspen Way, Elko, Nevada 898C

October 9, 2019

Te-Moak Tribe of Western Shoshone
525 Sunset Street
Elko, NV 89801

RE: SORNA Officer

Attn: Sharla Dick, Acting Tribal Administrator

Dear Ms. Dick,

I am in receipt of your letter dated October 7, 2019 regarding your new SORNA Officer, Ruben Ramirez. Before we can add him to our list and discuss dispatch services, there is the matter of arrears for the Temoke Tribe of Western Shoshone that needs to be taken care of.

For the budget year 2017/2018, the Temoke Tribe of Western Shoshone is in arrears for two (2) quarters.

| | |
|---|---|
| Quarter 1/1/2018 thru 3/30/2018 | $10,468.75 |
| Quarter 4/1/2018 thru 6/30/2018 | $10,468.75 |
| **Total Due CDAA** | **$20.937.50** |

5 radios with a yearly total of $41,875.00 ($8,375.00 per radio per year). Attached you will find the radio counts as per 4510 for the fiscal year 2017/2018 (July 1, 2017 thru June 30, 2018).

Multiple attempts were made via letters to collect for these services.

Your immediate attention to this matter is appreciated. You can contact me at 775-777-7301.

Sincerely,

Donna Holladay

Donna Holladay
Elko Central Dispatch Administrative Authority

CC: Executive Board, Operations Board, Tom Coyle, Counsel

# CENTRAL DISPATCH ADMINSTRATIVE AUTHORITY

**INVOICE**

**TO:** Temoke Tribe of Western Shoshone
Dept. of Pubic Safety No
1509 Shoshone Circle
Elko, NV 89801

**Please remit payment to:**
Elko Central Dispatch
c/o Elko County Comptroller
540 Court Street, Suite #101
Elko, NV 89801

**DATE:** 10/09/19

| QUANTITY | PERIOD | ANNUAL RATE | QUARTERLY RATE |
|---|---|---|---|
| | 2017/2018 PER UNIT COST $ 8,375.00 | | |
| 5.00 | 4/1/2018-6/30/2018 | $ 41,875.00 | $ 10,468.75 |
| | Third Quarter Previous Balance 1/1/2018-3/30/2018 | | $ 10,468.75 |
| 5.00 | | $ 41,875.00 | $ 20,937.50 |

**ELKO BAND COUNCIL**
1745 Silver Eagle Drive • Elko, Nevada 89801
775-738-8889 • Fax 775-753-5439

2020 NOV 13 A 2:30

November 12, 2020
WESTERN SHOSHONE

RE: Joseph Holley, Chairman
Te-Moak Tribe of Western Shoshone Indians
525 Sunset Street
Elko, NV 89801

Elko Band Council is assuming their own Law Enforcement Services. With assuming our own Law Enforcement, we have to have a contract with the City for Dispatch Services. Te-Moak Tribe has an outstanding bill of $20,937.50 for prior Dispatch Services that were not paid in 2018. Attached is the agreement that Te-Moak Tribe entered in along with your invoice.
Please pay your bill so Elko Band Council can be able to utilize Dispatch Services.

If you have any questions or concerns, please reach out to me at 775-738-8889 EXT 112.

Respectfully,

Davis Gonzales, Chairman
Elko Band Council
1745 Silver Eagle Dr. Elko, NV 89801

CC: Sam Biers, Administrator

Te-Moak Tribal Council

Elko Central Dispatch Administrative Authorit
725 Aspen Way, Elko, Nevada 8980

RECEIVED

DEC 1 [illegible] 2020

ELKO BAND COUNCIL
ADMINISTRATION

December 16, 2020

Elko Band Council
1745 Silver Eagle Drive
Elko, NV 89801

Attn: Davis Gonzales, Chairman

Dear Mr. Gonzales,

This is to inform you that it is the intent of Elko Central Dispatch to enter into an agreement/contract for dispatch services with Elko Band for dispatch services once the outstanding invoice for $20,937.50 is paid.

After the invoice is paid, I will send the agreement/contract to the Executive Board for approval, then once approved, forward to you for signature.

If you should have any questions, please do not hesitate to call.

Sincerely,

Donna Holladay

Donna Holladay
Director, CDAA



DISPATCH (775)777-730[illegible]
DIRECTOR (775)777-730[illegible]
FAX [illegible]

# ELKO BAND COUNCIL

1745 Silver Eagle Drive • Elko, Nevada 89801
775-738-8889 • Fax 775-753-5439

000102

January 12, 2021

2021 J 12 08

Joseph Holley, Chairman
Te-Moak Tribe of Western Shoshone
525 Sunset Street
Elko, Nevada 89801

Chairman Holley:

On November 12, 2020, Elko Band made a request to the Te-Moak Tribe to pay the outstanding debit of $20,937.50 for dispatch services for the Western Shoshone Public Defense Law Enforcement Program (LES) and was denied. (Copy attached) The reason for the denial was that Te-Moak Administration claimed that the Te-Moak Tribe was not responsible for the debt and that the Bureau of Indian Affairs (BIA) was because the BIA took over the LES Contract.

In researching the issue and speaking with the BIA LES Office of Justice Services, we found that the Te-Moak Administration is responsible for the bill.

Enclosed are the supporting documents that we received from the BIA LES office that support this conclusion:

1) Letter dated August 16, 2016 from Lydia Johnson, Chairperson, stating that that the Te-Moak Tribe "Will now be operating the financial oversight of the Public Safety Board" LES.

2) Te-Moak Tribal Resolution No 16-TM-31, stating that "the financial responsibility and management of all Contracts and Grants will be at the Te-Moak Level", which was for the Western Shoshone Department of Public Safety LES Program.

Based on these actions, the Te-Moak Administration utilized the dispatch services from July 1, 2017 through June 30, 2018 but only paid for half of the yearly total due of $41,875.00 which is $20,937.50, leaving the remaining balance of $20,937.50 still due.

When the Elko Band requested a new agreement for these services, the Elko Central Dispatch Service refused to consider it since the Te-Moak Administration had an outstanding debt for the services. The Elko Band was then forced to pay the Te-Moak Tribe's

outstanding bill. Enclosed is a copy of the payment and related documents.

Therefore, the Elko Band Council is hereby requesting reimbursement from the Te-Moak Tribe, for payment made for the Te-Moak Tribes' outstanding dispatch bill owed to the Elko Central Dispatch, in the amount of $20,937.50.

Please let us know when we will receive this reimbursement.

If you have any questions please contact Susan Zazueta, Administrator at (775) 738-8889 ext. 111 or by email at administrator@elkoband.org.

Sincerely,

Davis Gonzales, Chairman

cc: subject file w/copies
WRO BIA Glenn Shafer ATOR w/copies
EBC Finance w/copies

SZazueta:sz:1/12/21:JHolleyltrdispatch

Payee Elko Central Dispatch
Vendor ID ElkoCentralDisp Account #:

89132
12/16/2020

| Invoice | Description | Discount | Amount |
|---|---|---|---|
| Dispatch2020 | Outstanding Dispatch Bill from Te-Moak 2018 | $0.00 | $20,937.50 |
| | Total : | $0.00 | $20,937.50 |

104521

# Appendix II

# Exhibit II-B(6)

# SALES REPORT - NEWE CANNABIS

Update

Apr 1, 2021 12:00 AM - Jun 30, 2021 11:59 PM

| | Marijuana | Paraphernalia | Total |
|---|---|---|---|
| Gross Sales | $2,779,216.23 | $67,022.48 | $2,846,238.71 |
| Discounts | ($275,051.32) | ($6,842.95) | ($281,894.27) |
| Returns | ($5,237.85) | ($138.15) | ($5,376.00) |
| **Net Sales** | **$2,498,927.06** | **$60,041.38** | **$2,558,968.44** |

| Tax | Total |
|---|---|
| Excise Tax | $189,187.76 |
| Sales Tax | $156,153.78 |
| Excise Tax | $0.00 |
| **Total** | **$345,341.54** |

| Net Tender Breakdown | Total |
|---|---|
| Cash | $2,904,309.98 |
| Debit | $0.00 |
| Cashless ATM | $0.00 |
| Gift Card | $0.00 |
| **Total** | **$2,904,309.98** |

# Appendix II

# Exhibit II-B(7)

**Newo Cannabis P/L**

| | |
|---|---|
| Date | 07/06/2021 |
| Period | Q2 |
| **Revenues** | |
| Sales | $2,904,306.78 |
| Tips | $ 42,815.00 |
| ATM | $ 7,712.50 |
| **Total Income** | $2,954,834.28 |
| **COGS** | |
| Product - MMJ | $ 865,700.00 |
| Product - Apparel | $ 2,457.00 |
| Delivery to Salal | $ 275,000.00 |
| **Total COGS** | $1,143,157.00 |
| **Expenses** | |
| Administrative | $ 30,000.00 |
| Advertising and Marketing | $ 10,638.00 |
| Bank Fees | $ 2,202.04 |
| Contractors | $ 41,258.23 |
| Insurance (G/L and W/C) | $ 13,611.64 |
| Professional Services | $ 17,585.73 |
| Meals /Entertainment | $ 6,984.77 |
| Rentals | $ 9,224.12 |
| Repairs/Maintenance | $ 224.84 |
| Office Supplies | $ 21,043.81 |
| Payroll Taxes | $ 44,275.43 |
| Payroll Fees | $ 2,057.20 |
| Postage | $ 131.90 |
| Travel and Lodging | $ 2,560.09 |
| Subscriptions | $ 14,155.48 |
| Utilities | $ 2,185.42 |
| Wages | $ 180,348.68 |
| **Total Expenses** | $ 398,487.38 |
| **Net Income** | **$1,413,189.90** |

# appendix II

# Exhibit II-B(8)

**Elko Band Colony Enterprise**
**Distribution Tracker**

| | | | |
|---|---|---|---|
| Date | | 7/14/2021 | |
| Period | | Q2 2021 | |
| | | | % |
| Total Revenues | $ | 2,954,834.28 | |
| Expenses + COGS | $ | 1,541,644.38 | |
| Net Income | $ | 1,413,189.90 | 48% |
| Cash Position (7/14/21) | $ | 1,536,182.49 | |
| Working Capital | $ | 86,182.49 | |
| **Distribution Amount** | **$** | **1,450,000.00** | |
| EBCE | $ | 725,000.00 | |
| SCS | $ | 725,000.00 | |

X______________________________
Elko Band Representative

X ______________________________
SCS Representative

# Appendix II

# Exhibit II-B(9)

Newe Cannabis Commission
Monthly Finance Report for May 2021

May 1, 2021
Starting Balance $1,960,908.13

| DATE | TRANSACTION DESCRIPTION | DEPT | Deposits | Expenditures |
|---|---|---|---|---|
| 5/13/21 | No deposits | | $0.00 | |
| Total Deposits | | | $0.00 | |
| May 13, 2021 | NCC Stipends | NCC-5 | | $1,200.00 |
| May 13, 2021 | NCC Stipends | NCC-5 | | $450.00 |
| 4/31/2021 | Ending Balance | | | $1,959,258.13 |

Distribution (100%) $0.00

| March Balance | | |
|---|---|---|
| EBC-GF-80 | EBC-15 | NCC-5 |
| $1,516,571.24 | $325,669.00 | $117,017.89 |

Notes:

Newe Cannabis Commission
Monthly Finance Report for June 2021

June 1, 2021
Starting Balance $1,959,258.13

| DATE | TRANSACTION DESCRIPTION | DEPT | Deposits | Expenditures |
|---|---|---|---|---|
| 6/10/21 | No deposits | | $0.00 | |
| Total Deposits | | | $0.00 | |
| June 10, 2021 | NCC Stipends | NCC-5 | | $900.00 |
| June 30, 2021 | Ending Balance | | | $1,958,358.13 |

Distribution (100%) $0.00

June Balance

| EBC-GF-80 | EBC-15 | NCC-5 |
|---|---|---|
| $1,516,571.24 | $325,669.00 | $116,117.89 |

Notes:

# Appendix II

# Exhibit II-B(10)

ANNABIS
ELKO | NV

## Confirmation of Cash Payment

ır Name Temuck Tribe

ır Rep Darrin

/ Employee Number Joe Holley

e Date 4/14/2021 Vendor Invoice

ent Amount $ 30,000 Internal Invoice

y Signature JH

repared 4/14/2021

igning this document, you are affirming that you are an authorized representative of the company mentioned . and you have received and verified the cash payment for the amount designated on the invoice provided for the ent**

ed By Signature

icked Up / / Thumb Print

4/14/21

30,000 counted by hand 4:22pm

Darean Stanford

Holley Joseph Holley

Alfreda Walker Alfreda W.

Sharla Dick Sharla Dick

# Te Moak Tax Receipt - Newe

| | |
|---|---|
| Date: | 4/14/2021 |
| Period | Q1 - 2021 |

| | |
|---|---|
| EBCE Distribution Amount: | $600,000.00 |
| Te Moak Tax @ 5% | $ 30,000.00 |

X Joseph Holley

Te Moak Representative Name

X Joseph Holley

Temoak Representative Signature

# Appendix II

# Exhibit II-B(11)

# CASH COUNT RECEIPT

**August 6, 2021**

**Payment Received: $30,000.00** **Deductions: $7,931.75** **Total Cash: $22,068.25**

[signature] 8-6-2021

| NAME | AREA REPRESENTING | DATE | AMOUNT VERIFIED | SIGNATURE |
| --- | --- | --- | --- | --- |
| ivid Carrera | Battle Mountain Band | 8-6-2021 | 22,068-25 | [signature] |
| vis Gonzales | Elko Band Council | 8-6-2021 | 22,068.25 | [signature] |
| ne Garcia, Sr. | South Fork Band Council | 8-6-2021 | 22,068.25 | [signature] |
| drea Woods | Wells Band Council | —— | —— | —— |
| harla Dick | Witness | 08.06.2021 | 22,068.25 | [signature] |
| nifer Knight | Witness | 08.06.2021 | $22,068.25 | [signature] |

# Appendix II

# Exhibit II-B(12)

Find messages, documents, photos or people

← Back Archive Move Delete Spam •••

Inbox
Unread
Starred
Drafts 314
Sent
Archive
Spam
Trash
^ Less

Views Hide
Photos
Documents
Subscriptions
Travel

Folders Hide
+ New Folder
Junk E-mail 5

## Ending Balance

Yahoo/Inbox

**Accounting Manager** <accounting@newecannabis.com>
To: kevin@cascadestrategicinvestments.com, Eli Parris

Wed, Jul 14 at 10:25 AM

Good Morning

Here is the Ending Balance as of today 07/14/2021
Actual Cash Count: $1,401,093.89
Wells Fargo ATM Balance: $135,088.60
$100K is scheduled to be picked up today.
Have a great day!!

Adri H.

•••

Reply, Reply All or Forward

# Appendix II

# Exhibit II-B(13)

Elko Band Deposit

## Deposit ticket

| | | | |
|---|---|---|---|
| **Customer id** | NV210507aD | **Name** | Newe Cannabis |
| **Location** | NV210507aD | | |
| **Bag label** | L9131158 | | |
| | | **Deposit serial #** | 1050722820 |

| | |
|---|---|
| **User** | Newe Cannabis - NV |
| **Status** | Unprocessed |
| **Deposit date** | Wed Oct 20, 2021 |
| **Sales date** | Wed Oct 20, 2021 |
| **Declared currency** | $1,033,000.00 |
| **Declared coin** | $0.00 |
| **Declared checks** | $0.00 |
| **Declared total** | $1,033,000.00 |

## Bag packing slip

| | | | |
|---|---|---|---|
| **Customer id** | NV210507aD | **Name** | Newe Cannabis |
| **Location id** | NV210507aD | | |
| **Serial #** | 19315 | **Bag label** | L9131158 |
| **Bag count** | 1 | | EMPYREAL |
| **Departure date** | Wed Oct 20, 2021 | | |
| **Arrival date** | Wed Oct 20, 2021 | | |
| **Declared total** | $1,033,000.00 | | |

## Deposits

| Deposit serial # | Sales date | Declared total |
|---|---|---|
| 1050722820 | Wed Oct 20, 2021 | $1,033,000.00 |

**1 records**

**Signature 1** ______________________ **Signature 2** ______________________

# Appendix II

# Exhibit II-B(14)

ELKO BAND COLONY ENTERPRISES

1655 SHOSHONE CIRCLE

ELKO, NV 89801

775 [illegible]

$ [illegible]

100

DOLLARS

[redacted] 427

DOLLARS

[redacted] 4 27

# ELKO BAND COLONY ENTERPRISES

1545 SHOSHONE CIRCLE

ELKO, NV 89801

775-388-2705

# Appendix II

# Exhibit II-B(15)

# Financial Summary for August 2021 Reporting Period -Contracts & Grants

| Bureau of Indian Affairs (BIA) | | Contract Amount* | YTD Expenses Through 8/20/2021 | Funds Remaining |
|---|---|---|---|---|
| Contract Term 10/1/18-9/30/2021 | ATTG | $ 92,903.60 | $ 68,651.56 | $ 24,252.04 |
| | Enrollment | $ 99,361.18 | $ 77,535.03 | $ 21,826.16 |
| One Time Funding to be used by 9/30/2021 ** | CARES | $ 273,114.00 | $ 273,056.03 | $ 57.97 |

*Contract amount includes only modification received for current fiscal year and carry over amounts.
** YTD Expenses include all expenses for this grant. Including expenses from previous fiscal year.

| Department of Health & Human Services Indian Health Services | | Grant Amount | YTD Expenses Through 8/20/2021 | Funds Remaining |
|---|---|---|---|---|
| Project Period: 4/1/2016-12/31/2021<br>Budget Period: 1/1/2021-12/31/2021 | Diabetes | $ 653,882.15 | $ 291,897.94 | $ 361,984.20 |

*Grant amount includes only Notice of Awards received and carry over amounts.

| U.S. Environmental Protection Agency | | Grant Amount | YTD Expenses Through 8/20/2021 | Funds Remaining |
|---|---|---|---|---|
| Project Period: 10/01/2020-09/30/2021<br>Budget Period: 10/01/2020-09/30/2021 | EPA | $ 90,000.00 | $ 51,876.48 | $ 38,123.52 |

*Grant amount includes only Notice of Awards received and carry over amounts.

| Department of Justice (DOJ) | | Grant Amount | YTD Expenses Through 8/20/2021 | Funds Remaining |
|---|---|---|---|---|
| Project Period: 10/01/2020-09/30/2023<br>Budget Period: 10/01/2020-09/30/2023 | SORNA | $ 150,000.00 | $ 72,134.36 | $ 77,865.64 |

*Grant amount includes only Notice of Awards received and carry over amounts (remaining includes $42,060 for FY22 & FY23)

| Coronavirus Relief Fund -Treasury | | Grant Amount | YTD Expenses Through 8/20/2021 | Funds Remaining |
|---|---|---|---|---|
| One Time Funding to be used by 9/30/2021* | CARES | $ 3,664,804.02 | $ 3,548,297.65 | $ 116,506.37 |

*YTD Expenses include all expenses for this grant. Including expenses from previous fiscal year.

| Indirect (33.82%) | Indirect From Programs | YTD Expenses Through 8/20/2021 | Funds Remaining |
|---|---|---|---|
| | $ 161,843.62 | $ 173,147.49 | $ (11,303.87) |

*Indirect from programs only includes the amount earned as of reporting date.

**The following pages will give you additional backup for these numbers. This is a summary of the pages to follow.**

## Financial Summary for August 2021 Reporting Period -Non Federal Funds

| Eyewear | | Revenue | | YTD Expenses Through 8/20/2021 | | Funds Remaining |
|---|---|---|---|---|---|---|
| | $ | 45,129.49 | $ | 39,514.18 | $ | 5,615.31 |

*Revenue only includes amount actually received as of report date.

| General Fund | | Revenue | | YTD Expenses Through 8/20/2021 | | Funds Remaining |
|---|---|---|---|---|---|---|
| General | $ | 11,706.54 | $ | 3,237.23 | $ | 8,469.31 |
| Court** | $ | 73,334.70 | $ | 57,690.28 | $ | 15,644.42 |

*General Revenue only includes amount actually received as of report date.
**Court Revenue is the amount that was in the two Law Enforcement bank accounts.

| Rhama | | Bank Balance (includes interest received) | | YTD Expenses Through 8/20/2021 | | Funds Remaining |
|---|---|---|---|---|---|---|
| | $ | 400,021.95 | $ | 334,661.54 | $ | 65,360.41 |

*Bank balance is as of 9/30/2020 + interest earned as of report date.

**The following pages will give you additional backup for these numbers. This is a summary of the pages to follow.**

Te-Moak Tribe of Western Shoshone
General Fund (42)
Court broken out from the rest of General Fund.

FY 2021

| FY 21 Expected Revenue | 1st Qtr. Revenue | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| Law Force Accounts-Amount in banking accounts | 73,334.70 | | | | | | $ 73,334.70 |
| | | | | | | Total Expected Revenue | $ 73,334.70 |

QB: Accrual Method

| Acct # | Budget Category/Line Item | Category Budget | Line Item Budget | 1st Qtr. Expenses | 2nd Qtr. Expenses | 3rd Qtr. Expenses | 21-Jul | 21-Aug | Ytd Exp | Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| | **Personnel** | | | | | | | | **$ 18,601.19** | **(18,601.19)** |
| 5110 | Appellate Judge- Samuel Biers | | | $ - | $ - | $ - | | | $ - | - |
| 5110 | Trial Court Judge -Ramon Acosta | | | $ - | $ 6,152.44 | $ - | | | $ 6,152.44 | (6,152.44) |
| 5110 | Tribal Court Clerk & Tribal Court Administrator - Elisa Dave | | | $ - | $ 1,422.00 | $ 9,230.75 | | | $ 10,652.75 | (10,652.75) |
| 5110 | Bailiff - Tildon Smart | | | $ - | $ 300.00 | $ - | | | $ 300.00 | (300.00) |
| 5110 | Tribal Prosecutor- Anne Laughlin | | | $ - | $ 1,496.00 | $ - | | | $ 1,496.00 | (1,496.00) |
| 5110 | Tribal Public Defender - Angie Portel | | | $ - | $ - | $ - | | | $ - | - |
| | **Fringe Benefits** | | | | | | | | **$ 1,093.85** | **(1,093.85)** |
| 5210 | FICA | | | | $ - | $ 706.15 | | | $ 706.15 | |
| 5230 | NV Unemployment/Career | | | $ - | $ - | $ 387.70 | | | $ 387.70 | (387.70) |
| | **Travel** | | | | | | | | **$ 3,058.41** | **(3,058.41)** |
| 5310 | Tribal Court - Ramon Acosta | | | $ - | $ 1,467.73 | $ - | | | $ 1,467.73 | (1,467.73) |
| 5310 | Tribal Court Clerk & Tribal Court Administrator - Elisa Dave | | | $ - | $ 1,007.50 | $ - | | | $ 1,007.50 | (1,007.50) |
| 5310 | Appellate Judge- Samuel Biers | | | $ - | $ - | $ - | | | $ - | - |
| 5310 | Tribal Prosecutor- Anne Laughlin | | | $ - | $ - | $ - | | | $ - | - |
| 5310 | Tribal Public Defender - Angie Portel | | | $ - | $ - | $ - | | | $ - | - |
| 5310 | Bailiff - Tildon Smart | | | $ - | $ 301.95 | $ 281.23 | | | $ 583.18 | (583.18) |
| | **Equipment (Do not include in Indirect Calculation)** | | | | | | | | **$ 16,066.95** | **(16,066.95)** |
| | Equipment | | | $ - | $ - | $ - | $ 7,786.95 | $ 8,280.00 | $ 16,066.95 | (16,066.95) |
| | **Supplies** | **$ -** | | | | | | | **$ 1,772.53** | **(1,772.53)** |
| 5510 | Supplies | | | $ - | $ 55.00 | $ 1,717.53 | | | $ 1,772.53 | (1,772.53) |
| | | | | $ - | $ - | $ - | | | $ - | - |
| | **Construction** | **$ -** | | | | | | | **$ -** | **-** |
| | | | | $ - | $ - | $ - | | | $ - | - |
| | **Consultants/Contracts** | **$ -** | | | | | | | **$ 14,905.84** | **(14,905.84)** |
| | | | | $ - | $ - | $ - | | 14905.84 | $ 14,905.84 | (14,905.84) |
| | **Other** | **$ -** | | | | | | | **$ 2,314.01** | **(2,314.01)** |
| 5250 | Bank Service Charges | | | | | | | $ 122.50 | $ 122.50 | (122.50) |
| 5265 | Utilities | | | $ - | $ 619.60 | $ 591.17 | $ 370.94 | | $ 1,581.71 | (1,581.71) |
| 5630 | Telphone Internet | | | $ - | $ - | $ 304.90 | $ 154.95 | $ 149.95 | $ 609.80 | (609.80) |
| | **TOATAL** | **$ -** | | | $ 12,822.22 | $ 13,219.43 | $ 8,312.84 | $ 23,458.29 | **$ 57,812.78** | **(57,812.78)** |
| ***Revenue*** | | | | | | | | | | *$ -* |
| | | | | $ - | | | | | $ - | |
| | | | | $ - | | | | | $ - | |
| | **TOTAL REVENUE** | | | | **$ -** | | **$ -** | **$ -** | **$ -** | |
| | | | | | | | | | | |
| ***Revenue vs. Expenses*** | | | | | | | | | ***$ 15,521.92*** | |

**Remaining Balance**

**Need Line Item Budget using the approved rates below (removed previous amounts entered because the budget was never approved by council and do not reflect accurate funds required per the resolution 34 & 41**

Note: Per Sam's request, Court has been broken out of the General Fund. At this time, it is still considered to be in the General Fund because of the resolutions at the February meeting. Need to get approval to use another fund.
Funds currently setup in QuickBooks are 75 Tribal Court, 58 Judicial, 45 Court

Te-Moak Tribe of Western Shoshone
ARPA-FRF (15)

FY 2021

| | | | | | | | TOTAL |
|---|---|---|---|---|---|---|---|
| Date | | | | | | | |
| | | | 2,629,776.37 | | | | $ 2,629,776.37 |
| | | | | | | | $ - |
| | | | | | | | $ - |
| | | | | | | | |

QB: Accrual Method

| Acct # | Budget Category/Line Item | C/O FY2020 | Category Budget | Line Item Budget | 1st Qtr. FY21 Expenses | 2nd Qtr. Expenses | 3rd Qtr. Expenses | 21-Jul | 21-Aug | Ytd Exp | Balance |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Personnel** | | | | | | | | | **$ 7,602.32** | **$ (7,602.32)** |
| 5110 | Director | | | | $ - | $ - | $ 514.50 | $ 3,471.20 | $ 3,616.62 | $7,602.32 | $ (7,602.32) |
| | | | | | $ - | $ - | $ - | | | $0.00 | $ - |
| | **Fringe Benefits** | | | | | | | | | **$ 900.87** | **$ (900.87)** |
| 5210 | FICA | | | | $ - | $ - | $ 39.36 | $ 265.54 | $ 276.67 | $581.57 | $ (581.57) |
| 5230 | NV Unemployment/Career | | | | $ - | $ - | $ 21.61 | $ 145.79 | $ 151.90 | $319.30 | $ (319.30) |
| | **Travel** | | | | | | | | | $ - | $ - |
| | | | | | $ - | $ - | $ - | | | $0.00 | $ - |
| | **Equipment (Do not include in Indirect Calculation)** | | | | | | | | | $ - | $ - |
| | | | | | $ - | $ - | $ - | | | $0.00 | $ - |
| | **Supplies** | | | | | | | | | $ - | $ - |
| | | | | | $ - | $ - | $ - | | | $0.00 | $ - |
| | | | | | $ - | $ - | $ - | | | $0.00 | $ - |
| | | | | | $ - | $ - | $ - | | | $0.00 | $ - |
| | **Construction** | | | | | | | | | $ - | $ - |
| | | | | | $ - | $ - | $ - | | | $0.00 | $ - |
| | **Consultants/Contracts** | | | | | | | | | $ - | $ - |
| | | | | | $ - | $ - | $ - | | | $0.00 | $ - |
| | | | | | $ - | $ - | $ - | | | $0.00 | $ - |
| | **Other** | | | | | | | | | **$ 47,500.00** | **$ (47,500.00)** |
| | | | | | $ - | $ - | $ - | | | $0.00 | $ - |
| 6000 | Tribal Emergency Expenditures | | | | $ - | $ - | $ - | | $ 47,500.00 | $47,500.00 | $ (47,500.00) |
| | | | | | $ - | $ - | $ - | | | $0.00 | $ - |
| | **DIRECT COSTS** | $ - | $ - | | $ - | $ - | $ 575.47 | $ 3,882.53 | $ 51,545.19 | **$ 56,003.19** | **$ (56,003.19)** |
| | | | | | | | | | | | |
| | **INDIRECT COST** | | | | $ - | | | | | $ - | $ - |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | **TOTAL CONTRACT** | $ - | $ - | $ - | $ - | $ - | $ 575.47 | **$ 3,882.53** | $ 51,545.19 | $ 56,003.19 | **$ (56,003.19)** |

**Note: Need a budget for new program**

Te-Moak Tribe of Western Shoshone
Indirect (59)
FY 2021

QB: Accrual Method

| Acct # | Budget Category/Line Item | Category Budget | Line Item Budget | 1st Qtr. Expenses | 2nd Qtr. Expenses | 3rd Qtr. Expenses | 21-Jul | 21-Aug | Ytd Exp | Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| | **Personnel** | $ 117,640.00 | | | | | | | **$79,150.94** | **$38,489.06** |
| 5110 | Adminstrator | | $ 60,000.00 | $ 14,601.30 | $ 22,212.45 | $ 2,075.75 | $ 4,234.75 | $ 5,152.38 | $ 48,276.63 | $ 11,723.37 |
| 5110 | Receptionist | | $ 24,000.00 | $ 5,356.50 | $ 6,014.17 | $ 5,361.52 | $ 177.65 | $ 806.52 | $ 17,716.36 | $ 6,283.64 |
| 5107 | Payroll Expense-Finance Clerk | | $ 23,040.00 | $ - | $ 5,570.45 | $ - | | | $ 5,570.45 | $ 17,469.55 |
| 5640 | Council Pay /Meetings | | $ 9,600.00 | $ 562.50 | $ - | $ 3,975.00 | $ 1,275.00 | $ 1,775.00 | $ 7,587.50 | $ 2,012.50 |
| 5137 | Chairman | | $ 1,000.00 | $ - | $ - | $ - | | | $ - | $ 1,000.00 |
| | **Fringe Benefits** | $ 14,299.04 | | | | | | | **$9,951.80** | **$ 4,347.24** |
| 5210 | F.I.C.A. (in QB as 5210) | | $ 7,867.44 | $ 1,526.79 | $ 2,585.46 | $ 568.94 | $ 337.56 | $ 455.85 | $ 5,474.60 | $ 2,392.84 |
| 5230 | NV Unemploy/Career | | $ 4,281.60 | $ 208.76 | $ 1,419.48 | $ 312.37 | $ 185.31 | $ 250.28 | $ 2,376.20 | $ 1,905.40 |
| 5658 | Pro Liability Ins. (workers comp.) | | $ 2,150.00 | $ - | $ - | $ 2,101.00 | | | $ 2,101.00 | $ 49.00 |
| | **Travel** | $ 4,800.00 | | | | | | | **$5,765.09** | **$ (965.09)** |
| 5310 | Travel | | $ 4,800.00 | $ 195.95 | $ 92.70 | $ 1,827.74 | $ 1,549.03 | $ 2,099.67 | $ 5,765.09 | $ (965.09) |
| | **Equipment (Do not include in Indirect Calculation)** | $ - | | | | | | | **$0.00** | **$ -** |
| | | | | $ - | | $ - | | | $ - | $ - |
| | **Supplies** | $ 22,100.00 | | | | | | | **$13,735.26** | **$ 8,364.74** |
| 5510 | Supplies | | $ 18,000.00 | $ 648.45 | $ 2,675.86 | $ 5,521.20 | $ 1,784.23 | $ 418.10 | $ 11,047.84 | $ 6,952.16 |
| 5520 | Postage | | $ 2,400.00 | $ 182.19 | $ 794.05 | $ 734.75 | | | $ 1,710.99 | $ 689.01 |
| 5354 | Subscriptions | | $ 1,200.00 | $ - | $ - | $ 684.43 | | $ 192.50 | $ 876.93 | $ 323.07 |
| 5705 | Publications | | $ 500.00 | $ 99.50 | $ - | $ - | | | $ 99.50 | $ 400.50 |
| | **Construction** | $ - | | | | | | | **$ -** | **$ -** |
| | | | | $ - | $ - | $ - | | | $ - | $ - |
| | **Consultants/Contracts** | $ 12,700.00 | | | | | | | **$42,552.00** | **$ (29,852.00)** |
| 5260 | Audit | | $ 10,000.00 | $ 1,672.00 | $ - | $ 1,170.00 | | | $ 2,842.00 | $ 7,158.00 |
| 5261 | Consultant Fee | | $ 2,700.00 | $ 50.00 | $ 5,700.00 | $ 21,100.00 | $ 5,700.00 | $ 6,700.00 | $ 39,250.00 | $ (36,550.00) |
| 5262 | Professional Services | | | | | | $ 460.00 | | $ 460.00 | $ (460.00) |
| | **Other** | $ 25,380.00 | | | | | | | **$21,992.40** | **$ 3,387.60** |
| 5250 | Bank Service Charges | | $ 1,380.00 | $ 530.16 | $ 451.45 | $ 183.59 | $ 165.00 | | $ 1,330.20 | $ 49.80 |
| 5353 | Vehicle Ins. | | $ 3,600.00 | $ - | $ - | $ - | $ 10,609.00 | | $ 10,609.00 | $ (7,009.00) |
| 5356 | Phy/Damage/Ins | | $ 1,000.00 | $ - | $ 779.00 | $ - | | | $ 779.00 | $ 221.00 |
| 5420 | Equipment Rental | | $ 600.00 | $ - | $ - | $ 118.05 | | | $ 118.05 | $ 481.95 |
| 5630 | Telephone | | $ 10,000.00 | $ 660.07 | $ 1,945.90 | $ 1,768.19 | $ 184.12 | $ 340.86 | $ 4,899.14 | $ 5,100.86 |
| 5660 | Equip - M&R | | $ 300.00 | $ - | $ - | $ - | | | $ - | $ 300.00 |
| 5410 | Equipment | | $ 2,500.00 | $ - | $ - | $ - | | | $ - | $ 2,500.00 |
| 5265 | Utilities | | $ 6,000.00 | $ 1,141.26 | $ 1,609.63 | $ 1,376.17 | $ 129.95 | | $ 4,257.01 | $ 1,742.99 |
| | **DIRECT COSTS** | **$ 196,919.04** | **$196,919.04** | **$ 27,435.43** | **$ 51,850.60** | **$ 48,878.70** | **$ 26,791.60** | **$ 18,191.16** | **$ 173,147.49** | **$ 23,771.55** |
| | | | | | | | | | | |
| | **INDIRECT FROM OTHER PROGRAMS** | **241,362.02** | | **$ 34,281.57** | **$ 50,589.10** | **$ 49,487.99** | **$ 12,593.63** | **$ 14,891.33** | **$ 161,843.62** | **$ 79,518.40** |
| | | | | | | | | | | |
| | **MONTH +/-** | | | **$ 6,846.14** | **$ (1,261.50)** | **$ 609.29** | **$ (14,197.97)** | **$ (3,299.83)** | **$ (11,303.87)** | |

**Indirect Budget based off of direct amounts of FY21 grants, no carry over amounts.**

**Still have funds you could budget. Of course, this amount is only IF all programs use all of their direct funds.**
**You could budget consultant fees to this program if you want.**

# Appendix II

# Exhibit II-C(1)

# PUBLIC NOTICE

TO: All Vendors of the Te-Moak Tribe of Western Shoshone Indians of Nevada

TO: All Members of the General Public

DATE: January 1, 2022

FROM: Te-Moak Tribe of Western Shoshone Indians of Nevada

The Te-Moak Tribe of Western Shoshone Indians of Nevada NOTICE IS HEREBY GIVEN that the Te-Moak Tribe Election was held on Monday October 25, 2021, to select members to the Wells Band, Elko Band, South Fork Band and Battle Mountain Band Councils was declared invalid under the laws and Constitution of the Tribe. The incumbent members of Wells Band, Elko Band, South Fork Band and Battle Mountain Band Councils shall remain in office until a valid, new election is conducted, unless elected to serve another term.

The Te-Moak Tribe of Western Shoshone Indians of Nevada is a local legislative, and administrative governing body of the Te-Moak Tribe. It governs by a majority action of the Te-Moak Tribe, the current/incumbent membership of the Te-Moak Tribal Council consist of:

Joseph Holley, Chairman

Alice Tybo, Vice- Chairman

Dave Carrera, Member

Duane Garcia, Member

Andrea Woods, Member

Paula Garcia, Member

Davis Gonzales, Member

Thalia Marin, Member

Angelea Mendez remains in the position of Te-Moak Administrator.

Anyone claiming otherwise to these positions or is acting alone as a Te-Moak Tribal Council member (super majority) Vincent Garcia, Danena Ike, Rena Premo, Chauna Cota, Jay Allison, Tracy Jim, Helen Stevens, Sam Biers or Elaine Serrano or not official of the Te-Moak Tribe of Western Shoshone of Nevada. Acts alone without the authority of these positions. The Te-Moak Tribe of Western Shoshone will not answer for or be responsible for their actions,

# Appendix II

# Exhibit II-C(2)

TE-MOAK TRIBE OF WESTERN SHOSHONE

525 Sunset Street • Elko, Nevada 89801
775-738-9251 Fax 775-738-2345

December 16, 2021

Joseph McDade, Superintendent
Eastern Nevada Agency
2719-4 Argent Avenue
Elko, Nevada 89801

Dear Joseph,

On behalf of the Te-Moak Tribal Council of Western Shoshone Indians of Nevada, this letter is to inform you that the election held in October, 2021 violated both the Te-Moak Constitution and the Te-Moak Election Ordinance and were therefore null and void.

The Te-Moak Tribal Council does not recognize the Elko Band Council that were seated in October. Nor do they recognize the Elko Band Council that were falsely seated to our Te-Moak Tribal Council by Sam Biers, a convicted felon. This person claims to be the Judge for the "Te-Moak Supreme Court "(which doesn't exist) and has confiscated and is illegally using our letterhead and seal.

This Council will continue to do business for the Te-Moak tribe until a new election is held in February 2022, as stated in the attached resolution 21-TM132. We recognize the past Te-Moak representatives for Elko Band Council and welcome their participation in our meetings.

Any questions or concerns feel free to contact me at 775-738-9251 or email me at jhchairman1@yahoo.com

Sincerely,

Joseph Holly
Chairman, Te-Moak Tribe
Western Shoshone

Cc: Bryon Bowker, Regional Director
Glen Shafer, Regional Awarding Official
Sophia Torres, Tribal Operations Specialist
Administrator for: Elko Band Council, Wells Band Council, Battle Mountain Council, South Fork Council

Attachments: Resolution 21-TM132

TE-MOAK TRIBE OF WESTERN SHOSHONE

# TE-MOAK APPELLATE COURT JUDGE
# OATH OF OFFICE

"I, Wendell Hayes, do solemnly swear that I will support and defend the Constitution of the United States and the Constitution of the Te-Moak Tribe of Western Shoshone Indians of Nevada; that I will carry out, faithfully and impartially, the duties of my office to the best of my ability; that I will promote and protect the best interests of the Te-Moak Tribe of Western Shoshone Indians of Nevada."

INVALID IF NO SEAL APPEARS BELOW:

____________________ __________
Wendell Hayes Date
Te-Moak Supreme/ Appellate Court Judge

S. Jones 9/23/2021
Witness Date
Te-Moak Tribe of Western Shoshone

[signature] 28 Sept 2021
Elwood Mose Date
Te-Moak Election Board Chairman

# Appendix II

# Exhibit II-C(3)

SOUTH FORK INDIAN RESERVATION
SOUTH FORK BAND COUNCIL
21 LEE, UNIT - 13
SPRING CREEK, NEVADA 89815
775-744-4273 FAX 775-744-4523
sforkcouncil.adm@gmail.com

SOUTH FORK BAND

ELECTION COMMITTEE MEMBER

OATH OF OFFICE

I, Elwood Mose , do solemnly swear that I will support and defend the Constitution of the United States and the Constitution of the Te-Moak Tribe of Western Shoshone Indians of Nevada; that I will carry out, faithfully and impartially, the duties of my office to the best of my ability; that I will promote and protect the best interests of the Te-Moak Tribe of Western Shoshone Indians of Nevada.

**TERM OF OFFICE: Three (3) Years**

**25 September 2021 – 25 September 2024**

Elwood Mose — Date: 29 Sept 2021

Te-Moak Tribal Court Judge — Date

*South Fork Indian Reservation*
*South Fork Band Council*
*21 Lee, Unit - 13*
*Spring Creek, Nevada 89815*
*775-744-4273 Fax 775-744-4523*
sforkcouncil.adm@gmail.com

**SOUTH FORK BAND**

**ELECTION COMMITTEE MEMBER**

**OATH OF OFFICE**

I, Elwood Mose, do solemnly swear that I will support and defend the Constitution of the United States and the Constitution of the Te-Moak Tribe of Western Shoshone Indians of Nevada; that I will carry out, faithfully and impartially, the duties of my office to the best of my ability; that I will promote and protect the best interests of the Te-Moak Tribe of Western Shoshone Indians of Nevada.

**TERM OF OFFICE: Three (3) Years**

**25 September 2021 – 25 September 2024**

| | |
|---|---|
| Elwood Mose | Date |
| Te-Moak Tribal Court Judge | 10/1/2021<br>Date |

# Appendix II

# Exhibit II-C(4)

AARON FORD

Elko Band Colony -- Te-Moak Tribe of Western Shoshone
C/O Chairman Davis Gonzale
1745 Silver Eagle
Elko, NV 89801-5085

Dear Davis,

Thank you for the Te-Moak Tribe of Western Shoshone's generous contribution to my re-election campaign as Nevada's Attorney General. As the chief attorney for the state of Nevada, I work each day to help protect Nevadan families from harm, scams, and injustice. This work is reflected in my top three priorities — the three C's. These are constitutional & civil rights, consumer protections, and criminal justice & criminal justice reform.

As Attorney General, my job is to augment trust in government where it already exists, restore trust where it is diminished, and to create trust where it has never existed in the first place. This work has been some of the most rewarding and challenging work that I've ever been a part of. It is the kind of job that keeps me working late and gets me up early in the morning.

I can't thank you enough for joining me in this campaign to help make sure Nevadan families are protected. Your support means a lot to me. We built a strong coalition in 2018 and I can't wait to see the campaign that we will put together for 2022.

Sincerely,

Attorney General Aaron Ford

RECEIVED
DEC 1 - 2020
ELKO BAND COUNCIL
ADMINISTRATION

# Appendix II

# Exhibit II-C(5)

United States Department of the Interior
BUREAU OF INDIAN AFFAIRS
Western Regional Office
2600 N. Central Ave
Phoenix, Arizona 85004

000220
2021 JAN 27 A 10: 18
TE-MOAK TRIBE
WESTERN SHOSHONE

IN REPLY REFER TO:
Tribal Government Services

Honorable Joseph Holley
Chairman, Te-Moak Tribe of
Western Shoshone Indians
525 Sunset Street
Elko, Nevada 89801

Dear Honorable Holley:

We are responding to a filing from Mr. Darian Stanford, Attorney for the Elko Band of the Te-Moak Tribe of Western Shoshone Indians dated December 1, 2020. The Respondent Elko Band's Notice Re Lack of Jurisdiction was filed and received by the Court of Indian Offenses of the Western Region December 1, 2020.

Within the filing, it states:

> Respondent Elko Band Council hereby gives notice that, pursuant to the authority of Te-Moak Tribal Council, acting through Te-Moak Resolution No. 20-TM-129 dated November 23, 2020, the Court of Indian Offenses for the Western Region no longer has jurisdiction over this matter.

Attached with the filing was a letter from the Tribal Chairman to the Assistant Secretary-Indian Affairs dated November 24, 2020 which requests on behalf of the Tribe to remove the name of the Tribe from Title 25 Code of Federal Regulations 11.100. Also attached was Resolution No. 20-TM-129.

<u>Background</u>

Issues arose from within the Tribe that resulted in the June 12, 2017, decision by the Regional Awarding Official to reassume the Tribe's Judicial Services contract, Contract No. A15AV00203. Programs within the Region are currently working with the Department of the Interior, Office of Hearing and Appeals, in Case No. ISDA 2017-01/ADR, towards mediation with the Tribe and its representatives to potentially resolve the issues surrounding that decision.

We have had a few mediation sessions since our initial September 27, 2019, mediation in Reno, Nevada with the Tribe's representatives, the Bureau of Indian Affairs representatives, and the Office of Hearing and Appeals.

---

Discussion

The circumstances surrounding the reassumption of the Tribe's Judicial Services contract, as it relates to the Tribe's request for the Court of Indian Offenses to stop services and transfer to a tribal court, is different than most situations.

Since we are currently in mediation regarding the Tribe's Judicial Services contract that was reassumed by the Bureau of Indian Affairs, we will continue the mediation process and/or process through the Office of Hearing and Appeals until this matter is resolved before making any decisions that may impact the issue surrounding the Tribe's Judicial services contract.

Until the process is resolved, we will continue to operate the Court of Indian Offenses as the court providing judicial services to the Te-Moak Tribe of Western Shoshone Indians.

If you should have any questions, please Sophia J. Torres, Acting Tribal Operations Officer, or Karrie Quartz, Tribal Operations Specialist, at (602) 379-6786.

Sincerely,

BRYAN BOWKER

Digitally signed by BRYAN BOWKER
Date: 2020.12.17 08:58:27 -07'00'

Bryan Bowker
Regional Director

cc: Assistant Secretary – Indian Affairs
Superintendent, Eastern Nevada Agency

# Appendix II

# Exhibit II-C(6)

Battle Mtn.

11/12/21 Courts new Judge

Process of Court * Wendell Hayes

Andy Woods - Wells Chairperson

resolution May 4th meeting 1.6 mil / 13 mil
2118-72 May 27, 21

* Tribal Court - recorded on video microrecorder (no camera's allowed in most courts)

n Oath to swear in "Elwood Mose" Temoak election Board

Code CFR - must follow the rules
25 CFR 11.118 B Can't swear in people -

Mtg w/ BIA -

# Appendix II

# Exhibit II-C(7)

**TE-MOAK TRIBE OF WESTERN SHOSHONE**
**Te-Moak Tribal Council**
**Special Open Meeting**
**July 27, 2021**

The meeting was called to order by Chairman Joe Holley at 10:04 a.m.

**Roll Call:** Roll Call taken; quorum is present.

**Tribal Council:**

| | | | |
|---|---|---|---|
| Joseph Holley, Chairman | PRESENT | Thalia Marin, Member | PRESENT |
| Alice Tybo, Vice-Chairman | PRESENT | Clifton Oppenhein, Member | ABSENT |
| Dave Carrera, Member | PRESENT | Julia Oppenhein, Member | ABSENT |
| Duane Garcia, Sr., Member | PRESENT | Andrea Woods, Member | PRESENT |
| Paula Garcia, Member | PRESENT | Larry Yeager, Member | PRESENT (10:29) |
| Davis Gonzales, Member | PRESENT | | |

**Staff Present:**
Suzanna Sandoval, Acting Tribal Administrator/Recording Secretary.

**AGENDA APPROVAL:** Dave Carrera requested to include ITCN Broadband to the agenda. Dave Carrera motions to accept agenda with addition. Andrea Woods seconds the motion. **VOTE 7 FOR, 0 AGAINST, 0 ABSTENTIONS**

**NEW BUSINESS:**

**SCOTT SYPOLT – UPDATE:** Scott Sypolt informed the Council that the Department of Interior agreed to help fund the Te-Moak Tribal Courts. August 5th is the next scheduled Court date. The clerk is going to be on hand to accept documents to be filed in Tribal court. They are having issues with the software so that is why they will be here to accept documents. Any emergency matters like a T.R.O. can be heard while they are here. Te-Moak was involved with mediation on the CRF Courts after BIA reassumed their contract. Joseph Holley, Juan Arevalo, Alice Tybo and Andrea Woods were selected to participate in the mediation process. They are now going to close this matter and move forward with the Te-Moak Courts. Civil cases will be forwarded to Tribal Courts, Criminal cases will be transferred at a later date. Te-Moak would have to agree to the mediation settlement. Te-Moak would then collect the remaining funds of the courts once the settlement is signed. Scott has a draft resolution for Council to consider if they chose to accept the settlement. BIA agrees to formally recognize that the Te-Moak Tribal Court, re-established on November 23, 2020 (Tribal Court) has jurisdiction over all cases arising within the territory of the Tribe pursuant to Article 2 of the Tribal Constitution and that the regulations, establishing and governing the Court of Indian Offenses in 25 C.F.R. Part 11 no longer apply to the Tribe. Chairman Holley and Vice Chair Tybo would be identified as authorizing signatory for Te-Moak on the Agreement. After review, Alice Tybo motions to adopt Resolution 21-TM-94 and sign the Agreement for the Court. Andrea Woods seconds the motion. **VOTE 5 FOR, 0 AGAINST, 2 ABSTENTIONS** (Davis Gonzales, Thalia Marin).

Scott then discussed the removal of Elko Band from the Te-Moak Tribe to operate as a separate Sovereign entity per Davis's request. Scott says that it would be possible since there are other Tribes that have multiple Tribes sharing the same reservation boundaries. Davis wants the people to decide if Elko Band should separate from Te-Moak. He says that a tribal referendum can be done during elections to see if Elko Band members support this idea.

For the record Larry Yeager entered the meeting at approximately 10:29 a.m.

Scott briefly talked about amending the Constitution to remove Elko Band if that's what's decided upon. Along with enrollment criteria adding Wells Band to the Constitution and the other suggestions Te-Moak Council has discussed. Now is the time to move on matters in Indian Country. The Biden Administration is recognizing Tribal Sovereignty and the Department of Interior is lead by Deb Haaland who is an enrolled member of the Laguna Pueblo. Scott feels now is the time to look at making the amendments to the Constitution if that is what the Tribe choses to do so.

Scott also provided an amendment to the Law-and-Order code. This ordinance needs to be updated. It would strengthen the laws for the Tribe. The amendment would fill in a lot of the gaps that exist with the current code. Suzanna will work on getting the amendment drafted for Council review.

Discussion then turned to Sam Biers and comments that are being made by him. He is acting on behalf of the Te-Moak Courts without authorization to do so. Scott said he is creating havoc by making inaccurate statements about Scott. Davis then asked Scott to verify if he is currently employed by Denton. Scott informed Davis that he is aware of the calls the he, Robert Brady, Steve McDade and Sam Biers have made to Denton. Denton provided a statement to Chairman Holley indicated that Denton has not released information to the above-mentioned individuals as there is a confidentiality clause between Attorney and Client. Davis then informed Scott that Sam Biers was the individual who informed him of matters he felt were concerning. Scott then asked Davis why he would believe or trust Sam when he has shown himself to be untrustworthy. His background check came back unfavorable, he informed Te-Moak that he had a license to practice Law in the State of Nevada which was proven to be false. Sam took records from the Te-Moak Tribe that were confidential and not his property to take, so he could cause problems for the Te-Moak Tribe. Now all of a sudden Sam is the reason of truth and honesty. Sam took letter head from Te-Moak and is using it unauthorized. Alice says the Tribe should take action to notify the public that Sam Biers is not affiliated with the Te-Moak Tribe or the Te-Moak Tribal Courts. Sam has not been able to be served notice. Suzanna did provide him a copy of the Resolution removing him as the appellate Judge, but he still refuses to stop identifying himself as a Judge for the Te-Moak Tribal Courts. Alice Tybo motions to post public notice in the Elko Daily Free Press, Reno Gazette, Salt Lake Tribune and Times -News Idaho as official notice to Sam Biers. A letter shall also be written and sent out to all the Band Councils and Government agencies as notice that Sam Biers is not associated with Te-Moak or the Tribal Courts. Thalia Marin seconds the motion. **VOTE 7 FOR, 1 AGAINST** (Davis Gonzales), **0 ABSTENTIONS.**

**HINTON BURDICK CONTRACT:** McKay Hall was in attendance to discuss the possible extension of their contract with Te-Moak for finance services. He asked if the Council would like

# Appendix II

# Exhibit II-C(8)

**Te-Moak Tribal Council Meeting February 3, 2021 – Telephonic Meeting**
**Held via FreeConference Call Teleconferencing**
(um, ah and oh's are omitted)

**Te-Moak Tribal Council**

Chairman Joseph Holley – Present in Person at 525 Sunset Street and Telephonic Appearance

Vice Chairman Juan Arevalo (Also Elko Band Vice Chairman) –Telephonic Appearance

Davis Gonzales (Also Elko Band Chairman) – Telephonic Appearance

Andrea Woods (Also Wells Band Chairwoman) – Telephonic Appearance

Duane Garcia (Also South Fork Band Chairman) – Telephonic Appearance

Alice Tybo – Telephonic Appearance

Dave Carerra (Also Battle Mountain Band Chairman) – Telephonic Appearance

Julia Oppenhein - Telephonic Appearance

Paula Garcia – Telephonic Appearance

Clifton Oppenhein – Telephonic Appearance

Robert Brady – Telephonic Appearance

Larry Yeager – Telephonic Appearance

**Te-Moak Tribal Administrator**

Samuel L. Biers – Present in Person at 525 Sunset Street and Telephonic Appearance

**Te-Moak Recording Secretary**

Colby Boykin – Present in Person at 525 Sunset Street and Telephonic Appearance

**Dentons US LLP Attorney**

Scott Sypolt – Present in Person at 525 Sunset Street and Telephonic Appearance

**[Call to Order, Roll, Vote to Accept Agenda and Approval of Some Prior Meeting Minutes Omitted]**

10:46 Chairman Holley: "Ok, moving on to December 15, 2020 Special Open. . ."

. . .

12:13 Davis Gonzales: "Colby I have ah ah, page 3 number four, you got Robin Evans?"
12:33 Colby Boykin: "Yes."
12:35 Davis Gonzales: "R-O-B-I-N"
12:40 Colby Boykin: "ok."
12:47 Davis Gonzales: "it's in two place, you see that don't ya?"
12:49 Colby Boykin: "I see it."

. . .

40:25 Chairman Holley: "First report is from Scott Sypolt."
40:39 Davis Gonzales: "Did he submit his written report?"
40:47 Scott Sypolt: "Hello Council. This is Scott. It's great to be back in Te-Moak Country. It's an honor to work with the Council. I truly enjoyed it. In my report, as all of you know you are descendants of one of the most powerful and respected Tribes in the Western United States. Your elders were brave, courageous, powerful and honorable. Your elders refused to kiss the ring of the federal government and this is reflected in your treaty, the Ruby Valley Treaty which is the only Treaty that is only a Treaty of passage, it never actually ceded land. Each of you has honored your elders when you told the federal trustee 'enough,' and that you as Indian People are more than capable of governing yourself as a sovereign nation. You have . . ."
41:45 Davis Gonzales: "Excuse me. Excuse me Scott. Did you submit a report? I was asking that before you started. I didn't see no report here."
41:52 Scott Sypolt: "Na, I wasn't asked to submit a written report. It's a oral report. I uh uh submitted the. . .I was asked to select certain members of the tribal court, which I did. The Chairman directed me to give a oral report."
42:27 Davis Gonzales: "Well I think you should be submitting a written report."
42:35 Scott Sypolt: "I have no problem doing that, I'll be more than happy to do that if that's what the Council chooses."
42:42 Davis Gonzales: "Well I'm just one guy sitting here asking that question so . . ."
42:47 Scott Sypolt: "Well getting back to the court system, you have every legal right as a sovereign nation to have your own court system. **Your Te-Moak Constitution, Article 8 sections 1, 2, 3 and 4 give you that right**, and the constatation, the Constitution of the United States Article 1 section 8 and Article 1 section 2 clause 3 is the legal authority. It speaks of the inherent authority of indigenous tribes to govern themselves within the United States. This gives you the unabated authority to re-establish a tribal judicial system in accordance with the Tribe's constitution and the United States Constitution and pursuant to 25 CFR section 11 point 104b. Under this authority you also have the power to declare the regulations in 25 CFR part 11 are no longer, no longer apply to the Tribe, which means our CFR court is gone. **You all have asked me to create a legal pathway whereby you could create your own tribal court system. Ah, I have done that. We have crossed every "T" and dotted every "I" and then I was asked to look into candidates for the positions of judge of original jurisdiction, judge of appellate jurisdiction, the tribal clerk, Bailiff, prosecuting attorney and public defender, which are, which is the core basis of any court system. So, I went through piles and piles of applications, made calls on them, I checked on their qualifications, did background checks**, and I was asked to submit 2 names to the

administrator, which I did and I, hopefully each of you have those names. These names were submitted based on qualifications, based upon their familiarity with tribal court systems, based upon their honesty and integrity, their background education and all had to fit within a budget that was very tight. The names that I had submitted for judge were Ramon Acosta and Jane Long. My recommendation was Ramon Acosta because he has been a leading federal attorney, he was a chief judge at Fort McDermitt, chief judge at the a. . ."

46:50 Chairman Holley: "That all comes later on in the Agenda, they just needed an update."

46:51 Scott Sypolt: "So well. . .I've just been told by the Chairman, that the update is that the update of the Law and Order Code, the selection of candidates has been completed as instructed, and Joe has informed me that later on I discuss each of the candidates and why they're an appropriate choice."

46:16 Juan Arevalo: "Hey Scott"

46:18 Scott Sypolt: "There is some question as to who, what is going on with the CFR court and the tribal court, and again I, I cannot say strongly enough, you as a sovereign nation you have the ability to choose, you are the sovereign. Judge Harlan is not the sovereign. You are the sovereign. If you decide that you want your own court under your constitution, you're entitled to establish your own tribal court system. That is reinforced by the federal regulations, which is 25 CFR 11.104b. The reason that Judge Harlan still is visible is because some within the Council keep reaching out to them. You know who you are, but the CFR court at this point in time has absolutely no authority over you. That's the latest update for you."

47:19 Juan Arevalo: "Hey Scott? Scott? This is Juan."

47:27 Scott Sypolt: "Yes Juan."

47:29 Juan Arevalo: "So I'm gonna have several questions, so I'll start off with the first one. In the last meeting we had asked you to get a descriptive report of the billing, have you submitted that?"

47:40 Scott Sypolt: "Yes."

47:43 Juan Arevalo: "Who did you submit it to because I have not seen a copy of it?"

47:48 Scott Sypolt: "To your administrator. If you haven't gotten a copy I'll submit it again."

47:55 Juan Arevalo: "Okay well if he's there I need a copy of that. Second of all, with what the Council had approved you to be, all the tasks for you to be doing, you you said that the CFR court is pretty much done after today's meeting so have you started on any of the other 11 tasks?"

48:19 Scott Sypolt: "Yes all the tasks that I have been given are completed."

48:25 Juan Arevalo: "How come I don't have an update on any of it?"

48:29 Scott Sypolt: "I pass everything on to the Chairman and the Administrator, and then they pass it on to you."

48:38 Juan Arevalo: "I'm sorry, I didn't mean to direct that at you, I was directing that to everyone else. I'm asking Joe, Sam, whoever, how come I don't have a copy, an update on that?"

48:51 Sam Biers: "No you didn't Scott."

48:51 Chairman Holley: "I haven't seen an update that's why I have Scott here discussing it right now. So, that's what he's done."

48:53 Scott Sypolt: "Yeah that's what I sent to you."

48:55 Sam Biers: "I didn't get it."

48:56 Scott Sypolt: "Maybe it went to your junk box."

49:00 Sam Biers: "No it didn't."

49:02 Scott Sypolt: "There's an easy resolution to this, I can send it to, however you want to do it, you want me to send it to everybody individually? I'm happy to do that, I can send it in a chain email, however the Council decides they want me to produce it."
49:12 Juan Arevalo: "Yeah, I mean whatever the Council decides, but I think it probably, for me it'd be proper to go over each individual task to see where you would, what the status is on it and where we're gonna go from there. But, because, like I said, it was a lot of tasks to complete and that's what I was worried about is that if they were done or completed?"
49:37 Scott Sypolt: "They've all been completed."
49:41 Juan Arevalo: "Okay."
49:42 Scott Sypolt: "I'll make sure you get a written report on each of them."
49:42 Sam Biers: "Scott. Scott. Scott. Scott."
49:47 Juan Arevalo: "Okay, when do you think I can get that?"
49:51 Scott Sypolt: "I will, I'm here to the end of the week, but I will work to get it to you if not this week, then the very first part of next week."
49:53 Sam Biers: "You're talking about two different things, two different lists, one with 11 items, one with 4."
50:00 Juan Arevalo: "Okay."
50:01 Scott Sypolt: "We'll talk about it later."
50:04 Alice Tybo: "So, this is Alice. Can we get back to the tribal court again? I know that once we hire the judge we have to establish our rules of the court, and a fee schedule. Who's doing that? Is that the judge who is going to be doing that or is that someone at the Te-Moak Council and the Administrator do?"
50:26 Scott Sypolt: "Yeah, so the court schedule would be established by the judge and the clerk."
50:33 Alice Tybo: "So once we hire the judge they'll immediately start on that?"
50:37 Scott Sypolt: "That is correct?"
50:46 Davis Gonzales: "Scott this is Davis. We talked about the report and the justification at the Wells Council meeting, and so they, they, they, the administration should have notified you of that action that we have taken in Wells as for the reports that Juan has just been talking about, and he, and the other thing Scott that's in, in our constitution that states that the judge of both tribal courts shall, and shall you know what that means, shall be appointed by the tribal council. You have violated the constitution right there . . ."
51:30 Scott Sypolt: "That's my understanding of what we're, that you are doing today, is that you all are selecting the judge."
51:36 Davis Gonzales: "We don't even have any kind of documents of their qualifications or or anything to look at so I don't even know who you are talking about."
51:40 Sam Biers: "It's in the packet. We are addressing that later on."
51:51 Scott Sypolt: "Well Davis I think what we are going to have to do is establish some kind of communication, I, I don't know where the breakdown is. My understanding is that information was sent to you, but if it has not been I'd be more than happy to update you. Today I can orally go over each and every person but I'm more than happy to submit a report to you as well."
52:14 Davis Gonzales: "Well it's not your fault if you've been sending it then it's the fault of the administration."

52:22 Alice Tybo: "I don't believe it's anyone's fault. It's under new business and we're not talking about it. It's under new business."
52:29 Davis Gonzales: "We talked about . . ."
52:30 Scott Sypolt: "So I will make sure Davis you get what you need and Juan you get what you need, and exactly, my understanding the purpose of today is for the new business for, regarding the new tribal court system."
52:52 Chairman Holley: "Thanks for that Alice. We're, like I said, it was later on down in our Agenda. We can wait 'til then for these court questions to come out."
53:05 Juan Arevalo: "Hey, hey Joe so it was still appropriate for me to ask my questions and then get those requests honored right because. . ."
53:13 Chairman Holley: "Exactly."
53:14 Juan Arevalo: " . . .I just wanted to . . ."
53:17 Chairman Holley: "Right, updates well that's what we're here for."
53:22 Juan Arevalo: "Okay, sounds good."
53:29 Chairman Holley: "Is that all you got Scott?"
53:33 Scott Sypolt: "Yeah, we're. . .**every 'T' has been crossed, every 'I' has been dotted** and you all are prepared to have your own tribal court system which is, I think is something you all can be very proud of."
53:45 Chairman Holley: "Okay, we'll get back to that in a short minute here. Moving on down the line would be my report. January 1st I was just getting back from surgery and ended up doing business by phone. 13th I was in the phone, in the office. We had a meeting on the 15th we cancelled it and decided to have it on the 18th in Battle Mountain, and from that point I was in the office from the 18th to the 29th."
53:49 Sam Biers: "I check my spam there's nothing"
53:52 Scott Sypolt: Unintelligible
53:55 Chairman Holley: Sam do you have Hinton and Burdick? Finance report?"
54:42 Sam Biers: "I'll get them on the line, okay?"
54:43 Chairman Holley: "Get em."
54:43 Sam Biers: "Can you get McKay to conference in?"
. . .
1:07:54 Davis Gonzales: "Yeah Joe, Joe?
1:07:57 Chairman Holley: "Yeah."
1:07:58 Davis Gonzales: "Hey this is Davis. Yeah I didn't know that there was 73 thousand dollars in law enforcement account down there at Te-Moak. I thought it was all used up and gone. But, I don't even think we can do this action yet because Elko Band is on this Agenda for today concerning the dispatch that we paid for Te-Moak's bill of 20 thousand dollars."
1:08:23 Chairman Holley: "So we got another issue later on today with that, and Davis we'll cross that bidge then, that has been dissolved. We don't feel that Te-Moak has anything in it to have to pay."
1:08:44 Davis Gonzales: "How could you decision without even hearing us first?"
1:08:51 Chairman Holley: "We've already been . . ."
1:08:52 Alice Tybo: "Chairman Holley?"
1:08:55 Chairman Holley: "Yeah go ahead Alice."

1:08:57 Alice Tybo: "Since we are not on that Agenda item yet an we're on to authorize Resolution 21-TM-18, I'd like to make a motion that we approve to transfer 73 thousand 3 hundred and 70 cents from the Te-Moak law enforcement account into the General Fund."
1:09:17 Chairman Holley: "Okay a motion by Alice. Do we have a second?"
1:09:34 Duane Garcia: "Duane will second."
1:09:36 Chairman Holley: "Okay second by Duane."
1:09:40 Davis Gonzales: "Discussion?"
1:09:44 Chairman Holley: "Go ahead and discuss."
1:09:46 Davis Gonzales: "You know I disagree with Alice's motion because right now you made the motion to do, to move 73 thousand dollars by Resolution at this time, twenty after eleven and then at noon time you're gonna pass on the issue of the dispatch and then you guys are gonna come back and say that we already passed a resolution that we already transferred all the law enforcement into another category, so we don't have no money. So that's what I'm saying, you should hear us out, hear Elko Band out first before you even transfer the law enforcement money into a separate account."
1:10:03 Alice Tybo: "Well once it goes into General Fund we can pay it out of that [unintelligible]."
1:10:38 Chairman Holley: "That's exactly right Alice. We can move it to general and if we want to pay it, we pay it from general. So the discussion will be later on down as far as what we are gonna do with that. For right now we have a motion to move that money, seconded by Duane. . . "
1:10:55 Robert Brady: "Hey Joe? Real quick I have a question."
1:10:57 Chairman Holley: "Go ahead."
1:11:03 Robert Brady: "Where are the documents for that 73 thousand? I don't see them in my packet."
1:11:23 Chairman Holley: "It's the one with NSB on it along with our accounts on it."
1:11:40 Dave Carerra: "And it's also in the bank reports from the Nevada Bank."
. . .
**3:00:15 Chairman Joseph Holley gave authority to Vice Chairman Juan Arevalo to temporarily conduct the meeting due to Chairman Holley unavailability because Chairman Holley stepped out because of health issues.**
. . .
05:00:25 Andrea Woods: "Why can't we recess now?"
05:00:30 Sam Biers: "We got Scott here."
05:00:30 Chairman Holley: "Yeah, because Scott is here and it cost for him to come out so I wanted to cover this one first."
05:00:35 Andrea Woods "Okay."
05:00:37 Juan Arevalo: "Which one are you on Joe?"
05:00:39 Chairman Holley: "Take a break after this first one, new business. We still got three pages to go Juan. Do we want to keep crunching through it, I'm asking you guys?"
0:5:00:55 Juan Arevalo: "I don't have a problem with it. It's up to them though."
. . .
05:02:07 Chairman Holley: "**Alright let's go on to new business "Request to Appoint (1) Appellate Court Judge; (1) Tribal Court Judge each separately for an initial appointment term pursuant to the Constitution of the Te-Moak Tribe of Western Shoshone Indians of Nevada Article 8 with individual**

**candidates who are at least 30 years of age and of good moral character, with consideration of related matters.' So we initially gave this to Sam to appoint, Sam, Sam made some choice, Scott made some choices sent em out to Sam, we was gonna have Sam just appoint, but reading through the Constitution it was against the Constitution so he brought it back to the Council. They can only be appointed by the Council so that's why we are sittin here with what we got. Scott did send us some names, as as asked, and be'in he's here so it's a good time now that he's here he can read through this.** But always remember now guys we, we have a court that's been set up by the BIA that they, they keep kick'in us in the butt and knock'in us to the ground. This is the time for us to be sovereign, stand up, create our own court and do the things we're supposed to be do'in. That's the whole point to do'in this. So with that said, we'll move forward, I'll let Sam, ah Scott go through his choices that he has and we'll go from there."

05:03:48 Scott Sypolt: "I'd like to begin by saying that . . . ."

[Chairman Holley and Scott Sypolt Disconnected from FreeConference Call.]

05:03:59 Andrea Woods: "What happened? Hello?"

. . .

05:04:15 Alice Tybo: "I think we lost Scott."

. . .

05:04:30 Davis Gonzales: "I thought you guys said he was in Elko?"

05:04:34 Alice Tybo: "He is."

05:04:35 Davis Gonzales: "Oh, okay."

05:04:35 Colby Boykin: "We can't hear him."

05:04:36 Chairman Holley: "Can you guys hear me?"

05:04:38 Colby Boykin: "I think we lost him."

Unintelligible

05:04:47 Colby Boykin: "The Chairman's line got disconnected, he's gonna dial back in. Are you there?"

Unintelligible

05:05:07 Colby Boykin: "Well we're at 5, let me call in from my phone."

05:05:09 FreeConference Call Recorded Voice Prompt: "Welcome to the conference center, please enter your . . . welcome to the conference center, this call is being recorded."

05:05:45 Colby Boykin: "No, can you hear me?"

05:05:48 Dave Carerra: "This is Dave. I can hear you loud and clear."

05:05:52 Colby Boykin: "Ok, the Chairman's line got disconnected, so they're going to be calling back in."

. . .

05:08:46 Chairman Holley: "Ok perfect, I was just scared somebody else got kicked out besides just me. Alright, so anyway. We're going into the court. I don't know how much of this you guys heard but we've been we've been going back and forth we've been doing mediation with over at the bureau. We've actually put things forward an try to disregard our, our judge that they're cramming down our throat. It's time that we take up on our own sovereignty and create our own system, so that's what we're up against right now is trying to develop our own court and move forwards. With that, I'm gonna have Scott discuss what, where we are right now with it and what we need to think about here within the next few minutes."

05:09:45 Scott Sypolt: "So, this is the final step in your sovereignty to establish your own tribal court system. It's imperative that you make a decision today in the choices, you know, I heard nothing but complaints about Judge Harlan and the things she had done and the abuses so there is a clear choice between having a tribal court or going back to Harland. Those are the choices. So what I've done is, I wanted this to be as objective as and impartial as possible, I wanted to pick these people based on their educational background their experience in these respect roles and that would fit into your budget. I had a very large list of people a lot of them were knocked out because they wanted substantial money each month or because they were just too far away. So, the, the group that, that I'm presenting they're very familiar with Nevada tribal courts, they have extensive experience with Nevada tribal courts, they're not picked by you know, a friend or a cousin or an aunt of a the Te-Moak Tribe so they're going to be very objective, and I think this is the group that can do this heavy lift to get this court system going."

05:11:11 Scott Sypolt: "**You always have the ability if for some reason Council doesn't like them you can remove them. You have the right to remove the judges** and it's, it's even easier to remove the clerk and the bailiff and the others. So, I will, **I was asked out of the big list in each category to supply two names and a little bit about each of them which I've done. I'll go over with them, with you and since you've hired me do this and I have expertise in this area**. I'll tell you whom I recommended and tell you why, and then the choice is yours. So starting off the, the, the wording should be exactly as your constitution states, again, as I stated earlier make no mistake about it, you have a very, very clear constitutional, right to do this through the Te-Moak Constitution and through the United States Constitution, there's no doubt about that. The, so the first one is the, it would be entitled the judge of a general jurisdiction and this is a judge who would hear the, the vast majority of the cases. The other judge is a judge of supreme court appellate jurisdiction and the only time that judge hears something is if there was an error of law, not an error of fact, but an error of law. Then it goes up to that person for the decision to be made. So for the **judge of general jurisdiction I, I have two names, one is Ramon Acosta and the other is Jane Long**. Jane long is an assistant counsel for Reno sparks and was a judge in South Carolina, South Dakota. My recommendation however is Ramon Acosta. Ramon is a leading federal attorney, he was chief judge at Fort McDermott, he's been chief judge at Fallon tribal court, the chief judge at Walker River and was involved in Reno Sparks as well, and he was also a teacher at the, the tribal advocacy program, he also served in the Army. He was willing to come down in his rates and help meet the budget of the Te-Moak Tribe. He has the experience to hit the ground running and I think he would be an excellent choice."

05:13:32 Scott Sypolt: "And **in the next category and I'm gonna skip for a minute to the clerk** because the clerk and the judge of original jurisdiction go hand in hand. A clerk is absolutely. Critical. The, the clerk is really the one that runs the court system, if you choose Ramon, Ramon has worked very closely with a woman by the name of the **Elisa Dave**. Elisa has been the tribal clerk for McDermitt for ten years and she was also the clerk for Winnemucca. She has a degree in early childhood psychology and she is extremely well organized and again these two have the ability to get this court up and going and in fact in talking with these people I ask them how quickly they thought that they could actually hold court and have things up and going. And, they're, they're looking to do this within the month of February which I thought was outstanding and they laid out a program on how to do it. I asked them extensive questions about how they would do with the courts or what they've done in the past with courts, they're

experienced and these two people get four stars."
05:14:46 Scott Sypolt: "With the **judge of supreme court appellate jurisdiction I have two names one is Chadwick Smith**, who was the chairman of the Cherokee Nation, know him extremely well he set up the Cherokee tribal system there outstanding, outstanding choice. The only problem is he, he wanted what I considered an excessive amount of money a 10 grand a month, and I thought that was very high. The **second choice is Darian Stanford** who many of you know, Darian was a chief judge at McDermitt and was also involved with Reno Sparks as many of you know, **he started off as an adversary to the Te-Moak Council** and all I can do is be personally he's I believe, he's a man of his word and he's honest and he wants to do good things for the tribe plus he offered to do it pro bono, for free. For the **Bailiff I, I had two names and I just got a text earlier today that the one person is withdrawing, took another job, so the remaining name I have is Tilden Smart**. Several you may know Tilden has been also been involved at McDermitt, my understanding is that he is actually moving to Battle Mountain, so we don't have to incur the cost of travel or anything like that he is also worked with Ramon and work with Elisa. So again, I think you have a team that has worked well together efficiently together that you can come and put into place. **The next category is prosecuting attorney. I have two names one is Sam Biers, whom you all know well. I'm sure you know his qualifications and the other is Ann Laughlin**. Ann has been a prosecutor at Pyramid Lake, at Fort McDermott, at Walker River, at Lovelock-Paiute at Fallon-Paiute. And, I actually took the time to call these groups and talk to them and anybody that got even one black mark I, I took out of the category. **They all had backgrounds on them** and again, this is an objective and impartial group, that has no connections to Te-Moak so one band can't say oh well you know, they have a connection with South Fork because they have a connection with Wells, they have no connections with anyone. They're very, very invested in Indian tribes, they want to do the right thing they want to see great things happen for the Te-Moak and they're a huge believer in tribal sovereignty. **So just to recap my suggestions are for judge of original jurisdiction: Ramon Acosta. For Supreme Appellate court jurisdiction: Darien Stanford. For clerk: Elisa Dave. For Bailiff: Tilden Smart. For Prosecuting Attorney, I'll let you all make that choice because I shared with you what Ann has done and, and, you all know Sam**, and then for the public defender, we, I had two names and they texted yesterday and said they had found other jobs, so I will supply you with two names for that or if you want the Council can pick the, the, the prosecutor, the issue with that is everybody knows somebody and I just I wanted the, the entire Council to feel that this was an impartial objective pick based entirely on experience, education and what we could pay them. That's it. We do have some extremely exciting cases coming up. I know you just talked about the FCC. I have the biggest case in 2019 for Indian country. It was the United versus the FCC I sued the FCC and won, and that was in the second highest court in the land, the DC circuit court of appeals. So the FCC and broadband is something I know a lot about because I spent a few years of my life involved with it. You all have so many incredible lawsuits that are ripe for the Te-Moak whether Davis mentioned earlier and Andy had mentioned the easement issue. You all have been taken advantage of in many ways and these are lawsuits that you can win starting with the Treaty of Ruby Valley. Again, every other tribe signed a treaty that ceded their land, they gave up their land, the Western Shoshone never did that, it was a treaty of passage. The Shoshone was so powerful that the government, they wanted to, the Union wanted to get to the Goldfields in California during the Civil War, so Shoshone refused. Your elders refused to give up any of your land and so the union had to settle for the next best thing and that was a treaty of passage, your land has never been given up which

means you legally have a claim to almost all of Nevada. The water rights is another one. There's something called the Winter's Doctrine it is absolutely ridiculous and I've done a number of big water cases too. Elko, Wells these towns should be paying you for the water because the Winter's Doctrine is a supreme court case, that's says tribes get first dibs on the water and in a place like Nevada water is more valuable than gold. These cities should be paying you, not the other way around you've been ripped off forever and the law is very, very clear on it. The problem is most tribes don't know about the Winter's, so that that having been said I'll leave it in your hands. I think Joe has a few things to say."

5:20:45 Chairman Holley: "Ok guys, it's in our hands, what are we gonna do? Are we gonna do it, or you're not gonna do it? If we're not gonna do it let's, let's throw everything out the window and head on home because that's what we're gonna end up."

05:21:02 Alice Tybo: "Chairman Holley can we go, do like a round circle and have everyone say something so we can all know where we're at before we make any decisions to go forward? I mean, we all need, we all agree we need to go forward, but we just need to, I want to hear other people's ideas before I make a vote."

05:21:25 Chairman Holley: "Okay, so we'll start with, we'll start with Dave just like we'll go down to vote we'll hear what Dave's got to say and I'll call after Dave, Andy and so on and so forth so Dave you got something you want to say? Did we lose somebody? Hello?"

05:21:50 Dave Carerra: "Oh. Yeah, I totally agree that we need to go forward with our own court system, the hire these folks, right, there's a couple questions in there, so Darian, Darian, isn't he employed by Elko Band and would that cause a conflict?"

05:22:11 Scott Sypolt: "**Darian is employed by the cannabis company** that is involved with Elko Band and if a cannabis case ever arose and it went to the appellate level, which, it takes a lot for a case to go to the next level, it's very, very rare, but if it did he would recuse himself and then we could bring in someone like Chadwick Smith or someone else."

05:22:40 Dave Carerra: "Okay. So there wouldn't be an issue with him being a judge and you know with the other Band because he's already partnered with Elko with his company?"

05:22:54 Scott Sypolt: "That, that is correct on, on the vast majority of case if that there ever was a conflict he would recuse himself."

05:23:06 Dave Carerra: "There wouldn't be a conflict by him being employed by Elko Band?"

05:23:18 Scott Sypolt: "If the group thought there was a conflict, it would be a conflict against Te-Moak Council, so, so it would be up to Te-Moak Council whether they wanted to waive that or not. You are permitted to waive the conflict if you choose to do so. The power is totally in your hands."

Unintelligible

05:23:33 Scott Sypolt: "Like I said, I'm trying to, my first choice probably would have been Chad, but you know, it's pro bono versus ten thousand dollars a month."

05:23:45 Dave Carerra: "I guess we won't have to go, but we need a pro bono. Are you talking about one month, two months eight months, a year down the road?"

05:23:58 Chairman Holley: "So **remember these guys that we have to put on for three years, so the contract is going to be for three years that doesn't mean we have to keep them for three years because we can vote them back right back out in a month if that's what it takes** after we get to court up and running."

05:24:12 Scott Sypolt: "Yeah, you, **you all have a process for the judges that you can recall them** and

then with everybody else yeah, it's a contract and, and I'll write into the contract . . . that the Council hires them at-will."

05:24:36 Dave Carerra: "You're, you're mis-interpreting what I'm saying, and let me say it another way, so he's gonna come on, on pro bono. How long a duration is that pro bono, so it's gonna last, for the full three years or is it gonna be the first couple months an then we start paying them or if we get grant money what would that look like?"

05:24:51 Scott Sypolt: "My understanding is that is the full three years."

05:24:55 Dave Carerra: "Okay. So your understanding that would be in the papers?"

05:25:01 Scott Sypolt: "Yes."

05:25:05 Dave Carerra: "Okay, and then would like to court clerk, what is the, how is that gonna look? So it's everything's gonna be handled through the internet, you know, like emails texts zoom, whatever? We would do something like . . ."

05:25:25 Scott Sypolt: "It would be set up like a like a typical court system facing the pandemic, that's one thing I really like about this group is they're innovative and they've learned how to operate during a difficult time like COVID, you know, COVID might be with us another year, who knows but they know how to continue court even with the challenges that we face today. You know, your, your, your judge of original jurisdiction and the clerk are like a right leg and a left leg you really need both to have a smoothly run court system."

05:26:09 Dave Carerra: "I get it. I guess that's all the questions that I had, I mean, I know I'm ready to move forward."

05:26:21 Chairman Holley: "Okay, Andy?"

05:21:23 Andrea Woods: "Okay, since they can do stuff on zoom or stuff, the court, the bailiff would he come to each court proceedings?"

05:23:41 Scott Sypolt: "If, if, if the court is held, the first thing they said is they're going to do is put the health of the Te-Moak court first, that, that was one thing that really upset me about Harland, she really didn't hear, she wanted everybody crowded into a little room at the height of COVID, so the person, they said is they will consider what's best for the health of the Te-Moak People. If it is virtual, then you know, it's, it's obvious then you need to be available when, when everybody is, is together in the court [unintelligible] anyway that they can economize they will do so."

05:27:32 Andrea Woods: "So when the court clerk you'd have to call her and set up everything to get all your paperwork done and everything in order to go to court just like it is now?"

05:27:42 Scott Sypolt: "Yeah, it would be set up like, the way a normal court system works if they deem that things should be filed electronically, they have the wherewithal to, to make that happen. As the pandemic begins to die down, and, and have you all been vaccinated here?"

05:28:02 Chairman Holley: "No, well we started it."

05:28:04 Scott Sypolt: "Okay, so, so, once everybody gets vaccinated it starts to change the whole game but right now you know, most of the courts that I've been involved with have been virtual. There have been in some that are meeting in person, but we, they have the ability to do it electronically that's the way we need to do it."

05:28:24 Andrea Woods: "Okay, okay that's all I have."

05:28:33 Chairman Holley: "Okay, Julia, Julia you have any questions? Okay Cliff you have any questions? Clifton?"

05:29:06 Clifton Oppenhein: "Hold on. I'm on the road right now."
05:29:09 Chairman Holley: "Oh shoot. Okay. I'll come back you Dwayne?"
05:29:15 Duane Garcia: "Yep. I'm probably like everybody else we need to move forward and get our judicial system back in line. Acosta, how much he asking for his monthly payment?"
05:29:33 Scott Sypolt: "I'm sorry Duane, say that again?"
05:29:35 Chairman Holley: "Ramon, how much is he askin?"
05:29:37 Scott Sypolt: "yes, yeah it is, so the normal rate in Nevada per day for a judge is 1,500. Ramon's doing it for 1,200 and then the, the, federal rate for mileage and per diem it's pretty much every tribe follows it and that that comes to you know, a couple hundred dollars on top of that, so you're talking about meeting once a month, so the expense for that judge would probably come to around 1400 dollars a month. Somewhere around there, and I said all this to Sam breaking it down, and we did the math and it fit within the budget that, that, he gave me."
05:30:28 Duane Garcia: "That's 14 hundred a month or a day?"
05:30:30 Scott Sypolt: " You're only meeting once a month so that for that one day you're, you're only meeting one day a month, that's the way it's set up right now, possibly if the docket gets heavier you might move to two, but that would be quite some time down the road. So for the most part it's gonna be meeting one day where they start you know, first thing in the morning at eight o'clock and, and, they may end at eight o'clock at night, but it's the, right now the discussion was to meet one day a month and, and, and, they said that if more was needed they would adjust their schedules."
05:31:12 Duane Garcia: "Okay, so for Chadwick Smith he's obviously too high economy."
05:31:15 Scott Sypolt: "Yeah yeah, I fell out of my chair when he said that and there was some never even higher than that, in an area where 20 groups, there were some that were extremely high, I would try talking them all into doing it pro bono and you know, it's hard to get too many people to do things pro bono. You know, they have to feed their families to."
05:31:38 Duane Garcia: "Yeah, as far as Darian Stanford, if he is employed by Elko Band and the cannabis I think that would be a problem down the road on certain issues in the courts, so that's just my opinion."
05:31:55 Scott Sypolt: "So, so, what most judges do is if there is an issue that the client and in this case the client would be Te-Moak Council, that they feel is a conflict, it, the one that has the power is the Te-Moak Council. he would have to get permission from the Te-Moak Council to hear the case if the Te-Moak Council thought it was a conflict. Again, one of the big draws is I know he's qualified one of the big draws is you know, you can't beat free, but, but, if there is a case, I mean, I would be the first one to speak up if there was a case where there was a conflict. I would advise the Te-Moak Council to not, not, wait. **You all our sovereign, so if there's a conflict you don't have to waive the conflict, and then he would not be able to hear the case, so you, you, you, have total control over the judge.**"
05:32:49 Duane Garcia: "Okay perfect, thank you."
05:32:50 Scott Sypolt: "Thank you."
05:32:52 Chairman Holley: "Hey Alice?"
05:32:55 Alice Tybo: "Okay. I have a couple questions. Ramon Acosta. I don't have a problem with, the court clerk I understand he wants to bring his own court clerk, but one of the issues that we've had in the past is that we were having problems with getting things filed because we do not have a local court clerk, and then, our appellate court with, I also think that Darian has a conflict because he works with

Elko Band cannabis and I approach your arguments about why he would be okay. Then, the Bailiff Tilden Smart, why can't we get a bailiff, advertise a bailiff here because we're not going to have court till the end of the month, we would have plenty of time to advertise for a bail us and get a local bailiff. That would save us some money there. The prosecutor, we need a local prosecutor. I believe so and also local public defender, and we have time to advertise for those also. I think the two that we really need to get filled today are the, the, judge of general counsel and then the, Supreme Court Appellate and so I know that we also have another name that can also be an appellate court, and that is Sam Biers. He can also be a judge in the appellate court. So, I think we need to consider Sam as that also. **Mr. Biers is more than qualified to be our appellate court judge** and, and, I think we should consider him to be that if we, if there are too many of us that think that there might be a conflict with Darian and just throwing that in there."

05:34:46 Scott Sypolt: "And yes, so I'm here just to make recommendations. That the, the, choice is your's with Sam, I mean, if you want to throw his name in there, that's, that's fine. I guess we need to step out and ask, ask, Sam if he's interested. You do need to pick, **you need to have the court to come, the core of the court picked today per your constitution, and that is the judge of original jurisdiction, the judge of appellate jurisdiction** and then, the judge can do nothing without the clerk. That was one of the very first things I mentioned to everybody because a lot of these candidates were from out of state. So I did talk to everybody about their accessibility and getting to these locations. I truly do not think it's going to be an issue. I, I think it's critical that at the very least you have Ramon and Elisa. I, you have to have that muscle to get this court system up and going, and they have an incredible depth of education and experience to do that. You know, I can, I can go out and talk to Sam if you want and see if he's interested, or Joe can go out and talk to him and if you want to take him into consideration, that's fine. An appellate judge won't be meeting once a month and a appellate judge hears very few cases. It has to be an error of a law in order for an appellate judge. You can't say why didn't like the facts that you the judge depended on, the court the judge of original jurisdiction is the one that sorts through the facts. The appellate court only deals with legal errors. And, so because of that, there are very few, very few appeals, but yeah. I, I understand what you're saying, you know my, my concern with picking to many locals is that you know, everybody wants their cousin or their niece or their best friend and then the impartiality and the objectivity go away that's my only concern."

05:36:53 Alice Tybo: "Well, we had a really good bailiff and his name was John Terease that ran the court pretty good, and he was respected, he respected our people and did his job and went home, he was, he was good and, but he was local and I, I'll get you his name, but I, I don't see why we can't have the bailiff from our area, not a real conflict, we don't have, it should not be a big issue and as far as, and I understand that Ramon would like his court clerk because he's familiar with her and that, that's, that's good. If that's what the council wants I you know if, that, whatever it takes to get us going initially is, I think our goal is that we all agree that we need to get this done and if our, if we hire Ramon Acosta and if he's comfortable with his court clerk and if that's takes to get us going then. I would have no problem with that."

05:37:52 Scott Sypolt: "Yeah and my job is clear. My job was to make the legal pathway to allow this to happen, so we're there. I mean, again, I think your elders would be very proud you all are on the verge of having your own tribal court system, which every sovereign nation should have. I think that's wonderful, you know, the, the, I'm trying to make, I have a ton of experience in this and I just, and I've

spent a lot of time interviewing these people and I, I want this court to work. I want it to be efficient. I want it to be successful. I want it to be impartial. I want it to be objective and these are the people I recommend, but I certainly understand some of the things you're saying. I, I, my strongest urging is that you with the judge of original jurisdiction and the court clerk because they bear the brunt of the court, they carry the heavy weight. Everybody else is important, but they're on a secondary level. **So if you want to, I mean, if you all want to make a motion and submit that name since the one person dropped out and there's just Tilden Smart if you want to submit the other name.** I'm, I'm more than fine with that, what I have done what I would ask is allow me to run a background check on him and you know, I really thoroughly vetted all of these people your, **my only loyalty is, is, to the Te-Moak Courts.** I want to make sure the people that are put in are spotless and clean. And, so all that I would ask is that if he is selected he would be selected contingent upon me running the background check on him."

05:39:40 Chairman Holley: "Okay, you got any more questions Alice? Hello did we lose everybody again?"

05:39:55 Multiple overlapping voices

05:40:12 Chairman Holley: "Did we lose her? Hello?"

. . .

05:40:35 Scott Sypolt: "Are you interested in the appellate judge?"

05:40:36 Chairman Holley: "Julia?"

05:40:37 Sam Biers: "Oh yeah. I already let Joe know that this morning."

05:40:38 Julia Oppenhein: "Here."

05:40:40 Sam Biers: "I'll accept it."

05:40:41 Chairman Holley: "Cliff?"

05:40:42 Clifton Oppenhein: "Yo!"

05:40:45 Chairman Holley: "Duane?"

05:40:46 Scott Sypolt: "Well . . .when did he ask, I presumed you were only in for the prosecutor? So I've been with him all afternoon and he didn't say anything to me."

05:40:47 Duane Garcia: "Here."

05:40:49 Chairman Holley: "Alice?"

05:40:51 Alice Tybo: "Here."

05:40:53 Chairman Holley: "Larry?"

05:41:01 Chairman Holley: "Davis?"

05:41:02 Davis Gonzales: "I'm here."

05:41:05 Chairman Holley: "Robert?"

05:41:07 Robert Brady: "Here."

05:41:11 Chairman Holley: "Juan?"

05:41:12 Juan Arevalo: "Here."

05:41:18 Chairman Holley "Beings there is no Larry we are going to move on to Davis."

05:41:21 Larry Yeager: "I said I was here."

05:41:25 Chairman Holley: "oh you said you was here, I didn't hear you? Ok. If you got any questions go ahead and ask em now."

05:41:33 Larry Yeager: "Sorry I'm driving around trying to get some stuff done. My question would just be like with the Law Codes an stuff an how they're not pretty strict, could they help us get those Law

Codes a little tougher you know instead of doin . . .24 hours in jail an gettin out on domestic batteries I've been lookin at other tribe's codes and stuff which are way tougher than our's. How can we go about getting that implemented into our law system, our court system?"
05:43:34 Chairman Holley: "Okay Davis, Larry's done you want to speak?"
05:43:42 Davis Gonzales: "Yeah, look one of the things that I'm really concerned about is that we're not, that the Te-Moak Council is not interviewing these people. I know that we're doing it today, but we had a, we had a plan that supposed to be developed from Scott, from you Scott and I think that was Juan's question that we need a plan of operation and if this was going to happen and we had the people that's been selected, you know, should a been a courtesy that it should've come before the council to interview these people because right now, you're the only one that's interviewed these people, you're the only one that done this talking, but the only thing is that I know Tilden he was a tribal chairman that's how I know him, and of course I know Sam but and then Jane long, you know, she's the attorney for Reno Sparks right now. But the rest I don't even know, but Darian, you know, he was mentioned little earlier. He don't work for Elko, he's a partner to Elko. But a, he's not, I just . . .huh?"
05:44:48 Scott Sypolt: "**You're right he's a partner with Elko**, he doesn't work for Elko. You're right. You know Davis, there's a hundred different ways to do this, **it's, my area of expertise is in knowing judges and what they have to perform and checking into their legal background** and they're just their ability to make decisions and, I, you know to open it up to the whole Council, I mean, you could be sucked for six months trying to make a decision on one person because it goes back and forth and back and forth and as I said earlier you always have that risk of somebody wanting their cousin in or someone they dated or you know these are. **You all hired me for a certain expertise**. This is the way I was instructed to do this, good better and indifferent, I, I will always do it the way the council wants me to do it, but this, is the way I was instructed to do it, so I'm just following the orders that were given to me. I understand why they ask that it be done this way because it's efficient and **it's clear if these people get in and that the Council does not like them for whatever reason, you have the full power per your constitution to recall them.** But, you could spend the next six months picking these people and we just don't have any more."
05:46:15 Davis Gonzales: "You know, you know, I mean, I'm just telling you what I feel right now is that that we could have we could have looked at them on zoom we could have put them on make arrangements for them to where we could see them on the zoom, you know, we, we have that capability over at the Elko Band office we can zoom them in, you could have made arrange, but I'm sure because I'm sitting here on my phone an my phone keeps flashing with people making comments and saying what aren't you guys interviewing you know, why are you listening to one person? And, you don't know who really know who these people are."
05:46:52 Chairman Holley: "unintelligible. . . Yeah, Davis if you remember what my direct . . ."
05:47:03 Davis Gonzales: "except Sam. . .you guys asked me to say something, I'm gonna say it."
05:47:04 Scott Sypolt: "Thank you, thank you. I appreciate everybody's opinion."
05:47:10 Chairman Holley: "So I'm just explaining it, that that that's why we were instructed the way we instructed it to him to do what he's do and for us to pick in the manner we're picking, so, do you have anything else Davis? Ok, go on Robert."
05:47:38 Robert Gonzales: "Finish talking Davis."
Unintelligible

05:47:46 Davis Gonzales: "Oh yeah, now that I was really interrupted so back to my comments that we should be interviewing them, so we know we could have done it on the zoom and, and we got people out there that's gotta, we gotta satisfy to, so, and that's my feelings."
05:48:13 Chairman Holley: "Okay, you got anything Robert?"
05:48:15 Robert Brady: "Yeah, I have the same concerns because we're not interviewing these people an I don't know who they are and **he's said their background checks were done, but I don't have any of that documentation saying they're done.** I don't know anything about their resumes. I don't have any of that information, and **if we do appoint somebody we can't just get rid of them just as easy as we appointed them because we do have to follow that constitution for removing the judge, and we have to follow article four section eight and it's pretty much the same steps to remove the tribal chairperson.** That's all I can say about that."
05:42:12 Scott Sypolt: "Yeah, yeah yeah, that's an outstanding question. That's a great question. So that's another reason picked these particular people because of their experience with all these other courts. You have the power, the foundation, its already been approved, your law and order code has been approved. So it's something to work with, but of course we're going to of course, we're going to improve upon it and we will improve upon it as each item is changed it will be brought to counsel and council will decide you know, what they want in the law order code and what they don't want from the law to code. Oh and I just talk, I just I just talked with Sam and he said yeah, he would accept candidacy for the appellate judge."
05:43:16 Larry Yeager: "You'd have to do a background check on him too, also, right?"
05:43:18 Scott Sypolt: Yeah. I would recommend it."
05:43:24 Larry Yeager: "That's the only question I have."
05:43:26 Scott Sypolt: "So they would be selected, you know, dependent upon the outcome of the background check and that's you know, people are hired that way a lot of times."
05:48:56 Chairman Holley: "All right, very good moving on. Juan?"
05:49:04 Juan Arevalo: "So, before I even get into that I got, I got a question and I need Scott's opinion on it is, I need you to address this letter from Bowker that's in my packet."
05:49:17 Scott Sypolt: "Sure, okay."
05:49:11 Juan Arevalo: "So I need a better legal opinion on that before I even get into the court case because that seems like a to me a barrier before even going to court so if you can explain that and elaborate with your legal opinion on what that if, if that could be effective or what's the outcome of that or whatever, so you can explain that please?"
05:49:39 Scott Sypolt: "Sure, so the outcome is clear. **Bryan Bowker actually worked with one of the partners at Dentons and when I showed this to the Denton's team they were outraged.** First of all, he, he doesn't, he doesn't base his decision, every lawyer and every judge has to base their decision on some kind of existing authority meaning in either case law or a statute. This guy doesn't cite anything. What he says is, he bases it all on hey we have an ongoing mediation, that has been going on by the way for three and a half years. **When I showed that to Dentons they thought that was the most outrageous thing**. Mediation takes three months not three and a half years, they thought you were being abused and neglected by these people so he has absolutely no legal grounds whatsoever. I wrote a response to this and it is extremely clear that you all are a sovereign nation and under your Constitution and under the US Constitution and under 25 CFR 11.104 you have the right to do whatever you want to do and the

Council made their decision they wanted their own tribal court. It is the supreme example of sovereignty, there is nothing they can do about it, they will lose this battle they have absolutely no legal foundation whatsoever, this is the most ridiculous letter I've ever seen in my life. Joe has seen me in action before when we were with the justice department and they had some little right out of law school lawyer stating laws that were just out-in-out lies, and I had won a major case regarding the very issue and I told her you need to go back to law school and actually read the cases. The same thing with this guy right here, he needs to actually cite legal authority which he neglects to do. So this letter is worthless! I hope I said that . . ."

05:51:44 Juan Arevalo: "Okay, so that's not going to be a problem in the future now is it?"

05:51:48 Scott Sypolt: "Not at all."

05:41:50 Juan Arevalo: "Okay."

05:41:51 Scott Sypolt: "There, there, there, you know, the only reason they keep sticking their nose in is because someone from Council keeps contacting them, and I mean, you know who you are, but that's why they keep sticking in their nose. The problem is, they have no legal base, even they, you know, the thing I hated about Trump is he would always make decisions and he would tell everybody that he was the law. I think one of you told me I think Alice you told me that Harlan said that that the Te-Moak were not sovereign that they were only a sovereign if she wanted them to be. She can't make statements like that, you know, everything is based upon law and even those people, they're not dictators they have to follow the law too. This letter they're following no law, no law he completely ignores that your constitution allows it. He completely ignores that, that the US. Constitution allows the tribal court. He completely ignores all the legal foundation that you all have, the law is totally on your side."

05:52:55 Juan Arevalo: "Okay I see."

05:52:57 Davis Gonzales: "You know, Bryan Bowker you know, he's the area director, did you know that? I think that's what yeah that . . ."

05:53:10 Scott Sypolt: "You know, he's actually the regional director. I know that."

05:53:14 Davis Gonzales: "Okay the region."

05:53:15 Scott Sypolt: "Even the regional director has to follow the law. As we have found out you know, Donald Trump even the president of the United States has to follow the law."

Unintelligible multiple voices overlapping

05:53:37 Davis Gonzales: "I know, but you know if you guys were so pissed off about Harlan, how come we couldn't kick her out?"

05:53:40 Scott Sypolt: "Davis that was you trying to kick her out. You weren't successful with that. I got her kicked off she's gone. I did. I did. [laughter]."

05:53:45 Davis Gonzales: "I didn't try to kick her out, so don't worry. I know how to do it, but you didn't do it."

05:53:52 Scott Sypolt: "You know what, they tried to, to reach. . .again this group has absolutely abused you. Three and a half year mediation is ridiculous. They did try to concede [unintelligible] we'll rotate after they said no to you that Harlan would stay they said well, we'll rotate them so Harlan won't be here all the time. Get the F out of here you're either a social club or you're a sovereign nation if you're the sovereign nation you deserve your own court system if you want it."

05:54:24 Chairman Holley: "Okay Juan do you have more questions?"

05:54:26 Juan Arevalo: "No, I'm not done yet, I'm back to my questions."

05:54:27 Chairman Holley: "Okay."
05:54:28 Juan Arevalo: "Now, now it's, Scott I need you to, to, to show me how this process is gonna work. I need you to identify how each person that we select is gonna perform their duties how those duties are gonna be performed, locations, I need all that stuff. How is this, give me a example of a court date how it's gonna work?"
05:54:45 Scott Sypolt: "So you will select the, the group today, that group will immediately meet. They will retrieve existing court files, that would be transferred to this court. They will accept new causes of action and they will start scheduling them and that's what the court does is one by one they will schedule them and the discussion was that at least initially they would meet in all four bands, they would meet in locations all, all four of the bands, which I think is very fair to each of the bands that gives all the people an opportunity to meet, meet these people and get to know them and they've already, the group has already talked about how they will lay it out, that was one of the things I loved about Ramon and Elisa is they completely laid out how they would do it. They already read the Law and Order Code and they already started laying out how they want would like to have the first court session before the end of February. So it would be scheduled either in Battle Mountain or Elko or Wells or South Fork. And, it would take place like a normal court, that's what I'm saying is these people have the experience to hit the ground running versus someone who's never been a judge or a clerk before, who really wouldn't know how to put the whole puzzle together."
05:56:14 Juan Arevalo: "Okay, so we'll go back to location, so the, the each Band have to specify where that location is going to be or do they have that designated already."
05:56:20 Scott Sypolt: "If each Band has a particular location where they would like the court to be held, I'm absolutely certain that this legal court would be happy to, be happy to accept wherever you wanted them to go."
05:56:40 Juan Arevalo: "So, let's. . ."
05:56:41 Scott Sypolt: "You know, I've been told that there's their space within each of the Bands, there's a proper space to hold court. I mean, I know with some of the tribal courts from Nevada they meeting in gyms. You all have a much better situation where you have some designated council areas that are very nice council areas where you could hold, where you could hold court, you know, I'm familiar with the ones in Wells and Battle Mountain. They are very nice facilities."
05:57:13 Juan Arevalo: "Okay, so for instance if a Band was to be, you know resistant towards the court coming on their area is they're going to be a place designated for them to go to for that respective Band? So let's say they had a, we had one in one of the bands and one of the bands didn't give them a location to have their hearings. . .is there a solution to that?"
Unintelligible
05:57:43 Scott Sypolt: "I assume what you're telling me is if one of the councils didn't want the court to meet in a, meet in their band and then they would meet in the other three bands. I mean, it is the Te-Moak Tribe."
05:57:54 Juan Arevalo: "Okay."
05:57:55 Scott Sypolt: "So that, that, but you know, you, you can't have individual people say 'oh you're not going to meet there.' The system doesn't work that way, you know. . ."
05:58:05 Juan Arevalo: "I know, what I'm saying, I understand that Scott, what I'm saying is you, nobody can determine that because we see how the Bands act sometimes so I'm just trying to say I hope

that Te-Moak has something prepared in case of that happens, because I guarantee you it's gonna happen, because no matter if everybody's in the agreement with this, so for vindictive measures are gonna be met by saying 'oh we don't want your court there' so then we need to have a solution, you see what I'm saying? So do we have something that's prepared in the case that happens, you know what I mean?

05:58:34 Scott Sypolt: "Absolutely, and, and we will always have contingency plans but you know to be a sovereign nation you, you have to be brave and have the cojones to move forward and it, it's there always risks involved but you gotta move forward otherwise you just stay stagnant over 40 years and get nothing accomplished. You have to have the cojones to move forward just like your elders did .

05:58:59 Juan Arevalo: "Mhm, right. So, okay, so is that's something that this group has, has already, prepared, you know, some kind of plan like that in case of scenarios but that may arise because again, you don't you never know. So you always want to be prepared because again this is tribal government."

05:59:16 Scott Sypolt: "Yes."

05:59:16 Juan Arevalo: "So you always have to plan or something."

05:59:23 Scott Sypolt: "What Ramon and Elisa have suggested and again it was very suggestion and I love how they, they, they took the initiative they wanted to write a report explaining to the Council how the court system would open and unfold, and I think that's a great suggestion and then you'll most step by step exactly what they're going to do."

05:59:46 Juan Arevalo: "Okay, so again, in pursuance to the contract that they'll sign for three years, is there a clause in their stating that you know, the, liability of them or, not the liability but the, the risk of them you know, losing their positions is ultimately the Te-Moak Tribe's decision right so that they aren't, they are aware of that, that if they don't perform at the level of the Te-Moak Tribe wants that they will be removed immediately. Is there something in there that protects the Te-Moak Tribe in case that happens?"

06:00:15 Scott Sypolt: "**Absolutely, absolutely. It follows your constitution to the 'T'**"

06:00:17 Juan Arevalo: "Right, so then when we initiate these three years is that, are we now establishing pursuant to the constitution the staggered terms of, then it'll become six?"

06:00:32 Scott Sypolt: "Yes. **Yes. I'm following the Constitution to 'T'**."

06:00:35 Juan Arevalo: "Right because I, I believe it's, it's the two . . ."

06:00:41 Scott Sypolt: ". . . the initial. . ."

06:00:41 Juan Arevalo: "is three eight.

06:00:43 Scott Sypolt: "The initial judges are three-year terms in order yes, so it can be staggered correct."

06:00:47 Juan Arevalo: "Okay, so my next question is when when you've established the three years for the staggered terms, how does that play into effect to actually start the actual terms, so where you'll do the next one, is it just starting now and then they'll be done in three years and then you'll hire somebody else or how does that go so that you're following the Constitution?"

06:01:09 Scott Sypolt: "Yes, and so that you're following, yes, you should yeah, so you're nearing the end of the three years and you initiate the process where you decide whether you're going to rehire these people again or you're going to search for, for new judges."

06:01:24 Juan Arevalo: "Okay, so kind of switching off to that, so with a court what about the records like where they going to be stored, at who's responsible for keeping some confidential? Because I know

that when BIA came down to ours they took an all kinds of files, files that were damaged because of a water issue that we had and I don't think we've ever heard anything back from 'em because a lot of the cases of those files were damaged. I've seen them for myself so I don't even know where those are stored at so if we're starting our own course system, first off are those records going to be released back to us or is that remaining records of BIA?"

06:02:08 Scott Sypolt: "They're not BIA records, they're your records, so yes the records will come back and yes the records will be kept in a secure place, and yes this court will work with the Council to have the records in a designated place, so they're not accessible to everybody, only the court. Look you are a sovereign nation be this is your property, this is your land, this is your people."

06:02:32 Juan Arevalo: "I understand that but there's always levels to this Scott, so when I when I'm saying about this, I know it's ours, but because BIA, I witnessed BIA come in and take those records and files so once we took them out being that I don't know where they're at how do we get that records back?"

06:02:50 Scott Sypolt: "So I investigated that you know. When, when, when they came in an took the files this Tribe was in a complete cluster cluster F, I mean, it was, it was, there were allegations of corruption, there was all kinds of things going on and you all have a very, very different Council now than you did back then that is one of the things that we, we researched to see how this happened and the, the Council at that time was a bit of a mess."

06:03:26 Juan Arevalo: "Right."

06:03:27 Scott Sypolt: "You have it for about, you out, you have a Council now that you know, you all disagree from to time to time that's great, but you're all educated you're all articulate and you all want to move the Tribe forward and you're very proud of your sovereignty, and you know, very different situation from what happened in 2017."

06:03:45 Juan Arevalo: "Okay, so okay, so I understand that, so when you said you're gonna investigate that so you'll find some kind of solution to how we're gonna get that back to us because the ultimately is our records right?"

06:04:58 Scott Sypolt: "Yes."

06:04:59 Juan Arevalo: "from BIA?"

06:04:01 Scott Sypolt: "Yes, absolutely."

06:04:02 Juan Arevalo: "Okay, okay, great. So once again because this is a floating un-stationary court that is not one location permanently that still goes back to my question of the record files, so how does that, there's got to be a primary location right? There has to be or else. . .I wouldn't want those files walking around."

06:04:18 Scott Sypolt: "Yeah and that's the responsibility of the clerk. This is the way it's done in many, many state courts where, where it's in a state, stationary position and the judge and the clerk, it's usually the clerk, who comes and the, the clerk would come and access the files and then take them to the location where they're holding court. I mean, eventually that is it would be great to have you know, a Te-Moak tribal court and one local place? Yeah, and you know, they're there are funds for that, there are grants for that and that's what we will work toward. You know, we're, we're discussing a very court systems a very, very complicated thing and we're taking something that's very complicated and sort of putting it into nutshells, but these are all good questions and these are all questions that I discussed with them."

06:05:11 Juan Arevalo: "Right, so if you [unintelligible] I'm sorry going through that again, is this seems to me that Te-Moak needs to designate a primary location."
06:05:15 Scott Sypolt: "See when, when you, when you see the CFR court you see the reason?"
06:05:22 Scott Sypolt: "I'm sorry say that again."
06:05:24 Juan Arevalo: "It seems to me that Te-Moak Needs to designate a primary location. Right now?"
06:05:28 Chairman Holley: "and we could because you have, you have extra buildings Juan and that's . . ."
06:05:31 Juan Arevalo: "Right."
06:05:33 Chairman Holley: ". . .that we can grab those buildings and utilize it for one location and that would be awesome."
Unintelligible
06:05:42 Scott Sypolt: "But there are other tribes that have a large land mass where you know, Abraham Lincoln was a, he had a traveling circuit where he travelled from courthouse to courthouse to courthouse. And, so it is precedented, I mean it happens and it happens a lot. An ideal situation for your tribe is probably to eventually have one stationary location and that's probably what we will work for. As they say Rome was not built in a day."
06:06:11 Juan Arevalo: "No it wasn't and that's why I'm asking these questions because I want, I want us to be prepared and, and again being that the confidentiality of those records, you know should be something that we decide. You know bad now because me personally, I don't want that floating around to each Band, you know, I want it to be in a primary, stationary location."
06:06:15 Scott Sypolt: "Absolutely."
06:06:16 Juan Arevalo: "So, if the sooner we can I guess notify that you know, the more comfortable I feel about it, but yeah . . ."
06:06:40 Scott Sypolt: "That's our step two is once the court is in place our step two is to find a stationary home and that's that you applies the whole tribe that unifies all the bands to work toward a common goal."
06:06:57 Juan Arevalo: "That's true. So, so the next with, with, which the group has identified what the court proceedings and rules and regulations and all that of the court is going to be, have they developed something like that because they won't be going to CFR?"
06:07:13 Scott Sypolt: "Yes."
06:07:14 Juan Arevalo: "And, they they've identified all that?"
06:07:16 Scott Sypolt: "Yes. You, you've got to understand, you know, they're the rules and regulations of a court, so I practice in federal court. I practice in state court. The rules when you all boil them down are somewhat similar. I mean, they have common denominators that will move the court forward. So, yes that absolutely was discussed. The biggest issue, really the biggest issue is to eventually find a stationary home."
06:07:40 Juan Arevalo: "Right, right, but I just want to talk about preparation, so with the preparation of the court I just want to make sure that that those rules and regulations have been established because of the CFR no longer being in existence so that if we are not following that or if we're not receiving stuff, material support that we have to design and create this ourself so that needs to be in place initially so that"

06:08:03 Scott Sypolt: "Absolutely."

06:08:04 Juan Arevalo: "I wanted to know if that was already that. Has that been completed then? You're saying yes?"

06:08:10 Scott Sypolt: "Absolutely yes, yes, sir. Absolutely."

06:08:14 Juan Arevalo: "Oh, okay, so then my next thing is so I'm going to talk about conflict. So when, when, when people are when you are using the word conflict when you're picking judges, ultimately decisions is is how do you determine what, what proper conflict is, right? So if with the candidate that that you guys have named if we're going to talk about conflict so It's going to be everyone's going to be in conflict right? So, each candidate is going to be in conflict because of location, who they known, relations, all that stuff. So that no matter. . ."

06:08:53 Scott Sypolt: "That's exactly, yeah . . ."

06:08:56 Juan Arevalo: "Right. That matters who you pick right? So no matter who . . ."

06:09:02 Scott Sypolt: "Yeah, that's exactly why I picked these people because they are outsiders and the, the conflict is minimized. Any court, any judge that you pick I mean, watch some of the hearings for selecting judges for the Supreme Court. There's always going to be some kind of conflict there's always going to be some kind of objection someone's always going to find something wrong with the process, but you can't just freeze and do nothing you know, you work through it."

06:09:33 Juan Arevalo: "Right, yeah. I understand that though even, even because each candidate would have an, and it's not legitimately saying it's a conflict but everyone's gonna assume because again, it's a tribal government everyone's gonna assume what conflict means in an indirect relation so you can say anything is a conflict because you know this person or you know about this person so no matter what judge they're always gonna have to make, they're always going to have to sign some kind of exclusion, that would exclude them for I guess what the Te-Moak Tribe, Tribal Council would consider is a conflict right? So that would need to be in place for any candidate we select. . ."

06:10:11 Scott Sypolt: "For. .."

06:10:14 Juan Arevalo: "Right?"

06:10:15 Scott Sypolt: ". . .for any candidate, that's correct. Yeah."

06:10:17 Juan Arevalo: "We'd have to have some kind of exclusion that, that identifies that and protects the people who do feel like it would be a conflict if they're in front of that judge because giving it for us . . ."

06:10:27 Scott Sypolt: "That's correct."

06:10:28 Juan Arevalo: ". . .not a judge from across the United States that nobody knows, because let's be honest no matter what in the history of, of the tribe, any judge every Council has had a problem with the judge. It doesn't matter. It's because of the way they rule and that's a fact. Anyway a judge, any time a judge ruled not in the, in the, in your favor, it's an automatic removal. So it's always going to be a problem no matter. . ."

06:10:53 Scott Sypolt: "I was before a, I was before a federal judge in the second highest court of the land, the DC circuit court of appeals. The next highest is the Supreme Court, and one of the adversaries, one of the opposing counsel was raising a conflict because once upon a time when she was 18 the judge went to the Navajo Indian reservation and they said that was a conflict. So anybody can claim a conflict. There are legitimate conflicts and there are illegitimate conflicts. So, yes we have presented a way through that. . ."

06:11:25 Juan Arevalo: "Right and. I think that would be most beneficial for this, this Council is if you know, no matter who they select that there's gonna have to be some kind of exclusion because you're never gonna satisfy anyone because again, you look through the history of the tribe every judge there's been a Council that removed them, that they tried to remove because they had personal feelings of the way the outcome was of that trial so that's . . .

06:11:47 Scott Sypolt: "Correct we're not gonna satisfy everything."

06:11:49 Juan Arevalo: "Again, conflicts should not outweigh the decision of who is we let, because again, it's always gonna happen. It happened, right when I first got on, so I mean it, it what we need to do is put our personal feelings aside and kind of decide where we're gonna go with this because if we're not ready, we're gonna fail right at gate, and, and that's, and that's why I, I had so many questions is because I need that, that you know that, that what, what's the word I'm looking for? That re-assurance that you know that [unintelligible] yeah I need . . ."

06:12:26 Scott Sypolt: "I love these. . ."

06:12:28 Juan Arevalo: ". . .this is *something* that's gonna happen."

06:12:30 Scott Sypolt: "Yeah, these, these are great questions, but **you know, you, you, you all came to me and, myself and Dentons, please I know most people have looked up Dentons, we're the largest law firm in the world. We're the top Native American law practice in the country, the vast majority of our people in this practice are former high ranking BIA people, former our high ranking Department of Interior people. We have former Presidents. We have former Governors. We have former Senators. I mean the people who really know what they're doing and what they're talking about and so all this has been run, not just through me, but, but through them as well.** One of our partners that I had mentioned he wrote a large part of the CFR code, so he knows this better than anybody. So you're right I mean at some point it's, you can't live your life in fear, fearing everything and beaten down by the federal government. I mean you all are a sovereign nation and you have the power in the courage to move forward."

06:13:35 Juan Arevalo: "Right. So yeah, that's, that's it, I don't want to pick up too much so that that's all I got. Joe if I got more I'll bring it up but I don't want to take up more time."

06:13:45 Scott Sypolt: "Thank you, those are good questions."

06:13:47 Chairman Holley: "Okay, thanks Juan. So is everybody comfortable now to make a decision on this?"

06:13:53 Andrea Woods: "Joe this is Andy, can I say something?"

06:13:57 Chairman Holley: "Go ahead."

06:14:00 Andrea Woods: "Okay when we hired Scott we hired him because of his expertise, and then when we talked about selecting these people we have no idea where to get these people. **We relied on Scott to get these people and he already did their background checks which takes a long time and it's already done. He, we relied on his expertise in selecting these people**. Why should we question Scott when he's our lawyer and we rely on him to do these things for us. And, that's what we hired him for so we should go on what he has selected of all these people in the United States. Some don't come from this area we could get 'em from clear back East, but no we got some within this area that know Nevada tribal law, so why should we question all these people when we can get their profile? Yeah, I guess you could say their background check, their resume and read it that way. When you go into court downtown you don't know the judge you just know that he's the judge and he sitting up there whether

he's black green or white, and we don't question that and so we relied on Scott to make these legal choices and our behalf."
06:15:32 Chairman Holley: "You're exactly right Andy, and that's why we're where we're at and because of the things that we decided this is the way to go. I, mean we reached out to Scott because of his expertise you're a hundred percent correct and I agree with you we should just follow what he statin and how we need to go forward, but by any route if we're going to be sovereign we need to flex our wings and be sovereign, and if not then we can just fold everything up go home and have Harlan do her thing and we'll just fall and shoot. So we got a lot on the line, I don't know if anybody's comfortable to do anything now, but we got to do it we have to move right now."
06:16:20 Davis Gonzales: "**You know, Joe I'd like to, I gotta to tell you guys because I'm, I've known about this for a long time and I got to tell you about it. These guys like Elisa Dave clerk from McDermitt, Ramon Custer, Acosta, whatever her name was, and, and Tilden Smart, those all came from Darian. He was telling me that, he was telling me that those from the McDermitt court system** and they're having a fight up there and we ought to try and get them people in our court system, so I just want to tell all the Council members that. I just don't want to keep it. In my mind I just feel like I'm hiding, hiding things from you guys. So, but that's where it came from."
06:17:06 Scott Sypolt: "No, that's not the truth statement. That's not a true statement, they're not all from Darian.
06:17:14 Davis Gonzales: "That's what he told me."
06:17:16 Scott Sypolt: "That's not a true statement at all."
06:17:16 Alice Tybo: "So if Chairman Holley would like to entertain motion, I'd like to make one? This is Alice."
06:17:20 Chairman Holley: "Yes, I'm ready for a motion Alice."
06:17:24 Alice Tybo: "I'd like to make a motion that we go forward and hire Ramona Costa as our, of let me look at my notes, as our trial court judge."
06:17:38 Chairman Holley: "Okay. So we got the three parts for this appellate court judge, trial judge and [uinintelligible]."
06:17:58 Alice Tybo: "You want to do it all of the same time or separately?"
06:18:04 Unknown Voice whispering "separate."
06:18:08 Chairman Holley: "Yeah, we can do them separately I guess. We'll do Ramon first and we'll go right down our list and we'll decide from the list what we got, and we'll do 'em separately and go from there. Go ahead. So, for the first one was Ramon [unintelligible] Ramon and Jane. Jane."
06:18:28 Sam Biers: "Okay."
06:18:29 Scott Sypolt: "Well, the one's on your list are gonna come up."
06:18:30 Chairman Holley: "This is it right?"
06:18:32 Scott Sypolt: "We were too deep."
06:18:33 Chairman Holley: "So, you made a motion to hire Ramon for the appellate court judge right?"
06:18:29 Scott Sypolt: "No, no judge of original jurisdiction."
06:18:30 Alice Tybo: "Trial Court. Chairman Holley it was for the trial court. . ."
06:18:44 Chairman Holley: "Trial. Yeah, I got that Alice, with resolution number?"
06:19:10 Scott Sypolt: "27."
06:19:12 Chairman Holley: "21-TM-27. Do we have a second for that? Alice makes a motion to hire

Ramon as a trial court judge with resolution number 21, TM, 27."
06:19:29 Andrea Woods: "I'll second that."
06:19:30 Chairman Holley: "Second by Andy. We beat this one to death, so we're going to vote. Dave?
06:19:44 Dave Carerra: "Yeah."
06:19:47 Chairman Holley: "Andy?"
06:19:48 Andrea Woods: "Yes."
06:19:51 Chairman Holley: "Julia? Julia?"
06:19:57 Julia Oppenhein "Yes."
06:20:01 Chairman Holley: "Cliff?"
06:20:02 Clifton Oppenhein: "Yeah."
06:20:05 Chairman Holley: "Duane?"
06:20:07 Duane Garcia: "Yes."
06:20:09 Chairman Holley: "Alice?"
06:20:10 Alice Tybo: "Yes."
06:20:11 Chairman Holley: "Larry?"
06:20:18 Chairman Holley: "Davis? Davis?"
06:20:24 Davis Gonzales: "Okay, I just, I just, Joe I can't I can't vote on this because I can't vote on somebody that I don't even know, that I can't see . . ."
06:20:38 Chairman Holley: "Are you abstaining or?"
06:20:39 Davis Gonzales: "So I vote against it."
06:20:41 Chairman Holley: "Ok so you're against."
06:20:43 Davis Gonzales: "Yeah."
06:20:44 Chairman Holley: "Robert?"
06:20:46 Robert Brady: "No."
06:20:48 Chairman Holley: "Juan?"
06:20:50 Juan Arevalo: "Abstain."
06:20:55 Chairman Holley: "What was that Juan?"
06:20:56 Larry Yeager: "Hey Joe, I'm here too. Sorry, traveling, I'm gonna abstain."
06:21:02 Chairman Holley: "Okay. Juan?"
06:21:07 Juan Arevalo: "Yeah I abstained."
06:21:12 Chairman Holley: "Okay, you abstained too?"
06:21:12 Juan Arevalo: "Yup."
06:21:13 Chairman Holley: "6-2 and 2."
06:21:20 Scott Sypolt: "Let's do the clerk next."
06:21:23 Chairman Holley: "the trial court judge is Ramon, the vote was 6-2-2. You want to make another motion Alice or?"
. . . .
6:24:04 Chairman Holley: "Okay, the third one we talked about the appellate judge."
6:24:06 Scott Sypolt: "It'll be the judge of the appellate Court."
6:24:10 Chairman Holley: "Do you want to make a motion on that Alice?"
6:24:16 Alice Tybo: "I'll let somebody else motion."
6:24:20 Scott Sypolt: "Get Andy."

6:24:21 Chairman Holley: "Okay."
6:24:23 Dave Carerra: **"I'd like to make a motion that, to, for Sam Biers, Sam threw his hat in correct?"**
6:24:28 Chairman Holley: "**Okay Dave makes a motion for Sam Biers.**"
6:24:34 Dave Carerra: "**Under Te-Moak Resolution, the next one in line.**"
6:24:38 Chairman Holley: "**29, does somebody want to second that?**"
6:24:50 Alice Tybo: "I'll Second that motion. This is Alice."
6:24:54 Chairman Holley: "Second by Alice, goin to vote. Dave?"
6:25:03 Dave Carerra: "Yes."
6:25:06 Chairman Holley: "Andy?"
6:25:08 Andrea Woods: "Yes."
6:25:10 Chairman Holley: "Julia?"
6:25:13 Julia Oppenhein: "Yes."
6:25:15 Chairman Holley: "Clifton?" [No Response Not Present]
6:25:21 Chairman Holley: "Duane?"
6:25:23 Duane Garcia: "Yes."
6:25:25 Chairman Holley: "Alice?"
6:25:27 Alice Tybo: "Yes."
6:25:31 Chairman Holley: "Larry?" Pause
6:25:34 Larry Yeager: "**What was the motion again Joe, I missed part of it?**"
6:25:37 Chairman Holley: "**Ok Dave made a motion to hire Sam Biers as the appellate court judge by Resolution 21-TM-29.** Larry?"
6:25:49 Larry Yeager: "No. I vote no."
6:25:53 Chairman Holley: "Okay, Larry votes No. Davis?"
6:25:58 Davis Gonzales: "I thought, I thought he was running for prosecutor?
6:26:04 Chairman Holley: "Yes or no, hey Davis, yes or no for **Sam Biers to be the appellate judge?**"
6:26:10 Davis Gonzales: "No, he's a bad dude."
6:26:13 Chairman Holley: "Okay, Robert?"
6:26:15 Robert Brady: "No."
6:26:16 Chairman Holley: "Juan?"
6:26:17 Juan Arevalo: "Same thing, I abstain."
6:26:20 Chairman Holley: "Okay, 5-3-1. What's the next one."

**End Transcript where the Te-Moak Tribal Council Ended The Official Discussion Regarding the Appointment of Samuel L. Biers as the Appellate Judge for Te-Moak Supreme Court.**

I, Samuel L. Biers, do hereby certify under penalty of perjury pursuant to 28 U.S.C. §1746 that the foregoing transcript is a true and correct transcript of the Te-Moak Tribal Council Telephonic Meeting, (with bold text emphasis added), based on my personal knowledge, information or belief from the February 3, 2021 meeting that I personally attended, and that I personally supervised and also reviewed the electronic recording that was created as a routine matter of the Tribe's official business, as

required by tribal law as well as federal contracts, loans and grants, and that said recording was subsequently published via the internet onto a public website in its video format.

EXECUTED on this the 27th day of October 2021.

Hon. Samuel L. Biers
Te-Moak Supreme Court

# Appendix II

# Exhibit II-C(9)

**February 24, 2021 Te-Moak Tribal Council Close Meeting**

**Excerpt RE: *Performance Evaluation Samuel Biers as Tribal Administrator***

(um, ah and oh's are omitted)

**<u>Te-Moak Tribal Council</u>**

Chairman Joseph Holley – Present in Person at 511 Sunset Street

Vice Chairman Juan Arevalo (Also Elko Band Vice Chairman) –Present in Person at 511 Sunset Street arriving at 00:33:13

Andrea Woods (Also Wells Band Chairwoman) – Present in Person at 511 Sunset Street

Duane Garcia (Also South Fork Band Chairman) – Present in Person at 511 Sunset Street

Alice Tybo – Present in Person at 511 Sunset Street

Dave Carerra (Also Battle Mountain Band Chairman) – Present in Person at 511 Sunset Street

Julia Oppenhein - Present in Person at 511 Sunset Street

Paula Garcia – Present in Person at 511 Sunset Street

**<u>Te-Moak Tribal Administrator</u>**

Samuel L. Biers (Also Acting Recording Secretary) – Present in Person at 511 Sunset Street

| | |
|---|---|
| 00:00:06 | Sam Biers: "Alright it's recording Joe." |
| 00:00:08 | Chairman Holley: "Ok, you wanna take Roll Call Sam? |
| 00:00:10 | Sam Biers: "Do Roll. . .Joe?" |
| 00:00:12 | Chairman Holley: "Here." |
| 00:00:15 | Sam Biers: "Juan? Absent. Robert? Absent. Duane." |
| 00:00:28 | Duane Garcia: "Here." |
| 00:00:30 | Sam Biers: "Clifton? Absent. Davis? Absent. Alice?" |
| 00:00:41 | Alice Tybo: "Here." |
| 00:00:43 | Sam Biers: "Andy?" |
| 00:00:44 | Andrea Woods: "Here." |
| 00:00:46 | Sam Biers: "Larry? Absent. Dave? Carerra?" |
| 00:00:54 | Dave Carerra: "Here." |
| 00:00:56 | Sam Biers: "Julia? |
| 00:00:57 | Julia Oppenhein: "Here." |
| 00:01:02 | Sam Biers: "And, Paula?" |
| 00:01:03 | Paula Garcia: "Here." |
| 00:01:04 | Sam Biers: "Quorum present, 11:05?" |
| 00:01:10 | Alice Tybo: "No." |
| 00:01:11 | Sam Biers: "or 10:05." |

. . .

**Begin Discussion Point RE: *Recording Secretary Colby Boykin Performance Evaluation***

00:30:41 Sam Biers: "She doesn't have too many objections about anything. She's a good person and a she's still a viable asset to the Council and the Tribe."
00:30:50 Alice Tybo: "But, I've noticed that when we're signing payroll she has an awful lot of OT."
00:30:56 Sam Biers: "I think she had nine hours."
00:30:59 Alice Tybo: "I've seen previously where she's had a lot."
00:31:01 Sam Biers: "She has, and part of that was due to, she jumped into CARES so we could finish that and get it out of the way. Then she's been helping me with bringing the legislative record up to snuff. She's been scanning all of our Ordinances, Meeting Minutes and Resolutions so we can put them on the website."
00:31:28 Andrea Woods: "Alice, plus she caught us, got us caught up on all of our back Minutes and I worked with her and she got my notes and then compared them with the audio and she got all our notes in."
00:31:40 Alice Tybo: "[unintelligible] we are giving her a lot of pay, my question is why are we paying her so much OT? We have her eight hours a day and you can get a lot of work done in a day."
00:31:52 Sam Biers: "And, that's what I have done in the last, matter of fact since January when we got everything approved, the majority approved I said 'okay, we need to slow this down, bring us up, we're going to wrap up CARES and then all this OT is going to disappear."
00:32:08 Alice Tybo: "Okay."
00:32:10 Dave Carerra: "How much OT did you get paid Andy? How much OT did you get paid?"
00:32:14 Andrea Woods: "I don't get paid OT . . ."
00:32:16 Unintelligible multiple voices overlapping
00:32:23 Alice Tybo: "So was this informational only or?"
00:32:24 Sam Biers: "It's just her three months, she's not up for anything it's just. . ."
00:32:27 Alice Tybo: "Okay."
00:32:30 Sam Biers: "She has her six month in, so May."
00:32:34 Alice Tybo: "So I know that she has really caught us up with our Meeting Minutes so that can't be big gripe for all those people out there saying well you guys are taking action but you haven't approved the Meeting Minutes [unintelligible], so that's great, you've done a wonderful job with that Sam. Thank you."
00:32:49 Sam Biers: "Well, thank you all, you guys are the support group."
00:32:53 Alice Tybo: "You've done a great job."
00:33:55 Unknown
00:32:57 Sam Biers: "You got the next one, I'll step out."

. . .

00:33:36 Dave Carerra: "Where'd Sam go?"
00:33:37 Chairman Holley; Alice Tybo and Andrea Woods: "step out because his is next."
00:33:39 Unknown unintelligible

00:33:45 Chairman Holley: "**I've done a one year review on Sam. There's very little that you can say that's wrong with Sam other than what goes on a day-to-day basis at work. Communication to some of his staff is lacking in sorts and I can understand because he's got a lot more stuff going on with the court now that were movin forward with it. All the, the stuff in front of you that he does everyday tryin to gather us up a packet to proceed down that path, he does an awesome job of, of taking care of us. The, the sad picture is gonna come, what's are we going to do down the path? You know he's been, now he's accepted the Supreme Court for the . . .**"

00:33:45 Dave Carerra: "Appellate."

00:33:46 Andrea Woods: "Appellate."

00:33:46 Chairman Holley: "How are we, what are we gonna do?"

00:34:43 Andrea Woods: "We're gonna have to hire another. . ."

00:34:45 Alice Tybo: "We'll have to re-advertise and. . ."

00:34:47 Chairman Holley: "We're gonna be in a lot of trouble."

00:34:50 Alice Tybo: "**I'd like to talk a little bit about Sam and that is that I don't know how we could have gotten through this COVID thing and CARES Act funding without him. He was so on top of it. He kept us so . . .there were times like, 'another Resolution, really Sam?' You know, but in the long run it's gonna save us. We have documentation and paperwork backing every single penny that we spent so no one can say that we have not used it correctly.**"

00:35:19 Dave Carerra: "**That's what I like.**"

00:35:20 Alice Tybo: "**I don't know how we could have done that without Sam being there on top of that, so that was huge, HUGE. That's what I'd like to say about Sam. I think he's an outstanding individual.**"

00:35:28 Chairman Holley: "So we have to look down the road. Say, we got court on the 5th, by that time Sam should be out of the Administration or moving forward or what?"

00:35:39 Alice Tybo: "No because there won't be any appellates, anything coming out of the appellate. . ."

00:35:43 Chairman Holley: "Yeah, but one he's the judge. **I don't want any push back because legally he is the judge.**"

00:35:50 Alice Tybo: "mnhmn."

00:35:51 Chairman Holley: "I don't know where that's gonna leave us. You know what I mean?"

00:35:53 Dave Carerra: "That'd, that'd be Sam's choice right?"

00:36:04 Chairman Holley: "Well Sam wants to find a way to alleviate that. I don't know if there really is if you look at it, because at any given moment we can be brought into court, and at some point he's gonna have to hear that second side and if we don't like the decision or the other person doesn't like the decision then it's gotta be left to the appellate judge so you know, what's gonna be justified with that outcome?"

00:36:29 Alice Tybo: "So, so, another point to is that we're gonna have to hire at least two more appellate court judges, they're not full time judges. They're only gonna be there whenever we might need 'em. So, if that's, that's the case then he can abstain from that portion of it and not rule on that."

00:36:46 Chairman Holley: "So do we. . ."

00:36:50 Alice Tybo: "Because basically appellate courts are only ruling on procedure. Do they have the right to bring this into court? Did they, they're not, they're not ruling on anything other than

the procedure of the court, which is, which is a big difference. So, say, say we go into court. Someone files against us in court and our judge says 'okay, you guys waived your sovereign immunity,' so therefore these members of the tribe have the right to take us to court, and then we can take them to the appellate court that was appealed and the appellate court would say no they don't have the right to, they're a sovereign so they have the right to, we have a right to rule. They are only ruling on procedure."

00:37:29 Chairman Holley: "Okay. So, these are just questions that I just wanted to address. **I mean, there's nothing wrong with what Sam is doing. I can't find any flaws other than you know what we do with him day-to-day and I address them with him on the sheet, and we talked about it, you know, from here out, how are we gonna be if Sam is missing we're gonna be missing a lot of information. You know somebody else stepping in to take his shoes is, it's gonna be hard to re-train 'em and gettin this much information in front of you an for us to make fair and adequate calls.** It's just something we're gonna be thinking about, we have to . . ."

00:38:10 Andrea Woods: "We have to get somebody in there that's gonna . . ."

00:38:13 Paula Garcia: "When does he, I'm sorry I've been gone for a bit. When does he take his. . ."

00:38:18 Chairman Holley: "Tribal Court will start on the 5th."

00:38:20 Paula Garcia: "So he's done on the 5th?"

00:38:21 Chairman Holley: "Well that's what I'm askin. I'm not sure how it weights, so we can probably, what do they call it?"

00:38:30 Alice Tybo: "He can just, he can just abstain from anything that has to do with the Tribe. So he can still be our administrator. His. . .for number one we're not gonna have anything go to the appellate court for at least another six months. We're lookin six months out right now. So I think in about another three months we'll be needing to re-visit this again and say we need to advertise for another administrator. I think right now we're, we don't need to do anything right now, but in three months we will have to."

00:39:03 Paula Garcia: "What I'm thinking is, if we want this, if we want the person that we hire to work kind of like Sam does, have them work side-by-side where at least Sam can show them. . ."

00:39:14 Chairman Holley: "So that was the other decision that we discussed last week, if he was going to appoint someone who would sit with him and, and we can always use that help. Right? I mean it's not gonna hurt.

00:39:26 Alice Tybo: "Right, we got the money."

00:39:27 Chairman Holley: "Right. **To get someone to mirror what Sam does is going to be really hard to find no matter what we do.**"

00:39:36 Paula Garcia: "**Yeah.**"

00:39:37 Chairman Holley: "So you know depending on where he goes and how we design this from here on out it might get a little stickly. You know we might not have the material that we need in front of us, we might not you know, he's made a lot of changes for us, and it's for the good."

00:39:51 Alice Tybo: "Right."

00:39:52 Chairman Holley: "**He's helped us, he's benefitted us in every way there is as far as our Administration went and as far as us as the Te-Moak Council. You know there's just no loose ends on how, how well versed he's been in guiding us to where we're at so. . .**"

00:40:08 Dave Carerra: "So he can always rescind himself from the court too, right? Make that deduction . . ."

00:40:11 Chairman Holley: "Well like Alice just said, like she pointed out is you know we could actually appoint somebody else to do that part, and then he skips, picks, kinda picks and chooses what he will see. Okay so that was just information there. Like I said you know it's gonna be, we're gonna have to cross that bridge sooner or later. I'll grab him back in."

**00:40:39 END OF Te-Moak Tribal Council DISCUSSION RE: SAMUEL L. BIERS PERFORMANCE EVALUATION**

I, Samuel L. Biers, do hereby certify under penalty of perjury pursuant to 28 U.S.C. §1746 that the foregoing transcript is a true and correct transcript of the Te-Moak Tribal Council Telephonic Meeting, (with bold text emphasis added), based on my personal knowledge, information or belief from the February 24, 2021 meeting that I personally attended, and that I personally supervised and reviewed the electronic recording that was created as a routine matter of the Tribe's official government business, as required by tribal law as well as federal contracts, loans and grants.

EXECUTED on this the 10th Day of October 2021.

Hon. Samuel L. Biers
Te-Moak Supreme Court

# Appendix II

# Exhibit II-C(10)

RESOLUTION OF THE GOVERNING BODY

OF THE

TE-MOAK BANDS OF THE WESTERN SHOSHONE COUNCIL

RESOLUTION NO. 75-TM-21

BE IT RESOLVED BY THE TE-MOAK WESTERN SHOSHONE COUNCIL, that

WHEREAS, this organization is an Indian Organization known as the Te-Moak Western Shoshone Council as defined under the Indian Reorganization Act of June 18, 1934, as amended; and

WHEREAS, It is anticipated that State Law and Order jurisdiction will be retroceded back to Federal jurisdiction, Midnight, June 30, 1975, which will necessitate those affected Tribes and Colonies to establish necessary judicial systems and increase their law and order personnel and clerical assistance accordingly; and

WHEREAS, the Te-Moak Tribes have thoroughly screened and interviewed various professional attorneys in the immediate area in their endeavorance to select a candidate for appointment as Chief Tribal Judge.; and

WHEREAS, Mr. Robert B. Goicoechea of the law firm of Goicoechea & Digrazia, 463 5th. Street, Post Office Box 1358, Elko, Nevada 89801, has agreed to serve as Chief Tribal Judge of the Te-Moak Bands of Western Shoshone Indians of Nevada, if appointed, under the following provisions and conditions, which are acceptable to the said Te-Moak Western Shoshone Council:

1. The position of Chief Tribal Judge shall be based on a Fiscal Year intermittent basis of a maximum of 130 days per year, at a comparable daily salary rate of a GS-13(1) rating, not to exceed $10,908.30 per year.

2. Services provided hereunder for any portion of a day shall constitute a full day with wavier of any overtime compensation for any time over and above an ordinary working day.

3. Mileage reimbursements for use of personal vehicle and Per Diem rates shall be consistent with current Federal scale and established procedures.

NOW, THEREFORE, BE IT HEREBY RESOLVED, that the Te-Moak Western Shoshone Council does hereby approve, authorize and recommend that Mr. Robert B. Goicoechea of the law firm of Goicechea & Digrazia, 463 5th. Street, Post Office Box 1358, Elko, Nevada 89801, be designated and appointed as Chief Tribal Judge for the said Te-Moak Bands of Western Shoshone Indians of Nevada, effective as of Midnight, June 30,1975, under the provisions and conditions hereinabove set forth.

BE IT FURTHER RESOLVED, that it is urgently and respectfully requested that the Phoenix Area Director, or his authorized representative, render early favorable consideration to enable the Te-Moak Western Shoshone Council to immediately implement their program, and

BE IT FURTHER RESOLVED, that the Chairman of the Te-Moak Western Shoshone Council is hereby duly authorized to affix his signature on necessary documents pertaining hereto in behalf of said Te-Moak Council.

C-E-R-T-I-F-I-C-A-T-I-O-N

I, the undersigned, as Chairman of the Te-Moak Western Shoshone Council do hereby certify that the Te-Moak Western Shoshone Council is composed of 5 members, of whom ____ consitiuting a quorm were present at a duly held meeting on the 29th, day of JUNE 1976, and that the foregoing resolution was duly adopted at such meeting by a vote of 3 FOR, and 0 AGAINST, pursuant to Article VII, Section 1 of the Constitution and By-Laws of the Te-Moak Bands of Western Shoshone Indians and that said resolution has not been rescinded nor amended in any form.

[signature]

CHAIRMAN, Te-Moak Western Shoshone Council

RESOLUTION NO. 75-TM-21

# Appendix II

# Exhibit II-C(11)

August 28, 2021

Suzanna Sandoval
Tribal Administrator
Te-Moak Administration
525 Sunset Street
Elko, NV 89801

Dear Tribal Council and Tribal Administrator.

I write to respectfully resign my position as Judge of the Te-Moak Tribe of Western Shoshone Tribal Court effective immediately. I appreciate the opportunity to work with the Tribe. However, I am deeply concerned that the Tribe is receiving inaccurate legal advice regarding the Tribal Court and the laws governing it.

Additionally, the Tribe has never signed the independent contractor agreement I submitted months ago. I believe that a nascent tribal court needs the input and assistance from Tribal Council members to become successful. In this instance I am concerned that the Tribal Court is being rushed along without having the building blocks in place. I do not want to make the situation worse for the tribal members by participating in the court at this time when there is a rogue Appellate Justice issuing orders from the bench and an attorney who engaged in a physical fight with a tribal member at a sitting of the Tribal Court.

Sincerely yours,

*Carrie A. Frias*

Carrie A. Frias

cc: Chairman and Vice Chairwoman